**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER FOR AUTISM AND RELATED DISORDERS, LLC, *et al.*,[1] | ) | Case No. 23-90709 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT**
**FOR THE JOINT CHAPTER 11 PLAN OF CENTER**
**FOR AUTISM AND RELATED DISORDERS, LLC AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:(713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
        jwertz@jw.com
        mstull@jw.com
        vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors-in-Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher T. Greco, P.C. (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900
Email: christopher.greco@kirkland.com
        allyson.smith@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: June 12, 2023

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192). The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement") provides information regarding the *Joint Chapter 11 Plan of Center for Autism and Related Disorders, LLC and Its Debtor Affiliates*, filed contemporaneously herewith (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] for which the Debtors will seek confirmation by the Bankruptcy Court. A copy of the Plan is attached hereto as Exhibit A and is incorporated herein by reference. The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article X of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Class 3 (Credit Facility Claims) to read this Disclosure Statement (including the Risk Factors described in Article VIII hereof) and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**RECOMMENDATION BY THE DEBTORS**

EACH DEBTOR'S GOVERNING BODY HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT NO LATER THAN JULY 13, 2023, AT 4:00 P.M., PREVAILING CENTRAL TIME. PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.

---

[2]  Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan or the *Declaration of Steven Shenker, Chief Restructuring Officer of CARD Holdings, LLC, in Support of Chapter 11 Petitions, First Day Motions, and DIP Motion* (the "First Day Declaration"), filed contemporaneously herewith, as applicable. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan, as applicable**. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

**SPECIAL NOTICE REGARDING SECURITIES LAWS**

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

**DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable Law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date specified. Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any person or entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the SEC, any securities regulatory authority of any state, or any similar foreign regulatory authority.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against, or Interests in, the Debtors or any other party in interest. Please refer to <u>Article VIII</u> of this Disclosure Statement, entitled "Risk Factors" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection

with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.  If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein.  When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or persons or entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by Law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

## TABLE OF CONTENTS

I.  INTRODUCTION .........................................................................................................................1

II.  PRELIMINARY STATEMENT .............................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
     PLAN ........................................................................................................................................6

     A.  What is chapter 11? ...................................................................................................6
     B.  Why are the Debtors sending me this Disclosure Statement? ...................................7
     C.  What does it mean that the Debtors are seeking conditional approval of this Disclosure
         Statement? ..................................................................................................................7
     D.  Am I entitled to vote on the Plan? .............................................................................7
     E.  What are the Asset Sale(s) under the Plan? ...............................................................8
     F.  How do I vote for or against the Plan? ......................................................................8
     G.  Why is the Bankruptcy Court holding a Confirmation Hearing? ..............................8
     H.  When is the Confirmation Hearing set to occur? ......................................................8
     I.  What is the purpose of the Confirmation Hearing? ...................................................8
     J.  What is the effect of the Plan on the Debtors' ongoing businesses? .........................9
     K.  What will I receive from the Debtors if the Plan is consummated? ...........................9
     L.  What will I receive from the Debtors if I hold an Allowed Administrative Claim,
         DIP Claim, or a Priority Tax Claim? .......................................................................10
     M.  Are any regulatory approvals required to consummate the Plan? ............................13
     N.  What happens to my recovery if the Plan is not confirmed or does not go effective? ....13
     O.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan
         goes effective, and what is meant by "Confirmation," "Effective Date," and
         "Consummation?" .....................................................................................................13
     P.  What are the sources of Cash and other consideration required to fund the Plan? ...........14
     Q.  What is the Management Incentive Plan? .................................................................14
     R.  Is there potential litigation related to the Plan? ......................................................14
     S.  How will Claims asserted with respect to rejection damages affect my recovery under the
         Plan? .........................................................................................................................14
     T.  How will the preservation of the Causes of Action affect my recovery under the Plan? ...............15
     U.  Will there be releases and exculpation granted to parties in interest as part of the Plan? .............16
     V.  Does the Plan contain any injunctions? ...................................................................20
     W.  How will undeliverable distributions and unclaimed property be treated under the Plan? .............21
     X.  Are there minimum disbursement restrictions? .......................................................21
     Y.  Will any party have significant influence over the corporate governance and operations of
         the Wind-Down Debtors? .........................................................................................22
     Z.  What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ...........22
     AA.  What is the Marketing Process? ...............................................................................22
     BB.  Who do I contact if I have additional questions with respect to this Disclosure Statement
          or the Plan? ...............................................................................................................23
     CC.  Do the Debtors recommend voting in favor of the Plan? ........................................23
     DD.  Who Supports the Plan? ............................................................................................23

IV.  THE DEBTORS' DIP FACILITY AND PLAN .................................................................24

     A.  The DIP Facility. ......................................................................................................24
     B.  The Plan. ...................................................................................................................24

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..........29

     A.  The Company's Corporate History. ..........................................................................29
     B.  The Debtors' Corporate Structure, and Operations. .................................................30
     C.  The Debtors' Prepetition Capital Structure. .............................................................34

| | | |
|---|---|---|
| **VI.** | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** | **36** |
| A. | Challenges Facing the Debtors' Business and the Debtors' Approach to Addressing Financial Issues. | 36 |
| 1. | Challenges Facing Debtors' Business. | 36 |
| 2. | Proactive Approach to Addressing Financial Issues. | 37 |
| (a) | Operational Restructuring Efforts. | 37 |
| (b) | Liquidity Management Efforts. | 38 |
| B. | The Path Forward. | 39 |
| C. | The DIP Facility. | 40 |
| **VII.** | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **41** |
| A. | First Day Relief. | 41 |
| B. | Proposed Case Timeline. | 41 |
| C. | The Asset Sale(s). | 41 |
| D. | Rejection of Certain Unexpired Leases. | 43 |
| **VIII.** | **RISK FACTORS** | **43** |
| A. | Bankruptcy Law Considerations. | 43 |
| B. | Risks Related to Recoveries under the Plan. | 48 |
| C. | Risks Related to the Debtors' and the Wind-Down Debtors' Businesses. | 49 |
| **IX.** | **SOLICITATION AND VOTING** | **56** |
| A. | Holders of Claims Entitled to Vote on the Plan. | 56 |
| B. | Claims and Noticing Agent. | 57 |
| C. | Voting Record Date. | 57 |
| D. | Voting on the Plan. | 57 |
| E. | Ballots Not Counted. | 57 |
| **X.** | **CONFIRMATION OF THE PLAN** | **57** |
| A. | Requirements for Confirmation of the Plan. | 57 |
| B. | Best Interests of Creditors/Liquidation Analysis. | 58 |
| C. | Feasibility. | 58 |
| D. | Valuation. | 59 |
| E. | Acceptance by Impaired Classes. | 59 |
| F. | Confirmation Without Acceptance by All Impaired Classes. | 59 |
| **XI.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **60** |
| A. | **Introduction** | 60 |
| B. | **Certain U.S. Federal Income Tax Consequences to the Debtors, the Wind-Down Debtors, and Holders of Equity Interests in Parent** | 62 |
| C. | **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims** | 63 |
| D. | **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims** | 64 |
| E. | **Information Reporting and Back-Up Withholding** | 65 |
| F. | **FATCA** | 66 |
| **XII.** | **RECOMMENDATION** | **67** |

**EXHIBITS**[3]

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Stalking Horse APA

EXHIBIT D    Corporate Organization Chart

EXHIBIT E    Liquidation Analysis

---

[3]    Each Exhibit is incorporated herein by reference.

## I.     INTRODUCTION

The Center for Autism and Related Disorders, LLC and the other above-captioned debtors and debtors in possession (collectively, "CARD", the "Debtors" or the "Company"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan, dated June 12, 2023.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTORS AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, ATTACHED HERETO AS EXHIBIT B, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR SUCCESSFULLY COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

In 2020, the Center for Disease Control and Prevention ("CDC") estimated that about one in 36 children aged eight in the United States have autism spectrum disorder ("ASD").[4]   ASD is a developmental disability characterized by persistent impairments in social interaction and the presence of restricted, repetitive patterns of behaviors, interests, or activities that can cause a wide array of difficulties in social interaction, communication, and participation in daily activities.[5]   From over two decades of studying its prevalence, the CDC recognized a steady increase in the ASD diagnoses in children across the country.[6]

CARD is one of the nation's largest treatment providers for individuals diagnosed with ASD.  Founded on the principle that early intervention can yield outstanding clinical results, CARD has successfully treated tens of thousands of individuals with ASD, with many achieving optimal outcomes and leading successful, independent lives.  Since its inception in 1990, the Debtors' highly-trained technicians and behavior analysts, carrying a combined total of over 1,080 years of experience, have provided over ten million treatment hours.

CARD approaches treatment through the principles of applied behavior analysis ("ABA"), which have been empirically proven as the most effective method for treating individuals with ASD, and have been recommended by the American Academy of Pediatrics and the United States Surgeon General.[7]   Just

---

[4]     Maenner MJ, Warren Z, Williams AR, et al. *Prevalence and Characteristics of Autism Spectrum Disorder Among Children Aged 8 Years — Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2020*.  MMWR Surveill Summ 2023;72(No. SS-2):1–14. DOI:  http://dx.doi.org/10.15585/mmwr.ss7202a1.

[5]     American Psychiatric Association. *Diagnostic and statistical manual of mental disorders*. 5th ed. Arlington, VA: American Psychiatric Association; 2013.

[6]     Maenner MJ, et al. *Prevalence and Characteristics of Autism Spectrum Disorder Among Children Aged 8 Years — Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2020*.

[7]     *See Applied Behavior Analysis (ABA)*, AUTISM SPEAKS, https://www.autismspeaks.org/applied-behavior-analysis.

1

as every individual is unique, each of CARD's ABA programs is specifically tailored to meet the particular needs of each patient to maximize progress and nurture growth.

CARD primarily provides treatments through "center-based services," which are one-to-one ABA sessions for children, teens, and adults that take place at a CARD treatment center rather than at a patient's home. CARD's treatment centers are the ideal setting for patients to learn and practice skills that can be "generalized" to apply in actual, real-world situations. Center-based services also support a patient's family and caregivers by providing specific family and caregiver training hours, and by allowing families and caregivers more flexibility to work or complete other tasks while their loved-one is in a safe and trusted environment.

CARD was founded in 1990 by Dr. Doreen Granpeesheh, and in 2018 Blackstone Group LP (together with its affiliates, "Blackstone") struck a deal to acquire a majority stake in CARD. In the summer of 2022, Dr. Doreen Granpeesheh resigned from the Debtors' board, but still holds approximately 21 percent of CARD equity. Currently, CARD's operations include approximately 130 centers across 13 states, and approximately 2,500 employees and healthcare professionals to support its over 3,500 patients.

Guided by science and inspired by compassion, the Debtors' mission is to help individuals with ASD thrive. CARD's deep commitment to support individuals with ASD is evidenced by its actions beyond its treatment centers. CARD demonstrates a fulsome commitment to its patients by being at the forefront of ASD treatment research, accessibility, and advocacy. In fact, CARD was previously recognized as the third largest non-governmental organization contributing to ASD research in the United States.[8] In August 2009, researchers at CARD published the first-ever study to document recovery of a large group of individuals with ASD.[9] The study demonstrated that CARD helped individuals with ASD achieve substantial progress——many of the participating individuals no longer qualified as having an ASD diagnosis by the end of their treatment.[10]

CARD is a founding member of the National Coalition for Access to Autism Services, which broadens the impact of federal efforts to prohibit the discriminatory limits on mental health services, including ABA.[11] In 2022, CARD sponsored California Bill AB 2581, which came into effect at the start of this year. The bill improved access to ASD services and other mental health services in California by shortening the time required for new treatment providers to be credentialed by health plans.[12] Having faced the extreme delays first-hand, CARD sponsored the bill to ensure that newly hired, qualified medical

---

[8]   *Center for Autism Ranked in Top Three Non-Governmental Organizations Providing Largest Financial Support to Autism Research*, (July 18, 2011), https://centerforautism.com/card-ranked-top-three-ngos-providing-largest-financial-support-autism-research/.

[9]   Granpeesheh D, Tarbox J, Dixon DR, Carr E, Herbert M., *Retrospective analysis of clinical records in 38 cases of recovery from autism*. ANN. CLIN. PSYCHIATRY. 2009 Oct - Dec; 21(4):195-204. PMID: 19917210.

[10]  *Id.*

[11]  *CARD Celebrates Newly Enacted Federal Act that Would Remove Barriers to ABA . . .*, (Jan. 5, 2023), https://centerforautism.com/card-celebrates-newly-enacted-federal-act-that-would-remove-barriers-to-aba-therapy-for-people-with-autism/.

[12]  *CARD Champions California Bill to Improve Access to Care for Children Diagnosed with Autism*, Sept. 28, 2022, https://centerforautism.com/card-champions-california-bill-to-improve-access-to-care-for-children-diagnosed-with-autism/.

providers could start providing treatment with significantly less administrative delay. California Bill AB 2581 is the strongest of its kind in the nation and has paved the way for other states where CARD has treatment centers and beyond to take similar action.

Although CARD's treatment, research, and advocacy have had a positive impact, CARD, like many other healthcare providers,[13] faced significant headwinds since 2020. Due to the sudden onset of the COVID-19 pandemic, CARD experienced new operational challenges—the scale of which was impossible to predict. In 2020, the entire nation faced significant labor shortages in the healthcare space. As a result, it became exceptionally more difficult to recruit and retain qualified behavioral therapist to administer CARD's ABA treatments to its patients. Further, the cost of labor has been steadily increasing as a result of inflation. The COVID-19 pandemic compromised the lifeblood of CARD—without enough qualified behavioral therapists the Debtors did not have sufficient resources to meet demand. Further, as a treatment center-based company with locations spanning across the United States, during the COVID-19 pandemic, CARD was saddled with lease obligations and other corporate overhead costs during a time when in-person services came to a halt in most of the country.

Even after the upheaval to CARD's typical cadence of services, CARD remained committed to ensuring the continuity of high-quality treatment to its patients. In the wake of the COVID-19 pandemic, many of CARD's treatment centers shifted to telehealth and CARD's practitioners conducted behavioral therapy services remotely using video conferencing to ensure consistency of treatments. High-quality patient care remaining a top priority, in order to protect against any diminution in treatment quality while being remote, CARD developed an instrument ("TTIM") to measure the treatment integrity of ABA therapy delivered to patients with ASD via telehealth. At the time of its creation, TTIM was the first published instrument of its kind.

Additionally, CARD is party to a number of existing payor contracts that are no longer profitable. Between 2012 and 2016, the Debtors entered into certain agreements with commercial and government payors that established the reimbursement rates for certain treatments. Despite being adequate at the time of execution, said agreements are presently no longer profitable to CARD given that many have not had rate increases since the initial agreements were reached. Growing medical inflation, increasing wage pressures, and increasing shortages all contributed to the higher costs of doing business. Debtors made progress with some, but not all, payors in 2022, and to date in 2023, to address the need for contemporary rate adjustments, but not all payors agreed to engage in negotiations.

The Debtors moved mountains over the course of the past few years to maintain operations and consistent care for its patients in the wake of the unprecedented COVID-19 pandemic. As discussed further below, the Sponsor and the Debtors' prepetition lenders contributed additional rounds of liquidity infusions to support the Debtors in the leadup to these chapter 11 cases. Notwithstanding the resilience and ingenuity CARD exhibited during the COVID-19 pandemic, the aftershocks, including staffing shortages and burdensome lease obligations, have caused operational and liquidity challenges for the Debtors.

The Debtors are entering these chapter 11 cases to ensure their efforts were not for naught. The Debtors' primary focus has always been and continues to be the well-being and betterment of their patients, which includes maintaining the top-quality level of care provided by the Debtors' talented employee base. As such, it is essential that any path forward to a holistic solution provides for continued and consistent treatment of the Debtors' patients. Over the past year, the Debtors explored every opportunity to effectuate an out-of-court transaction before ultimately commencing these chapter 11 cases. To assist in these efforts,

---

[13]   As of the Petition Date, twenty-one healthcare chapter 11 cases have already been filed in 2023 alone as compared to 2021 and 2022, where 23 and 22 cases were filed respectively.

3

the Debtors retained Kirkland & Ellis LLP ("K&E") as counsel, Livingstone Partners LLC ("Livingstone") as investment banker, and Portage Point Partners, dba Triple P RTS, LLC ("Portage Point" and, together with K&E and Livingstone, the "Advisors") as restructuring advisors.  In March 2023, the Debtors appointed Steven Shenker from Portage Point as Chief Restructuring Officer.

Recognizing that the go-forward business initiatives alone would not generate enough liquidity for CARD's business, the Advisors worked with the Debtors to evaluate alternatives and determine the best path forward.  In addition to negotiating and securing multiple rounds of bridge financing from their sponsor and secured lenders, implementing additional governance initiatives (including in October 2022, the constitution of a special restructuring committee comprised of three independent directors:  Neal Goldman, as chairman; David D'Alessandro, an existing disinterested director of the Debtors' board, and Brent Kugman), working to right-size their lease footprint, and attempting to execute a new go-forward business plan, the Debtors commenced a robust and thorough marketing process in November 2022 for the sale of their business to one or more buyers.

Following months of extensive negotiations with potential bidders, CARD received five letters of intent and requested "best and final" bids from each of the submitting parties.  Ultimately, on March 13, 2023, CARD signed an exclusivity agreement with one of the bidders (the "Exclusive Bidder") to consummate an out-of-court transaction.  In late April 2023, the Exclusive Bidder unexpectedly reduced its bid value substantially and removed the out-of-court condition, instead stating that it would only be willing to act as a stalking horse for an in-court process.  Two and a half weeks later, after the exclusive period had expired, the Exclusive Bidder further reduced its bid, rendering it unactionable.  The Debtors ultimately rejected the Exclusive Bidder's reduced bid.

Despite the unfortunate turn of events, the Debtors again exhibited resilience in difficult circumstances.  Facing a rapidly shortening liquidity runway, the Debtors immediately pivoted to re-engage with interested parties.  Approximately five weeks later, the Debtors are pleased to report that they are commencing these chapter 11 cases with a committed stalking horse bidder.  On June 9, 2023, the Debtors executed an agreement (the "Stalking Horse APA") with Pantogran LLC (the "Stalking Horse Bidder"), with Dr. Doreen Granpeesheh, founder of CARD, and Sangam Pant acting as guarantors.  Dr. Granpeesheh stepped down as Chief Executive Officer in 2019 and resigned from the Debtors' board in the second half of 2022, but retains approximately 21 percent of CARD's equity.  Execution of the Stalking Horse APA is the result of arms'-length negotiations between the Debtors, their advisors, and the Stalking Horse Bidder and its advisors.  As set forth in more detail in the Bidding Procedures Motion,[14] the Stalking Horse APA provides for a $25 million purchase price for a going-concern acquisition of substantially all of the Debtors' assets—setting the "floor" for bidders in the continued marketing process postpetition.  The Stalking Horse APA is attached hereto as **Exhibit C**.  Notably, the Stalking Horse APA supports a seamless transition of all patients and each of the approximately 130 treatment centers and preserves the majority, if not all, of the Debtors' workforce.

In light of their constrained liquidity and to ensure continuity of care and retention of its employee base, it was vital that the Debtors enter these proceedings with committed financing to fund operations during these chapter 11 cases.  In the lead up to these chapter 11 cases, the Debtors engaged in negotiations with the Sponsor and certain of the Credit Facility Lenders to finance these chapter 11 cases.  To ensure

---

[14]  "Bidding Procedures Motion" means the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures (VI) Authorizing the Debtors to Enter into Definitive Purchase Agreement, and (VII) Granting Related Relief.*

that the Debtors had access to the liquidity they needed to fund these cases, the Sponsor indicated willingness to provide financing if the Debtors were otherwise unable to attain it, but ultimately Debtors were able to secure financing from certain of the Credit Facility Lenders on the most attractive terms available.  As described in greater detail in the Greenwood DIP Declaration,[15] following good faith, arm's-length negotiations with certain of the Credit Facility Lenders, the Debtors secured commitments for an approximately $18 million superpriority senior secured term loan debtor-in-possession financing facility (the "DIP Facility") and consensual use of cash collateral.[16]   $7.5 million of the DIP Facility will be available upon the entry of an interim order approving entry into the DIP Facility.  This capital will provide the Debtors with the necessary liquidity to continue operations and administer these chapter 11 cases while completing the ongoing sale process to maximize value.

With the capital provided by the DIP Facility, the Debtors intend to utilize the chapter 11 process to bring their robust marketing process to completion, to consummate one or more asset sales, and to shed burdensome liabilities, while ensuring their top priority—their patients and workforce—are protected and provided for.

The key terms of the Debtors' restructuring are as follows:

- **Marketing Process**.  The Debtors will continue their prepetition marketing process after the Petition Date and conduct an Auction to solicit bids for one or more Asset Sale(s) in accordance with the terms and conditions of the Bidding Procedures.  The Debtors will seek to elicit one or more Asset Sale offers pursuant to the process set forth in the Bidding Procedures.

- **DIP Facility**.  The DIP Facility will provide new money in the form of an $18 million superpriority senior secured term loan, including $7.5 million to be made available upon entry of the interim order approving the DIP Motion, as well as certain "roll-up" DIP loans, as further described in the DIP Motion.  The DIP facility's new money will provide the Debtors with the necessary liquidity to continue operations and administer these chapter 11 cases while completing the ongoing sale process to maximize value.

- **Milestones**.  Prosecution of these cases in accordance with the following timeline (as consensually extended or amended in accordance with the terms of the Disclosure Statement Order, the Bidding Procedures, and the Final DIP Order:

---

[15]  "Greenwood DIP Declaration" means the *Declaration of Joseph Greenwood of Livingstone Partners LLC in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, filed contemporaneously herewith.

[16]  The material terms of the DIP Facility are set forth in detail in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition Secured Parties (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "DIP Motion").  For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Documents (as defined in the DIP Motion).

- entry of the Interim DIP Order on or before three days following the Petition Date;

- entry of the Bidding Procedures Order on or before seven days following the Petition Date;

- entry of the Final DIP Order on or before twenty eight days following the petition date;

- entry of an order conditionally approving the Disclosure Statement and authorizing the Debtors to commence solicitation of votes to approve or reject the same (the "Disclosure Statement Order") on or before June 12, 2023;

- occurrence of deadline for the submission of qualified bids in respect of the Asset Sale(s) for substantially all of the Debtors' assets on or before July 14, 2023, at 4:00 p.m., prevailing Central Time;

- an auction (if necessary) pursuant to the Bidding Procedures Order on or before July 17, 2023, at 9:00 a.m., prevailing Central Time;

- deadline for Objections to Approval of any Bid (including Back-Up Bids), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder on or before July 19, 2023 at 4:00 p.m., prevailing Central Time; and

- a hearing regarding approval of the Plan and the Disclosure Statement and entry of an order approving the Sale Transaction(s) for all or substantially all of the Debtors' assets (the "Sale Order") on or before July 20, 2023, subject to Court availability.

