IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| CENTER FOR AUTISM AND RELATED DISORDERS, LLC, *et al.*,[1] | ) ) ) ) | Case No. 23-90709 (DRJ) |
| Debtors. | ) ) ) | (Joint Administration Requested) (Emergency Hearing Requested) |

**DECLARATION OF JOSEPH GREENWOOD
OF LIVINGSTONE PARTNERS LLC IN SUPPORT OF
THE DEBTORS' EMERGENCY MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO
SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING
THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF
THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION
TO THE PREPETITION FIRST LIEN SECURED PARTIES PURSUANT TO
SECTIONS 361, 362, 363, AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING
LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Joseph Greenwood, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury to the best of my knowledge, information, and belief:

1. I am a Partner at Livingstone Partners LLC ("Livingstone"), an internationally recognized, middle-market investment banking firm with over 80 professionals located across offices in Chicago, Los Angeles, Amsterdam, Dusseldorf, Stockholm, Madrid and Beijing. Livingstone is the proposed investment banker for the above-captioned debtors and debtors in possession (collectively, the "Debtors").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192).  The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

2. I submit this declaration (the "Declaration") on behalf of Livingstone in support of the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Motion").[2]

3. Except as otherwise indicated, all statements in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, (b) my review of relevant documents, (c) information provided to me by Livingstone Partners and employees working under my supervision, (d) information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, and (e) my opinion based upon my experience as a restructuring professional. If called to testify, I could and would testify to each of the facts set forth herein on foregoing bases.

4. I am not being specifically compensated for this testimony other than through payments received by Livingstone as a professional retained by the Debtors.

**Professional Background and Qualifications**

5. I am a Partner and the head of the Special Situations practice at Livingstone. I have over 23 years of financial advisory experience, of which 20 years have involved advising debtors, creditors, and equity holders on a wide variety of recapitalization and restructuring transactions, both inside and outside of chapter 11. The vast majority of my experience over the last 20 years

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

2

has involved advising distressed clients in M&A and financing transactions. More specifically, my experience includes procuring, structuring, and negotiating debtor-in-possession financing facilities across a broad range of industries.

6.  I have been involved in numerous chapter 11 matters, including those of Gissing North America, Aztec Shaffer, Arro Foods, Maurice Sporting Goods, Quadrant 4 Systems Corp., Lectrus Corporation, Cardiac Science, IPC International, LB Steel, Hartmarx Corporation, Robbins Bros. Corporation, Renew Energy, Key Lime Cove Resort, Waterworks Holding Corp., American IronHorse Motorcycles, Gateway Ethanol, Budget Group, Inc., Kmart Corp., and UAL Corporation. Prior to joining Livingstone in April 2010, I held various positions, including being one of three founding members of William Blair's Restructuring Group and serving as a Vice President within KPMG's Corporate Recovery practice. I am a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor.

7.  I received a BBA in Accounting from the University of Wisconsin-Madison and an MBA with High Distinction from Georgetown University. I am principally responsible for overseeing the day-to-day activities of the Livingstone deal team in this engagement.

**Advisor Retention**

8.  In October 2022, the Debtors engaged Livingstone to act as their investment banker to assist with the Debtors' evaluation of strategic and capital structure alternatives. Since then, Livingstone has worked closely with the Debtors' management, board of managers, creditors, and other professionals and advisors to analyze the Debtors' business affairs, assets and liabilities, capital structure, and financial position and to explore various proposed strategic transactions and otherwise assist in the Debtors' restructuring efforts. As a result of our extensive experience with the Debtors, I, and the Livingstone team, have become familiar with the Debtors' capital structure, liquidity needs, and business operations.

9. Livingstone and the Debtors' other advisors met regularly and evaluated a number of strategic and capital structure alternatives, including potential sales, mergers, financings, and amendments in connection with potential out-of-court and in-court restructuring options. Livingstone, along with the Debtors' other advisors, played an active role in (a) performing various financial analyses of the Debtors, (b) soliciting and analyzing multiple sale bids from potential purchasers, (c) meeting with the Debtors' existing creditor groups and their respective advisors in order to negotiate potential restructuring solutions, (d) preparing for the commencement of these Chapter 11 Cases, and (e) assisting the Debtors with soliciting, negotiating and documenting postpetition financing. As a consequence, Livingstone has become well-acquainted with the Debtors' business operations, capital structure, forecasted liquidity profile, and resulting need for DIP Financing.

