**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER FOR AUTISM AND RELATED | ) | Case No. 23-90709 (DRJ) |
| DISORDERS, LLC, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION OF
STEVEN SHENKER, CHIEF RESTRUCTURING
OFFICER OF CARD HOLDINGS, LLC, IN SUPPORT OF
CHAPTER 11 PETITIONS, FIRST DAY MOTIONS, AND DIP MOTION**

I, Steven Shenker, hereby declare under penalty of perjury:

1.     I am the Chief Restructuring Officer ("CRO") of CARD Holdings, LLC and have served in this role since March 2023.  I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

\*          \*          \*          \*          \*

2.     In 2020, the Center for Disease Control and Prevention ("CDC") estimated that about one in 36 children aged eight in the United States have autism spectrum disorder ("ASD").[2] ASD is a developmental disability characterized by persistent impairments in social interaction and the presence of restricted, repetitive patterns of behaviors, interests, or activities that can cause a wide array of difficulties in social interaction, communication, and participation in daily

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192).  The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

[2]     Maenner MJ, Warren Z, Williams AR, et al. *Prevalence and Characteristics of Autism Spectrum Disorder Among Children Aged 8 Years — Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2020.*  MMWR Surveill Summ 2023, 72(No. SS-2):1–14. DOI:  http://dx.doi.org/10.15585/mmwr.ss7202a1.

activities.[3]   From over two decades of studying its prevalence, the CDC recognized a steady increase in the ASD diagnoses in children across the country.[4]



3.      Center for Autism and Related Disorders, LLC (together with its affiliated debtors and debtors in possession, "CARD," the "Debtors" or the "Company") is one of the nation's largest treatment providers for individuals diagnosed with ASD.  Founded on the principle that early intervention can yield outstanding clinical results, CARD has successfully treated tens of thousands of individuals with ASD, with many achieving optimal outcomes and leading successful, independent lives.  Since its inception in 1990, CARD's highly-trained technicians and behavior analysts, carrying a combined total of over 1,080 years of experience, have provided over ten million treatment hours.

---

[3]     American Psychiatric Association. *Diagnostic and statistical manual of mental disorders.* 5th ed. Arlington, VA: American Psychiatric Association (2013).

[4]     Maenner MJ, et al. *Prevalence and Characteristics of Autism Spectrum Disorder Among Children Aged 8 Years — Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2020.*

4.     CARD approaches treatment through the principles of applied behavior analysis ("ABA"), which have been empirically proven as the most effective method for treating individuals with ASD, and have been recommended by the American Academy of Pediatrics and the United States Surgeon General.[5]  Just as every individual is unique, each of CARD's ABA programs is specifically tailored to meet the particular needs of each patient to maximize progress and nurture growth.

5.     CARD primarily provides treatments through "center-based services," which are one-to-one ABA sessions for children, teens, and adults that take place at a CARD treatment center rather than at a patient's home.  CARD's treatment centers are the ideal setting for patients to learn and practice skills that can be "generalized" to apply in actual, real-world situations.  Center-based services also support a patient's family and caregivers by providing specific family and caregiver training hours, and by allowing families and caregivers more flexibility to work or complete other tasks while their loved-one is in a safe and trusted environment.

6.     CARD was founded in 1990 by Dr. Doreen Granpeesheh, and in 2018 Blackstone Group LP (together with its affiliates, "Blackstone") struck a deal to acquire a majority stake in the Company.  In the summer of 2022, Dr. Doreen Granpeesheh resigned from the Debtors' board, but still holds approximately 21 percent of CARD equity.  Currently, CARD's operations include approximately 130 centers across 13 states, and approximately 2,500 employees and healthcare professionals to support its over 3,500 patients.

7.     Guided by science and inspired by compassion, CARD's mission is to help individuals with ASD thrive.  CARD's deep commitment to support individuals with ASD is

---

[5]     *See Applied Behavior Analysis (ABA)*, AUTISM SPEAKS, https://www.autismspeaks.org/applied-behavior-analysis.

evidenced by its actions beyond its treatment centers. CARD demonstrates a fulsome commitment to its patients by being at the forefront of ASD treatment research, accessibility, and advocacy. In fact, CARD was previously recognized as the third largest non-governmental organization contributing to ASD research in the United States.[6] In August 2009, researchers at CARD published the first-ever study to document recovery of a large group of individuals with ASD.[7] The study demonstrated that CARD helped individuals with ASD achieve substantial progress—many of the participating individuals no longer qualified as having an ASD diagnosis by the end of their treatment.[8]

8.     CARD is a founding member of the National Coalition for Access to Autism Services, which broadens the impact of federal efforts to prohibit the discriminatory limits on



mental health services, including ABA.[9] In 2022, CARD sponsored California Bill AB 2581, which came into effect at the start of this year. The bill improved access to ASD and other mental health services in California by shortening the time required for new treatment providers to be

*Treatment Center in Los Angeles, California.*

---

[6]     *Center for Autism Ranked in Top Three Non-Governmental Organizations Providing Largest Financial Support to Autism Research*, (July 18, 2011), https://centerforautism.com/card-ranked-top-three-ngos-providing-largest-financial-support-autism-research/.

[7]     Granpeesheh D, Tarbox J, Dixon DR, Carr E, Herbert M., *Retrospective analysis of clinical records in 38 cases of recovery from autism*. ANN. CLIN. PSYCHIATRY. 2009 Oct - Dec; 21(4):195-204. PMID: 19917210.

[8]     *Id.*

[9]     *CARD Celebrates Newly Enacted Federal Act that Would Remove Barriers to ABA . . .*, (Jan. 5, 2023), https://centerforautism.com/card-celebrates-newly-enacted-federal-act-that-would-remove-barriers-to-aba-therapy-for-people-with-autism/.

credentialed by health plans.[10]  Having faced the extreme delays first-hand, CARD sponsored the

bill to ensure that newly hired, qualified medical providers could start providing treatment with

significantly less administrative delay.  California Bill AB 2581 is the strongest of its kind in the

nation and has paved the way for other states where CARD has treatment centers and beyond to

take similar action.

9.      Although CARD's treatment, research, and advocacy have had a positive impact,

CARD, like many other healthcare providers,[11] faced significant headwinds since 2020.  Due to

the sudden onset of the COVID-19 pandemic, CARD experienced new operational challenges—

the scale of which was impossible to predict.  In 2020, the entire nation faced significant labor

shortages in the healthcare space.  As a result, it became exceptionally more difficult to recruit and

retain qualified behavioral therapist to administer CARD's ABA treatments to its patients.  Further,

the cost of labor has been steadily increasing as a result of inflation.  The COVID-19 pandemic

compromised the lifeblood of the Company—without enough qualified behavioral therapists the

Debtors did not have sufficient resources to meet demand.  Further, as a treatment center-based

company with locations spanning across the United States, during the COVID-19 pandemic CARD

was saddled with lease obligations and other corporate overhead costs during a time when in-

person services came to a halt in most of the country.

10.     Even after the upheaval to CARD's typical cadence of services, CARD remained

committed to ensuring the continuity of high-quality treatment to its patients.  In the wake of the

COVID-19 pandemic, many of CARD's treatment centers shifted to telehealth and the Company's

---

[10]    *CARD Champions California Bill to Improve Access to Care for Children Diagnosed with Autism*,
(Sept.   28,   2022), https://centerforautism.com/card-champions-california-bill-to-improve-access-to-care-for-
children-diagnosed-with-autism/.

[11]    As of the Petition Date, twenty-one healthcare chapter 11 cases have already been filed in 2023 alone as compared
to 2021 and 2022, where 23 and 22 cases were filed respectively.

practitioners conducted behavioral therapy services remotely using video conferencing to ensure consistency of treatments.  High-quality patient care remaining a top priority, in order to protect against any diminution in treatment quality while being remote, CARD developed an instrument ("TTIM") to measure the treatment integrity of ABA therapy delivered to patients with ASD via telehealth.  At the time of its creation, TTIM was the first published instrument of its kind.

11.     The Debtors moved mountains over the course of the past few years to maintain operations and consistent care for its patients in the wake of the unprecedented COVID-19 pandemic.  As discussed further below, the Sponsor (as defined herein) and the Debtors' prepetition lenders contributed additional rounds of liquidity infusions to support the Debtors in the leadup to these chapter 11 cases.  Notwithstanding the resilience and ingenuity the Company exhibited during the COVID-19 pandemic, the aftershocks, including staffing shortages and burdensome lease obligations, have caused operational and liquidity challenges for the Debtors.