The Debtors intend to move expeditiously through these cases and emerge as a stronger, better-capitalized business positioned to thrive for years to come. The Debtors believe that the Plan and the Restructuring Transactions contemplated thereby provide Holders of Claims and Interests with the best available recovery and are essential to ensure continuity of quality patient care at CARD's healthcare facilities. Accordingly, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      What does it mean that the Debtors are seeking conditional approval of this Disclosure Statement?**

Pursuant to the Conditional Disclosure Statement Motion,[17] the Debtors are seeking conditional approval of this Disclosure Statement pursuant to Rule 3016-2 of the Bankruptcy Local Rules for the Southern District of Texas and Section P of the Procedures for Complex Chapter 11 Cases in the Southern District of Texas.

**D.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on (a) what type of Claim or Interest you hold, (b) whether you held that Claim or Interest as of the Voting Record Date (as defined herein), and (c) whether the Debtors have elected to waive their rights to solicit Holders of such Claims. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Credit Facility Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

---

[17] The "<u>Conditional Disclosure Statement Motion</u>" means the *Debtor's Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballot and Notices in Connection Therewith, (IV) Conditionally Waiving The Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules and SOFAS, and (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief,* filed contemporaneously herewith.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 7 | Existing Parent Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

Regardless of whether you are entitled to vote on the Plan, you may object to the Plan.

**E.        What are the Asset Sale(s) under the Plan?**

The Asset Sale(s) under the Plan entails Restructuring Transactions that include, among other things, the disposition of all, substantially all, or a portion of the Debtors' assets through one or more Asset Sales, together with a waterfall distribution of the net cash proceeds (if any) and wind-down of the post-sale Estates, all as provided in the Plan.

**F.        How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots that will be distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, the ballot containing your vote must be properly completed, executed, and delivered as directed, so that the ballot containing your vote is **actually received** by the Debtors' claims and noticing agent, Stretto, Inc., (the "Claims and Noticing Agent") **on or before the Voting Deadline, as ordered by the Bankruptcy Court**.  *See* Article IX of this Disclosure Statement, entitled, "Solicitation and Voting," which begins on page 55 for more information.

**G.        Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.  The Confirmation Hearing may be adjourned from time to time without further notice.

**H.        When is the Confirmation Hearing set to occur?**

Through the Conditional Disclosure Statement Motion, the Debtors have requested that the Bankruptcy Court Schedule the Confirmation Hearing for July 20, 2023, or such other date as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.

The Debtors have also requested that objections to Confirmation of the Plan and final approval of the Disclosure Statement must be Filed and served on the Debtors, and certain other parties, by no later **than July 20, 2023,** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**I.        What is the purpose of the Confirmation Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any

other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

**J.      What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article X.B of the Plan).  On or after the Effective Date, and unless otherwise provided in the Plan, the Wind-Down Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**K.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the proposed treatment of Claims and Interests under the Plan and the projected total amount of Claims for each class of Claims and Interests under the Plan. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| | | SUMMARY OF PLAN TREATMENT OF CLAIMS AND INTERESTS | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Total Amount of Claims (in millions) | Projected Recoveries |
| 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claims agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor: (i) payment in full in Cash; (ii) Reinstatement of such Claim; or (iii) such other treatment rendering such Claim Unimpaired. | $0 | N/A |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees in writing to less favorable treatment, in exchange for the full and final satisfaction, settlement, release, and discharge of its Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor: (i) payment in full in Cash; or (ii) such other treatment rendering such Claim Unimpaired. | $0 | N/A |
| 3 | Credit Facility Claims | Except to the extent that a Holder of an Allowed Credit Facility Claim agrees to less favorable treatment, on the Effective Date (or as soon as practicable thereafter with respect to the distribution of Wind-Down Proceeds as set forth in this sentence), in full and final satisfaction, settlement, release, and | $244,775,857 | 0% |

| | SUMMARY OF PLAN TREATMENT OF CLAIMS AND INTERESTS | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Total Amount of Claims (in millions) | Projected Recoveries |
| | | discharge of, and in exchange for such Allowed Credit Facility Claim, each Holder of an Allowed Credit Facility Claim shall receive its Pro Rata share of the Distributable Asset Sale Proceeds and the Wind-Down Proceeds following payment in full in Cash of all Allowed Claims that are senior to Credit Facility Claims in priority of payment under the Bankruptcy Code; *provided, however,* that any portion of such Holder's Allowed Credit Facility Claim that is not fully satisfied pursuant to provisions (A) and (B) immediately above, shall still constitute an Allowed Credit Facility Claim up to the value of any remaining Credit Facility Collateral; *provided, further,* that any portion of such Holder's Allowed Credit Facility Claim that exceeds the value of such remaining Credit Facility Collateral (if any) shall constitute a Credit Facility Deficiency Claim and receive the treatment specified in Article III.B.4(b) of the Plan. | | |
| 4 | General Unsecured Claims | On the Effective Date, each General Unsecured Claim shall be discharged and released, and each Holder of General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claim. | $18,433,130 | 0% |
| 5 | Intercompany Claims | Subject to the Restructuring Transactions Memorandum, each Allowed Intercompany Claim shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Wind-Down Debtors; *provided* that no distributions shall be made on account of any Intercompany Claims. | $0 | N/A |
| 6 | Intercompany Interests | Subject to the Restructuring Transactions Memorandum, each Intercompany Interest shall be Reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Wind-Down Debtors. | $0 | N/A |
| 7 | Existing Parent Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, board of managers, members, shareholders, or officers of any Debtor or Wind-Down Debtor, as applicable, all Existing Parent Interests shall be cancelled, released, and extinguished without any distribution, and will be of no further force or effect, and each Holder of an Existing Parent Interest shall not receive or retain any distribution, property, or other value on account of such Existing Parent Interest. | $0 | N/A |
| 8 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be discharged and released, and each Holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Section 510(b) Claim. | $0 | N/A |

**L.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Credit Facility Adequate Protection Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.      **Administrative Claims.**

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, Credit Facility Adequate Protection Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be Filed and served on the Debtors or the Wind-Down Debtors no later than the Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date.** Objections to such requests, if any, must be Filed and served on the Plan Administrator and/or Wind-Down Debtors and the requesting party.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court or as agreed with the Wind-Down Debtors.

2.      **DIP Claims.**

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Documents without the need for the DIP Agent or DIP Lenders to file any Proof of Claim or request for payment.  Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Sale Order (which may be the Confirmation Order), the Asset Purchase Agreement(s), and the Plan, each as applicable, or other such treatment as contemplated by Article II.B of the Plan on the Effective Date, all Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed DIP Claim, each Holder of an Allowed DIP Claim shall receive payment in full in Cash of its Allowed DIP Claim.

3.      **Professional Fee Claims.**

Professional Fee Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein.

(a)      **Final Fee Applications and Payment of Professional Claims.**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Wind-Down Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account. The Wind-Down Debtors will establish the Professional Fee Escrow Account in trust for the Professionals and fund such account with Cash equal to the Professional Fee Amount on the Effective Date. For the avoidance of doubt, this paragraph shall be subject to the DIP Order and any budget set forth therein with respect to Professional Fee Claims held by the Committee's Professionals.

(b)      **Professional Fee Escrow Account.**

On the Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Wind-Down Debtors using Cash on hand. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors, as applicable. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When such Allowed Professional Fee Claims have been paid in full, any remaining amount held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further action or order of the Bankruptcy Court. For the avoidance of doubt, this paragraph shall be subject to the DIP Order and any budget set forth therein with respect to Professional Fee Claims held by the Committee's Professionals.

(c)      **Professional Fee Amount.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. For the avoidance of doubt, this paragraph shall be subject to the DIP Order and any budget set forth therein with respect to Professional Fee Claims held by the Committee's Professionals.

(d)      **Post-Confirmation Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, this paragraph shall be subject to the DIP Order and any budget set forth therein with respect to Professional Fee Claims held by the Committee's Professionals.

4.        **Priority Tax Claims.**

Priority Tax Claims will be satisfied as set forth in Article II.D of the Plan, as summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5.        **Restructuring Expenses.**

On the Effective Date, the Debtors or the Wind-Down Debtors, as applicable, shall pay in full in Cash any outstanding Restructuring Expenses without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases and without any requirement for further notice or Bankruptcy Court review or approval.

**M.**        **Are any regulatory approvals required to consummate the Plan?**

The Debtors anticipate that regulatory filings and subsequent approvals may be required to consummate the Plan, prior to and after any change of ownership resulting from any Asset Sale(s). Federal authorities and state regulators may require certain filings in applicable jurisdictions for the Debtors' businesses to continue healthcare-related operations (e.g., facility approvals to provide ABA services, as applicable) and receive reimbursement from healthcare programs and payors upon sale. It is a condition precedent to the Effective Date that any such required regulatory approvals or other authorizations, consents, rulings, or documents that are necessary to implement and effectuate the Plan be obtained by the applicable party. Additionally, a filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (and expiration or early termination of the waiting period thereunder) may be required as a condition precedent to any Asset Sale(s) that exceeds the applicable size of the transaction threshold.

**N.**        **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 57, and the Liquidation Analysis attached hereto as **Exhibit E**.

**O.**        **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the terms of the Plan can go in effect. Initial distributions to Holders of Allowed Claims and Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 56, for a discussion of the conditions precedent to consummation of the Plan.

**P.      What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund distributions under the Plan with, as applicable:  (a) Distributable Asset Sale Proceeds; (b) Cash on hand; (c) Cash or non-Cash consideration received by the Debtors in any consummated Asset Sale(s); and (d) the Wind-Down Proceeds.

**Q.      What is the Management Incentive Plan?**

On or after the Effective Date, a Governing Body may adopt and implement a Management Incentive Plan for certain of the Debtors' directors, officers, and employees.  The terms and conditions of any Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and Management Incentive Plan participants) shall be set forth in the Management Incentive Plan Term Sheet, if any.

**R.      Is there potential litigation related to the Plan?**

Parties in interest, regardless of whether they are entitled to vote on the Plan, may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, and such objections potentially could give rise to litigation.  *See* Article VIII.C.14 of this Disclosure Statement, entitled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.," which begins on page 54.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article X.F of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 58.

**S.      How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

Except otherwise provided in the Plan, on the Effective Date, all Executory Contracts or Unexpired Leases will be deemed rejected by the applicable Wind-Down Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Assumed Executory Contracts and Unexpired Leases Schedules; (2) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (3) are the subject of a motion to assume filed on or before the Confirmation Date; (4) are to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with any sale transaction pursuant to a Sale Order that is not the Confirmation Order; (5) are a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (6) is a D&O Liability Insurance Policy.

In the event that the Debtors reject a number of contracts and leases they have not yet decided to reject and are unsuccessful in reducing the rejection damage claims of any such lease counterparties, Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases could increase substantially.

14

**T.**     **How will the preservation of the Causes of Action affect my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, any applicable Final Order (including the DIP Order), and any applicable Asset Purchase Agreement, each Wind-Down Debtor shall retain and may enforce, as reasonably directed by the Credit Facility Agent, all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan, pursuant to a Final Order, or as assigned and transferred pursuant to any applicable Asset Purchase Agreement, which, in each case, shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors may pursue such retained Causes of Action, as reasonably directed by the Plan Administrator and the Credit Facility Agent.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  Except as specifically released under the Plan or pursuant to a Final Order or as assigned or transferred pursuant to any applicable Asset Purchase Agreement, the Debtors and the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan, pursuant to a Final Order, or as assigned and transferred under any applicable Asset Purchase Agreement.  Unless otherwise agreed upon in writing by the parties to the applicable Causes of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Wind-Down Debtor, without the need for any objection or responsive pleading by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Wind-Down Debtors may settle any such objection, subject to the prior consent of the Credit Facility Agent, without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Wind-Down Debtors, as applicable, and the objection party for thirty days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, transferred, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, or any applicable Asset Purchase Agreement(s), the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan.

The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  As reasonably directed by the Credit Facility Agent, the Wind-Down Debtors shall have the right and authority, in consultation with the Credit Facility Agent, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**U.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes.  The Plan proposes that the Releasing Parties will provide releases the Released Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts.  As further described in Article VI.A.2(a) of this Disclosure Statement, the Debtors' releases, third-party releases, and exculpation provisions in the Plan are subject to the ongoing Investigation of Mr. Goldman.  Upon the completion of the Investigation, Mr. Goldman will reach a final conclusion whether the releases and exculpations in the Plan are appropriate.  Mr. Goldman expressly reserves his right to conduct further inquiries or investigations within the scope of his authority as he deems necessary to act in accordance with his fiduciary duties.[18]

"*Releasing Parties*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors, as applicable; (c) the Credit Facility Agent and each Credit Facility Lender; (d) the DIP Agent and each DIP Lender; (e) all Holders of Claims; (f) all Holders of Interests; (g) the Purchaser(s); (h) the Sponsor; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); *provided* that, in each case, an Entity shall not be a Releasing Party if such Entity: (x) elects to opt out of the releases contained in Article IX.D of the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article IX.D  of the Plan that is not resolved before the Confirmation Date.

"*Released Parties*" means, each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Credit Facility Agent and each Credit Facility Lender; (d) the DIP Agent and each DIP Lender; (e) all Holders of Interests; (f) the Sponsor; (g) the Purchaser(s); (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); *provided* that, in each case, an Entity shall not be a Released Party if such Entity: (x) elects to opt out of the releases contained in Article IX.D of the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article IX.D of the Plan that is not resolved before the Confirmation Date.

The Plan provides an exculpation for the Exculpated Parties.

"*Exculpated Parties*" means the Debtors.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite standard under applicable law.  All releases are consensual as any party wishing to opt out may or will otherwise receive consideration under the plan.  The Debtors intend to present evidence

---

[18]   Defined terms used but not otherwise defined in this section have the meanings ascribed to them elsewhere in this Disclosure Statement.

at the Confirmation Hearing to demonstrate the basis for and propriety of the Plan's release and exculpation provisions.  The release and exculpation provisions contained in the Plan are copied in pertinent part below.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES:   ALL HOLDERS OF CLAIMS OR INTERESTS THAT (X) ABSTAIN FROM VOTING ON THE PLAN, (Y) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN, OR (Z) ARE DEEMED TO ACCEPT THE PLAN, IN EACH CASE THAT DOES NOT VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

      1.      **Release of Liens.**

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder (including the DIP Agent or Credit Facility Agent)) shall be authorized and directed, at the sole cost and expense of the Wind-Down Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder (including the DIP Agent or Credit Facility Agent)), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

**On the Effective Date, except as set forth in the Asset Purchase Agreement(s), the assets sold in such Asset Sale(s) shall be transferred to and vest in the Purchaser(s) free and clear of all Liens, Claims, charges, interests or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Sale Order (which may be the Confirmation Order), the Plan, and the Asset Purchase Agreement(s), as applicable.**

17

2.        **Releases by the Debtors.**

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives (including any Plan Administrator that may be appointed), and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Wind-Down Debtors, their Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Restructuring Support Agreement, the Plan (including the Plan Supplement), the Disclosure Statement, the DIP Facility, the DIP Documents, the Asset Purchase Agreement(s), the Credit Agreement, the pursuit of Confirmation and Consummation, the pursuit of the Asset Sale(s), the pre- and postpetition marketing and sale process, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Causes of Action released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

      3.        **Releases by the Releasing Parties.**

      **Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permissible under applicable Law, each Releasing Party (other than the Debtors or the Wind-Down Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Wind-Down Debtor, and each other Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates or their Affiliates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the Restructuring Support Agreement, the Plan (including the Plan Supplement), the Disclosure Statement, the DIP Facility, the DIP Documents, the Asset Purchase Agreement(s), the Credit Agreement, the pursuit of Confirmation and Consummation, the pursuit of the Asset Sale(s), the pre- and postpetition marketing and sale process, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, but not, for the avoidance of doubt, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.**

      **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims or Causes of Action released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.**

4.      **Exculpation.**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim arising prior to the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Restructuring Support Agreement, the Disclosure Statement, the Plan (including the Plan Supplement), the DIP Documents, the Asset Purchase Agreement(s), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

For more detail, see Article IX of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**V.      Does the Plan contain any injunctions?**

Yes.  Article IX.F of the Plan sets forth the below injunction provision:

**Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind**

20

against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

No Person or Entity may commence, continue, amend or pursue a Claim or Cause of Action or Covered Claim, as applicable, of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, the Released Parties, or Covered Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action or Covered Claim, as applicable, subject to Article IX.C, Article IX.D, and Article IX.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action or Covered Claim, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action or Covered Claim, as applicable, against any such Debtor, Wind-Down Debtor, Exculpated Party, Released Party, or Covered Party, as applicable.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Wind-Down Debtor, Exculpated Party, Released Party, or Covered Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.

The Bankruptcy Court will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

W.     **How will undeliverable distributions and unclaimed property be treated under the Plan?**

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no further distribution to such holder shall be made unless and until the Distribution Agent is notified in writing of the then-current address of such holder, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

X.     **Are there minimum disbursement restrictions?**

Notwithstanding any other provision of the Plan, neither the Wind-Down Debtors nor the Distribution Agent shall have any obligation to make distributions of Cash less than one hundred dollars ($100) in value, and each such Claim to which this limitation applies shall be settled and enjoined pursuant

to Article IX of the Plan and its Holder is forever barred pursuant to Article IX of the Plan from ascertaining Claims against the Debtors, the Wind-Down Debtors, or their property.

**Y.    Will any party have significant influence over the corporate governance and operations of the Wind-Down Debtors?**

On and after the Effective Date, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sole director, or Governing Body of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, officers, and other Governing Bodies without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Debtors, or the members of any Debtor.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors.  The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, in any capacity, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchaser(s). The Plan Administrator shall use best efforts to operate in a manner consistent with the Wind-Down Budget.

**Z.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

Prior to the Petition Date, the Debtors evaluated numerous potential alternatives to address their financial and operational issues, including potential out-of-court transactions.  In parallel, the Debtors also developed and implemented various turnaround initiatives.  As described in the First Day Declaration, following due consideration of CARD's financial and operational situation, each Debtor determined in its business judgment that a holistic chapter 11 restructuring was the best option to ensure the realization of CARD's healthcare mission while also maximizing Estate value.

**AA.    What is the Marketing Process?**

The Debtors will continue their prepetition marketing process after the Petition Date and conduct an Auction to solicit bids for Asset Sale(s), in accordance with the terms and conditions of the Bidding Procedures.  The Debtors will seek to elicit Asset Sale offers, if any, pursuant to the process set forth in the Bidding Procedures.  If the Debtors are able to secure a winning bid in accordance with the Bidding Procedures, the Holders of certain Claims will receive the Distributable Asset Sale Proceeds as set forth in Articles II and III of the Plan and the Asset Sale(s) will be consummated in accordance with the terms to be set forth in the Sale Order, Confirmation Order, and Plan Supplement, as applicable.  At any point, the Debtors may terminate pursuit of the Asset Sale(s) in accordance with the terms of the Bidding Procedures.

In the event that the Debtors determine to effectuate any Asset Sale(s), on or after the Confirmation Date, the Sale Order or Confirmation Order, as applicable, shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to consummate and effect such Asset Sale(s), including, among other things, transferring any purchased assets and interests to be transferred to and vested in any Purchaser free and clear of all Liens, Claims, charges or other encumbrances pursuant to the terms of any purchase agreement, approve the Asset Purchase Agreement(s), and authorize the Debtors or the Wind-Down Debtors, as applicable, to undertake the transactions contemplated by the Asset Purchase Agreement(s), including any transaction described in, approved by, contemplated by, or necessary to

effectuate the Plan, including the Asset Sale(s), including, for the avoidance of doubt, any and all actions required to be taken under applicable nonbankruptcy law.

**BB.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent via one of the following methods:

> *By regular mail, overnight mail, or hand delivery at:*
> Stretto, Inc.
> 410 Exchange, Suite 100
> Irvine, California 92602
>
> *By electronic mail at:*
> TeamCARD@stretto.com
> *By telephone (toll free) at:*
> (855) 925-7872 (domestic, toll free) or +1 (949) 892-1668 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Noticing Agent at https://cases.stretto.com/CARD (free of charge) or the Bankruptcy Court's website at http://ecf.txsd.uscourts.gov (for a fee).

**CC.    Do the Debtors recommend voting in favor of the Plan?**

Yes.   The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan offers a comprehensive, value-maximizing solution to the Debtors' financial and operational issues and is the best interests of the Debtors' stakeholders and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**DD.    Who Supports the Plan?**

**THE PLAN, WHICH REMAINS SUBJECT TO FURTHER NEGOTIATION, IS SUPPORTED BY THE DEBTORS, THE DIP AGENT, THE DIP LENDERS, AND THE CREDIT FACILITY LENDERS, INCLUDING THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT.  AS OF THE DATE HEREOF, CERTAIN ELEMENTS OF THE RESTRUCTURING TRANSACTIONS REMAIN SUBJECT TO FURTHER NEGOTIATION AND FINALIZATION WITHIN THE STRUCTURE SET FORTH IN THE PLAN, INCLUDING, *E.G.*, DECISIONS WITH RESPECT TO THE ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS, AND THE PRECISE CORPORATE STEPS REQUIRED TO IMPLEMENT THE RESTRUCTURING TRANSACTIONS (WHICH SHALL BE DESCRIBED IN FURTHER DETAIL IN THE RESTRUCTURING TRANSACTIONS MEMORANDUM).**

IV.     **THE DEBTORS' DIP FACILITY AND PLAN**

A.     **The DIP Facility.**

Immediately prior to the Petition Date, the Debtors entered into a super-senior secured DIP Facility Credit Agreement with the DIP Lenders and the DIP Agent, providing for $18 million in new money and certain "roll-up" DIP loans, as further described in the DIP Motion.  The DIP Facility's new money has provided the Debtors with critical liquidity to meet their obligations in the ordinary course of business during the Chapter 11 Cases, including importantly, assurance of continued safety and well-being of their patients and protection of their workforce.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed DIP Claim, each holder of an Allowed DIP Claim shall receive payment in full in Cash of its Allowed DIP Claim.

B.     **The Plan.**

The Plan contemplates the following key terms, among others described herein and therein:

1.     **General Settlement of Claims and Interests.**

As discussed in detail in the Disclosure Statement, unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article IV of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

2.     **Restructuring Transactions.**

On or before the Effective Date, the applicable Debtors or the Wind-Down Debtors shall enter into and shall take any actions as may be necessary or appropriate to affect the Restructuring Transactions, including as set forth in the Restructuring Transaction Memorandum.  The actions to implement the Restructuring Transactions shall include:  any transaction and any actions as may be necessary or appropriate to effect a restructuring of the Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan, the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.E of the Plan.

3.        **Wind-Down Debtors**

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible in accordance with the Wind-Down Budget, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided hereunder, (d) funding distributions in accordance with the Wind-Down Budget, (e) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns and regulatory notices, (g) complying with its continuing obligations under the Plan, the Confirmation Order, the Asset Purchase Agreement(s), if any, and the DIP Orders (as applicable), and (h) administering the Plan in an efficacious manner.

The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, (b) the DIP Orders (as applicable) and (c) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

4.        **Sources of Consideration for Plan Distributions.**

The Debtors shall fund distributions under the Plan pursuant to the Asset Sale(s) with, as applicable: (a) Distributable Asset Sale Proceeds; (b) Cash on hand; and (c) Cash or non-Cash consideration received by the Debtors in any consummated Asset Sale(s); and (d) the Wind-Down Proceeds.