## The Debtors' Immediate Liquidity Needs

10. The Debtors have an immediate and critical need to obtain the DIP Financing and the authority to use Cash Collateral throughout the chapter 11 process to, among other things, satisfy payroll obligations, pay vendors, maintain insurance coverage, pay taxes, and make other payments integral to the continued management, operation, and preservation of the Debtors' business to facilitate an orderly transition to one or more purchasers and to fund the administration of these Chapter 11 Cases, all of which are required to prevent disruption to the Debtors' patients.[3]

11. As described in the First Day Declaration, notwithstanding healthy demand for the Debtors' services, for several years, the Debtors have contended with ever-tightening liquidity resulting from lower-than-expected revenues, high labor costs, and burdensome lease obligations

---

[3] See generally Declaration of Steven Shenker, Chief Restructuring Officer of Center for Autism and Related Disorders, LLC, in Support of the Chapter 11 Petitions and First Day Motions (the "First Day Declaration").

4

stemming from the COVID-19 pandemic. Since the fall, the Debtors have actively explored a variety of strategic alternatives to address their liquidity problems without sacrificing patient care, including a potential sale, strategic merger, consolidation, or business combination. In November 2022, the Debtors formally commenced a comprehensive marketing and sale process.

12. The marketing process has already borne results. On June 9, 2023, following months of extensive negotiations with potential bidders, the Debtors entered into a stalking horse purchase agreement (the "Stalking Horse APA") with Pantogram LLC (the "Stalking Horse Bidder"), pursuant to which the Stalking Horse Bidder has agreed to purchase the Debtors' business and continue to operate the Debtors' treatment facilities. Dr. Doreen Granpeesheh, the Debtors' founder, and Sangam Pant guaranty the Stalking Horse Bidder's obligations under the Stalking Horse APA. The Stalking Horse APA provides for a $25 million purchase price for the entirety of the Debtors' business, including the assumption of all the Debtors' remaining lease obligations—setting the "floor" for bidders in the proposed postpetition marketing process. The Stalking Horse APA is invaluable to the Debtors' estates because it ensures a minimally disruptive outcome for the Debtors' patients. Notwithstanding, I believe it would be in the best interest of the Debtors' estates to further pursue the Debtors' competitive sale process to ensure that the Stalking Horse APA represents the highest or best offer for the Debtors' assets.

13. As of now, however, the Debtors are nearly out of liquidity, necessitating a chapter 11 filing to continue operations in the ordinary course. More specifically, the Debtors enter these Chapter 11 Cases with approximately $2.1 million in cash on hand, which I understand is insufficient to meet even the Debtors' near-term liquidity needs, let alone fund these Chapter 11

Cases. Therefore, the Debtors have an urgent need for significant and immediate incremental liquidity.

14. In light of the Debtors' liquidity position, Livingstone assisted the Debtors in evaluating potential financing alternatives. Among other things, Livingstone has worked closely with the Debtors, their management, and their other advisors to evaluate the cash requirements for the Debtors to operate their business as a going concern. Based on this work, the Debtors determined, in consultation with Livingstone and their other advisors, that procuring financing at the start of these Chapter 11 Cases is essential for the Debtors to maintain operations without disruption to patient care and to facilitate an orderly transition of their business to one or more purchasers.

15. Livingstone reviewed the Debtors' liquidity needs, including the 13-week cash flow forecast prepared by Portage Point Partners, LLC, which takes into account anticipated cash receipts and disbursements during the 13-week projection period and considers a number of factors, including required costs to maintain operations, fees and interest expense associated with the proposed DIP Facility, professional fees, and required operational payments. The Debtors and their advisors continued to update the budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these Chapter 11 Cases. Based upon these forecasts and discussions with the Debtors' management and other advisors, I do not believe it would be possible to administer the Debtors' estates and operate the Debtors' business in the ordinary course solely through the use of Cash Collateral given the Debtors' required liquidity and forecasted expenses.