12.     Additionally, CARD is party to a number of existing payor contracts that are no longer profitable.  Between 2012 and 2016, the Debtors entered into certain agreements with commercial and government payors that established the reimbursement rates for certain treatments.  Despite being adequate at the time of execution, said agreements are presently no longer profitable to the Company given that many have not had rate increases since the initial agreements were reached.  Growing medical inflation, increasing wage pressures, and increasing shortages all contributed to the higher costs of doing business.  Debtors made progress with some, but not all, payors in 2022, and to date in 2023, to address the need for contemporary rate adjustments, but not all payors agreed to engage in negotiations.

13.     The Debtors are entering these chapter 11 cases to ensure their efforts were not for naught.  The Debtors' primary focus has always been and continues to be the well-being and betterment of their patients, which includes maintaining the top-quality level of care provided by the Debtors' talented employee base.  As such, it is essential that any path forward to a holistic solution provides for continued and consistent treatment of the Debtors' patients.  Over the past year, the Debtors explored every opportunity to effectuate an out-of-court transaction before ultimately commencing these chapter 11 cases.  To assist in these efforts, the Debtors retained Kirkland & Ellis LLP ("K&E") as counsel, Livingstone Partners LLC ("Livingstone") as investment banker, and Portage Point Partners, dba Triple P RTS, LLC ("Portage Point" and, together with K&E and Livingstone, the "Advisors") as restructuring advisors.  In March 2023, I was appointed as Chief Restructuring Officer.

14.     Recognizing that the go-forward business initiatives alone would not generate enough liquidity for CARD's business, the Advisors worked with the Debtors to evaluate alternatives and determine the best path forward.  In addition to negotiating and securing multiple rounds of bridge financing from their sponsor and secured lenders, implementing additional governance initiatives (including in October 2022, the constitution of a special restructuring committee comprised of three independent directors:  Neal Goldman, as chairman; David D'Alessandro, an existing disinterested director of the Debtors' board; and Brent Kugman), working to right-size their lease footprint, and attempting to execute a new go-forward business plan, the Debtors commenced a robust and thorough marketing process in November 2022 for the sale of their business to one or more buyers.

15.     Following months of extensive negotiations with potential bidders, CARD received five letters of intent and requested "best and final" bids from each of the submitting parties.

Ultimately, on March 13, 2023, CARD signed an exclusivity agreement with one of the bidders (the "Exclusive Bidder") to consummate an out-of-court transaction.  In late April 2023, the Exclusive Bidder unexpectedly reduced its bid value substantially and removed the out-of-court condition, instead stating that it would only be willing to act as a stalking horse for an in-court process.  Two and a half weeks later, after the exclusive period had expired, the Exclusive Bidder further reduced its bid, rendering it unactionable.  The Debtors ultimately rejected the Exclusive Bidder's reduced bid.

16.     Despite the unfortunate turn of events, the Debtors again exhibited resilience in difficult circumstances.  Facing a rapidly shortening liquidity runway, the Debtors immediately pivoted to re-engage with interested parties.  Approximately five weeks later, the Debtors are pleased to report that they are commencing these chapter 11 cases with a committed stalking horse bidder.  On June 9, 2023, the Debtors executed an agreement (the "Stalking Horse APA") with Pantogran LLC (the "Stalking Horse Bidder"), with Dr. Doreen Granpeesheh, founder of CARD, and Sangam Pant acting as guarantors.  Dr. Granpeesheh stepped down as Chief Executive Officer in 2019 and resigned from the Debtors' board in the second half of 2022, but retains approximately 21 percent of CARD's equity.  Execution of the Stalking Horse APA is the result of arms'-length negotiations between the Debtors, their advisors, and the Stalking Horse Bidder and its advisors.  As set forth in more detail in the Bidding Procedures Motion,[12] the Stalking Horse APA provides for a $25 million purchase price for a going-concern acquisition of substantially all of the Debtors' assets—setting the "floor" for bidders in the continued marketing process postpetition.  Notably, I

---

[12]   "Bidding Procedures Motion":  *Debtors' Emergency Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures (VI) Authorizing the Debtors to Enter into Definitive Purchase Agreement, and (VII) Granting Related Relief.*

believe the Stalking Horse APA supports a seamless transition of all patients and each of the approximately 130 treatment centers and preserves the majority, if not all, of the Debtors' workforce.

17.     In light of their constrained liquidity and to ensure continuity of care and retention of its employee base, it was vital that the Debtors enter these proceedings with committed financing to fund operations during these chapter 11 cases.  In the lead up to these chapter 11 cases, the Debtors engaged in negotiations with the Sponsor and certain of the Credit Facility Lenders to finance these chapter 11 cases.  To ensure that the Debtors had access to the liquidity they needed to fund these cases, the Sponsor indicated willingness to provide financing if the Debtors were otherwise unable to attain it, but ultimately, the Debtors were able to secure financing from certain of the Credit Facility Lenders on the most attractive terms available.  As described in greater detail in the Greenwood DIP Declaration,[13] following hard-fought, arm's-length negotiations with certain of the Credit Facility Lenders, the Debtors secured commitments for an approximately $18 million superpriority senior secured term loan debtor-in-possession financing facility (the "DIP Facility") and consensual use of cash collateral.[14]  $7.5 million of the DIP Facility will

---

[13]    "Greenwood DIP Declaration" means the *Declaration of Joseph Greenwood of Livingstone Partners LLC in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, filed contemporaneously herewith.

[14]    The material terms of the DIP Facility are set forth in detail in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").  For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Documents (as defined in the DIP Motion).

be available upon the entry of an interim order approving entry into the DIP Facility. This capital will provide the Debtors with the necessary liquidity to continue operations and administer these chapter 11 cases while completing the ongoing sale process to maximize value. However, the provision of the DIP Facility is conditioned on an expeditious process, consistent with the following milestones:[15]

    i.    On or before the day following the Petition Date, the Debtors shall file (a) one or more motions, seeking approval of (i) the sale of the Debtors' assets free and clear of all liens, claims, interests and encumbrances; (ii) bidding procedures in connection with approval of a Sale Transaction; (b) a chapter 11 plan; and (c) the related disclosure statement;

    ii.    On or before three days following the Petition Date, the Court shall have entered (a) an order conditionally approving Disclosure Statement and authorizing the Debtors to commence solicitation of votes and (b) the Interim DIP Order;

    iii.    On or before four days following the Petition Date, the Debtors shall have completed the solicitation of votes;

    iv.    On or before seven days following the Petition Date, the Court shall have entered an order establishing bidding procedures consistent with the Bidding Procedures Motion;

    v.    On or before twenty-eight days following the Petition Date, the Final DIP Order shall have been entered by the Court;

    vi.    On or before thirty-three days following the Petition Date shall be the deadline for submission of qualified bids for a Sale Transaction;

    vii.    On or before thirty-six days following the Petition Date, if any qualified bids are received for a Sale Transaction, the Debtors shall have held an auction;

    viii.    On or before thirty-nine days following the Petition Date, the Court shall have entered an order approving a Sale Transaction for all or substantially all of the Debtors' assets, such order may be the order confirming the Plan; and

---

[15] Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion, filed contemporaneously herewith. To the extent that there is any inconsistency between this summary and the DIP Motion, the DIP Motion shall control.

      ix.    On or before sixty days following the Petition Date, the Debtors shall have either consummated the Sale Transaction or the Plan shall have become effective.

18.    With the capital provided by the DIP Facility, the Debtors intend to utilize the chapter 11 process to bring their robust marketing process to completion, to consummate one or more asset sales, and to shed burdensome liabilities, while ensuring their top priority—their patients and workforce—are protected and provided for.

            *         *         *         *         *

19.    I have nearly 10 years of experience serving in a variety of roles, including in management positions and as a financial advisor and investment banker.  I joined Portage Point in June 2020 and have served as a Senior Director since November 2022.  Prior to joining Portage Point, I held a variety of roles, including founding member and Vice President at private equity firm Periphas Capital, LP from 2018 to 2020; Associate at the Carlyle Group Inc. from 2016 to 2018; and Investment Banking Analyst at Moelis & Company from 2014 to 2016.

20.    In 2014, I received a B.S. in Business & Management with a concentration in Finance from the Sy Syms School of Business at Yeshiva University.  Prior to becoming CRO, I advised the Debtors in my capacity as a Senior Director of Portage Point.  Portage Point has advised the Debtors since January 29, 2023.

21.    Portage Point has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases.  I have personally been involved in recent comparable chapter 11 reorganizations such as *In re Bouchard Transportation, Co., Inc.*, No. 20-34682 (DRJ) (Bankr. S.D. Tex. October 22, 2020), where I served as Deputy Chief Restructuring Officer; *In re Teligent, Inc.*, No. 21-11332 (BLS) (Bankr. D. Del. October 14, 2021), in which I served as a financial advisor to the company; *In re IEH Auto Parts Holding LLC (Auto*

*Plus*), No. 23-90054 (CML) (Bankr. S.D. Tex. Jan. 31, 2023); and *In re Hornbeck Offshore Services, LLC*, No. 20-32685 (DRJ) (Bankr. S.D. Tex. May 19, 2020).  I specialize in advising senior executives, boards of directors, and creditors in distressed situations.