5.        **Plan Administrator**

On and after the Effective Date, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other Governing Body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, officers, directors, sale director, or Governing Body of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, officers, and other Governing Bodies without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, managers, or Governing Body, as applicable, of the Debtors, or the members of any Debtor.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors.  The foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchaser(s).  The Plan Administrator shall use best efforts to operate in a manner consistent with the Wind-Down Budget.

6.        **Dissolution of the Debtors**

Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, manager, and Governing Body, as applicable, of the Wind-Down Debtors with respect to their affairs.  Subject in all

respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of each Debtor under the applicable laws of its state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.  The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule.

### 7. Vesting of Assets in the Wind-Down Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, the Sale Order, the Asset Purchase Agreement(s), or any agreement, instrument, or other document incorporated in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, but after consummation of the Asset Sale(s), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the assets of the Debtors shall vest in the Wind-Down Debtors for the purpose of winding down the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that, after funding the Professional Fee Escrow Account, the collateral, or proceeds of sales of such collateral, of the Wind-Down Debtors securing the DIP Claims and Credit Facility Claims shall remain subject to the liens and claims of the DIP Lenders and the Credit Facility Lenders, as applicable, to the same extent and in the same priority as such liens and claims were enforceable against the Debtors and the Debtors' assets, until such DIP Claims and Credit Facility Claims, are satisfied in accordance with the Plan.  On and after the Effective Date, except as otherwise provided for in the Plan, the Confirmation Order, the Sale Order, the DIP Orders, or the Asset Purchase Agreement(s), the Debtors and the Wind-Down Debtors may operate their business and use, acquire, or dispose of property solely in accordance with the Wind-Down Budget, and compromise or settle any Claims, Interests, or Causes of Action.

### 8. Cancellation of Existing Securities and Agreements.

On the Effective Date, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise provided in the Plan and the Confirmation Order, all notes, instruments, certificates, credit agreements, indentures, Securities and other documents evidencing or governing Claims or Interests (other than those Claims or Interests Reinstated under the Plan) shall be cancelled and the rights of the Holders thereof and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order.  Nothing contained the Plan shall be deemed to cancel, terminate, release or discharge the obligations of the Debtors or any of their counterparts under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors or assumed and assigned to a Purchaser, pursuant to a Final Order or hereunder.

### 9. Corporate Action.

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including implementation of the Restructuring Transactions and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters

provided for in the Plan involving the corporate or organizational structure of the Debtors or the Wind-Down Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Wind-Down Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the equityholders, members, directors, or officers of the Debtors or the Wind-Down Debtors, as applicable.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by Article IV.E of the Plan shall be effective notwithstanding any requirements under nonbankruptcy Law.

### 10.  Indemnification Obligations.

Consistent with applicable law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former members of any Governing Body, directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall (1) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (2) remain intact, in full force and effect, and irrevocable, (3) not be limited, reduced or terminated after the Effective Date, and (4)  survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date irrespective of whether such indemnification obligation is owed for an act or event occurring before, on or after the Petition Date.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Wind-Down Debtors.  Any Claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, for any reason, including by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 11.  Effectuating Documents; Further Transactions.

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Wind-Down Debtors, the Plan Administrator, and the respective officers, members and managers (as applicable) thereof are authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of the Plan such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, actions, notices, or consents, except for those expressly required pursuant to the Plan, so long as the alternation, amendment, modification, or supplement is not inconsistent with state law or regulations.

### 12.  Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any

27

deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including in connection with any Asset Sale(s)), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 13.      Director and Officer Liability Insurance.

After the Effective Date, none of the Wind-Down Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

### 14.      Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, any applicable Final Order (including the DIP Order), and any applicable Asset Purchase Agreement, each Wind-Down Debtor shall retain and may enforce, as reasonably directed by the Credit Facility Agent, all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan, pursuant to a Final Order, or as assigned and transferred pursuant to any applicable Asset Purchase Agreement, which, in each case, shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors may pursue such retained Causes of Action, as reasonably directed by the Plan Administrator and the Credit Facility Agent.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  Except as specifically released under the Plan or pursuant to a Final Order or as assigned or transferred pursuant to any applicable Asset Purchase Agreement, the Debtors and the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan, pursuant to a Final Order, or as assigned and transferred under any applicable Asset Purchase Agreement.  Unless otherwise agreed upon in writing by the parties to the applicable Causes of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before**

thirty days after the Effective Date.  **Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Wind-Down Debtor, without the need for any objection or responsive pleading by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Wind-Down Debtors may settle any such objection, subject to the prior consent of the Credit Facility Agent, without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Causes of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Wind-Down Debtors, as applicable, and the objection party for thirty days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, transferred, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, or any applicable Asset Purchase Agreement(s), the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan.  The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  As reasonably directed by the Credit Facility Agent, the Wind-Down Debtors shall have the right and authority, in consultation with the Credit Facility Agent, to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## V.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   The Company's Corporate History.

CARD traces its roots back to 1990, when the first center opened in Encino, California.[19]  The concept for CARD originated from the renowned autism treatment performed by scientist Dr. Ivar Lovaas at the University of California, Los Angeles ("UCLA").  Dr. Lovaas, a phycology professor, discovered that intensive early intervention with applied behavior analysis treatment yielded a 47 percent reduction of ASD diagnoses among individuals previously diagnosed.  In 1987, Dr. Lovaas and Dr. Doreen Granpeesheh, the founder of CARD, published the paper demonstrating these findings.[20]  The paper become a seminal study in the field of ASD and behavioral intervention and shaped the study of ASD for years to come.

---

[19]   Bailey Bryant, *CARD Founder Details Company's Path to Success, 2021 Growth Outlook* (January 3, 2021), https://bhbusiness.com/2021/01/03/card-founder-details-companys-path-to-success-2021-growth-outlook/.

[20]   O I Lovaas, *Behavioral treatment and normal educational and intellectual functioning in young autistic children*; PMID: 3571656 DOI: 10.1037//0022-006x.55.1.3.

Building on their research further, Dr. Lovaas, Dr. Granpeesheh, and their colleagues developed an intensive one-on-one behavioral intervention for children with ASD.  The test group for the intervention received forty hours per week of treatment at UCLA led by behavioral therapists, and ten to fifteen hours of home-based intervention lead by their parents.  The study demonstrated three essential principles about the ASD treatment that are the basis for Debtors' treatment model today:  (i) ABA intervention works; (ii) children with ASD can recover from the diagnosis; and (iii) intensity of treatment matters.

A few years later, in 1990 when CARD first launched, this style of ASD treatment was novel. When CARD was created, it was one of the only ASD treatment providers in the nation to offer intensive ABA intervention.  When the first clinic opened, parents from all over the United States were eager to enroll their children.  Demand for treatment only accelerated when one of the mothers who received treatment from the Debtors published a book detailing the profound impact CARD had on her child.  As demand continued to increase, in 1994, Dr. Granpeesheh trained the first additional therapist, Evelyn Kung, who later became CARD's Clinical Director.  Shortly thereafter, Dr. Granpeesheh continued to train additional surpervisors, and the Company opened additional offices in New York state and San Jose, California.

In the mid-90s, demand for Company's services spanned across international lines when a father of one of the Company's patients garnered international support for expanding the Debtor's business.  Dr. Granpeesheh received requests to open centers all over the world, and proceeded to open additional treatment centers in North Carolina, London, England, and Australia.  The Debtors opened about ten additional treatment centers as a result of the public's demand.  For several years the Company continued to grow at a steady pace.  The Debtors opened two to five treatment centers per year to match demand that had been generated purely by word-of-mouth.  After years of steady growth, the Company intentionally slowed its expansion in 2000 to centralize and reorganize its management and business operations. Throughout its episodes of expansion, the Company has consistently taken routine pauses to ensure that it is constantly reassessing its policies and maintaining stable growth.

By 2016, the Debtors had grown to have about 100 clinics, and by 2018 CARD had doubled in size. After garnering considerable attention in the private equity space for years, in 2018, Blackstone struck a deal to acquire CARD.  As a result of the acquisition, Cardinal Buyer, LLC, an entity affiliated with Blackstone Capital Partners VII L.P. (together with any of their respective affiliates and funds or partnerships managed or advised by them or their respective affiliates, the "Sponsor") currently owns approximately 70 percent of the Debtors' equity, and Dr. Granpeesheh retains a significant share of the remaining interest, which is, in part, shared with several CARD employees who assisted with the founding of CARD.[21]

## B.      The Debtors' Corporate Structure, and Operations.

### 1.      Corporate Structure.

Card Holdings LLC is the Debtors' ultimate parent company, with four wholly-owned subsidiaries, including CARD.  The Company's complete corporate organization chart is attached hereto as **Exhibit D**.

### 2.      The Debtors' Operations.

CARD is one of the nation's largest treatment providers for individuals diagnosed with ASD. Founded on the principle that early intervention can yield outstanding clinical results, CARD has successfully treated tens of thousands of individuals with ASD, with many achieving optimal outcomes and

---

[21]    Bailey Bryant, *CARD Founder Details Company's Path to Success, 2021 Growth Outlook* (January 3, 2021).

leading successful, independent lives.  Since its inception in 1990, the Debtors' highly-trained technicians and behavior analysts, carrying a combined total of over 1,080 years of experience, have provided over ten million treatment hours.

CARD approaches treatment through the principles of ABA, which have been empirically proven as the most effective method for treating individuals with ASD, and have been recommended by the American Academy of Pediatrics and the United States Surgeon General.[22]  Just as every individual is unique, each of CARD's ABA programs is specifically tailored to meet the particular needs of each patient to maximize progress and nurture growth.

CARD primarily provides treatments through "center-based services," which are one-to-one ABA sessions for children, teens, and adults that take place at a CARD treatment center rather than at a patient's home.  CARD's treatment centers are the ideal setting for patients to learn and practice skills that can be "generalized" to apply in actual, real-world situations.  Center-based services also support a patient's family and caregivers by providing specific family and caregiver training hours, and by allowing families and caregivers more flexibility to work or complete other tasks while their loved-one is in a safe and trusted environment.

CARD was founded in 1990 by Dr. Doreen Granpeesheh, and in 2018 Blackstone struck a deal to acquire a majority stake in CARD.  In the summer of 2022, Dr. Doreen Granpeesheh resigned from the Debtors' board, but still holds approximately 21 percent of CARD equity.  Currently, CARD's operations include approximately 130 centers across 13 states, and approximately 2,500 employees and healthcare professionals to support its over 3,500 patients.

Guided by science and inspired by compassion, the Debtors' mission is to help individuals with ASD thrive.  CARD's deep commitment to support individuals with ASD is evidenced by its actions beyond its treatment centers.  CARD demonstrates a fulsome commitment to its patients by being at the forefront of ASD treatment research, accessibility, and advocacy.  In fact, CARD was previously recognized as the third largest non-governmental organization contributing to ASD research in the United States.[23]  In August 2009, researchers at CARD published the first-ever study to document recovery of a large group of individuals with ASD.[24]  The study demonstrated that CARD helped individuals with ASD achieve substantial progress——many of the participating individuals no longer qualified as having an ASD diagnosis by the end of their treatment.[25]

CARD is a founding member of the National Coalition for Access to Autism Services, which broadens the impact of federal efforts to prohibit the discriminatory limits on mental health services,

---

[22]  *See Applied Behavior Analysis (ABA)*, AUTISM SPEAKS, https://www.autismspeaks.org/applied-behavior-analysis.

[23]  *Center for Autism Ranked in Top Three Non-Governmental Organizations Providing Largest Financial Support to Autism Research*, (July 18, 2011), https://centerforautism.com/card-ranked-top-three-ngos-providing-largest-financial-support-autism-research/.

[24]  Granpeesheh D, Tarbox J, Dixon DR, Carr E, Herbert M., *Retrospective analysis of clinical records in 38 cases of recovery from autism*. ANN. CLIN. PSYCHIATRY. 2009 Oct - Dec; 21(4):195-204. PMID: 19917210.

[25]  *Id.*

including ABA.[26]  In 2022, CARD sponsored California Bill AB 2581, which came into effect at the start of this year.  The bill improved access to ASD services and other mental health services in California by shortening the time required for new treatment providers to be credentialed by health plans.[27]  Having faced the extreme delays first-hand, CARD sponsored the bill to ensure that newly hired, qualified medical providers could start providing treatment with significantly less administrative delay.   California Bill AB 2581 is the strongest of its kind in the nation and has paved the way for other states where CARD has treatment centers and beyond to take similar action.

*Treatment Centers*.  The crux of the Debtor's operations are its treatment centers.  The treatment centers are the primary method through which the Company provides its services.  At the time of the filing, the Debtors have approximately 130 centers across the United States.  Each treatment center employs approximately 15 treatment providers and, in the aggregate, the centers provide services for approximately 3,500 patients.

Each treatment center provides one-on-one ABA sessions for children, adolescents, and adults. Session are administered by board-certified behavior technicians that work with each patient under the supervision of a behavior analyst certified by the board of the Behavioral Intervention Certification Counsel.  The treatment centers also offer opportunities for socialization and peer play dates for individuals with ASD, and allow patients to engage with new toys, materials, and stimuli.  Each session at the treatment centers includes time for patients and therapists to learn, eat, take breaks, and play in a structured setting. For parents and caregivers, the treatment centers also provide training hours to teach them how to best care for their loved ones with ASD.

*Skills.*  To expand access to ASD treatment resources and to meet the widespread demand, the Debtors developed a comprehensive web-based treatment and training program ("Skills") for individuals with ASD, and the educators, clinicians, and loved ones supporting them.[28]  Skills was created to make the Company's resources available on a global scale.  Through its monthly or yearly subscriptions, Skills provides visual examples and videos to walk therapists, clinicians, teachers, and parents through the ABA methods for ASD treatment.[29]  Skills provides a robust curriculum that covers several areas of development. Each treatment program is customizable and can be individualized to match each patient's particular needs. The Skills curricula includes lessons ranging from basic to advanced in:  (i) language; (ii) play; (iii) social; (iv) cognition; (v) executive function; (vi) adaptive; (vii) motive; and (viii) academic.

Skills is a one-stop resource for creating and implementing comprehensive treatment plans, and includes a wide-range of assessment tools, customizable research-based lessons, and detailed progress trackers.  Skills allows clinicians, teachers, and parents to apply scientifically-proven treatments and

---

[26]  *CARD Celebrates Newly Enacted Federal Act that Would Remove Barriers to ABA . . .*, (Jan. 5, 2023), https://centerforautism.com/card-celebrates-newly-enacted-federal-act-that-would-remove-barriers-to-aba-therapy-for-people-with-autism/.

[27]  *CARD Champions California Bill to Improve Access to Care for Children Diagnosed with Autism*, Sept. 28, 2022, https://centerforautism.com/card-champions-california-bill-to-improve-access-to-care-for-children-diagnosed-with-autism/.

[28]  Samantha Murphy, *Online Therapy Program to Help Fight Autism*, (March 27, 2012), https://mashable.com/archive/autism-education

[29]  Joe Russel, *For-profit Tarzana autism agency boosted by sales, clinical study*, San Fernando Valley Business Journey, (February 24, 2014), https://www.skillsforautism.com/Documents/SFVBJ_Health_article.pdf.

interventions, measure their effectiveness, and help individuals with ASD reach their fullest potential, even if they do not have access to one of the Company's treatment centers.

At the time of the filing, the Debtors generate approximately $950,000 from Skills subscriptions annually.

**School Age and Adolescent Programs**.  The Debtors offer individualized ABA services to older children.  The program is designed to assist school age children and adolescents in meeting their specific learning goals, and to strive towards meaningful progress in their lives.  The Debtors offer both:  (i) comprehensive programs that target learning across multiple skill areas; and (ii) focused programs that target learning in a specific area or progress with a particular skill.  These programs have a heavy emphasis on assisting older children with attaining meaningful success in real-life settings by establishing individualized goals and targets based on the learners and family's priorities.  The aim is to teach skills that will promote life-long learning, independence, self-advocacy and happiness.[30]

At the time of the filing, the Debtors are receiving approximately $7 million from the school age and adolescent programs annually.

**Revenue**.  The Company generates revenue from patients, third-party payors (including health insurance and government programs in certain states), and from subscriptions to the Skills program.  The Debtors service seven states[31] that include ASD benefits in their insurance coverage.  In general, patients are responsible for deductibles related to third-party payors, which vary in amount.  Many patients rely heavily on government assistance for medical care, as opposed to private insurance carriers with higher reimbursement rates.  As a capital and liquidity-intensive business with high overhead costs, any delays associated with government assistance and reimbursement have had negative consequences.

In the twelve-month period ending in April 2023, the Debtors' total net operating revenue was approximately $160 million, which includes approximately $50 million from Medicaid supplemental programs and approximately $110 million from all other funding sources, after accounting for adjustments and denials.  In that same period, the Debtors' adjusted EBITDA loss was approximately $22 million and net loss was approximately $82 million.  Over the same time, the Debtors' operating expenses were approximately $144 million, including bad debt.  During this time approximately $2 million were made to effectuate early terminations of lease exited facilities.

### 3.  The Debtors' Workforce.

As of the Petition Date, the Debtors employ approximately 2,500 employees, including approximately 670 full-time employees and approximately 1,830 part-time employees.  The Debtors' workforce also includes specialized individuals, employed directly or through third parties as independent contractors, to supplement their workforce.  The Company's workforce is essential to the Debtors' overall patient care mission and the orderly administration of these chapter 11 cases.

---

[30]  *See* Center for Autism and Related Disorders, *School Age & Adolescent Programs*, https://centerforautism.com/services/school-age-and-adolescent-programs/.

[31]  This number does not include any states that solely provide ASD coverage through municipal payors through school programs.

### C.      The Debtors' Prepetition Capital Structure.

As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $245 million, comprised of the following obligations, each of which is described further herein:

| Prepetition Obligations | Approximate Outstanding Principal Amount |
|---|---|
| *Initial Term Loans* | $136 million |
| *Revolving Credit Loans* | $16 million |
| *First Incremental Term Loans* | $20 million |
| *Second Incremental Initial Term Loans* | $5 million |
| *Second Incremental Affiliated Term Loans* | $30 million |
| *Delayed Draw Term Loans* | $7.5 million |
| *October 2022 Superpriority Delayed Draw Term Loans* | $12.5 million |
| *December 2022 Superpriority Delayed Draw Term Loans* | $18 million |
| **Total** | $245 million |

### 1.      Initial Loans and Commitments.

On November 21, 2018, (a) CARD Intermediate Holdings II, LLC, as Holdings, (b) Center for Autism and Related Disorders, LLC, as Borrower, (c) the Guarantors party thereto from time to time, (d) Ares Capital Corporation, as administrative and collateral agent (the "Credit Facility Agent"), and (e) the Lenders from time to time party thereto (collectively, the "Credit Facility Lenders" and, together with the Credit Facility Agent and any other party to which obligations under the Credit Facility are owed, the "Credit Facility Secured Parties") entered a credit agreement (as amended, restated, or otherwise modified from time to time prior to the Petition Date, the "Credit Agreement")[32] under which the Credit Facility Secured Parties extended loans and other financial accommodations to the Debtor, which were designed to provide go-forward flexibility to the Debtors.

More specifically, pursuant to the Credit Agreement, at closing, the Credit Facility Lenders provided:  (a) $140 million in initial term loan commitments, which they funded at closing (the "Initial Term Loans"); (b) two-year commitments for $75 million in delayed draw term loans (to the extent drawn, the "Delayed Draw Term Loans"); and (c) $20 million in revolving loan commitments, inclusive of a $5 million letter of credit sublimit (to the extent drawn, the "Revolving Credit Loans").  As further described herein, the Credit Agreement was amended several times, altering these commitments and providing for additional credit facilities under the Credit Agreement.

The Initial Term Loans and the Delayed Draw Term Loans have a variable interest rate, mature on November 21, 2024, and are secured by substantially all assets of the obligors, subject to intercompany arrangements.  As of the Petition Date, approximately $136 million of the principal amount of the Initial Term Loans and approximately $7.5 million of the principal amount of the Delayed Draw Term Loans remains outstanding.  The Revolving Credit Loans mature on November 21, 2023, are secured by substantially all assets of the obligors on a *pari passu* basis with the liens securing the Initial Term Loans

---

[32]   Capitalized terms used in this paragraph but not otherwise defined herein shall have the meaning set forth in the Credit Agreement.

and the Delayed Draw Term Loans, and as of the Petition Date, approximately $16 million of principal of Revolving Credit Loans remain outstanding.

### 2.  Credit Agreement Amendments.

The Credit Agreement has been amended four times to provide for additional facilities, each of which is described herein.[33]

#### (a)  First Incremental Term Loans.

On June 11, 2021, the Debtors and certain of the Credit Facility Secured Parties entered into the First Incremental Amendment and Amendment No. 3 to Credit Agreement, which provided for an incremental $20 million in term loans on identical terms to the Initial Term Loans (the "First Incremental Term Loans"). As of the Petition Date, all of the principal amount ($20 million) of the First Incremental Term Loans remains outstanding.

#### (b)  Second Incremental Initial Term Loans and Second Incremental Affiliated Term Loans.

On December 21, 2021, the Debtors and certain of the Credit Facility Secured Parties entered the Second Incremental Amendment and Amendment No. 4 to Credit Agreement (the "Fourth Amendment"), which provided for (a) an incremental $5 million in term loans on identical terms to the Initial Term Loans (the "Second Incremental Initial Term Loans") and (b) an incremental $30 million in commitments from the Sponsor to make new term loans comprising a new class of term loans under the Credit Agreement (the "Second Incremental Affiliated Term Loans"). In addition to providing for the Second Incremental Initial Term Loans and the Second Incremental Affiliated Term Loans, the Fourth Amendment provided that future interest payments on the loans outstanding under the Credit Agreement would, at the Debtors' option, be paid in kind at a premium, with the new default being paid in kind.

The terms of the Second Incremental Affiliated Term Loans were largely the same as those of the Initial Term Loans, but the Second Incremental Affiliated Term Loans were payment subordinated to most of the obligations outstanding under the Credit Agreement. The Second Incremental Affiliated Term Loans mature on May 21, 2025 and are secured by the same assets as the Initial Term Loans. As of the Petition Date, all of the principal on the Second Incremental Initial Term Loans ($5 million) and the Second Incremental Affiliated Term Loans ($30 million) remain outstanding.

#### (a)  Superpriority Delayed Draw Term Loans.

On October 11, 2022, the Debtors and certain of the Credit Facility Secured Parties entered Amendment No. 6 to Credit Agreement and Amendment No. 1 to Security Agreement (the "Sixth Amendment") to fund the marketing process, which provided for $12.5 million in commitments to make new superpriority delayed draw term loans comprising a new class of term loans under the Credit

---

[33]  The Credit Agreement has been amended seven times in total, but only four of the amendments changed the Debtors' outstanding financial obligations. The amendments are as follows: (i) Amendment No. 1 to Credit Agreement, dated as of December 20, 2018; (ii) Amendment No. 2 to Credit Agreement, dated as of May 22, 2019; (iii) First Incremental Amendment and Amendment No. 3 to Credit Agreement, dated as of June 11, 2021; (iv) Second Incremental Amendment and Amendment No. 4 to Credit Agreement, dated as of December 21, 2021; (v) Amendment No. 5 to Credit Agreement, dated as of October 7, 2022; (vi) Amendment No. 6 to Credit Agreement, dated as of October 11, 2022; and (vii) Amendment No. 7 to Credit Agreement, dated as of December 23, 2022.