16. Without access to the DIP Term Loan Facility, the Debtors will have limited cash on hand, and based on the Debtors' liquidity forecast, would not be able to generate sufficient

levels of operating cash to cover their working capital needs and the costs of these Chapter 11 Cases. As a result, I believe that the DIP Term Loan Facility is critical to the Debtors' ability to administer these Chapter 11 Cases, and that the DIP Term Loan Facility would provide the Debtors with sufficient liquidity to continue operations in the ordinary course and complete their prepetition marketing process. Accordingly, I believe that the DIP Term Loan Facility is in the best interest of the Debtors' estates.

### The Debtors' Efforts to Secure DIP Financing

17. In October 2022, the Debtors, with the assistance of Livingstone and their other advisors, began discussing potential comprehensive restructuring proposals with stakeholders across the Debtors' capital structure. These discussions resulted in the commencement of a comprehensive marketing and sale process in November 2022, which remains ongoing today.

18. Until late April 2023, it appeared that the Debtors would consummate an out-of-court sale of their business to a strategic purchaser (the "Exclusive Bidder"). On March 13, 2023 CARD signed an exclusivity agreement with the Exclusive Bidder to consummate an out-of-court transaction. Throughout March, April, and early May, the Debtors and the Exclusive Bidder engaged in significant due diligence efforts. During that process, the Exclusive Bidder made material changes to the terms under which it was willing to close a transaction, reducing its bid substantially and removing the out-of-court condition, instead stating that it would only be willing to consummate the transaction as a stalking horse for an in-court process. Accordingly, the Debtors and their advisors shifted their focus to an in-court restructuring. Two weeks later, after the exclusive period had expired, the Exclusive Bidder further reduced its bid, rendering it unactionable. The Debtors rejected the Exclusive Bidder's bid.

19. After the Debtors rejected the Exclusive Bidder's reduced bid, Livingstone reopened the marketing process by reengaging with potential bidders from the initial marketing process. In connection therewith, Livingstone also began the process of soliciting debtor-in-possession financing proposals. In addition to engaging with the Debtors' existing lenders and Prepetition Majority Equity Holders, Livingstone explored financing from potential third parties. Starting in May 2023, Livingstone solicited interest from fourteen third-party sources of financing outside of the Debtors' capital structure (while continuing to share informational updates and engage with stakeholders across the capital structure) to determine the extent to which any such parties would be willing to provide postpetition financing to the Debtors.

20. The potential third-party lenders contacted by the Debtors included various institutions that routinely provide DIP Financing, including both well-known commercial banks and specialty lenders. Of these potential third-party lenders, one executed a confidentiality agreement with the Debtors and received access to non-public information. The feedback from third parties that Livingstone contacted with respect to providing DIP Financing was conclusive: no third party provided a term sheet or any indication of interest, whether on a priming or non-priming basis. The only other stakeholder in the Debtors' capital structure that made a DIP Financing proposal (the Debtors' Prepetition Majority Equity Holders) proposed worse economic terms than the proposed DIP Financing.[4]

21. Following arm's-length and good faith negotiations with the Prepetition Secured Parties, the Debtors were able to secure an $18 million new-money delayed-draw term loan facility

---

[4] To ensure that the Debtors had the liquidity they needed, the Debtors' Prepetition Majority Equity Holders committed to provide financing if the Debtors were otherwise unable to obtain it, but the economic terms from Ares were more attractive than the terms proposed by the Debtors' Prepetition Majority Equity Holders and, therefore, represented the best available financing option for the Debtors.

(the "DIP Term Loan Facility") (in which existing lenders have agreed to prime themselves) to be used for funding general operating expenses, including payroll and rent expenses, to allow the Debtors' marketing process to conclude and, in exchange, repaying a portion of the Superpriority Delayed Draw Term Loans.

22. I believe that the proposed DIP Term Loan Facility is the Debtors' best source of postpetition funding, and that no better alternative was attainable. As noted above, the Debtors received no third-party new money term loan proposals, and the Prepetition Majority Equity Holders' proposal to provide a DIP Financing facility was on worse economic terms than those of the DIP Term Loan Facility. I believe that the proposed DIP Term Loan Facility will provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases. I also believe the DIP Term Loan Facility will allow the Debtors to reassure the Debtors' other stakeholders—and, critically, the Debtors' patients—that the Debtors have sufficient funds to continue operating in the ordinary course.