22.     Since January 29, 2023, I have worked closely with the Debtors on their everyday operations, including on various financial and operational projects.  As a result of my role and experience with the Debtors, my review of relevant documents, and my discussions with other individuals who manage the Debtors' day-to-day business operations and affairs, I am generally familiar with the Debtors' business, financial affairs, and books and records.  I submit this declaration ("<u>Declaration</u>") to assist the Court and parties in interest in understanding the circumstances that compelled Debtors' commencement of these chapter 11 cases, and to provide support for the Debtors' voluntary chapter 11 petitions and related First Day Motions (as defined herein) filed on June 11, 2023 (the "<u>Petition Date</u>").[16]

23.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors' management team and Advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs and restructuring initiatives, or my opinions based on my experience and knowledge.

24.     I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

---

[16]    The factual statements set forth in the First Day Motions are incorporated herein by reference.

25. To further familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into four sections as follows:

- **Part I** provides a general overview of the Debtors' organizational history, services and treatment, and revenue;

- **Part II** provides an overview of the Debtors' prepetition organizational and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases and CARD's contemplated path forward through these chapter 11 cases; and

- **Part IV** sets forth the evidentiary basis for the relief requested in the First Day Motions.

I. **The Company's History and Business Operations.**

   A. **Corporate History.**

26. CARD traces its roots back to 1990, when the first center opened in Encino, California.[17] The concept for CARD originated from the renowned autism treatment performed by scientist Dr. Ivar Lovaas at the University of California, Los Angeles ("UCLA"). Dr. Lovaas, a phycology professor, discovered that intensive early intervention with applied behavior analysis treatment yielded a 47 percent reduction of ASD diagnoses among individuals previously diagnosed. In 1987, Dr. Lovaas and Dr. Doreen Granpeesheh, the founder of CARD, published the paper demonstrating these findings.[18] The paper become a seminal study in the field of ASD and behavioral intervention and shaped the study of ASD for years to come.

27. Building on their research further, Dr. Lovaas, Dr. Granpeesheh, and their colleagues developed an intensive one-on-one behavioral intervention for children with ASD. The

---

[17] Bailey Bryant, *CARD Founder Details Company's Path to Success, 2021 Growth Outlook* (January 3, 2021), https://bhbusiness.com/2021/01/03/card-founder-details-companys-path-to-success-2021-growth-outlook/.

[18] O I Lovaas, *Behavioral treatment and normal educational and intellectual functioning in young autistic children*; PMID: 3571656 DOI: 10.1037//0022-006x.55.1.3.

test group for the intervention received forty hours per week of treatment at UCLA led by behavioral therapists, and ten to fifteen hours of home-based intervention lead by their parents. The study demonstrated three essential principles about the ASD treatment that are the basis for Debtors' treatment model today:  (i) ABA intervention works; (ii) children with ASD can recover from the diagnosis; and (iii) intensity of treatment matters.

28.     A few years later, in 1990 when CARD first launched, this style of ASD treatment was novel.  When CARD was created, it was one of the only ASD treatment providers in the nation to offer intensive ABA intervention.  When the first clinic opened, parents from all over the United States were eager to enroll their children.  Demand for treatment only accelerated when one of the mothers who received treatment from the Debtors published a book detailing the profound impact CARD had on her child.  As demand continued to increase, in 1994, Dr. Granpeesheh trained the first additional therapist, Evelyn Kung, who later became CARD's Clinical Director.  Shortly thereafter, Dr. Granpeesheh continued to train additional supervisors, and CARD opened additional offices in New York state and San Jose, California.

29.     In the mid-90s, demand for Company's services spanned across international lines when a father of one of CARD's patients garnered international support for expanding the Debtor's business.  Dr. Granpeesheh received requests to open centers all over the world, and proceeded to open additional treatment centers in North Carolina, London, England, and Australia.  The Debtors opened about ten additional treatment centers as a result of the public's demand.  For several years CARD continued to grow at a steady pace.  The Debtors opened two to five treatment centers per year to match demand that had been generated purely by word-of-mouth.  After years of steady growth, CARD intentionally slowed its expansion in 2000 to centralize and reorganize its management and business operations.   Throughout its episodes of expansion, CARD has

consistently taken routine pauses to ensure that it is constantly reassessing its policies and maintaining stable growth.

30.     By 2016, the Debtors had grown to have about 100 clinics, and by 2018 CARD had doubled in size.  After garnering considerable attention in the private equity space for years, in 2018, Blackstone struck a deal to acquire CARD.  As a result of the acquisition, Cardinal Buyer, LLC, an entity affiliated with Blackstone Capital Partners VII L.P. (together with any of their respective affiliates and funds or partnerships managed or advised by them or their respective affiliates, the "Sponsor") currently owns approximately 70 percent of the Debtors' equity, and Dr. Granpeesheh retains a significant share of the remaining interest, which is, in part, shared with several CARD employees who assisted with the founding of CARD.[19]



---

[19]     Bailey Bryant, *CARD Founder Details Company's Path to Success, 2021 Growth Outlook* (January 3, 2021).

**B.       Services and Treatment Overview.**

31.       *Treatment Centers*.  The crux of the Debtor's operations are its treatment centers. The treatment centers are the primary method through which CARD provides its services.  At the time of the filing, the Debtors have approximately 130 centers across the United States.  Each treatment center employs approximately 15 treatment providers and, in aggregate, the centers provide services for approximately 3,500 patients.



*An inside look at one of CARD's treatment centers, demonstrating ABA services at work.*

32.       Each treatment center provides one-on-one ABA sessions for children, adolescents, and adults.  Sessions are administered by board-certified behavior technicians that work with each patient under the supervision of a behavior analyst certified by the board of the Behavioral Intervention Certification Council.  The treatment centers also offer opportunities for socialization and peer play dates for individuals with ASD, and allow patients to engage with new toys, materials, and stimuli.  Each session at the treatment centers includes time for patients and therapists to learn, eat, take breaks, and play in a structured setting.  For parents and caregivers,

the treatment centers also provide training hours to teach them how to best care for their loved ones with ASD.

33. **_Skills._**  To expand access to ASD treatment resources and to meet the widespread demand, the Debtors developed a comprehensive web-based treatment and training program ("Skills") for individuals with ASD, and the educators, clinicians, and loved ones supporting them.[20]  Skills was created to make CARD's resources available on a global scale.  Through its monthly or yearly subscriptions, Skills provides visual examples and videos to walk therapists, clinicians, teachers, and parents through the ABA methods for ASD treatment.[21]  Skills provides a robust curriculum that covers several areas of development.  Each treatment program is customizable and can be individualized to match each patient's particular needs.  The Skills curricula includes lessons ranging from basic to advanced in: (i) language;  (ii) play;  (iii) social;  (iv) cognition; (v) executive function;  (vi) adaptive;  (vii) motive; and (viii) academic.



34. Skills is a one-stop resource for creating and implementing comprehensive treatment plans, and includes a wide-range of assessment tools, customizable research-based lessons, and detailed progress trackers.  Skills allows clinicians, teachers, and parents to apply

---

[20]  Samantha Murphy, *Online Therapy Program to Help Fight Autism*, (March 27, 2012), https://mashable.com/archive/autism-education.

[21]  Joe Russel, *For-profit Tarzana autism agency boosted by sales, clinical study*, San Fernando Valley Business Journey, (February 24, 2014), https://www.skillsforautism.com/Documents/SFVBJ_Health_article.pdf.

scientifically-proven treatments and interventions, measure their effectiveness, and help individuals with ASD reach their fullest potential, even if they do not have access to one of CARD's treatment centers.

35.     At the time of the filing, the Debtors generate approximately $950,000 from Skills subscriptions annually.

36.     ***School Age and Adolescent Programs***.  The Debtors offer individualized ABA services to older children.  The program is designed to assist school age children and adolescents in meeting their specific learning goals, and to strive towards meaningful progress in their lives. The Debtors offer both:  (i) comprehensive programs that target learning across multiple skill areas; and (ii) focused programs that target learning in a specific area or progress with a particular skill.  These programs have a heavy emphasis on assisting older children with attaining meaningful success in real-life settings by establishing individualized goals and targets based on the learners and family's priorities.   The aim is to teach skills that will promote life-long learning, independence, self-advocacy and happiness.[22]

37.     At the time of the filing, the Debtors are receiving approximately $7 million from the school age and adolescent programs annually.

**C.     Revenue.**

38.     CARD generates revenue from patients, third-party payors (including health insurance and government programs in certain states), and from subscriptions to the Skills program.  The Debtors service seven[23] states that include ASD benefits in their insurance coverage.