Agreement (the "October 2022 Superpriority DDTLs"). The Sixth Amendment also (a) waived certain specified defaults and (b) terminated the revolving loan commitments.

On December 23, 2022, the Debtors and certain of the Credit Facility Secured Parties entered Amendment No. 7 to Credit Agreement (the "Seventh Amendment"), which provided for $18 million in commitments to make new superpriority delayed draw term loans to combine with the October 2022 Superpriority DDTLs as a single class of term loans under the Credit Agreement (the "December 2022 Superpriority DDTLs" and, together with the October 2022 Superpriority DDTLs, the "Superpriority DDTLs").

The Superpriority DDTLs mature on October 11, 2023. As of the Petition Date, all of the principal on both the October 2022 Superpriority DDTLs ($12.5 million) and the December 22 Superpriority DDTLs ($18 million) remains outstanding.

### 3.    Equity Interests.

The Debtors are majority-owned by Cardinal Buyer, LLC, which holds approximately 70 percent of the Debtors' equity. The remaining equity is primarily owned by Dr. Doreen Granpeesheh Living Trust and Haftshance, LLC, entities affiliated with Dr. Granpeesheh.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Challenges Facing the Debtors' Business and the Debtors' Approach to Addressing Financial Issues.

#### 1.    Challenges Facing Debtors' Business.

Primarily due to the COVID-19 pandemic's impact on in-person services and the labor supply, the Debtors have faced multiple challenges in the lead up to these chapter 11 cases. *First*, the COVID-19 pandemic led to tightening in the healthcare labor market and disrupted supply chains, and as a result, CARD's costs for labor and supplies have ballooned. Despite the significant continued unmet demand, ongoing staffing shortages have prevented the Debtors from meeting such demand. *Second*, in light of the Debtors' treatment-center business model, the Debtors are party to a number of burdensome lease obligations. Though the Debtors have been able to right-size their lease footprint and eliminate many of their significant lease obligations over the last twelve-months, historical lease costs put severe pressure on the Debtors' liquidity. *Third,* reimbursement rates under previously negotiated payor contracts have not kept up with the higher cost of doing business. *Fourth*, CARD is facing several pending and threatened litigation actions, including serving as a defendant in a California class action; audits; and other informal proceedings that may result in financial liabilities. *Fifth,* compounded by these challenges, notwithstanding the Debtors great treatment success, the Debtors collected revenues below what it expected for years. Together, these circumstances have placed CARD in a position where it no longer has adequate liquidity to continue operations absent the liquidity available under the DIP Facility.

***Revenue Below Expectations.*** Despite the successful outcomes CARD's business model produced, in light of unprecedented impact of the COVID-19 pandemic, CARD's growth model could not be supported. Prior to the pandemic, the Debtors had been pursuing a growth model to match the large demand, under the belief that more centers would lead to greater revenue. The unexpected headwinds from 2020 suppressed the Debtors' financials and tightened liquidity. In effort to halt COVID-19's impact and to prevent liquidity from bleeding, the Debtors pivoted to closing treatment centers rather than expanding. While the Debtors had many successful negotiations with its landlords, the Debtors' lease obligations are hefty and the revenue for these largely unutilized centers has not been enough to provide the Debtors with

sufficient liquidity.  The Debtors turned to these chapter 11 cases to reassess its growth strategy, tighten its operations, and continue its life changing treatments.

2.     **Proactive Approach to Addressing Financial Issues.**

In response to growing liquidity issues, the Company pursued several actions to evaluate its restructuring alternatives.

(a)     **Operational Restructuring Efforts.**

Despite the Debtors' efforts to mitigate the financial strain brought on by adverse market conditions, the Debtors' liquidity position remained strained.  To facilitate a broader capital structure solution, the Company retained Kirkland in November 2021 to provide certain restructuring advice, and in October 2022, the Company retained Livingstone to provide certain financial advising services and advice on strategic transaction alternatives with respect to a potential sale process.  In March 2023 the Company retained Portage Point to provide certain turnaround-related financial advisory services.

In response to growing liquidity issues, the Debtors pursued several actions to evaluate its restructuring alternatives.

*Governance Initiatives*.  In connection with consideration of strategic restructuring alternatives, the Debtors, in consultation with the Advisors, reviewed its existing governance infrastructure.  The board of managers of CARD Holdings, LLC (the "Board") determined that it was in the best interest of the Company and its stakeholders to appoint certain independent and disinterested directors.  Specifically, on July 8, 2022, the Board appointed Neal Goldman as an independent director.  On October 14, 2022, the Board appointed Brent Kugman as an independent director.  Further, on October 17, 2022, the Debtors a formed a special restructuring committee (the "Special Restructuring Committee"), comprised of Neal Goldman, as chairman, Brent Kugman, and David D'Alessandro an existing disinterested director of the Board.  The Special Restructuring Committee was vested with the authority to determine, review, negotiate, approve, authorize, and act upon any matters arising in relation to a restructuring process.  Finally, in the lead up to these chapter 11 cases, the Debtors appointed Steven Shenker from Portage Point to serve as the Debtors' Chief Restructuring Officer ("CRO") to assist the Debtors with managing liquidity and the preparation and negotiation of these chapter 11 cases.  The CRO reports to the Special Restructuring Committee.

*Special Investigation*.  Subsequent to Mr. Goldman's appointment as disinterested director, he retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as independent counsel to, among other things, conduct an investigation into certain insider transactions (the "Investigation").  The Investigation commenced at the end of July 2022.  At the outset, the Investigation focused on the Sponsor and its acquisition of the Company and the financing transactions executed in connection with the acquisition.  The Investigation has since expanded to include claims relating to material transactions involving other third parties in addition to the Sponsor.  Quinn Emanuel propounded various document requests on both the Company and the Sponsor and reviewed hundreds of documents produced by both, including emails, and interviewed relevant Sponsor principals.  Alvarez & Marsal North America, LLC ("A&M"), assisted Mr. Goldman and Quinn Emanuel in analyzing the Company's financial condition as of the times relevant to the 2018 acquisition transactions.

On November 18, 2022, Quinn Emanuel and A&M gave a comprehensive presentation to Mr. Goldman regarding the investigation of the 2018 acquisition transactions.  The balance of the Investigation is ongoing and will be completed on or before the Voting Deadline.  Upon its completion, Mr. Goldman will reach a final conclusion whether the releases and exculpations in the Plan are

37

appropriate.  Mr. Goldman expressly reserves his right to conduct further inquiries or investigations within the scope of his authority as he deems necessary to act in accordance with his fiduciary duties.

***Revitalized Business Plan and Reduced Lease Footprint***.  In conjunction with the Debtors' Advisors, and as a condition under the October 2022 Superpriority DDTLs, the Debtors developed a go-forward business plan (the "Business Plan") to return the Company to profitability.

The Business Model focused on three operational initiatives:  (i) early intervention patient conversion; (ii) treatment adherence/scheduling optimization; and (iii) cancellation reduction.  Early intervention patient conversion aims to increase the number of patients at under-exposed sites through marketing and outreach, to improve conversion rate of prospectives to patients through admissions timeline improvement and patient focus, and to ensure patients receive the appropriate level of treatment intensity.  The actions to increase treatment adherence and scheduling adherence include, improving the availability windows for patients and staff, applying consistent operating hours at all sites, boosting field scheduling capability and technologies, and refreshing the parent handbook and roll out through the network.  To reduce cancellations, the Business Plan proposes to, among other things, target patient and staff generated cancellations and roll out SMS reminders to reduce last-minute cancellations.

The Business Plan also sets forth certain improvements and initiatives to the revenue cycle management.  To attain this goal, the Business Plan contemplated focus on:  (i) internal focus areas, such as vendor partnership, patient collection management, and charge and capture billing; (ii) external investment such as, automated eligibility checks, benefit verification improvement, enterprise legacy planning aging, and patient collection solutions; and (iii) future investments and efforts, such as collection vendor replacement.

Lastly, the Business Plan contemplated a reduction to the Company's footprint.  As part of this process, the Company engaged Hilco Real Estate, LLC ("Hilco") to perform an analysis of the Company's lease locations.  Upon conclusion of the analysis, the Company and Hilco initiated discussions with the Company's landlords to negotiate terms of the various existing leases.  As of the Petition Date, the Company had successfully negotiated concessions totaling approximately $10 million.  Right-sizing the lease footprint was an important facet of the Business Plan to ensure that the Debtors shed the leases for unprofitable centers.  Since January 2022, the Debtors have reduced their treatment center footprint by approximately 92 locations.  While the Debtors have been able to exit a number of leases in the lead up to these chapter 11 cases, not all of the landlords have been amenable to cancellation cost reductions.  The Debtor have incurred approximately $4 million in lease cancellation liabilities.  In order to reduce the lease footprint, as set forth in the Business Plan, the Debtor need additional funding to pay for any additional lease cancellation liabilities that may be incurred.

(b)      **Liquidity Management Efforts.**

***Bridge Financings***.  Following the COVID-19 pandemic, the Company began to experience significant liquidity challenges, but were able to manage most via bridge financing from their Credit Facility Lenders and Sponsor.  The first iteration of bridge financing was obtained in June 2021, when Ares Capital Corporation ("Ares"), the Credit Facility Agent and majority lender under the Credit Agreement, provided $20 million to bridge the Company to profitability.  When it became clear that additional liquidity would be necessary, the Debtors received additional financing in December 2021 in the amount of $5 million from the Credit Facility Lenders and in the amount of $30 million from the Sponsor, for a total of $35 million to bridge the Company to profitability by late 2022.  Despite the continued unmet demand for ABA therapy, performance remained below expectations as ongoing staffing shortages suppressed fulfilled hours.  By late 2022, it again became apparent that the Debtors needed an additional infusion of cash.  In October 2022, Ares provided the Debtors with an additional $12.5 million, this time earmarked to run a marketing process.

Finally, in December 2022, the Credit Facility Agent provided the Debtors a final round of bridge financing in the amount of $18 million to maintain and continue the Debtors' marketing efforts.

*Marketing and Sale Process*.  Funded using the proceeds from the Superpriority Delayed Draw Term Loans, the Debtors' sale process formally began in November 2022 and remains ongoing today.  With the assistance of Livingstone, the Debtors commenced a marketing process for the sale of the Debtors' business in its entirety or for subsets of its clinics.  Livingstone contacted 58 potential strategic and financial buyers across the globe, all of which either have a platform investment in the behavioral health space or a stated interest in acquiring a business in the behavioral space.  Out of the 58 strategic buyers contacted, 50 executed nondisclosure agreements with the Debtors and were provided with significant confidential information regarding the Debtors' financial, operational, and legal affairs.  In early January 2023, Livingstone had received 13 indications of interest from potential buyers, and CARD's management team hosted virtual presentations with ten potential purchasers.  Livingstone received five letters of intent by the end of January 2023.

Ultimately, on March 13, 2023, CARD executed an exclusivity agreement with one of the bidders, the Exclusive Bidder, to consummate an out-of-court transaction.  In late April 2023, the Exclusive Bidder unexpectedly reduced its bid value substantially and removed the out-of-court condition, instead indicating that it would only be willing to act as a stalking horse for an in-court process.  Two and a half weeks later, after the exclusive period had expired, the Exclusive Bidder further reduced its bid, rendering it unactionable.  The Debtors rejected the Exclusive Bidder's bid and immediately reengaged with the potential bidders who had demonstrated a bona fide interest during the initial marketing outreach.  Livingstone, along with the Advisors, helped the Debtors consider the proposals received.  When analyzing the proposals, the Debtors and the Advisors considered the risk and benefits associated with each proposed transaction, including overall value delivered, timing considerations, and execution risk.

Ultimately, the Debtors' renewed marketing efforts bore fruit.  After deliberation and extensive negotiations with several parties, the Debtors selected the Stalking Horse Bidder for the sale of substantially all of the Debtors' assets.  Pursuant to the Stalking Horse APA, the Stalking Horse Bidder will purchase substantially all of the Debtors' assets and continue to operate the Debtors' treatment facilities as a going-concern after the Debtors emerge from chapter 11.  Critically, the Stalking Horse APA ensures that the Debtors' business will continue to operate without disruption post-emergence and that the Debtors' patients will receive the treatment and services they need.

In advance of any potential sale transaction, the Debtors preemptively issued conditional notice under the Work Adjustment and Retraining Notification Act ("WARN") to those employees of the Debtors that may trigger potential WARN liability.  None of the Debtors' employees working directly at the Debtors' treatment centers received such notice.  While the dismissal of the noticed employees is not currently contemplated in the Stalking Horse APA, due to the razor thin liquidity in these cases and the potential of an asset sale on different terms as a result of the postpetition sale process, the Debtors issued the notice out of an abundance of caution.

### B.    The Path Forward.

The Debtors need an immediate-term solution to prevent any degradation to operations, including critically, patient care.  Having worked around the clock for the past several weeks, the Debtors believe they are well positioned to move quickly through these chapter 11 cases and obtain such solution.

C.        **The DIP Facility.**

By the DIP Motion, and as set forth in greater detail in the Greenwood Declaration, the Debtors seek authorization from the Court to enter into the DIP Facility.  The Debtors require immediate access to additional liquidity to fund the administration of the chapter 11 cases, stabilize and continue operations, pay critical vendors, and finance the ongoing marketing process, among other things.

The Debtors, through the assistance of the Advisors, thoroughly explored alternate opportunities for in-court financing, including outreach to various third-parties to determine the availability and viability of third-party financing either on a priming or junior-lien basis.  For various reasons as described in the Greenwood Declaration, this process did not yield any financing offers—leaving the Debtors with no actionable third-party alternative to the DIP Facility.

Given the constraints imposed by the Debtors' existing capital structure, including the unlikelihood of obtaining postpetition financing on a junior basis to the Prepetition Credit Agreement liens, the Debtors, in consultation with the Advisors, concluded that seeking postpetition financing from their existing lenders represented the only viable path to obtaining critically needed liquidity (without engaging in what would be a costly and potentially drawn out priming fight at the outset of these cases).

Accordingly, the Debtors and certain Credit Facility Lenders negotiated a DIP Facility that will provide the Debtors with crucially required funding to administer these cases, fund the sale and marketing process to conclusion, and continue operations, among other things.  The Debtors and certain Credit Facility Lenders ultimately agreed upon the terms of a debtor-in-possession financing, which provides, (a) a super priority secured t new money, multi-draw term loan facility consisting of up to $18 million, $7.5 million of which will be available on an interim basis, and (b) certain "roll-up" DIP loans, as more fully set forth in the DIP Motion.  On an interim basis, the Debtors are seeking authority to use the proceeds from the DIP Facility to fund general operating expenses, including payroll.  The remaining material terms of the DIP Facility are described in greater detail in the DIP Motion.

The Credit Facility Secured Parties have also agreed to provide the Debtors with immediate access to the use of cash collateral on a consensual basis, subject to the terms and conditions of the DIP Documents and the DIP Orders (as defined in the DIP Motion).  Immediate access to cash collateral will:  (a) ensure that the Debtors have sufficient working capital to, among other things, pay their employees, vendors, landlords, and service providers; (b) enable the Debtors to honor their prepetition obligations under and in accordance with the proposed "first-day" relief if approved by the Bankruptcy Court of the Southern District of Texas; and (c) satisfy the administrative expenses of these chapter 11 cases.  The ability to immediately use cash collateral also ensures that the Debtors avoid unnecessary operational disruptions that would otherwise be costly and potentially damaging to the business and harmful to patients.  Utilizing cash collateral is fundamental to the preservation and maintenance of the Debtors' going-concern value during these chapter 11 cases, is critical for the successful completion of the Debtors' sale process, and is in the best interests of the Debtors and the estates.

The funds available from the DIP Facility and access to cash collateral will provide the Debtors with critical liquidity to enable the Debtors to continue operating their facilities and providing high-quality patient care and fund the costs of the chapter 11 process while they complete their sale process.  The engagement with, and support from, the Credit Facility Lenders with respect to prepetition liquidity, postpetition financing, and timing of these cases has been a critical element of the Debtors' efforts to preserve both value and treatment services for patients.

VII.    **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES**

A.    **First Day Relief.**

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.

A brief description of each of the First Day Motions and evidence in support thereof is set forth in the First Day Declaration.  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/CARD.

B.    **Proposed Case Timeline.**

The Debtors' main priority in these chapter 11 cases is to ensure continuity of care to its patients and job retention for its employee base.  Both the nature of the Debtors' business and the milestones under the Debtors' proposed DIP Financing, make an efficient chapter 11 process essential.  Subject to Court approval, the Debtors intend to solicit votes to accept or reject the Plan and proceed in accordance with the following timeline, which is consistent with the milestones below and the Bankruptcy Code.

| Event | Date |
|---|---|
| Voting Record Date | June 11, 2023 |
| Solicitation Mailing Deadline | Three Business Days after entry of the Order |
| Publication Deadline | Five Business Days after entry of the Order |
| Plan Supplement Filing Deadline | June 29, 2023 |
| Voting Deadline | July 13, 2023, at 4:00 p.m. (prevailing Central Time) |
| Opt Out Deadline | July 13, 2023, at 4:00 p.m. (prevailing Central Time) |
| Plan and Disclosure Statement Objection Deadline | July 13, 2023, at 4:00 p.m. (prevailing Central Time) |
| Deadline to File Voting Report | July 19, 2023 |
| Confirmation and Disclosure Statement Hearing Date | July 20, 2023 |

C.    **The Asset Sale(s).**

Although the Debtors did not consummate an out-of-court transaction, the Debtors' robust prepetition marketing process provided a head start on a potential transaction, paving the way for an expeditious in court process to punctuate the Debtors' prepetition efforts and ensure that the Debtors receive

the highest or otherwise best offer(s) for their assets. The Bidding Procedures Motion requests a month-long process to close out any remaining leads from the Debtors' prepetition marketing process, solicit final bids, and effectuate an orderly transition of the Debtors' business to the Stalking Horse Bidder if no better offer arises.

Despite the length and fulsome prepetition marketing process already conducted, the Bidding Procedures (as defined in the Bidding Procedures Motion) will allow the Debtors to conduct a postpetition "market check" of the Stalking Horse Bid to ensure that the Debtors obtain the highest or otherwise best offer, or combination of offers, for the sale of their business or some or all of their assets. The Plan provides for a sale of the Debtors' assets to the Stalking Horse Bidder or, in the event that the postpetition marketing process yields a more value-maximizing sale of the Debtors' assets, the winning bidder. The proposed process will maximize the value of the Debtors' estates for the benefit of all parties in interest by allowing the Debtors to complete their marketing process with minimal additional administrative costs, while protecting against disruption to patient care.

The proposed timeline for the postpetition marketing process, though expeditious, is more than sufficient when viewed in the context of the Debtors' prepetition marketing process. At this stage, time is of the essence—even with a $18 million in DIP Facility, the Debtors project that they will run out of liquidity by early August 2023. As such, any delay in consummation of the Plan puts the wellbeing of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses. Additionally, the Debtors' DIP Agent and the Debtors' Credit Facility Lenders–who, despite their secured status, are impaired under the Plan–understand the extreme risks of a lengthy in-court process and support the Debtors' proposed timeline.

The proposed timeline for the postpetition marketing process, though expeditious, is more than sufficient when viewed in the context of the Debtors' prepetition marketing process. At this stage, time is of the essence—even with a $18 million in DIP Facility, the Debtors project that they will run out of liquidity by early August 2023. As such, any delay in consummation of the Plan puts the wellbeing of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses. Additionally, the Debtors' DIP Agent and the Debtors' Credit Facility Lenders–who, despite their secured status, are impaired under the Plan–understand the extreme risks of a lengthy in-court process and support the Debtors' proposed timeline.

| Event or Deadline | Date and Time[34] (all times in Central Time) |
|---|---|
| Cure Objection Deadline | July 14, 2023, at 4:00 p.m. |
| General Bid Deadline | July 14, 2023, at 4:00 p.m. |
| Auction (If Required) | July 17, 2023, at 9:00 a.m. |
| Deadline for Objections to Approval of any Winning Bid (including Back-Up Bids), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline. | July 19, 2023, at 4:00 p.m. |
| Confirmation and Sale Hearing | July 20, 2023 |

---

[34] These dates and deadlines are subject to the Debtors' ability to modify deadlines in accordance with the terms of the Bidding Procedures Order.

The proposed timeline for the postpetition marketing process, though expeditious, is more than sufficient when viewed in the context of the Debtors' prepetition process.  At this stage, time is of the essence—even with $18 million in postpetition financing, the Debtors project that they will run out of liquidity by mid-August 2023.  As such, any delay in consummation of the Plan puts the wellbeing of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.

### D.      Rejection of Certain Unexpired Leases.

In connection with the Debtors' ongoing restructuring efforts, the Debtors, with the assistance of their advisors, undertook a comprehensive review of their Unexpired Leases to identify such Unexpired Leases that are no longer tailored to the Debtors' operational needs or that are otherwise financially burdensome.  Accordingly, on the Petition Date, the Debtors filed the *Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing, Effective as of the Rejection Date, (A) the Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Professional Property, and (II) Granting Related Relief*, seeking the rejection of 65 unexpired leases, among other things.

## VIII.    RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.      Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

#### 1.      The Asset Sale May Not Occur.

The Debtors' Plan is premised on the occurrence of the Asset Sale(s).  There is no assurance that the Asset Sale(s) will occur.

#### 2.      Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 3.      The Restructuring Support Agreement May Be Terminated.

As more fully set forth in the Restructuring Support Agreement, attached hereto as **Exhibit B**, the Restructuring Support Agreement may be terminated upon the occurrence of certain events.

4.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article X of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

5.      **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims, or may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan, and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6.      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan, with the DIP Lenders' reasonable consent, as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

44

### 7.     Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 8.     The Debtors' Exclusivity Period May Expire.

At the outset of these Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan as of the date hereof.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 9.     Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses.  *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Wind-Down Debtors' Businesses.," which begins on page 48.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 10.     The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May Be Dismissed.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a

controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

Additionally, if the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

**11.**      **The Chapter 11 Cases could result in a "Structured Dismissal".**

If the Confirmation or Consummation of the Plan does not occur as to any Debtor, (a) the Plan shall be null and void in all respects as to such Debtor, other than as set forth therein and (b) nothing contained in the Plan or this Disclosure Statement shall:  (i) constitute a waiver or release of any Claims by the Debtors, any Holder of Claims or Interests, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holder of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Holder of Claims or Interests, or any other Entity in any respect.

**12.**      **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**13.**      **Contingencies Could Affect Distributions Available to Holders of Allowed Claims Under the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

14.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Plan.