## The DIP Term Loan Facility Should be Approved

23. As noted above, the Debtors and the Prepetition Secured Parties engaged in arm's-length negotiations regarding the DIP Term Loan Facility. Following these negotiations, the Debtors and the Prepetition Secured Parties agreed upon the terms of the DIP Term Loan Facility. I believe that the DIP Term Loan Facility is necessary and appropriate for the following reasons.

   A. *Alternative Sources of Financing on Better Terms Than the DIP Term Loan Facility Are Not Available to the Debtors.*

24. Based on the nature of the responses received by Livingstone when it went to the market for DIP Financing proposals and the fact that the vast majority of the Debtors' assets are encumbered and that unencumbered assets are not expected to have provided sufficient (if any)

value to fund the case, I do not believe that any alternative sources of financing with terms as favorable as those contained in the DIP Term Loan Facility are currently available to the Debtors.

25. In my opinion, the terms of the DIP Term Loan Facility are the product of extensive and good faith negotiations between the Debtors and the DIP Lenders, each of whom was represented by experienced counsel and financial advisors. Through these negotiations, the Debtors were able to secure the most favorable terms possible for the DIP Term Loan Facility and the Debtors were not able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting the liens securing the DIP Term Loan Facility and providing superpriority claims. Simply put, the DIP Term Loan Facility provides the Debtors with the liquidity they need at the most optimal terms. Based on the negotiation history and the marketing efforts undertaken by the Debtors and Livingstone, the proposed DIP Term Loan Facility represents the Debtors' best available postpetition financing option.

        B.      *The Fees and Milestones Provided in Connection with the DIP Term Loan Facility Are Appropriate Under the Circumstances.*

26. My team and I, along with the Debtors' other advisors, negotiated the terms and provisions of the DIP Term Loan Facility on behalf of the Debtors. I understand that the Debtors have agreed, subject to Court approval, to pay commitment fees to the DIP Lenders pursuant to the DIP Loan Documents. The fees and interest to be paid under the DIP Term Loan Facility were the subject of arm's-length and good faith negotiation between the Debtors and the DIP Lenders, are an integral component of the overall terms of the proposed DIP Term Loan Facility, and were required by the DIP Lenders as consideration for the extension of DIP Financing. Under the current circumstances, I believe that the fees, rates, and other economics provided for in the DIP Term Loan Facility are appropriate, given the operational fragility of the business, the volatility of

the credit markets, the fact that the Debtors were unable to obtain other DIP financing on similar or better terms.

27.     The DIP Term Loan Facility also contains certain milestones that the Debtors must meet throughout their Chapter 11 Cases.  The milestones were negotiated by the Debtors and the DIP Lenders as a condition to providing the DIP Term Loan Facility.  These milestones were negotiated at arm's-length and are an integral component of the DIP Term Loan Facility and the broader set of transactions contemplated by the Plan.  Failure to meet such milestones constitutes an event of default under the DIP Loan Documents.  I have reviewed the milestones and believe that they are appropriate, reflective of the need to move quickly through these Chapter 11 Cases, and achievable.

## Conclusion

28.     I believe that, given the circumstances, the process to obtain DIP Financing produced the best financing available for the Debtors in these Chapter 11 Cases and that the terms of the DIP Term Loan Facility are reasonable and appropriate under the circumstances.  I also believe that, based on the Debtors' projections, the proposed DIP Term Loan Facility will provide the Debtors with the necessary liquidity to effectively manage their Chapter 11 Cases and complete their marketing and sale process.

29.     Based on the foregoing, it is my belief that the DIP Term Loan Facility represents the best option available to address the Debtors' liquidity needs, and that the fees, terms, and conditions of the DIP Term Loan Facility are reasonable and appropriate under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

June 12, 2023

By:<br>
/s/ *Joseph Greenwood*<br>
Joseph Greenwood<br>
Partner<br>
Livingstone Partners LLC