---

[22]    *See* Center for Autism and Related Disorders, *School Age & Adolescent Programs*, https://centerforautism.com/services/school-age-and-adolescent-programs/.

[23]    This number does not include any states that solely provide ASD coverage through municipal payors through school programs.

In general, patients are responsible for deductibles related to third-party payors, which vary in amount.  Many patients rely heavily on government assistance for medical care, as opposed to private insurance carriers with higher reimbursement rates.  As a liquidity-intensive business with high overhead costs, any delays associated with government assistance and reimbursement have had negative consequences.

39.     In the twelve-month period ending in April 2023, the Debtors' total net operating revenue was approximately $160 million, which includes approximately $50 million from Medicaid supplemental programs and approximately $110 million from all other funding sources, after accounting for adjustments and denials.  In that same period, the Debtors' EBITDA loss was approximately $22 million and net loss was approximately $82 million.  Over the same time, the Debtors' operating expenses were approximately $144 million, including bad debt.

## II.     The Company's Organizational Structure and Prepetition Capital Structure.

### A.     Organizational Structure.

40.     CARD Holdings, LLC is the ultimate parent with four wholly-owned subsidiaries, including CARD.  Each of the wholly-owned subsidiaries are debtors in these chapter 11 cases.



**B.      Prepetition Capital Structure.**

41.      As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $245 million, comprised of the following obligations, each of which is described further herein:



Total: $245 million

| December 2022 Superpriority Delayed Draw Term Loans $18 million |
| October 2022 Superpriority Delayed Draw Term Loans $12.5 million |
| Delayed Draw Term Loans $7.5 million |
| Second Incremental Affiliated Term Loans $30 million |
| Second Incremental Initial Term Loans $5 million |
| First Incremental Term Loans $20 million |
| Revolving Credit Loans $16 million |
| Initial Term Loans $136 million |

42.      ***Initial Loans and Commitments.***  On November 21, 2018, (a) CARD Intermediate Holdings II, LLC, as Holdings, (b) Center for Autism and Related Disorders, LLC, as Borrower, (c) the Guarantors party thereto from time to time, (d) Ares Capital Corporation, as administrative and collateral agent (the "Credit Facility Agent"), and (e) the Lenders from time to time party thereto (collectively, the "Credit Facility Lenders" and, together with the Credit Facility Agent and any other party to which obligations under the Credit Facility are owed, the "Credit Facility

Secured Parties") entered a credit agreement (as amended, restated, or otherwise modified from time to time prior to the Petition Date, the "Credit Agreement")[24] under which the Credit Facility Secured Parties extended loans and other financial accommodations to the Debtor, which were designed to provide go-forward flexibility to the Debtors.

43.     More specifically, pursuant to the Credit Agreement, at closing, the Credit Facility Lenders provided:  (a) $140 million in initial term loan commitments, which they funded at closing (the "Initial Term Loans"); (b) two-year commitments for $75 million in delayed draw term loans (to the extent drawn, the "Delayed Draw Term Loans"); and (c) $20 million in revolving loan commitments, inclusive of a $5 million letter of credit sublimit (to the extent drawn, the "Revolving Credit Loans").  As further described herein, the Credit Agreement was amended several times, altering these commitments and providing for additional credit facilities under the Credit Agreement.

44.     The Initial Term Loans and the Delayed Draw Term Loans have a variable interest rate, mature on November 21, 2024, and are secured by substantially all assets of the obligors, subject to intercompany arrangements.  As of the Petition Date, approximately $136 million of the principal amount of the Initial Term Loans and approximately $7.5 million of the principal amount of the Delayed Draw Term Loans remains outstanding.  The Revolving Credit Loans mature on November 21, 2023, are secured by substantially all assets of the obligors on a *pari passu* basis with the liens securing the Initial Term Loans and the Delayed Draw Term Loans, and as of the Petition Date, approximately $16 million of principal of Revolving Credit Loans remain outstanding.

---

[24]   Capitalized terms used in this paragraph but not otherwise defined herein shall have the meaning set forth in the Credit Agreement.

45.     ***Credit Agreement Amendments.***  The Credit Agreement has been amended four times to provide for additional facilities, each of which is described herein.[25]

46.     *First Incremental Term Loans*.  On June 11, 2021, the Debtors and certain of the Credit Facility Secured Parties entered into the First Incremental Amendment and Amendment No. 3 to Credit Agreement, which provided for an incremental $20 million in term loans on identical terms to the Initial Term Loans (the "First Incremental Term Loans").  As of the Petition Date, all of the principal amount ($20 million) of the First Incremental Term Loans remains outstanding.

47.     *Second Incremental Initial Term Loans and Second Incremental Affiliated Term Loans*.  On December 21, 2021, the Debtors and certain of the Credit Facility Secured Parties entered the Second Incremental Amendment and Amendment No. 4 to Credit Agreement (the "Fourth Amendment"), which provided for (a) an incremental $5 million in term loans on identical terms to the Initial Term Loans (the "Second Incremental Initial Term Loans") and (b) an incremental $30 million in commitments from the Sponsor to make new term loans comprising a new class of term loans under the Credit Agreement (the "Second Incremental Affiliated Term Loans").  In addition to providing for the Second Incremental Initial Term Loans and the Second Incremental Affiliated Term Loans, the Fourth Amendment provided that future interest payments on the loans outstanding under the Credit Agreement would, at the Debtors' option, be paid in kind at a premium, with the new default being paid in kind.

---

[25]    The Credit Agreement has been amended seven times in total, but only four of the amendments changed the Debtors' outstanding financial obligations.  The amendments are as follows:  (i) Amendment No. 1 to Credit Agreement, dated as of December 20, 2018; (ii) Amendment No. 2 to Credit Agreement, dated as of May 22, 2019; (iii) First Incremental Amendment and Amendment No. 3 to Credit Agreement, dated as of June 11, 2021; (iv) Second Incremental Amendment and Amendment No. 4 to Credit Agreement, dated as of December 21, 2021; (v) Amendment No. 5 to Credit Agreement, dated as of October 7, 2022; (vi) Amendment No. 6 to Credit Agreement, dated as of October 11, 2022; and (vii) Amendment No. 7 to Credit Agreement, dated as of December 23, 2022.

48.     The terms of the Second Incremental Affiliated Term Loans were largely the same as those of the Initial Term Loans, but the Second Incremental Affiliated Term Loans were payment subordinated to most of the obligations outstanding under the Credit Agreement.  The Second Incremental Affiliated Term Loans mature on May 21, 2025 and are secured by the same assets as the Initial Term Loans.  As of the Petition Date, all of the principal on the Second Incremental Initial Term Loans ($5 million) and the Second Incremental Affiliated Term Loans ($30 million) remain outstanding.

49.     *Superpriority Delayed Draw Term Loans*.  On October 11, 2022, the Debtors and certain of the Credit Facility Secured Parties entered Amendment No. 6 to Credit Agreement and Amendment No. 1 to Security Agreement (the "Sixth Amendment") to fund the marketing process, which provided for $12.5 million in commitments to make new superpriority delayed draw term loans comprising a new class of term loans under the Credit Agreement (the "October 2022 Superpriority DDTLs").  The Sixth Amendment also (a) waived certain specified defaults and (b) terminated the revolving loan commitments.

50.     On December 23, 2022, the Debtors and certain of the Credit Facility Secured Parties entered Amendment No. 7 to Credit Agreement (the "Seventh Amendment"), which provided for $18 million in commitments to make new superpriority delayed draw term loans to combine with the October 2022 Superpriority DDTLs as a single class of term loans under the Credit Agreement (the "December 2022 Superpriority DDTLs" and, together with the October 2022 Superpriority DDTLs, the "Superpriority DDTLs").

51.     The Superpriority DDTLs mature on October 11, 2023.  As of the Petition Date, all of the principal on both the October 2022 Superpriority DDTLs ($12.5 million) and the December 2022 Superpriority DDTLs ($18 million) remains outstanding.

52. ***Equity Interests.*** The Debtors are majority-owned by Cardinal Buyer, LLC, which holds approximately 70 percent of the Debtors' equity. The remaining equity is primarily owned by Dr. Doreen Granpeesheh Living Trust and Haftshance, LLC, entities affiliated with Dr. Granpeesheh.