15.     **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan.**

Although the Debtors propose to complete the process of obtaining Confirmation and Consummation of the Plan within sixty days from the Petition Date, the process could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

While the Debtors have made efforts to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects and ability to generate stable, recurring cash flows from long-term contracts with established customers.

Lengthy Chapter 11 Cases also would involve additional expenses, putting strain on the Debtors' liquidity position, and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

16.     **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are waived or not met, the Effective Date will not take place.

**B.     Risks Related to Recoveries under the Plan.**

**1.     Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XI.C of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the Plan" which begins on page 62, to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Wind-Down Debtors, and Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

**2.     The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**3.     Contingencies Could Affect Allowed Claims Classes**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.

The estimated Claims set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

C.      **Risks Related to the Debtors' and the Wind-Down Debtors' Businesses.**

1.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, payors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, payors, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

2.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  If the Chapter 11 Cases last longer than anticipated, the Debtors will require additional debtor-in-possession financing to fund the Debtors' operations.  If the Debtors are unable obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

3.    **Financial Results May Be Volatile and May Not Reflect Historical Trends.**

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments may significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

4.    **The Debtors' Substantial Liquidity Needs May Impact Debtors' Ability to Operate.**

The Debtors' business requires sufficient liquidity to ensure that the Debtors' properties and operations are maintained.  If the Debtors' cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the Cash necessary to fund ongoing operations, the Debtors expect to continue to incur significant Professional fees and costs throughout the remainder of the Chapter 11 Cases.  The Debtors cannot guarantee that Cash on hand, cash flow from operations, and Cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of the DIP Order; (b) their ability to maintain adequate Cash on hand; (c) their ability to develop, confirm, and consummate the Plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that Cash on hand, cash flow from operations, and Cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

5.    **Reimbursement Rates Paid by Federal or State Healthcare Programs or Commercial Insurance and Other Managed Care Payors May be Reduced, The Debtors May be Unable to Maintain Favorable Contract Terms with Payors or Comply with The Debtors' Payor Contract Obligations, or**

**Insurance Coverage May Otherwise be Restricted, and, As A Result, The Debtors' Net Operating Revenues May Decline.**

The Debtors generate a significant portion of net patient revenues from third-party payors, and the Medicaid and TRICARE programs, including Medicaid and TRICARE managed care plans.  Third-party payors, and federal and state governments have made, and continue to make, significant changes in the Medicaid and TRICARE programs, including changes in payment methodologies, administrative rules related to submissions of claims to qualify for reimbursements, reductions in reimbursement payment levels and reductions to payments made to providers under state supplemental payment programs.  Some of these changes have already occurred, and could re-occur in the future, limiting the amount of payments the Debtors receive for their services.

Furthermore, the Debtors' contracts with payors require the Debtors to comply with a number of terms related to the provision of services and billing for services.  If the Debtors are unable to negotiate increased reimbursement rates, maintain existing reimbursement rates or other favorable contract terms, effectively respond to payor cost controls or comply with the terms of the Debtors' payor contracts, the payments the Debtors receive for their services may be reduced or the Debtors may be involved in disputes with payors and experience payment denials, both prospectively and retroactively.

6.     **The Debtors May Experience Delayed Payments of Third-Party, Medicaid and TRICARE Reimbursements or Incur Additional Costs and May be Required to Repay Amounts Already Paid to the Debtors under These Programs.**

The Debtors are subject to routine post-payment inquiries, investigations and audits of the claims they submit to third-party payors, Medicaid and TRICARE for reimbursement for their healthcare services provided to covered patients.  Responding to and defending such investigations and inquiries can be time consuming and costly.  Third-party audits or investigations of third-party payors, Medicaid and TRICARE claims could result in increases or decreases in the Debtors' revenues to be recognized in periods subsequent to when the related healthcare services were performed as well as reputational damage in the event of adverse findings, which could have an adverse effect on the Debtors' results of operations.

7.     **A Material Portion of The Debtors' Revenues Are Concentrated in a Few States which Makes the Debtors Particularly Sensitive to Regulatory and Economic Changes in Those States.**

The Debtors' revenues are particularly sensitive to regulatory and economic changes in the states of California, Illinois, and Texas, where the Debtors generate a significant portion of their revenues.  Accordingly, any change in the current demographic, economic, competitive, legal or regulatory conditions in this state could have an adverse effect on the Debtors' business, organizational structure, results of operations, financial condition and cash flows. Changes to the state Medicaid and other governmental payor programs in California, Illinois, and Texas, including reductions in reimbursement rates or delays in timing of reimbursement payments, could also have an adverse effect on the Debtors' business, results of operations, financial condition and cash flows.

8.     **The Debtors' Inability to Recruit and Retain Quality ABA Providers Could Adversely Impact The Debtors' Performance.**

The success of the Debtors' healthcare facilities depends in part on the number and quality of the ABA providers of the Debtors' facilities, the Debtors' ability to employ or contract with quality ABA providers, and maintaining good relations with such providers.  In many of the markets the Debtors serve,

there has been and is heightened competition to retain such ABA providers, which can often result in turnover and increased wage pressures. If the Debtors are unable to provide adequate support and ABA providers that meet the needs or expectations of their patients, they may be adversely impacted.

9.     **If the Debtors Fail to Comply with the Extensive Laws and Governmental Regulations That Apply to the U.S. Healthcare Industry, Including Anti-Fraud and Abuse Laws, the Debtors Could Suffer Penalties or be Required to Make Significant Changes to Their Operations.**

The U.S. healthcare industry is governed by extensive laws and regulations at the federal, state and local government levels.  These healthcare laws and regulations include standards that address, among other issues, the following:

- the adequacy of medical care, equipment, personnel, and operating policies;
- compliance and marketing policies and procedures;
- billing and coding for medical services;
- proper handling of overpayments, refunds, and reimbursements;
- relationships with referral sources and referral recipients;
- maintenance of adequate records; and
- privacy and security of protected health information.

Examples of these laws include, but are not limited to, HIPAA, the Anti-Kickback Statute, the False Claims Act, licensure requirements, corporate practice of medicine applicable to ABA providers, and similar state-level equivalents laws.  These laws are applicable to financial arrangements that the Debtors have with ABA providers and other healthcare providers who refer patients to the Debtors' facilities. The laws are quite complex and subject to varying interpretations.  In the future, evolving interpretations or enforcement of the laws and regulations applicable to the U.S. healthcare industry could subject the Debtors' current practices to allegations of impropriety or illegality or could require the Debtors to make changes to their healthcare facilities, personnel, healthcare service offerings, capital expenditure programs and operating expenses.

Accordingly, noncompliance could have an adverse effect on the Debtors' business, results of operations, financial condition, reputation, and cash flows.  Government agencies periodically open investigations and obtain information from healthcare providers pursuant to the legal process which can be time-consuming and expensive to comply with.  Violations of law or regulations can result in severe administrative, civil and criminal penalties and sanctions, including disqualification from Medicaid programs and other reimbursement programs, which could have an adverse effect on the Debtors' business, reputation, results of operations, financial condition and cash flows. Additionally, changes to the U.S. and other governmental payor programs, including reductions in reimbursement rates or delays in timing of reimbursement payments, could also have an adverse effect on the Debtors' business, results of operations, financial condition and cash flows.

While the Debtors have established numerous policies and procedures to address compliance with these laws and regulations, there can be no assurance that the Debtors' efforts will be effective to prevent a material adverse effect on the Debtors' business from noncompliance issues.

10.     **The Debtors May from Time to Time Become the Subject of Legal, Regulatory and Governmental Proceedings That, If Resolved Unfavorably,**

52

**Could Have An Adverse Effect on the Debtors, and the Debtors May be Subject to Other Loss Contingencies, Both Known and Unknown.**

The Debtors may from time to time become a party to various legal, regulatory and governmental proceedings and other related matters. Those proceedings include, among other things, governmental investigations. In addition, the Debtors may become subject to other loss contingencies, both known and unknown, which may relate to past, present and future facts, events, circumstances and occurrences. Addressing any investigations, lawsuits or other claims may distract management and divert resources, even if the Debtors ultimately prevail. Should an unfavorable outcome occur in some or all of any such current or future legal, regulatory or governmental proceedings or other such loss contingencies, or if successful claims and other actions are brought against the Debtors in the future, there could be an adverse impact on the Debtors' results of operations, financial position and cash flows.

Governmental investigations, as well as qui tam lawsuits, may lead to significant fines, penalties, settlements or other sanctions, including exclusion from federal and state healthcare programs. Settlements of lawsuits involving third-party payors, Medicaid and TRICARE issues routinely require both monetary payments and/or corporate integrity agreements, each of which could have an adverse effect on the Debtors' business, results of operations, financial position and cash flows.

11.     **The Debtors Could be Subject to Substantial Uninsured Liabilities or Increased Insurance Costs As A Result of Significant Legal Actions.**

Healthcare providers have become subject to an increasing number of legal actions alleging malpractice and other liability claims or legal theories. Many of these actions involve large claims and significant costs for legal defense. To protect the Debtors from the vulnerability to the potentially significant costs arising from these claims, the Debtors maintain claims-made professional and general liability insurance coverage in excess of those amounts for which they are self-insured. The Debtors' insurance coverage, however, may not continue to be available in the future at a reasonable cost for the Debtors to maintain adequate levels of insurance. Additionally, the Debtors' insurance coverage does not cover all claims against the Debtors, such as fines, penalties, or other damage and legal expense payments resulting from qui tam lawsuits. The Debtors cannot predict the outcome of current or future legal actions against them or the effect that judgments or settlements in such matters may have on them or on their insurance costs. Additionally, all professional and general liability insurance the Debtors purchase is subject to policy limitations. If the aggregate limit of any of the Debtors' professional and general liability policies is exhausted, in whole or in part, it could deplete or reduce the limits available to pay any other material claims applicable to that policy period. Furthermore, one or more of the Debtors' insurance carriers could become insolvent and unable to fulfill its or their obligations to defend, pay or reimburse the Debtors when those obligations become due. In that case, or if payments of claims exceed the Debtors' estimates or are not covered by the Debtors' insurance, it could have an adverse effect on their business, financial condition or results of operations.

The Debtors maintain certain insurance coverage for professional and general liability as set forth in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage, Premium Financing Agreements, and Letters of Credit Entered into Prepetition and Pay Related Prepetition Obligations, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (C) Pay Prepetition Broker Fees, and (II) Granting Related Relief*, filed contemporaneously herewith. The Debtors intend to oppose any motion to lift the automatic stay and any other action to collect against available insurance proceeds to the extent any such action would require the Debtors to expend estate resources in order for the party thereof to collect against available insurance proceeds (if any).

12. **The Debtors' Operations Could be Impaired by a Failure of Their Information Systems.**

The operation of the Debtors' information systems is essential to a number of critical areas of their operations, including (a) accounting and financial reporting; (b) billing and collecting accounts; (c) coding and compliance; (d) patient records and document storage; and (e) clinical systems.

In general, information systems may be vulnerable to damage from a variety of sources, including telecommunications or network failures, human acts and natural disasters. In addition, the Debtors' business is at risk from and may be impacted by information security incidents, including ransomware, malware, and other electronic security events. Such incidents can range from individual attempts to gain unauthorized access to information technology systems to more sophisticated security threats. These events can also result from internal compromises, such as human error or malicious acts. These events can occur on the Debtors' systems or on the systems of their partners and subcontractors.

The Debtors believe that their subcontractors and vendors take precautionary measures to prevent problems that could affect the Debtors' business operations as a result of failure or disruption to information systems. However, there is no guarantee such efforts will be successful in preventing a disruption, and it is possible that the Debtors may be impacted by information system failures. The occurrence of any information system failures could result in interruptions, delays, loss or corruption of data and cessations or interruptions in the availability of these systems. All of these events or circumstances, among others, could have an adverse effect on the Debtors' business, results of operations, financial position and cash flows, and they could harm the Debtors' business reputation.

13. **A Cyber-Attack or Security Breach Could Result in The Compromise of the Debtors' Facilities, Confidential Patient Data, Confidential Corporate Information, or Critical Systems and Give Rise to Potential Harm to Patients, Remediation and Other Expenses, Expose the Debtors to Liability under HIPAA, Consumer Protection Laws, Common Law or Other Legal Theories, Subject the Debtors to Litigation and Federal and State Governmental Inquiries, Damage The Debtors' Reputation, and Otherwise be Disruptive to The Debtors' Business.**

The Debtors rely extensively on their computer systems and those of third-party vendors to collect, store and manage clinical and financial data on their networks and devices, to communicate with patients, payors, vendors and other third parties, and to summarize and analyze operating results. The Debtors' networks and devices store sensitive information, including intellectual property, proprietary business information and personally identifiable information of patients, partners and employees. The Debtors' ability to recover from a ransomware, phishing, social engineering, hacking or other cyber-attack is dependent on the continued development and enhancement of controls, process and practices designed to protect the Debtors' information systems and data from attack, damage or unauthorized access, including successful backup systems and other recovery procedures.

Despite these efforts, threats from malicious persons and groups, new vulnerabilities and advanced new attacks against the Debtors' and third-party vendor's information systems and devices create risks of cybersecurity incidents. These risks include ransomware, malware, and other electronic security events and the resulting damage. Such incidents can range from individual attempts to gain unauthorized access to the Debtors' information technology systems to more sophisticated security threats. They can also result from internal compromises, such as human error or malicious acts. Breaches of personal information can result from deliberate attacks or unintentional events. There can be no assurance that the Debtors, or their third-party vendors, will not be subject to cyber-attacks or security breaches in the future. Such attacks or

breaches could impact the integrity, availability or privacy of protected patient medical data or other information subject to privacy laws, or they could disrupt the Debtors' information technology systems, medical devices or business, including the Debtors' ability to provide various healthcare services. Additionally, growing cyber-security threats related to the use of ransomware, phishing and other malicious software threaten the access to, availability of, and utilization of critical information technology and data. As cyber-threats continue to evolve, the Debtors may be required to expend significant additional resources to continue to modify or enhance the Debtors' protective measures or to investigate and remediate any information security vulnerabilities or incidents.

In addition, the healthcare industry is currently experiencing increased attention on compliance with regulations designed to safeguard protected health information and mitigate cyber-attacks on entities. There continues to be an increased level of attention focused on cyberattacks on healthcare providers because of the vast amount of personally identifiable information these organizations possess. Most healthcare providers, including all who accept Medicaid and TRICARE, must comply with the Health Insurance Portability and Accountability Act, or HIPAA, regulations regarding the privacy and security of protected health information. States also maintain laws focused in this area. The HIPAA regulations impose extensive administrative requirements with regard to how protected health information may be used and disclosed. Further, the regulations and similar state laws include extensive and complex provisions which require the Debtors to establish reasonable and appropriate administrative, technical and physical safeguards to ensure the confidentiality, integrity and availability of protected health information maintained in electronic format. The Debtors must safeguard protected health information against reasonably anticipated threats or hazards to the information.

Violations of these various privacy and security laws can result in significant civil monetary penalties, as well as the potential for criminal penalties. In addition to state data breach notification requirements, HIPAA authorizes state attorneys general to bring civil actions on behalf of affected state residents against entities that violate HIPAA's privacy and security regulations. These penalties could be in addition to other penalties assessed by a state for a breach which would be considered reportable under the state's data breach notification laws. Further, there are significant costs associated with a breach, including investigation costs, remediation and mitigation costs, notification costs, attorney fees, and the potential for reputational harm and lost revenues due to a loss in confidence in the provider. The Debtors cannot predict the costs to comply with these laws or the costs associated with a potential breach of protected health information, which could have a material adverse effect on the Debtors' business, results of operations, financial position and cash flows, and business reputation.

If the Debtors are subject to cyber-attacks or security breaches in the future, this could also result in harm to patients; business interruptions and delays; the loss, misappropriation, corruption or unauthorized access of data; litigation and potential liability under privacy, security and consumer protection laws or other applicable laws; reputational damage and federal and state governmental inquiries, any of which could have an adverse effect on the Debtors' business, results of operations, financial position and cash flows.

### 14. The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Wind-Down Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to nor the final resolution of such litigation.

15. **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the healthcare industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

16. **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the wind-down entity and may have an adverse effect on the Wind-Down Debtors' financial condition and results of operations.

## IX. SOLICITATION AND VOTING

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the proposed Disclosure Statement Order.

*The proposed Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE PROPOSED DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 7, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 (the "Voting Class"). The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 4, 5, 6, 7, and 8 (collectively, the "Non-Voting Classes").

### B.      Claims and Noticing Agent.

The Debtors have retained Stretto, Inc. to act as, among other things, the Claims and Noticing Agent in connection with the solicitation of votes to accept or reject the Plan.

### C.      Voting Record Date.

**The Voting Record Date is June 11, 2023** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### D.      Voting on the Plan.

**The Voting Deadline is July 13, 2023 at 4:00 p.m. (prevailing Central Time).**  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline.  Ballots returned by electronic mail or facsimile will not be counted.

### E.      Ballots Not Counted.

**No ballot will be counted toward Confirmation if, among other things**:  (1) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (2) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (3) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot submitted via the online balloting portal will be deemed to contain an original signature); (4) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan;[35] (5) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein; and (6) any Ballot submitted by improper means; **Please refer to the proposed Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE IX OF THE DISCLOSURE STATEMENT AND AS ATTACHED AS EXHIBIT 2 TO THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

## X.      CONFIRMATION OF THE PLAN

### A.      Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting

---

[35]   For the avoidance of doubt, a Holder's election, if any, to opt out of the Third-Party Release will be counted even if such Holder abstains from voting to accept or reject the Plan in the Ballot.

Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## B.     Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## C.     Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of Portage Point and Livingstone have analyzed their ability to meet their respective obligations under the Plan. Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 42, for a discussion of certain factors that may affect the future financial performance of the Wind-Down Debtors.

D.      **Valuation.**

As described above, the Debtors are presently engaged in marketing their assets for sale and soliciting bids in connection therewith pursuant to the Bidding Procedures.  The Debtors believe that this process provides the best method of valuing their enterprise, as it allows the market to speak as to that value.  The Debtors' marketing and sale process is a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions.   Expected recoveries for Credit Facility Claims are estimated based on the "floor" set by the Stalking Horse Bid.  However, to ensure that the integrity of the marketing and sale process is preserved and value is maximized, this Disclosure Statement does not include a valuation analysis (which the Debtors at this time do not anticipate filing).   *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re Pipeline Health System, LLC, et al.*, Case No. 22-90291 (MI) (Bankr. S.D. Tex. Nov. 16, 2022) (ECF No. 506) (order approving disclosure statement without a valuation analysis); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI) (Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

E.      **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

F.      **Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and

equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, subject to the DIP Lenders' consent, or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Wind-Down Debtors, and Holders of Claims entitled to vote on the Plan. It does not address the U.S. federal income tax consequences to Holders of Claims or Holders of Interests that are not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested any ruling or determination from the IRS or any other taxing authority with respect to the tax

consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Wind-Down Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, accrual-method U.S. Holders that prepare an "applicable financial statement" (as defined in Section 451 of the Tax Code), banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy. In addition, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). Furthermore, the following summary assumes that the Exit Facility will be respected as a debt instrument for U.S. federal income tax purposes.

This summary does not address the receipt, if any, of property by Holders of Claims other than in their capacity as such (*e.g.*, this summary does not discuss the treatment of any commitment fee or similar arrangement).

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.     **Certain U.S. Federal Income Tax Consequences to the Debtors, the Wind-Down Debtors, and Holders of Equity Interests in Parent**

Each of the Debtors are currently treated as a partnership or as an entity that is disregarded as separate from its owner for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Debtors, but by their partners (i.e., the Holders of equity in the Debtors). Holders of equity in the Debtors should consult their own tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Holders.

1.     **COD Income**

In general, absent an exception, a taxpayer will realize and recognize cancelation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of any cash paid, (ii) the issue price of any new indebtedness of the debt issued, and (iii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange; except to the extent that payment of the indebtedness would have given rise to a deduction.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (but only to the extent of the taxpayer's insolvency) (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses; (b) most tax credits, including minimum tax credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

Under section 108(d)(6) of the Tax Code, when an entity that is a pass-through entity (such as the Debtors) recognizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the partner level rather than at the entity level. Accordingly, the Holders of equity in the Debtors will be treated as receiving their allocable share, if any, of the COD Income recognized by the Debtors. If a Holder has suspended loss with respect to its equity interest in the Debtors, the allocation of COD Income may allow some or all of such suspended losses to be used to offset the COD Income.

2.     **Gain or Loss**

In general, absent an exception, a taxpayer will realize and recognize gain or loss upon the sale of assets or membership interests in disregarded entities equal to the difference, if any, between (i) the amount realized on the sale and (ii) the taxpayer's adjusted tax basis in such assets or in the assets of such disregarded entities, as applicable. Accordingly, if the Asset Sale(s) occur, the Debtors may recognize gain or loss. To the extent that such a sale constitutes a sale of business assets under Section 1231 of the Tax Code, net gain resulting from such sale would be treated as a capital gain (except to the extent such gain is treated as the "recapture" of previous depreciation and amortization deductions), and net loss resulting from such sale would be treated as an ordinary loss.

When an entity that is a pass-through entity (such as the Debtors) recognizes gain or loss, its partners are treated as receiving their allocable share of such gain or loss. Accordingly, the Holders of equity in the Debtors will be treated as receiving their allocable share, if any, of the gain or loss recognized by the Debtors.

### C.  Certain U.S. Federal Income Tax Consequences to U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the transactions.

#### 1.  U.S. Federal Income Tax Consequences to U.S. Holders of Claims

##### (a)  Asset Sale(s)

Pursuant to the Plan, if the Asset Sale(S) occurs, a U.S. Holder of certain Claims shall receive (A) in its Pro Rata share of the Distributable Asset Sale Proceeds distributable under the Plan; and (B) otherwise, its Pro Rata share of the Debtors' remaining Cash (if any) following payment of senior Claims, funding of the Professional Fee Escrow Account, and any wind-down reserves as set forth in the Wind-Down Budget.

If the Debtors' assets are sold in the Asset Sale, then such U.S. Holder will be treated as having exchanged its Claim for its Pro Rata Share of the Distributable Asset Sale Proceeds or Cash in a taxable exchange governed by Section 1001 of the Tax Code on which gain or loss is recognized in an amount equal to the difference between (i) the amount of Cash or the fair market value of the Distributable Asset Sale Proceeds received and (ii) such U.S. Holder's adjusted basis in such Claim.

Any amount received in respect of accrued but untaxed interest will be taxed as set forth below under "--Accrued but Untaxed Interest." A U.S. Holder's tax basis in the share of any such Distributable Asset Sale Proceeds received should be equal to its fair market value and a U.S. Holder's holding period would begin on the day after the Effective Date.

#### 2.  Character of Gain or Loss

To the extent a U.S. Holder of Claims recognizes gain or loss as described in Section (1) above, and subject to the discussion below on accrued but untaxed interest and market discount, any gain or loss recognized on the exchange of Claims should be capital gain or loss and will generally be long-term capital gain or loss if the U.S. Holder held his or her Claims for more than one year on the Effective Date. Under current U.S. federal income tax law, certain non-corporate U.S. Holders (including individuals) are eligible for preferential rates of U.S. federal income tax on long-term capital gains. The deductibility of capital losses is subject to limitation.