### III. Circumstances Leading to Chapter 11 Filing.

#### A. Challenges Facing Debtors' Business.

53. Primarily due to the COVID-19 pandemic's impact on in-person services and the labor supply, the Debtors have faced multiple challenges in the lead up to these chapter 11 cases. *First*, the COVID-19 pandemic led to tightening in the healthcare labor market and disrupted supply chains, and as a result, CARD's costs for labor and supplies have ballooned. Despite the significant continued unmet demand, ongoing staffing shortages have prevented the Debtors from meeting such demand. *Second*, in light of the Debtors' treatment-center business model, the Debtors are party to a number of burdensome lease obligations. Though the Debtors have been able to right-size their lease footprint and eliminate many of their significant lease obligations over the last twelve-months, historical lease costs put severe pressure on the Debtors' liquidity. *Third,* reimbursement rates under previously negotiated payor contracts have not kept up with the higher cost of doing business. *Fourth*, CARD is facing several pending and threatened litigation actions, including serving as a defendant in a California class action; audits; and other informal proceedings that may result in financial liabilities. *Fifth,* compounded by these challenges, notwithstanding the Debtors great treatment success, the Debtors collected revenues below what it expected for years. Together, these circumstances have placed CARD in a position where it no longer has adequate liquidity to continue operations absent the liquidity available under the DIP Facility.

54. ***Revenue Below Expectations.*** Despite the successful outcomes CARD's business model produced, in light of unprecedented impact of the COVID-19 pandemic, CARD's growth

model could not be supported. Prior to the pandemic, the Debtors had been pursuing a growth model to match the large demand, under the belief that more centers would lead to greater revenue. The unexpected headwinds from 2020 suppressed the Debtors' financials and tightened liquidity. In effort to halt COVID-19's impact and to prevent liquidity from bleeding, the Debtors pivoted to closing treatment centers rather than expanding. While the Debtors had many successful negotiations with its landlords, the Debtors' lease obligations are hefty and the revenue for these largely unutilized centers has not been enough to provide the Debtors with sufficient liquidity. The Debtors turned to these chapter 11 cases to reassess its growth strategy, tighten its operations, and continue its life changing treatments.

**B.      Proactive Approach to Addressing Financial Issues.**

55.      In response to growing liquidity issues, CARD pursued several actions to evaluate its restructuring alternatives.

i.   **Operational Restructuring Efforts.**

56.      *Governance Initiatives*.  In connection with consideration of strategic restructuring alternatives, the Debtors, in consultation with the Advisors, reviewed its existing governance infrastructure. The board of managers of CARD Holdings, LLC (the "Board") determined that it was in the best interest of the Company and its stakeholders to appoint certain independent and disinterested directors. Specifically, on July 8, 2022, the Board appointed Neal Goldman as an independent director. On October 14, 2022, the Board appointed Brent Kugman as an independent director. Further, on October 17, 2022, the Debtors a formed a special restructuring committee (the "Special Restructuring Committee"), comprised of Neal Goldman, as chairman, Brent Kugman, and David D'Alessandro, an existing disinterested director of the Board. The Special Restructuring Committee was vested with the authority to determine, review, negotiate, approve, authorize, and act upon any matters arising in relation to a restructuring process. Finally, in the

lead up to these chapter 11 cases, I was appointed to serve as the Debtors' Chief Restructuring Officer to assist the Debtors with managing liquidity and the preparation and negotiation of these chapter 11 cases.  I report to the Special Restructuring Committee.

57.     ***Special Investigation.***  I understand that subsequent to Mr. Goldman's appointment as disinterested director, he retained Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") as independent counsel to, among other things, conduct an investigation into certain insider transactions (the "Investigation").  The Investigation commenced at the end of July 2022.  At the outset, the Investigation focused on the Sponsor and its acquisition of the Company and the financing transactions executed in connection with the acquisition.  The Investigation has since expanded to include claims relating to material transactions involving other third parties in addition to the Sponsor.  Quinn Emanuel propounded various document requests on both the Company and the Sponsor and reviewed hundreds of documents produced by both, including emails, and interviewed relevant Sponsor principals.  Alvarez & Marsal North America, LLC ("A&M"), assisted Mr. Goldman and Quinn Emanuel in analyzing the Company's financial condition as of the times relevant to the 2018 acquisition transactions.

58.     I further understand that on November 18, 2022, Quinn Emanuel and A&M gave a comprehensive presentation to Mr. Goldman regarding the investigation of the 2018 acquisition transactions.  The balance of the Investigation is ongoing and will be completed on or before the Voting Deadline (as defined in the DS Motion[26]).  Upon its completion, Mr. Goldman will reach a final conclusion whether the releases and exculpations in the Plan are appropriate.  Mr. Goldman

---

[26]   "DS Motion" means the *Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballot and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, (V) Extending the Time by which the Debtors File Schedules and SOFAs, and (VI) Granting Related Relief*, filed contemporaneously herewith.

expressly reserves his right to conduct further inquiries or investigations within the scope of his authority as he deems necessary to act in accordance with his fiduciary duties.

59.    ***Revitalized Business Plan and Reduced Lease Footprint***.  In conjunction with the Debtors' Advisors, and as a condition under the October 2022 Superpriority DDTLs, the Debtors developed a go-forward business plan (the "Business Plan") to return the Company to profitability.

60.    The Business Model focused on three operational initiatives:  (i) early intervention patient conversion; (ii) treatment adherence/scheduling optimization; and (iii) cancellation reduction.   Early intervention patient conversion aims to increase the number of patients at under-exposed sites through marketing and outreach, to improve conversion rate of prospectives to patients through admissions timeline improvement and patient focus, and to ensure patients receive the appropriate level of treatment intensity.  The actions to increase treatment adherence and scheduling adherence include, improving the availability windows for patients and staff, applying consistent operating hours at all sites, boosting field scheduling capability and technologies, and refreshing the parent handbook and roll out through the network.  To reduce cancellations, the Business Plan proposes to, among other things, target patient and staff generated cancellations and roll out SMS reminders to reduce last-minute cancellations.

61.    The Business Plan also sets forth certain improvements and initiatives to the revenue cycle management.  To attain this goal, the Business Plan contemplated focus on: (i) internal focus areas, such as vendor partnership, patient collection management, and charge and capture billing; (ii) external investment such as, automated eligibility checks, benefit verification improvement, enterprise legacy planning aging, and patient collection solutions; and (iii) future investments and efforts, such as collection vendor replacement.

62.     Lastly, the Business Plan contemplated a reduction to the Company's footprint.  As part of this process, the Company engaged Hilco Real Estate, LLC ("Hilco") to perform an analysis of CARD's lease locations.   Upon conclusion of the analysis, CARD and Hilco initiated discussions with the Company's landlords to negotiate terms of the various existing leases.  As of the Petition Date, the Company had successfully negotiated concessions totaling approximately $10 million.  Right-sizing the lease footprint was an important facet of the Business Plan to ensure that the Debtors shed the leases for unprofitable centers.  Since January 2022, the Debtors have reduced their treatment center footprint by approximately 92 locations.  While the Debtors have been able to exit a number of leases in the lead up to these chapter 11 cases, not all of the landlords have been amenable to cancellation cost reductions.  The Debtor have incurred approximately $4 million in lease cancellation liabilities.  In order to reduce the lease footprint, as set forth in the Business Plan, the Debtor need additional funding to pay for any additional lease cancellation liabilities that may be incurred.

ii.   **Liquidity Management Efforts.**

63.     ***Bridge Financings***.  Following the COVID-19 pandemic, the Company began to experience significant liquidity challenges, but were able to manage most via bridge financing from their Credit Facility Lenders and the Sponsor.  The first iteration of bridge financing was obtained in June 2021, when Ares Capital Corporation ("Ares"), the Credit Facility Agent and majority lender under the Credit Agreement, provided $20 million to bridge the Company to profitability.  When it became clear that additional liquidity would be necessary, the Debtors received additional financing in December 2021 in the amount of $30 million from the Sponsor and in the amount of $5 million from Credit Facility Lenders, for a total of $35 million to bridge the Company to profitability by late 2022.  Despite the continued unmet demand for ABA therapy, performance remained below expectations as ongoing staffing shortages suppressed fulfilled

hours.  By late 2022, it again became apparent that the Debtors needed an additional infusion of cash.  In October 2022, Credit Facility Lenders provided the Debtors with an additional $12.5 million, this time earmarked to run a marketing process.  Finally, in December 2022 the Credit Facility Lenders provided the Debtors a final round of bridge financing in the amount of $18 million to maintain and continue the Debtors' marketing efforts.

64.     ***Marketing and Sale Process***.  Funded using the proceeds from the Superpriority Delayed Draw Term Loans, the Debtors' sale process formally began in November 2022 and remains ongoing today.  With the assistance of Livingstone, the Debtors commenced a marketing process for the sale of the Debtors' business in its entirety or for subsets of its clinics.  I understand that Livingstone contacted 58 potential strategic and financial buyers across the globe, all of which either have a platform investment in the behavioral health space or a stated interest in acquiring a business in the behavioral space.  Out of the 58 strategic buyers contacted, 50 executed nondisclosure agreements with the Debtors and were provided with significant confidential information regarding the Debtors' financial, operational, and legal affairs.  In early January 2023, I understand that Livingstone had received 13 indications of interest from potential buyers, and CARD's management team hosted virtual presentations with ten potential purchasers.  Livingstone received five letters of intent by the end of January 2023.