#### 3.  Accrued but Untaxed Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder), in which case, such amount will be excluded from a U.S. Holder's calculation of gain or loss on such exchange of Claims. Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 4.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain recognized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 5.    Net Investment Income Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### D.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims

### 1.    In General

The following discussion includes only certain U.S. federal income tax consequences of the transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holders.

Whether a Non-U.S. Holder recognizes gain or loss on the exchange of Claims pursuant to the Plan, or upon a subsequent disposition of the consideration received under the Plan, the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

**a.**      **Gain Recognition in Connection with the Plan**

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), any gain recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the gain is recognized and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder with respect to such gain. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**E.**      **Information Reporting and Back-Up Withholding**

The Debtors and Wind-Down Debtors will withhold all amounts required by law to be withheld from payments of interest and distributions with respect to equity. The Debtors and Wind-Down Debtors will also comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan, as well as future payments or allocations of income made with respect to consideration received under the Plan. In addition, backup withholding of taxes will generally apply to payments in respect of a Claim under the Plan, as well as future payments with respect to the consideration received under the Plan, unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of a Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or, in each case, such Holder otherwise establishes eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### F.  FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN.**

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., OR NON-INCOME TAX LAW, AND OF ANY CHANGE IN APPLICABLE TAX LAW.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated: June 12, 2023                             CENTER FOR AUTISM AND RELATED DISORDERS, LLC
                                                 on behalf of itself and all other Debtors

                                                 By:  /s/ *Steven Shenker*
                                                      Steven Shenker
                                                      Chief Restructuring Officer
                                                      CARD Holdings, LLC

## Exhibit A

**Plan of Reorganization**

[Filed at Docket No. 16]

## Exhibit B

**Restructuring Support Agreement**

*EXECUTION VERSION*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of June 11, 2023 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, a "Party" and, collectively, the "**Parties**"):[1]

   i.     CARD Holdings, LLC, a company incorporated under the Laws of Delaware ("**CARD**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

   ii.    Cardinal Buyer, LLC, in its respective capacity as a direct holder of Equity Interests (the "**Consenting Sponsor**"); and

   iii.   the undersigned holders of Credit Facility Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Secured Lenders**" and, together with the other entities in clause (ii) through clause (iii), the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Plan attached as **Exhibit B** hereto (and such transactions as described in this Agreement and the Plan, the "**Restructuring Transactions**");

**WHEREAS**, the Restructuring Transactions set forth in the Plan contemplate a restructuring through the sale of substantially all of the Company Parties' business enterprise;

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**      *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Credit Facility, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the Plan).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

2

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind, nature, description, or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, asserted or unasserted, accrued or unaccrued, pending or threatened, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Credit Facility Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting Secured Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Credit Agreement**" means that certain amended and restated facility agreement, dated as of November 21, 2018, by and among certain of the Company Parties, as borrowers or guarantors, the lenders party thereto from time to time, and the Agent thereunder, as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms therein.

3

"**Credit Facility**" means that certain prepetition credit facility provided for under the Credit Agreement.

"**Credit Facility Claims**" means any and all Claims arising under, derived from, or based upon the Credit Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" means Ares Capital Corporation, or any assign or successor thereto, in its capacity as administrative agent under the DIP Credit Agreement.

"**DIP Credit Agreement**" means the debtor-in-possession financing credit agreement by and among certain Company Parties, the DIP Agent, and the lenders party thereto setting forth the terms and conditions of the DIP Facility.

"**DIP Documents**" means, collectively, the DIP Credit Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including, without limitation, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**DIP Facility**" means the new superpriority secured term loans to be made in accordance with the DIP Credit Agreement.

"**DIP Lenders**" means the lenders party to the DIP Credit Agreement.

"**DIP Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral, which shall be consistent in all material respects with the DIP Credit Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means an order entered by the Bankruptcy Court approving the adequacy of the Disclosure Statement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Law**" means any federal, state, local, or foreign law (including any common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions.

"**Plan Effective Date**" means the occurrence of the Effective Date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting Secured Lenders**" means, as of the relevant date, Consenting Secured Lenders holding at least 50.01% of the aggregate outstanding principal amount of Credit Facility Claims that are held by Consenting Secured Lenders.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Stalking Horse Purchase Agreement**" means that certain asset purchase agreement, dated June 9, 2023, by and between CARD and Pantogran LLC for the sale of substantially all of CARD's assets.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; <u>provided</u> that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)   references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)   the use of "include" or "including" is without limitation, whether stated or not; and

(j)   the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties.

**Section 2.**      *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)      the following shall have executed and delivered counterpart signature pages of this Agreement:

(i)      the Consenting Sponsor; and

(ii)      holders of at least 66 2/3% of the aggregate outstanding principal amount of Credit Facility Claims;

(c)      counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

**Section 3.**      *Definitive Documents*.

3.01.      The Definitive Documents governing the Restructuring Transactions shall include the following:  (A) the Plan; (B) the Stalking Horse Purchase Agreement; (C) the Confirmation Order; (D) the Disclosure Statement; (E) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (F) the First Day Pleadings and all orders sought pursuant thereto; (G) the DIP Documents; (H) the Plan Supplement; and (I) the DIP Order.

3.02.      The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties, the DIP Agent, and the Required Consenting Secured Lenders; *provided* any Definitive Document that (i) adversely affects the rights, obligations, or treatment (including the treatment of any Company Claims/Interests held by a Consenting Sponsor) of the Consenting Sponsor under this Agreement, the Plan, the Stalking Horse Purchase Agreement, or any other Definitive Document, or (ii) relates to the release, indemnification, or insurance provisions under this Agreement, the Plan, or any other Definitive Document, in each case under clause (i) and (ii), shall be in form and substance reasonably acceptable to the Consenting Sponsor.

**Section 4.**      *Commitments of the Consenting Stakeholders*.

4.01.      General Commitments.

(a)     During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, severally, and not jointly, to:

(i)     support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

(iii)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)     During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that is materially inconsistent with this Agreement or the Plan;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind that is materially inconsistent with this Agreement with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document;

(v)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties; or

(vi)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

4.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)      During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees in respect of all of its Company Claims/Interests, severally, and not jointly, that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)      vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)      not object to the releases set forth in the Plan, and, to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above.

(b)      During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 5.      *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; and (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.      *Commitments of the Company Parties*.**

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

(f)     (1) provide counsel for the Consenting Secured Lenders and the Consenting Sponsor a reasonable opportunity to review draft copies of all First Day Pleadings and, (2) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Consenting Stakeholders, the Agent, or the DIP Agent materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with Bankruptcy Court, as applicable.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 7.**     ***Additional Provisions Regarding Company Parties' Commitments***.

7.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.

7.02.   Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to, in each case upon consultation and prior notice to the DIP Agent and its counsel:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-

public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.

7.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Interests and Securities*.

8.01.   During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)     either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided*, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**      *Representations and Warranties of Consenting Stakeholders*.  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)      it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 10.      *Mutual Representations, Warranties, and Covenants*.**   Each of the Parties represents, warrants, and covenants to each other Party, severally and not jointly (other than the Company Parties which make such representations jointly and severally), that, as of the Execution Date and as of the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state or other jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.      *Termination Events*.**

11.01.   <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated (a) with respect to the Consenting Sponsor, by the Consenting Sponsor, and (b) with respect to the Consenting Secured Lenders, by the Required Consenting Secured Lenders, in each case, by the

delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days following such Company Party's receipt of written notice in accordance with Section 14.10 hereof identifying any such breach;

(b)    the Company Parties' filing and/or seeking approval by the Bankruptcy Court of any Definitive Document inconsistent with the consent rights set forth in Section 3.02;

(c)    the termination of the Stalking Horse Purchase Agreement without the prior written consent of the Required Consenting Secured Lenders or the Consenting Sponsor, as applicable;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof identifying any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)    the Bankruptcy Court enters an order denying confirmation of the Plan;

(f)    the reversal, stay, dismissal, vacation, reconsideration, material modification, or material amendment of the Confirmation Order or an order approving the Disclosure Statement, without the prior written consent of the Consenting Sponsor or Required Consenting Secured Lenders, as applicable;

(g)    the Company Parties' filing and/or seeking approval of any motion or pleading that is not materially consistent with this Agreement, and such motion or pleading has not been withdrawn within five (5) calendar days following the Company's receipt of written notice by the terminating Consenting Stakeholder in accordance with Section 14.10 hereof;

(h)    entry of an order by the Bankruptcy Court granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any asset of any Company Party that would materially and adversely affect the Company Party's operational or financial performance;

(i)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Secured Lenders and the Consenting Sponsor, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement; or

(j)      the Company Parties' filing and/or seeking approval of any motion, application, or adversary proceeding challenging the amount, scope, extent, validity, enforceability, perfection, priority of, or seeking avoidance of, (i) the Credit Facility Claims, or the liens securing such Credit Facility Claims, (ii) the Company Claims/Interest held by a Consenting Sponsor; or (iii) any other cause of action against and/or seeking to restrict the rights of the Consenting Stakeholders (or the Company Parties' support of any such motion, application, or adversary proceeding commenced by any third party or their consent to the standing of any such third party to do so); or

(k)      solely as it relates to the right of the Consenting Sponsor to terminate, the breach in any material respect by one or more of the Consenting Secured Lenders of any provision set forth in this Agreement that would (i) materially and adversely affect such Consenting Sponsor and (ii) result in non-breaching Consenting Secured Lenders holding less than 66.67% of the aggregate outstanding principal amount of the aggregate outstanding principal amount of Credit Facility Claims that remains uncured for a period of five (5) Business Days after the terminating Party transmits a written notice detailing any such breach.

11.02.  <u>Consenting Secured Lenders Termination Events</u>.  This Agreement may be terminated by the Required Consenting Secured Lenders by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events:

(a)      the Company Parties' failure to keep the Consenting Stakeholders reasonably informed of the progress of, and all material developments in, the negotiation of the covenants, conditions and other material terms of the Restructuring Transactions;

(b)      the occurrence of an Event of Default (as defined in the DIP Credit Agreement) under the DIP Credit Agreement;

(c)      the failure of the Petition Date to occur on or prior to June 12, 2023 at 9:30 a.m. Eastern Time;

(d)      the Company Parties lose their exclusive right to file and/or solicit acceptance of a chapter 11 plan;

(e)      the Company Parties' (x) seeking to sell any material assets, (y) entering into any material contractual obligations, or (z) entering into any material settlements, in each case, outside the ordinary course of business without the prior written consent of the Consenting Secured Lenders; and

(f)      the reversal, stay, dismissal, vacation, reconsideration, modification, or amendment of the DIP Order without the prior written consent of the Consenting Secured Lenders.

11.03.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

15

(a)      the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan.

11.04.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Secured Lenders; (b) the Consenting Sponsor; and (c) each Company Party.

11.05.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.06.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict

16

(a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d).  Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.**     *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the following Parties, solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of such Parties and unless otherwise specified in this Agreement: (i) the Consenting Sponsor; (ii) the Required Consenting Secured Lenders; and (iii) the DIP Agent; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**     **[Reserved]**.

**Section 14.**     *Miscellaneous*

14.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance

with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02. <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03. <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04. <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof,

is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Center for Autism and Related Disorders, LLC
9089 S Pecos Rd., Suite 3600
Henderson, Nevada 89074
Attention: Michelle Rapoport, General Counsel
E-mail address:  michellerapoport@centerforautism.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Christopher T. Greco and Allyson B. Smith
E-mail address:  christoper.greco@kirkland.com and
allyson.smith@kirkland.com

(b)     if to a Consenting Secured Lender, to:

Latham & Watkins LLP
330 N Wabash Ave, Suite 2800
Chicago, Illinois 60611
Attention:  James Kstanes, Asif Attarwala
Email address:  jim.kstanes@lw.com, asif.attarwala@lw.com

-and-

1271 Avenue of the Americas
New York, New York 10020
Attention:  Nacif Taousse
E-mail address:  nacif.taousse@lw.com

(c)      if to the Consenting Sponsor, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Paul M. Basta, Jacob A. Adlerstein, Brian Bolin
E-mail address:  pbasta@paulweiss.com,
jadlerstein@paulweiss.com, bbolin@paulweiss.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  Independent Due Diligence and Decision Making.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  Waiver.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  Specific Performance.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  Several, Not Joint, Claims.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and

not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18. <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19. <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 14 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.20. <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties, the Required Consenting Secured Lenders, and the Consenting Sponsor, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**


**CARD HOLDINGS, LLC**
**CARD INTERMEDIATE HOLDINGS I, LLC**
**CARD INTERMEDIATE HOLDINGS II, LLC**
**CENTER FOR AUTISM AND RELATED DISORDERS, LLC**
**SKILLS GLOBAL, LLC**
**CARDINAL MANAGEMENT LLC**

By: _____

Name: Jennifer Webster

Authorized Signatory

**[Consenting Stakeholders' Signature
Pages on File With the Debtors]**

## <u>EXHIBIT A</u>

**Company Parties**

CARD Holdings, LLC

Card Intermediate Holdings I, LLC

Card Intermediate Holdings II, LLC

Center for Autism and Related Disorders, LLC

Skills Global, LLC

Cardinal Management LLC

# **EXHIBIT B**

**Plan**

**[Filed Separately]**

## EXHIBIT C

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among CARD Holdings, LLC and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a ["Consenting [__] Lender"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
|---|---|
| Credit Facility Claims | |
| Equity Interests | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit C**

**Stalking Horse APA**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JUNE 9, 2023**

**BY AND AMONG**

**PANTOGRAN LLC, AS PURCHASER,**

**AND**

**CARD HOLDINGS, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

KE 97112963.20

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS;  ASSUMPTION OF
    ASSUMED LIABILITIES.................................................................................1
1.1         Purchase and Sale of the Acquired Assets ..................................1
1.2         Excluded Assets ..........................................................................3
1.3         Assumption of Certain Liabilities ...............................................5
1.4         Excluded Liabilities ....................................................................6
1.5         Assumption/Rejection of Certain Contracts ...............................6

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ................................................8
2.1         Consideration; Payment ..............................................................8
2.2         Deposit ........................................................................................8
2.3         Closing ........................................................................................9
2.4         Closing Deliveries by Sellers .....................................................9
2.5         Closing Deliveries by Purchaser .................................................9
2.6         Withholding ...............................................................................10

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ...............................10
3.1         Organization and Qualification .................................................10
3.2         Authorization of Agreement .....................................................10
3.3         Conflicts; Consents ...................................................................10
3.4         Intentionally Omitted. ...............................................................11
3.5         Financial Statements .................................................................11
3.6         Title to Properties .....................................................................11
3.7         Contracts ...................................................................................11
3.8         No Litigation .............................................................................13
3.9         Permits; Compliance with Laws ...............................................13
3.10        Environmental Matters ..............................................................13
3.11        Intellectual Property ..................................................................13
3.12        Tax Matters ...............................................................................14
3.13        Assumed Benefit Plans ..............................................................15
3.14        Employees .................................................................................15
3.15        Affiliate Transactions ...............................................................16
3.16        Brokers ......................................................................................16
3.17        No Other Representations or Warranties ...................................16

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ..........................17
4.1         Organization and Qualification .................................................17
4.2         Authorization of Agreement .....................................................17
4.3         Conflicts; Consents ...................................................................17
4.4         Financing...................................................................................18
4.5         Brokers ......................................................................................18
4.6         No Litigation .............................................................................18
4.7         Investment Representation; Investigation ..................................18
4.8         Certain Arrangements ...............................................................18
4.9         Solvency....................................................................................19
4.10        Tax Matters ...............................................................................19

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.11 | No Additional Representations or Warranties | 19 |
| 4.12 | No Outside Reliance | 19 |
| | | |
| **ARTICLE V** | **BANKRUPTCY COURT MATTERS** | **20** |
| 5.1 | Bankruptcy Actions | 20 |
| 5.2 | Cure Costs | 21 |
| 5.3 | Confirmation Order | 22 |
| 5.4 | Approval | 22 |
| | | |
| **ARTICLE VI** | **COVENANTS AND AGREEMENTS** | **22** |
| 6.1 | Conduct of Business of Sellers | 22 |
| 6.2 | Access to Information | 24 |
| 6.3 | Employee Matters | 25 |
| 6.4 | Regulatory Approvals | 27 |
| 6.5 | Reasonable Efforts; Cooperation | 28 |
| 6.6 | Further Assurances | 28 |
| 6.7 | Insurance Matters | 28 |
| 6.8 | Receipt of Misdirected Assets; Liabilities | 28 |
| 6.9 | Acknowledgment by Purchaser | 29 |
| 6.10 | Guaranty | 31 |
| | | |
| **ARTICLE VII** | **CONDITIONS TO CLOSING** | **32** |
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 32 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 32 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 33 |
| 7.4 | Waiver of Conditions | 33 |
| | | |
| **ARTICLE VIII** | **TERMINATION** | **33** |
| 8.1 | Termination of Agreement | 33 |
| 8.2 | Effect of Termination | 34 |
| | | |
| **ARTICLE IX** | **TAXES** | **35** |
| 9.1 | Transfer Taxes | 35 |
| 9.2 | Cooperation | 36 |
| | | |
| **ARTICLE X** | **MISCELLANEOUS** | **36** |
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 36 |
| 10.2 | Expenses | 37 |
| 10.3 | Notices | 37 |
| 10.4 | Binding Effect; Assignment | 38 |
| 10.5 | Amendment and Waiver | 38 |
| 10.6 | Third Party Beneficiaries | 38 |
| 10.7 | Non-Recourse | 38 |
| 10.8 | Severability | 39 |
| 10.9 | Construction | 39 |

**TABLE OF CONTENTS**

**Page**

10.10      Schedules ...................................................................39
10.11      Complete Agreement ....................................................40
10.12      Specific Performance ....................................................40
10.13      Jurisdiction and Exclusive Venue................................40
10.14      Governing Law; Waiver of Jury Trial ........................41
10.15      No Right of Set-Off ......................................................42
10.16      Counterparts and PDF..................................................42
10.17      Publicity ......................................................................42
10.18      Bulk Sales Laws...........................................................42
10.19      Fiduciary Obligations...................................................42
10.20      Release ........................................................................43
10.21      Sellers' Representative.................................................43

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS........................44**
11.1       Certain Definitions.......................................................44
11.2       Index of Defined Terms ...............................................51
11.3       Rules of Interpretation .................................................52

**INDEX OF EXHIBITS**

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
                    AGREEMENT
EXHIBIT B    FORM OF TRADEMARK ASSIGNMENT AGREEMENT
EXHIBIT C    FORM OF BIDDING PROCEDURES ORDER
EXHIBIT D    FORM OF PLAN

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of June 9, 2023, is made by and among Pantogran LLC, a Delaware limited liability company ("<u>Purchaser</u>"), Doreen Granpeesheh ("<u>Granpeesheh</u>"), Sangam Pant ("<u>Pant</u>", and together with Granpeesheh, the "<u>Guarantors</u>") and Card Holdings, LLC a Delaware limited liability company ("<u>Holdings</u>") and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "<u>Seller</u>" and collectively "<u>Sellers</u>"). Purchaser and Sellers are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, within 3 days following the date hereof, Sellers shall commence voluntary cases (collectively, the "<u>Bankruptcy Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), which cases are jointly administered for procedural purposes; and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Plan and subject to the entry and terms of the Confirmation Order and the effectiveness of the Plan;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Confirmation Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)     subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party, including the Contracts listed on <u>Schedule 1.1(a)</u>, and all purchase orders, to the extent assignable under applicable Law (the "<u>Assigned Contracts</u>");

(b)     all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

(c)     all Documents and data, including (without limitation) all rights, interests, assets, Intellectual Property, and data associated with Skills Global and Skill;

(d)     all Patient Records;

(e)     the Leased Real Property listed on <u>Schedule 1.1(e)</u> (including the leases related thereto, the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(f)     all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller;

(g)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(h)     to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(i)     the sponsorship of, and all rights, interests and assets associated with, the Seller Plans (collectively, the "<u>Assumed Benefit Plans</u>");

(j)     all Intellectual Property of Sellers, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including (without limitation) all Intellectual Property and all other rights, interests, and assets associated with Institute for Behavioral Training;

(k)     all inventory and supplies of the Sellers;

2

(l)     all goodwill, payment intangibles and general intangible assets and rights of Sellers; and

(m)     (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law of the Sellers or their estates and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller (including in its capacity as the managing member or manager of another Person) or its estate against any member of the Seller Group or Sangam Pant (other than in his capacity as a Guarantor hereunder) and The Sangam Pant and Supriya Pande Irrevocable Trust dated December 18, 2015, The Sangam Pant and Supriya Pande Revocable Trust dated June 28, 2012, and Sangam Pant and Supriya Pande Charitable Remainder Trust, in each case, arising out of or relating to events occurring on or prior to the Closing Date, other than any claim under this Agreement or any Transaction Agreement (the claims and causes of action set forth in this Section 1.1(m) "Transferred Claims") (which Transferred Claims against any member of the Seller Group are for the avoidance of doubt Released Claims pursuant to Section 10.20).

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):

(a)     all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)     the Contracts of Sellers listed on Schedule 1.2(b)(ii) (the "Excluded Contracts");

(c)     all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, or (iii) that any Seller is required by Law to retain; provided that Purchaser shall have the right to make copies of any portions of such Documents to the extent not prohibited by applicable Law and Sellers shall provide Purchaser access to such Documents;

(d)     all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers'

3

businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(e)     all current and prior insurance policies of any Seller that are not Assumed Benefit Plans, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)     all Equity Interests of any Seller or any of their respective Subsidiaries;

(g)     (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (other than Transferred Claims), and (iii) all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)     Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)     all Tax refunds, Tax attributes and Tax assets;

(j)     every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(k)     all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date; and

(l)     all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries.

1.3     <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Confirmation Order, effective as of the Closing, in addition to the payment

of the Cash Payment in accordance with <u>Section 2.1</u>, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)     all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;

(d)     all Liabilities, including all accounts payable and trade payables arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;

(e)     all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)     without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; and (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period as limited to the amount incurred after the Closing Date;

(g)     all Liabilities related to the Transferred Employees, except for any Liabilities with regard to compensation prior to the Closing Date and/or arising under retention and/or severance agreements entered into prior to the Closing Date and except as otherwise set forth herein;

(h)     the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Assumed Benefit Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;

(i)     all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement; and

(j)     all other Liabilities to the extent related to the Acquired Assets that arise after the Closing.

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").  For the avoidance of doubt, Purchaser shall have no liability or responsibility to any employee of Sellers who is not a Transferred Employee and Purchaser's assumption of liability to Transferred Employees is limited as set forth above and as otherwise set forth in this Agreement.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of the motion seeking entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Confirmation Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs as part of the Cash Payment (as defined below) and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than purchase orders or the Acquired Leased Real Property) that it does not wish to assume or a Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract (other than those Contracts set forth on Schedule 1.2(b)(ii) as of the date hereof) up to one Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract (other than purchase orders or the Acquired Leased Real Property) that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract (other than those Contracts set forth on Schedule

6

1.2(b)(ii) as of the date hereof) that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(c)     <u>Non-Assignment</u>.