65.     Ultimately, on March 13, 2023, CARD executed an exclusivity agreement with one of the bidders, the Exclusive Bidder, to consummate an out-of-court transaction.  In late April 2023, the Exclusive Bidder unexpectedly reduced its bid value substantially and removed the out-of-court condition, instead indicating that it would only be willing to act as a stalking horse for an in-court process.  Two and a half weeks later, after the exclusive period had expired, the Exclusive Bidder further reduced its bid, rendering it unactionable.  The Debtors rejected the

Exclusive Bidder's bid and immediately reengaged with the potential bidders who had demonstrated a bona fide interest during the initial marketing outreach.  Livingstone, along with the Advisors, helped the Debtors consider the proposals received.  When analyzing the proposals, the Debtors and the Advisors considered the risk and benefits associated with each proposed transaction, including overall value delivered, timing considerations, and execution risk.

66.     Ultimately, the Debtors' renewed marketing efforts bore fruit.  After deliberation and extensive negotiations with several parties, the Debtors selected the Stalking Horse Bidder for the sale of substantially all of the Debtors' assets.  Pursuant to the Stalking Horse APA, the Stalking Horse Bidder will purchase substantially all of the Debtors' assets and continue to operate the Debtors' treatment facilities as a going-concern after the Debtors emerge from chapter 11.  Critically, the Stalking Horse APA ensures that the Debtors' business will continue to operate without disruption post-emergence and that the Debtors' patients will receive the treatment and services they need.

67.     In advance of any potential sale transaction, the Debtors preemptively issued conditional notice under the Work Adjustment and Retraining Notification Act ("WARN") to those employees of the Debtors that may trigger potential WARN liability.  None of the Debtors' employees working directly at the Debtors' treatment centers received such notice.  While the dismissal of the noticed employees is not currently contemplated in the Stalking Horse APA, due to the razor thin liquidity in these cases and the potential of an asset sale on different terms as a result of the postpetition sale process, the Debtors issued the notice out of an abundance of caution.

## C.     The Path Forward.

68.     The Debtors need an immediate-term solution to prevent any degradation to operations, including critically, patient care.  Having worked around the clock for the past several

weeks, the Debtors believe they are well positioned to move quickly through these chapter 11 cases
and obtain such solution.

### D.      DIP Facility.

69.      By the DIP Motion, and as set forth in greater detail in the Greenwood Declaration,
the Debtors seek authorization from the Court to enter into the DIP Facility.  I understand that the
Debtors require immediate access to additional liquidity to fund the administration of the
chapter 11 cases, stabilize and continue operations, pay critical vendors, and finance the ongoing
marketing process, among other things.

70.      The Debtors, through the assistance of the Advisors, thoroughly explored alternate
opportunities for in-court financing, including outreach to various third-parties to determine the
availability and viability of third-party financing either on a priming or junior-lien basis.  For
various reasons as described in the Greenwood Declaration, this process did not yield any
financing offers—leaving the Debtors with no actionable third-party alternative to the DIP Facility.

71.      Given the constraints imposed by the Debtors' existing capital structure, including
the unlikelihood of obtaining postpetition financing on a junior basis to the prepetition Credit
Agreement liens, the Debtors, in consultation with the Advisors, concluded that seeking
postpetition financing from their existing lenders represented the only viable path to obtaining
critically needed liquidity (without engaging in what I understand would be a costly and potentially
drawn out priming fight at the outset of these cases).

72.      Accordingly, the Debtors and certain Credit Facility Lenders negotiated a DIP
Facility that will provide the Debtors with crucially required funding to administer these cases,
fund the sale and marketing process to conclusion, and continue operations, among other things.
The Debtors and certain Credit Facility Lenders ultimately agreed upon the terms of a
debtor-in-possession financing in the form of super priority secured term loan under a new money,

multi-draw term loan facility consisting of up to $18 million, $7.5 million of which will be available on an interim basis. On an interim basis, the Debtors are seeking authority to use the proceeds from the DIP Facility to fund general operating expenses, including payroll. The remaining material terms of the DIP Facility are described in greater detail in the DIP Motion.

73.     Without immediate financing, the Debtors will be unable to pay essential costs required to continue operating as a going concern and to conclude their marketing process, resulting in immediate and irreparable harm to the Debtors' business and, most importantly, their patients. The Debtors require cash to, among other things, satisfy payroll obligations, pay vendors which provide goods and services, maintain insurance coverage, pay taxes, and make other payments integral to the continued management, operation, and preservation of the Debtors' business to facilitate an orderly transition to one or more purchasers, all of which are required to ensure that patients receive uninterrupted care.

74.     I have had a substantial number of discussions and meetings with the Debtors' management team and other advisors regarding the quantum of capital needed and the potential forms that a financing and/or restructuring could take. After those extensive discussions and meetings, and based upon my experience in restructuring, analyses prepared by myself and my team, and my familiarity with the Debtors and their operations, I do not believe it would be possible to administer these chapter 11 cases, conclude the marketing and sale process, and operate the Debtors' business in the ordinary course solely through the use of cash collateral. I believe the Debtors require immediate access to the DIP Facility to meet their near-term working capital needs, stabilize their operations, fund the costs of administering these cases, and ensure an orderly transition of the Debtors' business with minimal disruption to patients.

75.     The size of the DIP Facility and the amount requested on an interim basis has been determined based on a thorough analysis conducted by myself and others at Portage Point, together with the Debtors' management team and Advisors.  The amount was derived from a cash-flow projection that Portage Point developed based on an analysis of the Debtors' projected receipts and disbursements during these chapter 11 cases (the "Budget"), and from discussions with the Debtors' management team.  Based on my experience in comparable large-scale corporate bankruptcy cases, my familiarity with the Debtors' operations, and extensive discussions with the Debtors' management team and Advisors, including a team from Portage Point acting under my supervision, I believe the Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.  Given these estimates, I believe that the DIP Facility will provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases.  I also believe the DIP Facility will allow the Debtors to reassure the Debtors' other stakeholders—and, critically, the Debtors' patients—that the Debtors have sufficient funds to continue operating in the ordinary course.

76.     The Credit Facility Secured Parties have also agreed to provide the Debtors with immediate access to the use of cash collateral on a consensual basis, subject to the terms and conditions of the DIP Documents and the DIP Orders (as defined in the DIP Motion).  Immediate access to cash collateral will:  (a) ensure that the Debtors have sufficient working capital to, among other things, pay their employees, vendors, landlords, and service providers; (b) enable the Debtors to honor their prepetition obligations under and in accordance with the proposed "first-day" relief if approved by the Court; and (c) satisfy the administrative expenses of these chapter 11 cases. The ability to immediately use cash collateral also ensures that the Debtors avoid unnecessary operational disruptions that would otherwise be costly and potentially damaging to the business

and harmful to patients.  I believe that utilizing cash collateral is fundamental to the preservation

and maintenance of the Debtors' going-concern value during these chapter 11 cases, is critical for

the successful completion of the Debtors' sale process, and is in the best interests of the Debtors

and the estates.

77.     Absent funds available from the DIP Facility and access to cash collateral, I believe

the Debtors could face a value-destructive interruption to their business and lose support from

important stakeholders on which the Debtors' business depends, including employees, vendors,

and other contract counterparties.  I believe that this, in turn, would hinder the Debtors' ability to

maximize the value of their estates, and the Debtors would be forced to curtail their operations

significantly, if not entirely, to the detriment of patients and all stakeholders.

78.     Further, without access to the DIP Facility, the Debtors will have extremely limited

cash on hand, and based on the Debtors' liquidity forecast, would not be able to generate sufficient

levels of operating cash to cover their working capital needs and the costs of these chapter 11

cases.  As a result, I believe that the DIP Facility is critical to the Debtors' ability to administer

these chapter 11 cases and provide the Debtors with sufficient liquidity to continue operations in

the ordinary course and pursue the restructuring contemplated by the Plan.

    **E.     Bidding Procedures and Plan Process.**

79.     Although the Debtors did not consummate an out-of-court transaction, the Debtors'

robust prepetition marketing process provided a head start on a potential transaction, paving the

way for an expeditious in-court process to punctuate the Debtors' prepetition efforts and ensure

that the Debtors receive the highest or otherwise best offer(s) for their assets.  The Bidding

Procedures Motion requests a month-long process to close out any remaining leads from the

Debtors' prepetition marketing process, solicit final bids, and effectuate an orderly transition of the Debtors' business to the Stalking Horse Bidder if no better offer arises.