(i)     Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)     Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Confirmation Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this Section 1.5(c)(ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s), if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Confirmation Order. Notwithstanding anything herein to the contrary, no Seller will be obligated to pay any consideration therefor

7

to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment.

(a)     The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $25,000,000 (the "Cash Payment").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller an amount in cash (the "Closing Date Payment") equal to the Cash Payment minus an amount equal to the Deposit.

(c)     The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2     Deposit.

(a)     Purchaser has, on or prior to the date hereof, made an earnest money deposit with Acquiom Clearinghouse LLC  (the "Escrow Agent") in the amount equal to $2,500,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the escrow agreement entered into on the date hereof among Holdings, Purchaser, and the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)     If this Agreement has been terminated by Holdings pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(b) or 8.1(c), in each case in circumstances where Holdings would be entitled to terminate this Agreement pursuant to Section 8.1(d) or 8.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)     If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.

(d)     The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the

consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

       (e)     If the Closing occurs, the Deposit shall be transferred to Seller.

     2.3    <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities in accordance with this Agreement and the Confirmation Order (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>."

     2.4    <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser:

       (a)     a bill of sale and assignment and assumption agreement substantially in the form of <u>Exhibit A</u> (the "<u>Assignment and Assumption Agreement</u>") duly executed by the applicable Sellers;

       (b)     a short-form trademark assignment agreement substantially in the form of <u>Exhibit B</u> (the "<u>Trademark Assignment Agreement</u>"), duly executed by the applicable Sellers;

       (c)     an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; and

       (d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Holdings certifying that the conditions set forth in <u>Sections 7.2(a)</u> and <u>7.2(b)</u> have been satisfied.

     2.5    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

       (a)     the Closing Date Payment;

       (b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

       (c)     the Trademark Assignment Agreement, duly executed by Purchaser; and

       (d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied.

2.6     <u>Withholding</u>. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under <u>Section 2.4(c)</u>.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (ii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to <u>Section 10.10</u>, Sellers represent and warrant to Purchaser as follows.

3.1     <u>Organization and Qualification</u>. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation.

3.2     <u>Authorization of Agreement</u>. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3     <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 3.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the Transactions, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Seller,

10

except, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4     Intentionally Omitted.

3.5     Financial Statements. Attached to Schedule 3.5 are Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries audited consolidated balance sheets as of December 31, 2021 and as of December 31, 2020, and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for each fiscal year then ended (collectively, the "Audited Financial Statements"). The Audited Financial Statements have been prepared in all material respects in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of Center for Autism and Related Disorders, LLC and its respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

3.6     Title to Properties.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, one or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers which constitutes an Acquired Asset (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). None of the Sellers owns any real property.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Sellers hold good title to, or a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Sellers and the Acquired Assets, taken as a whole.

3.7     Contracts.

(a)     Schedule 3.7 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)     relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)     provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $10,000, other than letters of credit;

11

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $10,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $10,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Sellers);

(iv)    is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, inventory, Equipment, or other assets pursuant to which Sellers would reasonably be expected to make payments of more than $10,000 during any fiscal year; or

(v)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property that is material to Sellers, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) and (B), other than (1) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (2) Contracts entered into in the Ordinary Course granting exclusive rights to certain of Sellers, services or containing "most favored nation" provisions with respect to certain of Seller's, products or (z) any provision in any license agreements for Intellectual Property limiting Seller's, use of such Intellectual Property to specified fields of use or specified territories.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases and (iii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of Sellers (other than with respect to late payments) under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.8     No Litigation. Except as set forth in Schedule 3.8, there are no material Actions pending or, to Sellers' knowledge, threatened in writing against or affecting any of the Sellers that will materially adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the Transactions.

3.9     Permits; Compliance with Laws. Except as set forth in Schedule 3.9, each Seller is, and has been since January 1, 2023, in compliance in all material respects with all state or federal laws, statutes, or regulations ("Laws") or Orders, applicable to such Seller, and each Seller holds all licenses, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of its respective business (collectively, "Permits"), except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2023, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and regulations promulgated thereunder.

3.10     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws, (b) since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Sellers possesses and are in compliance with all Permits required under Environmental Laws for the operation of their businesses as currently conducted ("Environmental Permits"), (d) except as set forth in Schedule 3.10, there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, and (f) no Seller has released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Sellers to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11     Intellectual Property.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers own all of the rights, title and interest in and to the Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property is subsisting, valid and enforceable.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Sellers with respect to the Acquired Assets as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual

13

Property with respect to the Acquired Assets; provided that nothing in this Section 3.11(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(d).

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person, in each case with respect to the Acquired Assets.

(d)     Except as set forth on Schedule 3.11(d), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2022, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to Sellers and (ii) the operation of the business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person, in each case with respect to the Acquired Assets.

3.12    Tax Matters.

(a)     Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns with respect to the Acquired Assets required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are correct and complete in all material respects.

(b)     All material Taxes owed by a Seller with respect to the Acquired Assets that are due and payable on any Tax Return have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)     There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)     None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(e)     Except to the extent that doing so would not adversely impact the Acquired Assets or the Purchaser's ownership of the Acquired Assets, none of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(f)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 and Section 3.13 (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    <u>Assumed Benefit Plans</u>.

(a)    With respect to each material Assumed Benefit Plan, Sellers have made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the material terms thereof, including any amendments thereto, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description and (v) each current material related insurance Contract or trust agreement.

(b)    Each Assumed Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to Purchaser.

(c)    None of the Sellers maintains, contributes to, or has any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d)    No Assumed Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(e)    The consummation of the Transactions will not (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Assumed Benefit Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by Purchaser or any of its Affiliates.

3.14    <u>Employees</u>. None of the Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of a Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) no demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union and (ii) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work

15

stoppage by or with respect to the employees of any Seller. Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.15    Affiliate Transactions. Except as set forth on Schedule 3.16, no Affiliate of any Seller, or, to the Knowledge of Sellers, any officer or director of any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.16    Brokers. Except for Livingstone, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Livingstone) (the "Information Presentation") or in that certain datasite administered by SmartRoom (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1     Organization and Qualification. Purchaser is a Delaware limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2     Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     Conflicts; Consents.

(a)     Assuming that (i) requisite Bankruptcy Court approvals are obtained and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(a) are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually

17

or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)     Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

4.4     Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     Brokers. Except for Calex Partners, all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.6     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

4.7     Investment Representation; Investigation. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which the Acquired Assets operate and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded appropriate access to the books and records, facilities and personnel of the Acquired Assets and Assumed Liabilities for purposes of conducting a due diligence investigation and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of managers (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9     Solvency. Purchaser is, and immediately after giving effect to the Transactions shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

4.10    Tax Matters. No person who is or has been treated as a partner of Holdings, for US federal income tax purposes is or is reasonably expected to become a partner of Purchaser (or its direct or indirect regarded parent, if applicable), for US federal income tax purpose.

4.11    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

4.12    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the Transactions. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller, or the quality, quantity or condition of any Seller's assets (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not

19

relying on, and will not rely on, any Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1     Bankruptcy Actions.

(a)     As promptly as practicable after the date hereof, Sellers shall file with the Bankruptcy Court (i) the petitions to commence the Bankruptcy Cases, (ii) a motion seeking approval of (A) the Bidding Procedures Order; and (B) the form of this Agreement and Sellers' authority to enter into this Agreement (the "Bidding Procedures Motion") and (iii) the Plan and the Plan Solicitation Motion; provided that Sellers may modify the Bidding Procedures Motion and the Plan Solicitation Motion pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications to the Bidding Procedures Motion being acceptable to Purchaser in its commercially reasonable discretion.

(b)     The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(c)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and the Confirmation Order.

(d)     The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order, the Plan Solicitation Order, and the Confirmation Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist obtaining Bankruptcy Court approval of the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions, as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement.

(f)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the later of (i) 45 days following the hearing to consider the Confirmation Order and (ii) such other date as this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Sellers may consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(g)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining Bankruptcy Court approval of the Confirmation Order and a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(i)     Nothing in this Section 5.1 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

5.2     Cure Costs. Subject to entry of the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs (as part of the Cash Payment) and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3     Confirmation Order. The Confirmation Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability.

5.4     Approval. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Confirmation Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Sellers.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their commercially reasonable efforts to carry on their business in the Ordinary Course except as would not reasonably be expected to be material to Sellers; provided that no action by any Seller or one of its Subsidiaries with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an

Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not:

(i)      sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets for consideration, individually or in the aggregate, in excess of $10,000, except (A) Ordinary Course dispositions of inventory and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of the Sellers, (B) transfers among the Sellers or their Subsidiaries, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(ii)      except as permitted under <u>Section 6.1(b)(ii)</u>, and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger), except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to include acquisitions of inventory in the Ordinary Course);

(iii)      except (A) in the Ordinary Course or (B) pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $75,000 per annum, (5) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (6) take any action to accelerate any rights or benefits under any Assumed Benefit Plan; <u>provided</u> that the foregoing shall not restrict any Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(iv)      make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(v)      grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under <u>Section 6.1(b)(i)</u>;

23

(vi)     settle any pending or threatened Action against any Seller that would result in an Assumed Liability in an amount in excess of $50,000; or

(vii)     authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)     Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by any Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this <u>Section 6.1</u> and (ii) any action taken, or omitted to be taken, by a Seller to protect the business of such Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its sole and reasonable discretion (any action or inaction described in <u>clauses (i)</u> or <u>(ii)</u> of this <u>Section 6.1(c)</u>, a "<u>COVID-19 Response</u>"), shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

6.2     <u>Access to Information</u>.

(a)     From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Sellers will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the Transactions, (iii) all requests for access will be directed to Livingstone or such other Person(s) as Sellers may designate in writing from time to time, and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the Transactions are not consummated, (B) would require any Seller to disclose any financial or proprietary information of or regarding the Affiliates of any Seller (other than Sellers themselves) or otherwise disclose information regarding the Affiliates of any Seller (other than Sellers themselves) that such Seller deems to be commercially sensitive, (C) would waive any legal privilege, or (D) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty. Notwithstanding anything to the contrary contained herein, no COVID-19 Response by any Seller shall be deemed to violate or breach this <u>Section 6.2</u> in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)     The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of consummating the Transactions, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the Transactions without the prior written consent of Seller for each such contact. Notwithstanding the foregoing, Seller agrees that Purchaser's representatives shall be provided reasonable access to and shall be allowed to meet with and interview Seller's employees for the purposes set forth in <u>Section 6.3</u> commencing the first business day following the date of this Agreement and Seller shall provide reasonable assistance in arranging and facilitating such meetings and interviews, in each case which shall be upon reasonable advance notice and during normal business hours and conducted in a manner which does not unreasonably interfere with the ongoing operations of the business of the Sellers or the bankruptcy proceedings or Auction.

6.3     <u>Employee Matters</u>.

(a)     At least 10 Business Days prior to Closing, Purchaser shall extend to each employee of Sellers (other than those employees set forth on <u>Schedule 6.3</u>), a written offer of employment providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing (including level of responsibility, primary location of

employment and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") and that, if accepted, shall become effective immediately after the Closing. Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees." Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates. Notwithstanding the foregoing or anything else set forth in this Agreement, Purchaser is not required to provide written offers to executive employees (VP and up) that are as favorable as existing arrangements with regard to pay, bonuses, severance, and any other agreements with such executives. Further, notwithstanding the foregoing or anything else set forth in this Agreement, Purchaser may amend Schedule 6.3 by adding or subtracting those employees set forth on Schedule 6.3 at any time prior to ten (10) Business Days prior to the Closing by written notice to Sellers.

(b)     For a period of one (1) year from and after the Closing Date, Purchaser intends to provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is not lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) cash bonus opportunities that are no less favorable in the aggregate than those provided to such Transferred Employee as of immediately prior to the Closing; and (iii) other employee benefits that are no less favorable in the aggregate than those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date, Purchaser intends that each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date and shall

otherwise be solely responsible for paying, providing and satisfying when due all compensation accruing, incurred or arising as a result of employment on or after the Closing Date with respect to the Transferred Employees.

(e)      The provisions of this <u>Section 6.3</u> are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this <u>Section 6.3</u> or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this <u>Section 6.3</u>, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment. Following the Closing, Sellers shall not enforce non-competition or non-solicitation restrictive covenants against any Transferred Employee (which for the avoidance of doubt do not include restrictive covenants with respect to confidentiality and non-disparagement) and any such restrictive covenants which are not Transferred Assets shall be deemed terminated and cancelled as of the Closing (for the avoidance of doubt this sentence shall not apply to any restrictive covenants referenced in or set forth in the Side Letter).

(f)      Effective as of the Closing, Purchaser and Purchaser's Affiliates shall be responsible for all obligations, liabilities and commitments in respect of claims arising after the Closing made by any Transferred Employee and solely based on events, actions or conduct occurring after the Closing.

(g)      Purchaser shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

6.4      <u>Regulatory Approvals</u>.

(a)      Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any material filings required to be made by the Purchaser Group pursuant to <u>Section 6.4(b)</u>, if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings required to be made pursuant to this <u>Section 6.4(a)</u> or <u>Section 6.4(b)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)      Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> and

(B) use reasonable best efforts to take all actions necessary to obtain all required clearances. For the avoidance of doubt, Purchaser shall be responsible for all filings pursuant to Sections 6.4(a) and 6.4(b), except where Sellers are obligated in accordance with submission guidelines to file on behalf of Purchaser.

6.5     Reasonable Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Closing to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of Sellers pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Plan Solicitation Order and the Confirmation Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.7     Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.8     Receipt of Misdirected Assets; Liabilities.

(a)     From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller

for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)     From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

6.9     Acknowledgment by Purchaser.

(a)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, or the quality, quantity or condition of any Seller's assets, are, in each case, specifically disclaimed

by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Sellers, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this <u>Section 6.9</u>, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this <u>Section 6.9</u> (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this <u>Section 6.9</u>, Seller would not enter into this Agreement.

6.10    Guaranty.

(a)    The Guarantors collectively hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to Sections 2.1 (the matters set forth in clauses (i), (ii), and (iii), collectively, "Guaranteed Obligations"). Doreen Granpeesheh shall have responsibility allocated and limited to 60% of the Guaranteed Obligations. Sangam Pant shall have responsibility allocated and limited to 40% of the Guaranteed Obligations.

(b)    If Purchaser fails to perform any of the Guaranteed Obligations, then each Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)    Notwithstanding any other provision of this Section 6.10, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless the Seller against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this Section 6.10, including Section 6.10(f) and 6.10(h).

(d)    The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Section 6.10 and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this Section 6.10.

(e)    The Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to the Guarantors but not available to Purchaser, and each Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)    The guarantee by the Guarantors contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser of all of the Guaranteed Obligations and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and the Guarantors shall stand discharged of all of its obligations under this guarantee. The Guarantors shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this Section 6.10, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. The Guarantors' obligations under this Section 6.10 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

31

(g)      The liability of the Guarantors under this <u>Section 6.10</u> shall be unlimited (except as set forth above with regard to the allocation to and between Guarantors) and unconditional, and this <u>Section 6.10</u> shall be a continuing guaranty.

(h)      Each Guarantor hereby makes the representations and warranties set forth in <u>Article IV</u> as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1      <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)      no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)      the Bankruptcy Court shall have entered the Confirmation Order and the Plan shall become effective in accordance with its terms.

7.2      <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> or in <u>Section 3.7</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.16</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)      Sellers shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Sellers under this Agreement on or prior to Closing; and

(c)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3     Conditions Precedent to the Obligations of Sellers. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)     Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

7.4     Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VIII
## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Holdings and Purchaser;

(b)     by written notice of either Purchaser or Holdings, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)     by written notice of either Purchaser or Holdings, if the Closing shall not have occurred on or before September 15, 2023 (the "Outside Date") (or such later date as provided in Section 5.1(f)); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)      by written notice from Holdings to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Holdings may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Holdings at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)      by written notice from Purchaser to Holdings, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Holdings of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)      by written notice from Holdings to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(g)      by written notice from Holdings to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)      by written notice of either Purchaser or Holdings, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(i)      by written notice from either Purchaser or Sellers, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction or (ii) is the Backup Bidder at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder.

8.2      Effect of Termination.

(a)      In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses

(which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 8.1(g), 8.1(h), or 8.1(i), Seller shall pay to Purchaser a break-up fee in an amount equal to $750,000 (the "Breakup Fee") and an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed $350,000 ("Expense Reimbursement"); provided that the Breakup Fee and the Expense Reimbursement shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Seller.

(c)     Subject in all cases to Section 10.12, prior to the Closing, in the event of any breach by Seller of this Agreement, whether or not a Willful Breach, or any failure of the Transactions to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1 and, if applicable, to receive the Expense Reimbursement and/or the Breakup Fee, as applicable, in accordance with Section 8.2(b), if payable thereunder. Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of the Bidding Procedures Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against the Seller under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case.

(d)     Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2 are an integral part of this Agreement and that the Breakup Fee and the Expense Reimbursement are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Breakup Fee and Expense Reimbursement, as applicable, are payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

## ARTICLE IX
## TAXES

9.1     Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this

Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2 <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

**ARTICLE X**
**MISCELLANEOUS**

10.1 <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions. Purchaser, for itself and on behalf of the Purchaser Group, acknowledge and agree that to the fullest extent permitted under applicable Law, including by contractually shortening the applicable statute of limitation, any and all rights, claims and causes of action, whether known or unknown, it may have against any member of the Seller Group relating to the Acquired Assets, the Assumed Liabilities, the operation of the Sellers and their respective Subsidiaries or their respective businesses or relating to the subject matter of this Agreement or the Schedules, whether arising under, or based upon, any Law (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages or any other recourse or remedy, including as may arise under common law or any other Law) are hereby irrevocably waived. Furthermore, without limiting the generality of this Section 10.1, no claim shall be brought or maintained by, or on behalf of, Purchaser or any member of the Purchaser Group against any member of the Seller Group, and no recourse shall be sought or granted against any member of the Seller Group, by virtue of, or based upon, any alleged misrepresentation or inaccuracy in, or breach of, any of the representations, warranties, covenants or agreements of the Seller or any other Person set forth or contained in this Agreement, the

36

Schedules, any certificate, instrument, opinion, agreement or other document of a Seller or any other Person delivered hereunder, the subject matter of this Agreement or the Schedules, the business or the ownership, operation, management, use or control of the business of any of the Sellers or their Subsidiaries, including the Acquired Assets and Assumed Liabilities, any of their assets, or any actions or omissions at, or prior to, the Closing. Nothing set forth in this Section 10.1 shall limit Section 10.20.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 9.1 and (b) all Cure Costs will be allocated to the Purchaser pursuant to Sections 1.3(b), 2.1(b), and 5.2.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

        Notices to Purchaser:

        **Pantogran LLC**
        Attention:     **Dr. Doreen Granpeesheh**
                    **Sangam Pant**
        Email:        **drgranpeesheh@gmail.com**
                    **sangampant@gmail.com**

        with a copy to (which shall not constitute notice):

        **Locke Lord LLP**
        **300 S. Grand Avenue, Suite 2600**
        **Los Angeles, CA 90071**
        Attention:     **David S. Kupetz**
        Email:        **David.kupetz@lockelord.com**
                    **Sean Feener**
                    **sean.feener@lockelord.com**

Notices to Sellers:

Card Holdings, LLC
c/o Center for Autism and Related Disorders, LLC
9089 S Pecos Rd., Suite 3600
Henderson, NV 89074
Attention:     **Michelle Rapoport, General Counsel**
Email:          **MichelleRapoport@centerforautism.com**

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Lauren M. Colasacco, P.C.
               Christopher T. Greco, P.C.
               Steve Toth
               Allyson B. Smith
Email:          lauren.colasacco@kirkland.com
               cgreco@kirkland.com
               steve.toth@kirkland.com
               Allyson.smith@kirkland.com

10.4   Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Confirmation Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5   Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6   Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7   Non-Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document delivered hereto, this Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as

38

a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any of the foregoing (collectively, a "Non-Recourse Party") will have any Liability and there will be no right of recovery or any claims against any Non-Recourse Party (in each case whether in contract, tort, equity, through piercing or attempted piercing of the corporate veil, or otherwise, whether known or unknown, contingent or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute, and each of the Non-Recourse Parties are intended third party beneficiaries of this Section 10.7 and shall be entitled to enforce this Section 10.7 as if a party directly hereto.

10.8     Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9     Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10     Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan,

arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13   Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether

sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

      10.14   Governing Law; Waiver of Jury Trial.

      (a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

      (b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES

HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order and the Plan. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20   <u>Release</u>. Effective as of the Closing, each of Purchaser and the Guarantors (on behalf of themselves and the other Releasing Parties) (and, from and after the Closing, shall cause their respective Subsidiaries and Affiliates and each of its and their respective current and former officers, directors, employees, equityholders, partners, members, Advisors, successors and assigns (collectively with Purchaser and the Guarantors, the "<u>Releasing Parties</u>") to) hereby irrevocably and unconditionally releases and forever discharges each member of the Seller Group (collectively, the "<u>Released Parties</u>") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, obligations, liabilities, counterclaims, defenses, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever of any kind, nature or description, whether known or unknown or arising in law or equity, which the Releasing Parties may have against each of the Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to any of the Released Parties, the Acquired Assets, the Assumed Liabilities or otherwise occurring or arising on or prior to the Closing Date (collectively, the "<u>Released Claims</u>"), and each of the Releasing Parties hereby agrees not to sur or bring any action in respect of the Released Claims. The Released Claims shall include, but are not limited to, those actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts, covenants, claims and demands arising out of, or relating to, the organization, management or operation of the businesses of the Sellers or of their respective Subsidiaries relating to any matter, occurrence, action or activity on or prior to the Closing Date including the businesses associated with the Acquired Assets and their capital structure;

(b)      relating to this Agreement and the transactions contemplated hereby (including Article V hereto and the transactions contemplated thereby or which occur in connection therewith);

(c)      arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement contained in this Agreement, the Schedules, exhibits and annexes hereto, in any document delivered in connection herewith or contemplated hereby or in any certificate contemplated hereby and delivered in connection herewith; and

(d)      relating to any information (whether written or oral), documents or materials furnished by or on behalf of the Sellers and their Subsidiaries and/or Affiliates.

The Released Parties to whom this <u>Section 10.20</u> applies shall be express third party beneficiaries of this <u>Section 10.20</u>. The releases contemplated in this <u>Section 10.20</u> is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties.

10.21 <u>Sellers' Representative</u>. Each Party agrees that Holdings has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Holdings on behalf of the Sellers.

**ARTICLE XI**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

11.1 <u>Certain Definitions</u>.

(a) "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b) "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c) "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d) "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires a material portion of the Acquired Assets or equity of the Sellers, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, none of a liquidation or wind-down of Sellers' estates or the Plan shall be an Alternative Transaction.

(e) "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f) "<u>Bidding Procedures Order</u>" means an Order substantially in the form attached hereto as <u>Exhibit D</u>.