80.    Despite the length and fulsome prepetition marketing process already conducted, the Bidding Procedures (as defined in the Bidding Procedures Motion) will allow the Debtors to conduct a postpetition "market check" of the Stalking Horse Bid to ensure that the Debtors obtain the highest or otherwise best offer, or combination of offers, for the sale of their business or some or all of their assets.  The Debtors' *Joint Chapter 11 Plan of Reorganization of Center for Autism and Related Disorders, LLC and Its Debtor Affiliates* (the "Plan"), filed concurrently herewith, provides for a sale of the Debtors' assets to the Stalking Horse Bidder or, in the event that the postpetition marketing process yields a more value-maximizing sale of the Debtors' assets, the winning bidder.  The proposed process will maximize the value of the Debtors' estates for the benefit of all parties in interest by allowing the Debtors to complete their marketing process with minimal additional administrative costs, while protecting against disruption to patient care.

81.    The proposed timeline for the postpetition marketing process, though expeditious, is more than sufficient when viewed in the context of the Debtors' prepetition marketing process. At this stage, time is of the essence—even with a $18 million in DIP Facility, the Debtors project that they will run out of liquidity by early August 2023.  As such, any delay in consummation of the Plan puts the wellbeing of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.  Additionally, the Debtors' DIP Agent and the Debtors' Credit Facility Lenders–who, despite their secured status, are impaired under the Plan–

understand the extreme risks of a lengthy in-court process and support the Debtors' proposed timeline.

82.     The Debtors have proposed the following key dates in connection with the Bidding Procedures:[27]

| Event or Deadline | Date and Time (all times in Central Time) |
|---|---|
| Cure Objection Deadline[28] | Friday, July 14, 2023, at 4:00 p.m. |
| General Bid Deadline | Friday, July 14, 2023, at 4:00 p.m. |
| Auction (If Required) | Monday, July 17, 2023, at 9:00 a.m. |
| Deadline for Objections to Approval of any Winning Bid (including Back-Up Bids), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline. | Wednesday, July 19, 2023, at 4:00 p.m. |
| Confirmation and Sale Hearing | Thursday, July 20, 2023, subject to Court availability |

   **F.     Proposed Plan.**

83.     The Plan, filed concurrently herewith, provides for a continuation of the marketing process and an auction to solicit bids for one or more asset sales in accordance with the Bidding Procedures.  The order confirming the Plan will also serve as the order approving the sale to the Stalking Horse Bidder, in the event no bid exceeds the Stalking Horse Bid.  Pursuant to the Plan, an orderly wind-down of any unsold assets will be funded by the sale proceeds.

84.     Because expediency is critical both to the nature of the business and milestones under the DIP Financing, progressing the Plan in parallel with the marketing process is vital.  The

---

[27]   Capitalized terms used in this summary but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Motion.  To the extent that there is any inconsistency between this timeline and the Bidding Procedures Motion, the Bidding Procedures Motion shall control.

[28]   The Debtors will provide notice of proposed cure amounts as soon as reasonably practicable after entry of the Bidding Procedures Order.

Plan provides for maximum flexibility, and will be funded by one or more asset sales consummated by the Debtors.  As set forth in greater detail in the DS Motion, to preserve the proposed timeline the Debtors are also seeking conditional approval of the Disclosure Statement.[29]

G. **Proposed Timeline for These Chapter 11 Cases.**

85.     It is critical that the Debtors obtain confirmation of these chapter 11 cases on an expedited timeline and emerge from these chapter 11 cases as soon as reasonably practicable due to the specific nature of their business—maintaining healthcare and treatment services for their thousands of patients.  Progressing the Plan process in parallel with the Bidding Procedures will ensure continued operations of the Debtors' facilities, employment of their workforce and technicians, and importantly, safety of their patients.  Any delay in consummation of the Plan puts the well-being of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.  Thus, the Debtors have a particular need for an expedited chapter 11 proceeding.

86.     The Debtors' main priority in these chapter 11 cases is to ensure continuity of care to its patients and job retention for its employee base.  I believe that it is crucial that the timeline of these chapter 11 cases provide certainty to the Debtors' patient base.  Both the nature of the Debtors' business and the milestones under the Debtors' proposed DIP Financing, make an efficient chapter 11 process essential.  Further, the Debtors' robust and lengthy prepetition marketing process has ensured that the timeline proposed in these chapter 11 cases will not compromise the Debtors receiving the best possible bid in the sale process.  I believe that expeditious confirmation of the Plan and consummation of the asset sale(s) are in the best interest

---

[29]   "Disclosure Statement" means the *Disclosure Statement for the Joint Chapter 11 Plan of Center for Autism and Related Disorders, LLC and its Debtor Affiliates*, filed contemporaneously herewith.

of the Debtors, their estates, and their stakeholders.  Accordingly, the Debtors propose to progress through these chapter 11 cases with the following key dates, subject to Court approval and availability:[30]



(1)   Any objections to the Plan in connection with the assumption or rejection of the Executory Contract(s) and Unexpired Lease(s) and/or related Cure costs or rejection damages, respectively, proposed in connection with the Plan that remain unresolved as of the Combined Hearing will be heard at the first omnibus hearing following the Combined Hearing, or such other date as fixed by the Court.

---

[30]   Capitalized terms used in this summary but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Emergency Motion for Entry of an Order Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures With Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballot and Notices in Connection Therewith, (IV) Scheduling Certain Dates With Respect Thereto, (V) Extending the Time by Which The Debtors File Schedules and SOFAs, and (VI) Granting Related Relief* (the "DS Motion"), filed contemporaneously herewith.  To the extent that there is any inconsistency between this timeline and the DS Motion, the DS Motion shall control.

## IV.   First Day Motions.[31]

87.    Contemporaneously herewith, the Debtors have filed the first day motions (collectively and, with the DIP Motion, the "Frist Day Motions").  The First Day Motions (other than the DIP Motion) include the following:

*Procedural Motions*

A.   **Joint Administration Motion.**  *Debtors'* <u>*Emergency*</u> *Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>");

B.   **Claims Agent Retention Application.** *Debtors Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc., as Claims, Noticing, and Solicitation Agent* (the "<u>Claims Agent Retention Application</u>");

C.   **Creditor Matrix Motion.**  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief* (the "<u>Creditor Matrix Motion</u>");

D.   **Patient Information Procedures Motion.**  *Debtors' Emergency Motion for Entry of an Order Authorizing the Implementation of Procedures to Protect Confidential Patient Information* (the "<u>Patient Information Procedures Motion</u>");

*Operational Motions*

E.   **Cash Management Motion.**  *Debtors'* <u>*Emergency*</u> *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, and (B) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>");

F.   **Critical Vendors Motion.**  *Debtors'* <u>*Emergency*</u> *Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Patient Care and Safety Vendors, (B) Lien Claimants, and (C) 503(b)(9) Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Honoring and Reissuance of Rent Checks, and (IV) Granting Related Relief* (the "<u>Critical Vendors Motion</u>");

---

[31]   Capitalized terms used but not defined in this section have the correlative meaning ascribed to such term as in the corresponding First Day Motion, as applicable.

G. **Insurance Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage, Premium Financing Agreements, and Letters of Credit Entered into Prepetition and Pay Related Prepetition Obligations, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (C) Pay Prepetition Broker Fees, and (II) Granting Related Relief* (the "<u>Insurance Motion</u>");

H. **Patient Refunds Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Refund Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "<u>Patient Refund Motion</u>");

I. **Taxes Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "<u>Tax Motion</u>");

J. **Utilities Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>"); and

K. **Wages Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "<u>Wages Motion</u>").

88.     I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' Advisors to ensure that I understand each First Day Motion and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

89.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions is (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) critical to the Debtors' achieving a successful restructuring; and (c) in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business

and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

### B.  Procedural Motions

#### i.  **Joint Administration Motion**.

90.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order, (a) directing procedural consolidation and joint administration of these chapter 11 cases, and (b) granting related relief.  Specifically, the Debtors request that one file and one docket be maintained for all of the jointly administered cases under the case of Center for Autism and Related Disorders, LLC.

91.     Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Entry of the order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration will also allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

92.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

#### ii.  **Claims Agent Retention Application**.

93.     Pursuant to the Claims Agent Retention Application, the Debtors seek entry of an order authorizing the Debtors to employ Stretto, Inc. (the "Stretto") as claims, noticing, and

solicitation agent in accordance with the terms and conditions set forth in the engagement letter dated May 2, 2023.

94. Stretto's appointment as Claims and Noticing Agent is in the best interest of the Debtors' estates and their creditors because it will expedite the distribution of notices and the processing of claims.  Moreover, in my experience, Stretto's rates are competitive and reasonable, especially given Stretto's quality of services and expertise.

95. I believe that the relief requested in the Claims Agent Retention Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.

iii. **Creditor Matrix Motion.**

96. Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to redact certain personally identifiable information, (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases, and (c) granting related relief.