(g) "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

44

(h)      "<u>Cash and Cash Equivalents</u>" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(i)      "<u>Confidentiality Agreement</u>" means those certain confidentiality agreements, dated as of November 10, 2022, and May 13, 2023, by and between Sangam Pant and Investor Group and Holdings and Yasoca Partners, LP and Holdings, respectively.

(j)      "<u>Confirmation Order</u>" mean an Order of the Bankruptcy Court (i) pursuant to section 1129 of the Bankruptcy Code confirming the Plan in a form reasonably acceptable to Seller and, solely to the extent related to this Agreement and the Transactions, Purchaser, as may have been amended, supplemented or otherwise modified with the consent of Seller and, solely to the extent related to this Agreement and the Transactions, Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (ii) approving this Agreement in a form reasonably acceptable to the Parties and (iii) authorizing Seller to undertake the Transactions, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code in a form reasonably acceptable to the Parties.

(k)      "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(l)      "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

(m)      "<u>Disclosure Statement</u>" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(n)      "<u>Documents</u>" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(o)      "<u>Encumbrance</u>" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title

retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(p)     "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(q)     "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(r)     "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(s)     "ERISA" means the Employee Retirement Income Security Act of 1974.

(t)     "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(u)     "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(v)     "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether federal or, state, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(w)     "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(x)     "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property.

(y)     "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Michelle Rapoport and Jennifer Webster, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(z)      "Law" means any federal or state, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, regulation, or Order, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(aa)      "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(bb)      "Livingstone" means Livingstone Partners LLC.

(cc)      "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(dd)      "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any Equipment or supplies necessary to or used in the provision of services by any Seller; (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for

the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in <u>Section 6.1</u> or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets, Assumed Liabilities, or employees, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xv)(A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Plan Solicitation Order, the Plan, the Confirmation Order or the reorganization or liquidation of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith.

(ee)    "<u>Order</u>" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Confirmation Order).

(ff)    "<u>Ordinary Course</u>" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and past practice in light of the current pandemic, epidemic or disease outbreak; <u>provided</u> that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the ordinary course of business.

(gg)    "<u>Patient Records</u>" means any of the Sellers' written and electronic patient files for all patients that were created as a result of services provided by the Sellers or clinical providers acting on behalf of the Sellers, including, but not limited to, treatment records and plans, observations, medical and behavioral history, progress summaries, clinical documentation, forms, authorizations, consents, notes, client data, insurance information, personally identifying

48

information, discharge plans, and all other documentation required to be stored or kept in accordance with applicable laws and payor agreements.

(hh)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on Schedule 11.1(hh), and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Confirmation Order.

(ii)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(jj)    "Plan" means a plan of reorganization of Sellers in the form attached hereto as Exhibit E, together with such changes as are approved by Sellers and, solely to the extent related to this Agreement and the Transactions, approved by Purchaser in its reasonable discretion.

(kk)    "Plan Solicitation Motion" means Sellers' motion for an Order, (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory Contracts and unexpired leases under the Plan.

(ll)    "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, approve the relief sought in the Plan Solicitation Motion, including (i) the Disclosure Statement and (ii) the commencement of a solicitation of votes to accept or reject the Plan.

(mm)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser, and each of their respective direct and indirect equityholders, and each of their respective former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, agents, Advisors, successors or permitted assigns.

(nn)    "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(oo)    "Seller Group" means each Seller and any of its Affiliates and funds or partnerships managed or advised by it or its respective Affiliates, including Cardinal Buyer, LLC, and each of their respective direct and indirect equityholders, former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, investment vehicles, agents, Advisors, predecessors, successors or permitted assigns.

(pp)    "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by any Seller that is an Acquired Asset.

(qq)    "Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(rr)    "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(ss)    "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(tt)    "Side Letter" means that certain letter agreement, dated as of the date hereof, by and among Holdings, Center for Autism and Related Disorders, LLC, Cardinal Buyer, LLC, Donisocha, Inc., Doreen Granpeesheh Living Trust, DG Charitable Remainder Trust, Haftchance LLC, YASOCA Partners, LP and Dr. Doreen Granpeesheh.

(uu)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(vv)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment,

disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ww)   "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(xx)   "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(yy)   "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement, including the Side Letter.

(zz)   "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(aaa)   "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2   Index of Defined Terms.

Acquired Assets ...........................................2
Acquired Leased Real Property ..................2
Agreement ...................................................1
Agreement Dispute ....................................44
Assigned Contracts .....................................2
Assignment and Assumption Agreement ..11
Assumed Benefit Plans ...............................3
Assumed Liabilities ....................................5
Audited Financial Statements...................13
Backup Bidder ..........................................23
Bankruptcy Cases .......................................1
Bankruptcy Code ........................................1
Bankruptcy Court........................................1
Bidding Procedures Motion......................22
Breakup Fee ..............................................38
Cash Payment .............................................9
Chosen Courts...........................................44
Closing ......................................................10
Closing Date .............................................10
Closing Date Payment ................................9
COVID-19 Response .................................26
Cure Costs...................................................5
Dataroom ..................................................18
Deposit ......................................................10

Effect.........................................................50
Enforceability Exceptions.........................12
Environmental Permits .............................15
Escrow Agent............................................10
Excluded Assets..........................................3
Excluded Contracts.....................................3
Excluded Liabilities ....................................7
Expense Reimbursement ..........................38
Express Representations ............................18
Fundamental Representations...................35
Guaranteed Obligations ............................34
Guarantor ....................................................1
Holdings.......................................................1
Information Presentation ..........................18
Laws...........................................................15
Material Contract ......................................14
Outside Date .............................................36
Parties ..........................................................1
Party.............................................................1
Permits ......................................................15
Projections ................................................33
Purchase Price.............................................9
Purchaser.....................................................1
Responsible Person Liabilities...................6

| | | | |
|---|---|---|---|
| Seller | 1 | Transfer Offer | 28 |
| Sellers | 1 | Transfer Taxes | 39 |
| Successful Bidder | 23 | Transferred Employees | 28 |
| Trademark Assignment Agreement | 11 | WARN Act | 30 |

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**PANTOGRAN LLC**

By:    Donisocha, Inc.
Its:    Manager

By:    _____
Name:  Doreen Granpeesheh, Ph.D.
Title:  President

**GUARANTORS:**

Doreen Granpeesheh

_____

Sangam Pant

_____

**GUARANTORS:**

Doreen Granpeesheh

_____

Sangam Pant

_____

**SELLERS:**

Card Holdings, LLC

By: _____
Name:   Jennifer Webster
Title:   Authorized Signatory

Card Intermediate Holdings I, LLC

By: _____
Name:   Jennifer Webster
Title:   Authorized Signatory

Card Intermediate Holdings II, LLC

By: _____
Name:   Jennifer Webster
Title:   Authorized Signatory

Center for Autism and Related Disorders, LLC

By: _____
Name:   Jennifer Webster
Title:   Authorized Signatory

SKILLS Global, LLC

By: _____
Name:   Jennifer Webster
Title:   Authorized Signatory

**Exhibit D**

**Corporate Organization Chart**



**CARD**
**Corporate Structure Chart**



**Exhibit E**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS[1]

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either:  (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their restructuring, legal, and financial advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' Estates.  Because the net liquidation proceeds would provide for lower recoveries relative to the recoveries under the Plan, as illustrated by this Liquidation Analysis, the Debtors believe that holders of Claims would receive greater value under the Plan than the amounts such holders would receive if the Debtors were forced to liquidate under chapter 7, and that, as a result, the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

## I.    Statement of Limitations

THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES DESCRIBED ABOVE AND MAY NOT BE USED FOR ANY OTHER PURPOSE.

The Liquidation Analysis contains numerous estimates, including estimated Allowed Claims, based upon a review of the Debtors' financial statements to establish estimated amounts of certain liabilities.  The Liquidation Analysis includes estimates for Claims as part of the Chapter 11 Cases that could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind-down costs and Trustee fees.  To date, the Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.  **THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

The assumptions utilized in developing the hypothetical Liquidation Analysis are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors or a Trustee.  Accordingly, there can be no assurance that

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the disclosure statement to which this exhibit is attached (the "Disclosure Statement") or the *Joint Chapter 11 Plan of Center for Autism and Related Disorders, LLC and Its Debtor Affiliates* (as supplemented or amended from time to time, the "Plan"), as applicable.

1

the values assumed in the Liquidation Analysis would be realized if the Debtors' assets were actually liquidated.  In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Debtors recognize that there are other potential alternatives that could occur in a hypothetical chapter 7 liquidation that are not presented in the Liquidation Analysis, including alternatives that would give rise to reduced and delayed creditor recoveries.

**THE DEBTORS RESERVE THE RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.**

## II.    Key Assumptions Underlying the Hypothetical Liquidation

The following general assumptions were considered by the Debtors and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation.

### A.    Administrative Procedures and Conversion of Cases

The Liquidation Analysis assumes that each of the Chapter 11 Cases is converted to a case under chapter 7 and consolidated during the chapter 7 cases for procedural purposes only.  In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, Trustee fees, and operational costs would likely be higher than if the cases were consolidated.

### B.    Professionals Involved in the Chapter 7 Cases

As part of the chapter 7 cases, the Debtors assume that the Trustee would choose to retain certain professionals, including counsel, advisors, and investment bankers, among others, to provide expertise and assistance in the liquidation of the Debtors.  The Liquidation Analysis assumes that the existing counsel and advisors would be replaced by the Trustee with new professionals.

### C.    Timing Considerations of Chapter 7 Cases

The Liquidation Analysis assumes an orderly liquidation of substantially all of the Debtors' operations over a 3-month period commencing on or around June 11, 2023 (the "Conversion Date"). This timeline assumes substantially all of the Debtors' assets are to be realized and all remaining operations wound down by September 11, 2023, representing a three-month period following the Conversion Date.

The Liquidation Analysis assumes the Debtors' DIP Facility, which would be in default, would be unavailable as a source of liquidity, the use of cash collateral would be limited, and that the Debtors would not have funds to support any process other than an orderly and expedited wind-down of the Debtors' businesses by the Trustee to convert the Debtors' assets to cash and limit the amount of administrative expenses.  There can be no assurance, however, that a liquidation would be completed in a limited timeframe, nor is there any assurance that the recoveries assigned to the Debtors' assets would in fact be realized.  If the Debtors are not allowed the use of cash collateral, recoveries in a liquidation are likely to be materially less than shown in this Liquidation Analysis.

In an actual liquidation, the process and length of a wind-down could be significantly longer and more expensive than the amounts assumed herein and thereby significantly reduce the actual recoveries

compared to this analysis.

### D.   Trustee Fees for Chapter 7 Administration

Under section 326(a) of the Bankruptcy Code, for a case under chapter 7, the Court may allow reasonable compensation for the Trustee's services not to exceed three percent (3%) of the moneys disbursed or turned over in the case by the Trustee to parties in interest, excluding the Debtors, but including holders of secured Claims.  The Debtors assume in the Liquidation Analysis that such fees would be approximately three percent (3.0%) of gross liquidation proceeds, excluding cash.

### E.   Additional Claims

The cessation of the Debtors' business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the proposed Plan.  Examples of these kinds of Claims include tax liabilities triggered upon liquidation or from the sale of assets, Claims related to rejection of executory contracts, and litigation Claims.  While some of these Claims could be significant and may be entitled to priority in payment over General Unsecured Claims, no adjustment has been made for these potential Claims unless specified in the assumptions and notes to the Liquidation Analysis.

### F.   Basis of Presentation

The Liquidation Analysis is based on the unaudited balance sheets of the Debtors as of [April 30], 2023, with certain adjustments to reflect anticipated activity through to the Conversion Date. The Liquidation Analysis contemplates that the Debtors' operations and assets are sold on a liquidation basis.  This Liquidation Analysis is presented on a consolidated basis to show the recoveries of the Debtors' classes of creditors.

### G.   Liquidation Analysis

The Debtors assume a liquidation would be conducted pursuant to Chapter 7 of the Bankruptcy Code, with a Trustee appointed to manage the bankruptcy estate.  The Trustee would be responsible for liquidating the Debtors' assets in a manner intended to maximize the recovery to creditors.  Asset sale proceeds resulting from the liquidation process would be reduced by the expenses of the liquidation process prior to distributing such proceeds to any holders of allowed Claims.   The three major components of the liquidation process would be as follows:

- the generation of cash proceeds from the sale of assets and equity interests;
- administering and managing costs and post-conversion operational cash flow related to the liquidation process, such as personnel retention costs, claims reconciliation costs, estate wind down costs, and Trustee and professional fees; and
- the distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme under Chapter 7 of the Bankruptcy Code.

## III.   Consummation of the Plan Will Provide Greater Value than Under a Hypothetical Liquidation through Chapter 7 of the Bankruptcy Code

Because the distributions to holders of Claims under the Liquidation Analysis provide for lower recoveries relative to the recoveries under the Plan, the Debtors believe that Consummation of the Plan will provide greater value to such holders than would a liquidation under chapter 7 of the Bankruptcy

Code.

## IV.     Chapter 7 Liquidation Analysis for the Debtors

The schedule shown below presents the net liquidation proceeds available for distribution in a hypothetical Chapter 7 case. The Liquidation Analysis estimates the high and low asset recoveries, which are based on the asset book value as of April 30, 2023, except as otherwise indicated

| | | | Chapter 7 Liquidation Scenario | | | | Chapter 11 Asset Sale | |
|---|---|---|---|---|---|---|---|---|
| | | April 2023 | | Estimated Recovery Ranges | | | | |
| Account | Notes | Book Value | Low % | Low $ | High % | High $ | | Amount |
| *Current Assets* | | | | | | | | |
| Cash & Cash Equivalents | 1 | 2,036,451 | 100% $ | 2,036,451 | 100% $ | 2,036,451 | Forecasted Cash on Hand as of 8/13/23 $ | 411,291 |
| Net Accounts Receivable | 2 | 12,465,372 | 50% | 6,232,686 | 75% | 9,349,029 | | |
| Reserve for Doubtful Accounts | 3 | 21,671,564 | 1% | 216,716 | 5% | 1,083,578 | | |
| Unbilled Receivables | 4 | 6,683,345 | 0% | - | 0% | - | | |
| Miscellaneous Receivables | 5 | 179,941 | 0% | - | 0% | - | | |
| Deposits & Prepaids | 6 | 2,877,346 | 2% | 69,274 | 7% | 208,513 | | |
| **Total Current Assets** | | **45,914,018** | **19% $** | **8,555,127** | **28% $** | **12,677,571** | | |
| *Non-Current Assets* | | | | | | | | |
| Net Property, Plant & Equipment | 7 | 2,611,799 | 1% $ | 26,118 | 5% $ | 130,590 | | |
| Lease Right of Use | 8 | 28,845,036 | 0% | - | 0% | - | | |
| Goodwill | 9 | 39,000,000 | 0% | - | 0% | - | | |
| Intangibles | 10 | 8,084,250 | 1% | 80,843 | 3% | 242,528 | | |
| Other Non-Current Assets | 11 | 303,590 | 0% | - | 0% | - | | |
| **Total Non-Current Assets** | | **$ 78,844,675** | **0% $** | **106,960** | **0% $** | **242,528** | | |
| **Total Distributable Proceeds Before Liquidation Cost** | 12 | **$ 124,758,693** | **7% $** | **8,662,087** | **10% $** | **12,920,099** | **Distributable Sale Proceeds** | **$ 21,748,614** |
| **Less: Plan Administration Costs** | 13 | | | | | | | |
| Chapter 7 Professional Fees | 14 | | | $ 1,000,000 | | $ 1,500,000 | Investment Banking Fees | $ 1,000,000 |
| Trustee Fees | 15 | 3.00% | | 259,863 | | 387,603 | Estimated Wind Down Budget | 2,000,000 |
| Plan Administration | 16 | | | 100,000 | | 100,000 | | |
| **Total Plan Administration Costs** | | | | **$ 1,359,863** | | **$ 1,987,603** | | |
| **Net Liquidation Proceeds Available for Distribution** | 17 | | | **$ 7,302,225** | | **$ 10,932,496** | **Proceeds Available for Distribution** | **$ 19,159,906** |
| Claims | | | | | | | | |
| **DIP Claims** | | $ 52,310,195 | 14% $ | 7,302,225 | 21% $ | 10,932,496 | $ 52,310,195 | 37% $ 19,159,906 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Administrative Claims** | | $ - | n/a $ | - | n/a $ | - | $ - | n/a $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 1 - Other Secured Claims** | | $ - | n/a $ | - | n/a $ | - | $ - | n/a $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 2 - Other Priority Claims** | | $ - | n/a $ | - | n/a $ | - | $ - | n/a $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 3 - Credit Facility Claims** | | $ 244,775,857 | 0% $ | - | 0% $ | - | 244,775,857 | 0% $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 4 - General Unsecured Claims** | | $ 61,136,052 | 0% $ | - | 0% $ | - | 18,433,130 | 0% $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 5 - Intercompany Claims** | | $ - | n/a $ | - | n/a $ | - | $ - | n/a $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 6 - Intercompany Interests** | | $ - | n/a $ | - | n/a $ | - | $ - | n/a $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 7 - Existing Parent Interests** | | $ - | n/a $ | - | n/a $ | - | $ - | n/a $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |
| **Class 8 - Section 510(b) Claims** | | $ - | n/a $ | - | n/a $ | - | $ - | n/a $ - |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | - | | - | | - |

## Footnotes to Chapter 7 Liquidation Analysis

### 1.     Cash and Cash Equivalents

The Debtors' cash and cash equivalents balance is $2,036,451 and represents the forecasted amount as of the week ending June 11, 2023.

4

**2.      Accounts Receivable**

Accounts Receivable recoveries are based upon net accounts receivable outstanding as of April 30, 2023. These amounts account for outstanding accounts receivable including the existing reserve for doubtful accounts. The recovery percentages assume collection of 50% of net outstanding receivables in the low recovery case and 75% of net receivables in the high recovery case.

| Net Accounts Receivable Build | | April 2023 Value |
|---|---|---|
| Accounts Receivable | $ | 35,666,580 |
| AR Clearing | | (1,529,644) |
| Reserve for Doubtful Accounts | | (21,671,564) |
| Net Accounts Receivable | $ | 12,465,372 |

**3.      Reserve for Doubtful Accounts**

The reserve for doubtful accounts fully reserves for all accounts receivable over 365 days past due as of December 31, 2022, along with a formulaically driven reserve for all other accounts receivable including unbilled receivables in line with CARDs historical accounting policies and procedures. In a Chapter 7 liquidation scenario it is assumed that these reserves could potentially be sold to a collections agency generating de minims recoveries of 1% in the low case and 5% in the high case.

**4.      Unbilled Receivables**

Unbilled receivables represent certain billings or charges that have not been issued along with a $5 million true up entry in December 2022 to account for unbilled services not recognized under CARDs previous revenue recognition accounting policies. In the event of a Chapter 7 liquidation, it is assumed that these charges are ultimately not billed or received, resulting in a 0% recovery for these assets.

| Net Unbilled Receivables Build | | April 2023 Value |
|---|---|---|
| Unbilled Receivables | $ | 6,704,679 |
| Unbilled Co-Pay | | (21,334) |
| Net Unbilled Receivables | $ | 6,683,345 |

**5.      Miscellaneous Receivables**

Miscellaneous Receivables represent funds paid toward leasehold improvements that are eligible for refunds by landlords. It is assumed that landlords will hold any potential refunds in an effort to offset any lease damages resulting in a 0% recovery in both the low and high cases.

**6.      Deposits & Prepaid Expenses**

The Debtors' estimated book balance of deposits & prepaid expenses is approximately $2,877,346. Deposits include lease payments, prepaid insurance and other prepaid expenses and deposits. No agreements have been made with the lessors to return lease deposits. The Debtors expect landlords to keep any existing lease deposits to offset outstanding amounts under the lease agreements resulting in no recovery. The Debtors may recover additional cash from resolutions regarding the cancellation of prepaid insurance policies no longer required by the Debtors, but these recoveries are expected to be limited as the prepaid balance will continue to decrease leading up to a liquidation. The Chapter 7 Liquidation Analysis contemplates recovery of 10% to 20% for prepaid insurance and other deposits

5

and a 0% to 10% recovery on prepaid expenses. In aggregate, the Debtors estimate a net recovery range for deposits & prepaid expenses of 2% to 7%.

| | | April 2023 | Estimated Recovery Ranges | | | |
|---|---|---|---|---|---|---|
| **Deposits & Prepaid Expenses Build** | | **Book Value** | **Low %** | **Low $** | **High %** | **High $** |
| Prepaid Expense | $ | 699,645 | 0% | $          - | 10% | $    69,965 |
| Deposits - Leases | | 1,484,958 | 0% | - | 0% | - |
| Prepaid - Insurance | | 651,877 | 10% | 65,188 | 20% | 130,375 |
| Deposits - Other | | 40,866 | 10% | 4,087 | 20% | 8,173 |
| **Total Deposits & Prepaid Expenses** | $ | **2,877,346** | **2%** | $  **69,274** | **7%** | $  **208,513** |

7. **Property, Plant & Equipment**

Net Fixed Assets are comprised of owned equipment and office furniture (chairs, desks, tables, etc) of which some minimal recovery can be expected depending on the age, quality and condition of the items. A recovery range of 1% to 5% in the low and high cases, respectively, has been assumed.

8. **Lease Right of Use**

Lease right of use relates to a recognized asset related to lease right and the ability to use existing facilities in the operations of the business to generate revenues. In a Chapter 7 liquidation these lease rights would generate no recovery.

9. **Goodwill**

Goodwill comprised of assets not captured on the balance sheet and is associated with the assembled workforce driving CARD revenue. It is assumed there is no recovery on Goodwill.

10. **Intangible Assets**

Intangible assets reflect the Debtors' intangible assets as of April 30, 2023 and relates to the Debtors' intellectual property ("IP") in the form of patents, trademarks, clinical curriculum ("CARD Care Pathways") and websites (including SKILLS) that may carry de minimis value in the event of a Chapter 7 liquidation. The recovery range of 1% to 3% reflects estimates for what an interested party may pay for SKILLS, the CARD brand name and other IP.

11. **Other Non-Current Assets**

The Debtors' estimated book balance of other non-current assets is approximately $303,590. Other non-current assets include capitalized software which would not generate a recovery in a Chapter 7 liquidation.

12. **Total Distributable Value Before Liquidation Costs**

Represents the gross value generated through the sale / disposition of the Debtors' assets prior to liquidation related expenses.

13. **Chapter 7 Professional Fees**

Includes an estimate for certain professionals that would be retained by the Trustee during the Liquidation Period, including financial advisors and legal counsel. The Debtors estimate that Chapter 7 Professional Fees will range between $1,000,000 and $1,500,000.

**14.    Trustee Fees**

Trustee fees required to facilitate the sale and wind-down of the Debtors' assets, assumed to be 3% of Total Distributable Value. These fees are assumed to be used for marketing and administrative costs of the Trustee during the Liquidation Period.

**15.    Plan Administration Costs**

Plan administration costs include an estimate for incremental expenses that may be associated with winding down the Debtors' in a Chapter 7 liquidation scenario.

**16.    Net Liquidation Proceeds Available for Distribution**

Represents the net value available for distribution to the Debtors' claims.