97. Specifically, the Debtors request that Stretto be allowed to redact the consolidated list of creditors, the schedules of assets and liabilities and the statements of financial affairs, claims registers, and proofs of claim the names, home and email addresses, and other personally identifiable information.

98. Redaction of personally identifiable information is appropriate because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, stalking, or phishing scams under section 107(c)(1) of the Bankruptcy Code, and disclosure risks violating relevant law.  As operators of healthcare centers, a large proportion of

the Debtors' creditors are current and former patients.  The Debtors propose to protect the confidential information of the Patients.

99.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

iv.  **Patient Information Procedures Motion**.

100.     Pursuant to the Patient Information Procedures Motion, the Debtors seek entry of an order (a) authorizing the implementation of procedures to protect confidential patient information and (b) granting related relief.

101.     Specifically, the Debtors request that Stretto, Inc., the proposed claims agent in these chapter 11 cases be allowed to prepare a separate creditor matrix of the Patients and separate schedules of claims that may be asserted by and against the Patients as well as a redacted version of the Patient Schedules that redacts the names and addresses, and any unique identifying numbers of the Patients.

102.     I believe that the relief requested in the Patient Information Procedures Motion balances the need to maintain confidential patient information under HIPAA with the need for disclosure under the Bankruptcy Code.  The relief requested is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

103.     I believe that the relief requested in the Patient Information Procedures Motion balances the need to maintain confidential patient information under HIPAA with the need for disclosure under the Bankruptcy Code.  The relief requested is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### C.  Operational Motions.

#### v.  <u>Cash Management Motion</u>.

104.    The Debtors seek entry of interim and final orders (a)authorizing the Debtors to (i) continue to operate their cash management system, as described herein and as illustrated on Exhibit A attached to the Cash Management Motion, and maintain their existing bank accounts; and (ii) maintain existing business forms and books and records, and (b) granting related relief.

105.    Given the economic and operational scale of the Debtors' businesses, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of their estates and numerous stakeholders.

106.    I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

#### vi.  <u>Critical Vendors Motion</u>.

107.    Pursuant to the Critical Vendors Motion, the Debtors seek entry of an Order (a) authorizing the Debtors to pay certain prepetition claims of (i) patient care and safety vendors, (ii) lien claimants, and (iii) 503(b)(9) claimants; (b) granting administrative expense priority to all undisputed obligations on account of goods ordered by the Debtors prior to the date hereof that will not be delivered until after the Petition Date and authorizing the Debtors to satisfy such obligations in the ordinary course of business; (c) authorizing honoring and reissuance of outstanding prepetition rent checks; and (d) granting related relief.

108.    The Debtors and the communities their centers serve are in a vulnerable position, as the centers require a steady supply of goods and services from certain vendors in order to provide essential healthcare services.  A disruption in the supply of such goods and services could jeopardize the availability of critical care and could compromise the Debtors' ability to maintain

their high standards of patient care and safety.  To provide treatment, the Debtors rely on a steady flow of supplies and services, including medical supplies, regular maintenance services, and other critical operations services.  In many cases, these goods and services are highly specialized and technologically complex.  In most cases, the ability to find replacement vendors for these goods and services would be difficult if not impossible.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another could irreparably harm the Debtors' patients.

109.    The Debtors regularly hire Lien Claimants to make improvements and repairs to their properties and certain equipment used in the operation of the centers.  Countless aspects of the Debtors' operations depend on continuing business relationships with, and services provided by, their Lien Claimants.  Failure to timely pay amounts owed to the Lien Claimants could disrupt the Debtors' ordinary course operations and delivery of quality patient care.

110.    The Debtors may have received certain goods or materials from various vendors within the 20 days before the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

111.    The Debtors may have ordered goods prior to the Petition Date in the ordinary course of business that will not be delivered until after the Petition Date.  Under the belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition, potentially disrupting the Debtors' ongoing business operations and requiring the

Debtors to expend substantial time and effort in issuing such substitute orders.  Each month, the Debtors pay certain of their rent obligations via check.  In some instances, the Rent Checks are not processed for up to 21 days after issuance.  The Debtors request that the outstanding prepetition Rent Checks, to the extent such checks have been cancelled as a result of the commencement of these chapter 11 cases, be honored on a postpetition basis, the Debtors request authority to reissue the Rent Checks.

112.    I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### vii. **<u>Insurance Motion</u>**.

113.    Pursuant to the Insurance Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to (i) maintain insurance coverage, premium financing agreements, and letters of credit entered into prepetition and pay related prepetition obligations, (ii) renew, supplement, modify, or purchase insurance coverage in the ordinary course of business, (iii) pay prepetition brokerage fees, and (b) granting related relief.

114.    The nature of the Debtors' business makes it essential for the Debtors to maintain their Insurance Policies on an ongoing and uninterrupted basis.  Failure to maintain the Insurance Policies could have a detrimental impact on the Debtors' business, operations, and the value of their estates.  Any interruption in insurance coverage would expose the Debtors to a number of risks, including potential (a) direct liability for the payment of claims that otherwise would have been covered under the Insurance Policies, (b) material costs and other losses that otherwise would have been reimbursed, (c) inability to obtain similar insurance coverage on terms as equally favorable as the present coverage, (d) higher costs for reestablishing lapsed Insurance Policies or obtaining new insurance coverage, and (e) regulatory exposure in the event the Debtors are

required to maintain certain insurance to continue hospital operations.  If any of these situations arise, the Debtors and their advisors would be forced to address these matters, thus expending limited time and resources.  It is therefore in the best interests of the Debtors, their estates, and stakeholders for the Debtors to have authority to maintain as well as revise, extend, supplement, or change insurance coverage, including in connection with the Debtors' Premium Financing Agreements, Deductibles, SIRs, and Letters of Credit, as necessary.

115.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### viii. **Patient Refunds Motion**.

116.    Pursuant to the Patient Refunds Motion, the Debtors seek entry of an order (a) authorizing the debtors to maintain and administer ordinary course prepetition refund programs and honor certain prepetition obligations related thereto and (b) granting related relief.

117.    The Refund Recipients consist of patients, insurers, and school district partners, all of whom are vital to the Debtors' business.  If the relationships established by the Debtors with their Refund Recipients are harmed by the Debtor's failure to provide reimbursement for overpayments or pursuant to negotiated contractual arrangements, the Debtors could suffer serious reputational consequences.  Without functional relationships with their patients, healthcare insurers, and school district partners, the Debtors have no business.  Further, the Debtors may lose the trust of such Refund Recipients and new and existing Refund Recipients alike may be unwilling to engage with the Debtors going forward.  If that were to occur, the negative impact on the Debtors' business, their estates, and creditors would be significant and potentially irreversible.  It is therefore necessary for the successful reorganization of the Debtors that they be permitted to honor the Refund Programs.

48

118.     I believe that the relief requested in the Patient Refund Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

ix.  **Taxes Motion.**

119.     The Debtors seek entry of an order (a) authorizing the Debtors to (i) remit and pay or use tax credits to offset prepetition Taxes and Fees and postpetition Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date) and (ii) undertake the Tax Planning Activities; and (b) granting related relief.

120.     I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

x.  **Utilities Motion.**

121.     Pursuant to the Utilities Motion, and in light of the severe consequences to the Debtors, their operations, and their patients should the Utility Providers interrupt their services, the Debtors seek entry of an order (a) approving the Debtors' proposed adequate assurance of payment for future utility services; (b) prohibiting utility providers from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests; and (d) granting related relief.

122.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and their ability to provide essential care to their patients and to promote their betterment and wellbeing.  Should any Utility Provider refuse or discontinue services, even for a

brief period, the Debtors' business operations could be severely disrupted to the detriment of the Debtors' patients and the Debtors' reorganization efforts.

123.     I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

      xi. **Wages Motion.**

124.     Pursuant to the Wages Motion, the Debtors seek entry of an order (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course, including paying certain prepetition obligations related thereto, and (b) granting related relief.

125.     The Debtors' ability to provide quality patient care at their approximately 130 treatment center locations depends on the continued service and morale of the Debtors' workforce. The Employees and Independent Contractors perform functions critical to the Debtors' ordinary course operations and the orderly administration of these chapter 11 cases.  In many instances, the Employees or Independent Contractors are distinctly familiar with the Debtors' patients, processes, and systems and possess specialized knowledge, skills, or experience that cannot be easily replaced.  The remainder of the Employees and Independent Contractors provide services necessary to continue the Debtors' operations and maximize the value of the Debtors' estates.  Without the continued, uninterrupted services of their Employees and Independent Contractors, the Debtors' ability to efficiently conduct their business operations during the pendency of these chapter 11 cases will be threatened, and patient treatments could be disrupted.

126.     I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  June 12, 2023

/s/ Steven Shenker
Steven Shenker
Chief Restructuring Officer
CARD Holdings, LLC