LY IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER FOR AUTISM AND RELATED | ) | Case No. 23-90709 (DRJ) |
| DISORDERS, LLC, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN
ORDER (I) APPROVING THE BIDDING PROCEDURES, (II) APPROVING
BID PROTECTIONS, (III) SCHEDULING CERTAIN DATES WITH RESPECT
THERETO, (IV) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT
PROCEDURES, (VI) AUTHORIZING THE DEBTORS TO ENTER INTO DEFINITIVE
PURCHASE AGREEMENTS, AND (VII) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 11:00 a.m. (prevailing Central Time) on June 16, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on June 16, 2023, at 11:00 a.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones' homepage. The meeting code is "JudgeJones". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance"**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192). The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

link on Judge Jones' homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.

The above-captioned debtors and debtors in possession (collectively, "<u>CARD</u>" or the "<u>Debtors</u>") submit the motion (this "<u>Motion</u>") and in support thereof file the *Declaration of Joseph Greenwood in Support of Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Debtors to Enter into Definitive Purchase Agreements, and (VII) Granting Related Relief*, filed contemporaneously herewith (the "<u>Greenwood Declaration</u>"). The Debtors state the following in support of this motion:[2]

## <u>Preliminary Statement</u>[3]

1.      CARD is the world's largest autism treatment provider and the third-largest non-governmental organization contributing to autism research in the United States.  Since CARD's founding, CARD employees have successfully treated tens of thousands of individuals with autism spectrum disorder ("<u>ASD</u>"), allowing them to live successful, independent lives in large part due to early intervention treatment at CARD's centers.  For several years, however, CARD has contended with ever-tightening liquidity stemming from reduced reimbursement rates, labor shortages, lower-than-expected revenues, and burdensome lease obligations.

---

[2]   A description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Steven Shenker, Chief Restructuring Officer of CARD Holdings, LLC, in Support of Chapter 11 Petitions, First Day Motions, and DIP Motion* (the "<u>First Day Declaration</u>"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), on June 11, 2023 (the "<u>Petition Date</u>").

[3]   Terms capitalized but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Motion.

2.      While every company seeks to minimize operational disruptions as a result of financial distress, CARD, as a key service provider to the ASD community, felt a deep responsibility to ensure consistency and quality in patient care notwithstanding business headwinds.  In furtherance of the companion goals of ensuring continuity in patient care and maintaining their talented workforce, the Debtors have been actively exploring a variety of strategic alternatives including a potential sale, strategic merger, consolidation, or business combination since October 2022.  The Debtors hired Livingstone Partners LLC ("Livingstone") to commence a full marketing and sale process.

3.      The Debtors' sale process formally began in November 2022.  As part of the sale process, the Debtors, with the assistance of Livingstone, contacted 58 strategic buyers, 50 of which executed nondisclosure agreements and were provided with a confidential information presentation and substantial additional financial, operational, and legal diligence materials.  In mid-January 2023, CARD's management team hosted virtual presentations with ten potential purchasers and requested letters of intent by January 26, 2023.  CARD received five letters of intent and requested "best and final" bids from each of the submitting parties.  Ultimately, on March 13, 2023 CARD signed an exclusivity agreement with one of the bidders (the "Exclusive Bidder") to consummate an out-of-court transaction.

4.      Throughout March and April, the Debtors and the Exclusive Bidder engaged in significant due diligence efforts.  During that process, the Exclusive Bidder made material changes to the terms under which it was willing to close a transaction, reducing its bid substantially and removing the out-of-court condition, instead stating that it would only be willing to consummate the transaction as a stalking horse for an in-court process.  Two and a half weeks later, after the

exclusive period had expired, the Exclusive Bidder further reduced its bid, rendering it unactionable. The Debtors rejected the Exclusive Bidder's bid.

5.      After terminating negotiations with the Exclusive Bidder, the Debtors, with the assistance of Livingstone, immediately reopened the marketing process by reengaging with the potential bidders who demonstrated a bona fide interest during the initial marketing outreach in acquiring some or all of the Debtors' assets. Ultimately, those efforts were successful. On June 9, 2023, the Debtors executed the Stalking Horse Agreement, pursuant to which Pantogran LLC, an entity owned by Dr. Doreen Granpeesheh, the Debtors' founder, will purchase the Debtors' business and continue to operate the Debtors' treatment facilities after the Debtors emerge from chapter 11. Critically, the Stalking Horse Agreement ensures that the Debtors' business will continue to operate without disruption post-emergence and that the Debtors' patients will receive the treatment and services they need.

6.      Although the Debtors did not consummate an out-of-court transaction, the Debtors' robust prepetition marketing process provided a head start on a potential transaction, paving the way for an expeditious in-court process to advance the Debtors' prepetition efforts and ensure that the Debtors receive the highest or otherwise best offer(s) for their assets. This Motion requests a month-long process to close out any remaining leads from the Debtors' prepetition marketing process, solicit final bids, and effectuate an orderly transition of the Debtors' business to the Stalking Horse Bidder if no better offer arises.

7.      Despite the length and fulsome prepetition marketing process already conducted, the The Bidding Procedures will allow the Debtors to conduct a postpetition "market check" of the Stalking Horse Bid to ensure that the Debtors obtain the highest or otherwise best offer, or combination of offers, for the sale of their business or some or all of their assets. The Debtors'

*Joint Chapter 11 Plan of Reorganization of Center for Autism and Related Disorders, LLC and Its Debtor Affiliates* (the "Plan"),[4] filed concurrently with this Motion, provides for a sale of the Debtors' assets to the Stalking Horse Bidder or, in the event that the postpetition marketing process yields a more value-maximizing sale of the Debtors' assets, the Winning Bidder.  The proposed process will maximize the value of the Debtors' estates for the benefit of all parties in interest by allowing the Debtors to complete their marketing process with minimal additional administrative costs, while protecting against disruption to patient care.

8.      The proposed timeline for the postpetition marketing process, though expeditious, is more than sufficient when viewed in the context of the Debtors' prepetition marketing process. At this stage, time is of the essence—even with a $18 million DIP Facility, the Debtors project that they will run out of liquidity by early August 2023. As such, any delay in consummation of the Plan puts the wellbeing of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.  Additionally, the Debtors' DIP Agent and the Debtors' Credit Facility Lenders—who, despite their secured status, are impaired under the Plan— understand the extreme risks of a lengthy in-court process and support the Debtors' proposed timeline.

9.      The Debtors seek approval of the Bidding Procedures to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for the Assets, have sufficient time to receive and evaluate bids, hold an Auction, if necessary, and prepare documentation to effectuate one or more sale(s) of the Assets.  The Bidding Procedures and relief requested in this

---

[4]   Terms capitalized but not defined herein shall have the meanings ascribed to such terms in the Plan or the Bidding Procedures, as applicable.

Motion are in the best interests of the Debtors' estates and their stakeholders. The Debtors request that the Court grant the relief requested herein.

**Relief Requested**

1.    The Debtors seek entry of an order (the "Bidding Procedures Order"):

    (a)    authorizing and approving the Bidding Procedures attached to **Exhibit 1** to the Bidding Procedures Order as (the "Bidding Procedures");

    (b)    approving the form and manner of notice of the sale hearing (the "Sale Hearing") with respect to the sale (the "Asset Sale") of the Assets (as such term is defined in the Stalking Horse Agreement), attached as **Exhibit 2** to the Bidding Procedures Order (the "Sale Notice");

    (c)    scheduling the auction (the "Auction") (if necessary) and Sale Hearing;

    (d)    approving procedures for the assumption and assignment of executory contracts and leases (the "Assigned Contracts"), including notice of proposed cure amounts attached as **Exhibit 3** to the Bidding Procedures Order; and

    (e)    granting related relief.

2.    Lastly, the Debtors will seek entry of an order at the Sale Hearing (the "Sale Order")[5]:

    (a)    authorizing and approving the Sale to the Stalking Horse Bidder or otherwise the Winning Bidder (as defined in the Bidding Procedures) on the terms substantially set forth in the Stalking Horse Agreement or Winning Bid, as applicable;

    (b)    authorizing and approving the Sale of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Stalking Horse Agreement attached as **Exhibit 1** to the Bidding Procedures, or to extent set forth in asset purchase agreement with a Winning Bidder which shall be attached to the Sale Order as **Exhibit 1**;

    (c)    authorizing the assumption and assignment of the Assigned Contracts as set forth in the Stalking Horse Agreement or asset purchase agreement with the Winning Bidder; and

---

[5]    The Sale Order may be the Confirmation Order.

(d)    granting any related relief.

### Jurisdiction and Venue

3.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157 (b).  The Debtors confirm their consent to the entry of a final order.

4.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The bases for the relief requested herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and rules 2002, 6003, 6004, 6006(a), 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

6.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

### Sale and Marketing Process

**I.    The Stalking Horse Bidder and the Proposed Timeline**.

7.    On June 9, 2023, the Debtors and the Stalking Horse Bidder reached agreement on the form of asset purchase agreement (including all exhibits and schedules related thereto, the "Stalking Horse Agreement").  Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder proposes to acquire substantially all of the Debtors' assets for total consideration valued at

approximately $25 million as of the expected closing date, subject to certain adjustments (the "Purchase Price").

8.     Pursuant to the Bidding Procedures, the Debtors will solicit any higher or otherwise better proposals according to the following proposed schedule, subject to Court approval and availability:

| Event or Deadline | Date and Time (all times in Central Time) |
|---|---|
| Cure Objection Deadline[6] | Friday, July 14, 2023, at 4:00 p.m. |
| General Bid Deadline | Friday, July 14, 2023, at 4:00 p.m. |
| Auction (If Required) | Monday, July 17, 2023, at 9:00 a.m. |
| Deadline for Objections to Approval of any Winning Bid (including Back-Up Bids), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline. | Wednesday, July 19, 2023, at 4:00 p.m. |
| Confirmation and Sale Hearing | Thursday, July 20, 2023, subject to Court availability |

9.     The proposed timeline will provide the Debtors with an opportunity to conclude their marketing process and proceed expeditiously towards confirmation of one or more sales. The Debtors believe the proposed schedule is in the best interests of their creditors, other stakeholders, and all other parties in interest, and should be approved.

10.     The Debtors believe the Bidding Procedures will provide sufficient time for any potential topping bidder to put forth an actionable competing bid. During the Debtors' lengthy prepetition marketing process, relevant information regarding the Debtors' business was made available in the virtual data room, allowing potential bidders to conduct diligence on the Debtors'

---

[6]     The Debtors will provide notice of proposed cure amounts as soon as reasonably practicable after entry of the Bidding Procedures Order

business, and the Debtors and their advisors began marketing the Debtors' assets prior to the commencement of these chapter 11 cases. To the extent that any potential bidder has not previously conducted such diligence, such bidder will have immediate access to, subject to the execution of an appropriate confidentiality agreement, the information regarding the Debtors' assets contained in the virtual data room.

## II.    Material Terms of the Stalking Horse Agreement.

11.    The following chart summarizes the terms and conditions of the Stalking Horse Agreement attached to the Bidding Procedures as **Exhibit 1**.

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **Stalking Horse Agreement Parties**<br><br>*See* Preamble | <u>Seller</u>:  Card Holdings, LLC and the subsidiaries listed in the Stalking Horse Agreement<br><br><u>Purchaser</u>: Pantogran LLC |
| **Purchase Price**<br><br>*See* § 2.1 | The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $25,000,000 (the "<u>Cash Payment</u>"). |
| **Acquired Assets**<br><br>*See* § 1.1 | <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Confirmation Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:<br><br>    (a)    subject to Section 1.5, all Contracts to which any Seller is a party, including the Contracts listed on Schedule 1.1(a), and all purchase orders, to the extent assignable under applicable Law (the "Assigned Contracts");<br><br>    (b)    all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;<br><br>    (c)    all Documents and data, including (without limitation) all rights, interests, assets, Intellectual Property, and data associated with Skills Global and |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | Skill; |

(d)      all Patient Records;

(e)      the Leased Real Property listed on Schedule 1.1(d) (including the leases related thereto, the "Acquired Leased Real Property"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(f)      all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller;

(g)      all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(h)      to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(i)      the sponsorship of, and all rights, interests and assets associated with, the Seller Plans (collectively, the "Assumed Benefit Plans");

(j)      all Intellectual Property of Sellers, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including (without limitation) all Intellectual Property and all other rights, interests, and assets associated with Institute for Behavioral Training;

(k)      all inventory and supplies of the Sellers;

(l)      all goodwill, payment intangibles and general intangible assets and rights of Sellers; and

(m)      all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law of the Sellers or their estates and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller (including in its capacity as the managing member or manager of another Person) or its estate against any member of the Seller Group or Sangam Pant (other than in his capacity as a Guarantor hereunder) and The Sangam Pant and Supriya Pande Irrevocable Trust dated December 18, 2015, The Sangam Pant and Supriya Pande Revocable Trust dated June 28, 2012, and Sangam Pant and Supriya Pande Charitable Remainder Trust, in each case, arising

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | out of or relating to events occurring on or prior to the Closing Date, other than any claim under this Agreement or any Transaction Agreement (the claims and causes of action set forth in this Section 1.1(m) "Transferred Claims") (which Transferred Claims against any member of the Seller Group are for the avoidance of doubt Released Claims pursuant to Section 10.20) |
| **Assumed Liabilities** <br><br> *See* § 1.3 | <u>Assumption of Certain Liabilities.</u> On the terms and subject to the conditions set forth herein and in the Confirmation Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):<br><br>(a)    all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;<br><br>(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");<br><br>(c)    all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;<br><br>(d)    all Liabilities, including all accounts payable and trade payables arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;<br><br>(e)    all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;<br><br>(f)    without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; and (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period as limited to the amount incurred after the Closing Date;<br><br>(g)    all Liabilities related to the Transferred Employees, except for any Liabilities with regard to compensation prior to the Closing Date and/or arising under retention and/or severance agreements entered into prior to the Closing Date and except as otherwise set forth herein;<br><br>(h)    the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Assumed Benefit Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;<br><br>(i)    all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement; and |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | (j)    all other Liabilities to the extent related to the Acquired Assets that arise after the Closing |
| **Excluded Assets**<br><br>*See* §1.2 | <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):<br><br>(a)    all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;<br><br>(b)    the Contracts of Sellers listed on Schedule 1.2(b)(ii) (the "Excluded Contracts");<br><br>(c)    all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, or (iii) that any Seller is required by Law to retain; provided that Purchaser shall have the right to make copies of any portions of such Documents to the extent not prohibited by applicable Law and Sellers shall provide Purchaser access to such Documents;<br><br>(d)    all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;<br><br>(e)    all current and prior insurance policies of any Seller that are not Assumed Benefit Plans, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;<br><br>(f)    all Equity Interests of any Seller or any of their respective Subsidiaries; |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | (g)      (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (other than Transferred Claims), and (iii) all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities; |
| | (h)      Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the date hereof; |
| | (i)      all Tax refunds, Tax attributes and Tax assets; |
| | (j)      every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement; |
| | (k)      all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date; and |
| | (l)      all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries. |
| **Excluded Liabilities**<br><br>*See* §1.4 | <u>Excluded Liabilities</u>. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").  For the avoidance of doubt, Purchaser shall have no liability or responsibility to any employee of Sellers who is not a Transferred Employee and Purchaser's assumption of liability to Transferred Employees is limited as set forth above and as otherwise set forth in this Agreement. |
| **Representations and Warranties of Sellers**<br><br>*See* §3 | The Staking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Seller regarding: (a) organization and qualification; (b) authorization of agreement (c) conflicts, consents; (d) financial statements; (e) title to properties; (f) contracts; (g) no litigation; (h) permits, compliance with laws; (i) environmental matters; (j) intellectual property; (k) tax matters; (l) assumed benefit plans; (m) employees; (n) affiliate transactions; (o) brokers; and (p) disclaimer of other representations and warranties. |
| **Representations and Warranties of Purchaser** | The Staking Horse Agreement contains customary representations and warranties, including, but not limited to, representations of Purchaser regarding: (a) |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| *See* §4 | organization and qualification; (b) authorization of agreement (c); conflicts, consents; (d) financing; (e) brokers; (f) no litigation; (g) investment representation, investigation (h); certain arrangements; (i) solvency; (j) tax matters; (k) disclaimer of additional representations or warranties; and (l) no outside reliance. |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **Good Faith Deposit**<br><br>*See § 2.2* | Deposit.<br><br>    (a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit with Acquiom Clearinghouse LLC (the "Escrow Agent") in the amount equal to $2,500,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the escrow agreement entered into on the date hereof among Holdings, Purchaser, and the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.<br><br>    (b)    If this Agreement has been terminated by Holdings pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(b) or 8.1(c), in each case in circumstances where Holdings would be entitled to terminate this Agreement pursuant to Section 8.1(d) or 8.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.<br><br>    (c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.<br><br>    (d)    The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.<br><br>    (e)    If the Closing occurs, the Deposit shall be transferred to Seller. |
| **Taxes**<br><br>*See §9* | 9.1    Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.<br><br>9.2    Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes. |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **Sale of Unexpired Leases Free and Clear**<br><br>*See §5.3–5.4* | 5.3     <u>Confirmation Order</u>. The Confirmation Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability.<br><br>5.4     <u>Approval</u>. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Confirmation Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders. |
| **Breakup Fee and Expense Reimbursement**<br><br>*See §8.2* | In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 8.1(g), 8.1(h), or 8.1(i), Seller shall pay to Purchaser a break-up fee in an amount equal to $750,000 (the "<u>Breakup Fee</u>") and an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed $350,000 ("<u>Expense Reimbursement</u>"); provided that the Breakup Fee and the Expense Reimbursement shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Seller. |

## II.    The Bidding Procedures.

12.     To optimally and expeditiously solicit, receive, and evaluate final bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures.  Because

the Bidding Procedures are attached to the proposed Bidding Procedures Order, they are not restated fully herein.  Generally speaking, the Bidding Procedures establish, among other things:[7]

- the deadlines and requirements that Potential Bidders must satisfy to participate in the bidding process and become Qualified Bidders;

- the availability of and access to due diligence by Potential Bidders;

- the conditions for having an Auction and procedures for conducting the Auction, if any; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights (including the right to modify the Bidding Procedures as appropriate).

13.     Importantly, the Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals, and they preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.  As such, the Bidding Procedures uphold and comply with the Debtors' fiduciary obligations to maximize value.

14.     Following conclusion of the Auction, if any, and the selection of a Winning Bidder, the Debtors shall present the results of the Auction at the Sale Hearing, which may be the Confirmation Hearing, and shall seek entry of the Sale Order (or Sale Orders).  Each Sale Order shall authorize the Debtors to enter into and perform under the applicable definitive purchase agreement and deem the Debtors' selection of the applicable Winning Bid final.

**III.     Form and Manner of Sale Notice.**

15.     The Debtors intend to conduct the Auction, if any, on **Monday, July 17, 2023, at 9:00 a.m. (prevailing Central Time)**, in person, by videoconference, or by such other form of remote communication selected by the Debtors.

---

[7]   This summary is qualified in its entirety by the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

16.     Within three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as <u>Exhibit 2</u> to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known: (a) the Office of the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis);[8] (c) counsel to the Debtors' prepetition credit facility lender; (d) counsel to the DIP Agent; (e) counsel to the Stalking Horse Bidder; (f) all parties who have expressed a written interest in the Assets; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the state attorneys general for states in which the Debtors conduct business; (j) all known holders of liens, encumbrances, and other claims secured by the Assets; (k) each governmental agency that is an interested party with respect to the Asset Sale and transactions proposed thereunder; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (m) any other party entitled to notice pursuant to Local Rule 9013-1(d).

17.     In addition, within five (5) business days after entry of the Bidding Procedures Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (U.S. national edition) and the *Financial Times* (global edition) to provide notice to any other potential interested parties.

18.     The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Asset Sales, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto.

---

[8]     The Debtors request that any obligation to notice the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis) be replaced with providing notice to counsel to the official committee of unsecured creditors if and when one is appointed.

Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Asset Sales or the Auction (in each case, if any) be required.

**IV.     Summary of the Assumption and Assignment Procedures.**

19.     The Debtors are also seeking approval of the assumption and assignment procedures (the "<u>Assumption and Assignment Procedures</u>") set forth below to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtors' contracts (the "<u>Contracts</u>") in connection with any Asset Sale(s).  The proposed Assumption and Assignment Procedures are as follows:

    a.    **<u>Potential Assumption Notice</u>**.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Potential Assumption Notice, attached as <u>Exhibit 3</u> to the proposed Bidding Procedures Order, on certain non-Debtor Contract counterparties (collectively, the "<u>Contract Counterparties</u>," and each, a "<u>Contract Counterparty</u>"), and post the Potential Assumption Notice to the case website: https://cases.stretto.com/CARD.

    b.    **<u>Content of Potential Assumption Notice</u>**.  The Potential Assumption Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with an Asset Sale, and contain the following information: (i) a list of the applicable Contracts that may be assumed and assigned in connection with an Asset Sale; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Contract (the "<u>Cure Costs</u>"); and (iv) the deadline by which any Contract Counterparty to a Contract on the Potential Assumption Notice must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "<u>Cure Objection</u>"); *provided* that service of a Potential Assumption Notice does not constitute an admission that such Contract is an executory contract or unexpired lease or that such Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Winning Bid.

    c.    **<u>Cure Objections</u>**.  Cure Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the

objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court prior to **Friday, July 14, 2023, at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"); *provided* that the Debtors may extend the Cure Objection Deadline by filing a notice of such extension on the Court's docket.

d.    **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

e.    **Dispute Resolution**.  Any Cure Objection to the proposed assumption and assignment of a Contract or Cure Costs that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the applicable Winning Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the applicable Winning Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the applicable Winning Bidder may determine that such Contract should be rejected and not assigned, in which case the Winning Bidder will not be responsible for any Cure Costs in respect of such contract.  Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.    **Supplemental Potential Assumption Notice**.  If the Debtors discover Contracts inadvertently omitted from the Potential Assumption Notice or the Winning Bidder identifies other Contracts that it desires to assume or assume and assign in connection with an Asset Sale, the Debtors may, after consultation with the Winning Bidder, at any time before the closing of the Asset Sale supplement the Potential Assumption Notice with previously omitted Contracts or modify a previously filed Potential Assumption Notice or Supplemental Potential Assumption Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Potential Assumption Notice").  The Debtors shall serve such Supplemental Potential Assumption Notice on the Contract

Counterparties to Contracts that were added or removed or to the Contract Counterparties to Contracts for which the Cure Costs were changed.

g.  **Objection to the Supplemental Potential Assumption Notice**.  Any Contract Counterparty listed on the Supplemental Potential Assumption Notice may file an objection (a "Supplemental Cure Objection") only to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs included in the Supplemental Potential Assumption Notice, if any.  All Supplemental Cure Objections must: (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Potential Assumption Notice, which date will be set forth in the Supplemental Potential Assumption Notice.

h.  **Dispute Resolution of Supplemental Cure Objection**.  If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Potential Assumption Notice.  Notwithstanding the foregoing, if a Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i.  **No Cure Objections**.  If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Potential Assumption Notice (or Supplemental Potential Assumption Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract

21

against the Debtors or the Winning Bidder, or the property of any of them.

j.     **Other Assumption Objections**.     All other assumption objections ("Assumption Objections") shall be made by the Sale Objection Deadline. If there are no Assumption Objections, or if a Contract Counterparty does not file and serve an Assumption Objection in a manner that is consistent with the requirements set forth above for Cure Objections, and absent a subsequent order of the Court, (i) the assumption shall be effective, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract, and will be forever barred from asserting any other claims related to such Contract against the Debtors or the Winning Bidder, or the property of any of them.

### Basis for Relief

**I.     The Bidding Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Consistent with the Debtors' Reasonable Business Judgment**.

20.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

21.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  To that end, courts recognize that procedures intended to enhance

competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

22.     Here, the Bidding Procedures will continue the Debtors' lengthy prepetition efforts and promote active bidding from interested parties to elicit the highest or otherwise best offers available for some or all of the Assets.  The Bidding Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by these estates from any eventual transactions.  In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties—many of whom have been engaged with the Debtors for months—with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

23.     Where there is a court-approved auction process, a full and fair price is presumed obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999).  This is especially true here, where any Sale or Sales of the Assets and related transactions have been subjected to an extensive marketing process and intensively scrutinized by the Debtors and their retained advisors.  As a result, the Debtors and their creditors can be assured that, taking into account current macroeconomic and industry conditions, the consideration obtained will be fair and reasonable and at or above market.

24.     The proposed Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the Court should enter the Bidding Procedures Order.

II.     **The Bid Protections and Expense Reimbursement Have a Sound Business Purpose and Should Be Approved**.

25.     The Debtors also seek to designate the Stalking Horse Bidder and offer Bid Protections and Expense Reimbursements to the Stalking Horse Bidder.  The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Interforum Holding LLC*, 2011 WL 2671254 at *1 n. 1.  As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted).  Thus, the use of bidding protections has become an established practice in chapter 11 cases.

26.     Specifically, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11:  "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . .  In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis in original).  Bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

27.    Courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").  The allowance of Bid Protections and Expense Reimbursements is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Agreement establishes a floor for further bidding that may increase the consideration given in exchange for the Assets that are the subject of the Stalking Horse Agreement, which will inure to the benefit of the Debtors' estates.

28.    Courts in the Fifth Circuit apply the "business judgment rule" standard and consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule).

29.    The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Debtors' assets.  The proposed Bidding Procedures will allow the Debtors to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Debtors' assets and who can demonstrate the ability to close a transaction.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with

sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

30.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtors obtain fair market value by setting a minimum purchase price for the Debtors' assets that will be tested in the marketplace.  As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.

31.     The Bid Protections and Expense Reimbursement provided to the Stalking Horse Bidder (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder.  Greenwood Declaration ¶ 21. The Bid Protections and Expense Reimbursement were necessary to induce the Stalking Horse Bidder to enter into the Stalking Horse Agreement.  Greenwood Declaration ¶ 21.  In short, the proposed Bid Protections and Expense Reimbursement are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.

32.     The Bid Protections and Expense Reimbursement are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all

stakeholders. Accordingly, the Court should approve Bid Protections and Expense Reimbursement.

III.    **The Court Should Approve the Debtors' Entry into One or More Definitive Purchase Agreements As a Sound Exercise of Business Judgment**.

33.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Courts authorize the sale of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

34.     The business judgment rule shields a debtor's management's decisions from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation). The business judgment rule protects certain debtor decisions—such as the Debtors' entry into one or more definitive purchase agreements—from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case

impartially."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

A.    **A Sound Business Purpose Exists for the Sale**.

35.    The Debtors have a sound business justification for selling the Assets. As indicated above, while the Debtors have worked to minimize their overhead expenses, the Debtors are not (and do not anticipate) generating revenue necessary to sustain the Debtors' ability to exit bankruptcy on a standalone basis. The Stalking Horse Agreement and the DIP Facility, however, provide a clear path towards a resolution of these chapter 11 cases. The Debtors believe the Sale will maximize the Assets' going-concern value by allowing a party to bid on assets that would have substantially less value on a stand-alone basis. Further, due to the Debtors' entry into the Stalking Horse Agreement and the receipt of several other bids at the Bid Deadline, the Debtors and their advisors determined that an extension of the Debtors' prepetition marketing process will unlock the highest possible value for the Debtors' estate.

36.    The Stalking Horse Bidder and Stalking Horse Agreement will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the ultimate Winning Bid(s), after being subject to a further "market check" in the form of the Auction (if warranted), will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

37.     Thus, the Stalking Horse Agreement or the purchase agreement of any Winning Bidder(s) will constitute the highest or otherwise best offer for the applicable Assets, which will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into the Winning Bidder's purchase agreement will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court authorize the proposed Sale (or Sales) as a proper exercise of the Debtors' business judgment.

**B.     The Sale (or Sales) Should Be Approved "Free and Clear" Under Section 363(f) of the  Bankruptcy Code.**

38.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

39.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.   Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may be assumed Encumbrances under definitive purchase agreement of the applicable Winning Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

40.     Any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the Assets to the Winning Bidder(s) free and clear of all Encumbrances including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the applicable Sale.

**C.      The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Winning Bidder Is a "Good-Faith Purchaser."**

41.     The Debtors request that the Court find the Stalking Horse Bidder and/or other Winning Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

42.     Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

43.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.* ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Servs., Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

44.     The Debtors submit that the Stalking Horse Bidder, or any other Winning Bidder arising from the Auction, is or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse Agreement, or any marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[9]  **First**, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the Stalking Horse Agreement is substantial, fair, and reasonable.  **Second**, the parties entered into the Stalking Horse Agreement in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Winning Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  **Third**, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that

---

[9]     The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Winning Bidder arising from the Auction.  Pursuant to the Bidding Procedures, any Winning Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Winning Bidder or Back-Up Bidder (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

would cause or permit the Sale or Stalking Horse Agreement to be avoided under section 363(n) of the Bankruptcy Code.  And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  **Finally**, the Stalking Horse Bid offer was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a successful bid will have been evaluated in a similar fashion.  Accordingly, the Debtors believe that the Stalking Horse Bidder (or other Winning Bidder arising from the Auction, if any) and Stalking Horse Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### D.    The Sale and Purchase Price Reflects a Fair Value Transaction.

45.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

46.    Moreover, as described herein, even as the Debtors move forward with the Sale Process, Livingstone will continue to market the Debtors' assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because

no Auction is necessary, the Stalking Horse Agreement's Purchase Price will, conclusively, be fair value.

**IV.      The Form and Manner of the Sale Notice Should Be Approved**.

47.      Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21 days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein.  As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction.  Notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Sale Notice.

**V.      The Assumption and Assignment Procedures Are Appropriate and Should Be Approved**.

**A.      The Assumption and Assignment of the Assigned Contracts Reflects the Debtors' Reasonable Business Judgment**.

48.      To facilitate and effectuate the Sale (or Sales), the Debtors seek authority to assign or transfer the Contracts to a Winning Bidder to the extent required by such bidder.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an

unreasonable exercise of such judgment. *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's determination to assume unexpired lease).

49.     The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts identified in the Potential Assumption Notice. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent).

50.     Here, the Court should approve the decision to assume and assign the Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. ***First***, the Contracts are essential to the value of the Assets and, as such, they are essential to inducing the highest or otherwise best offer for the Assets. ***Second***, it is unlikely that any purchaser would want to acquire certain of the Assets unless certain of the contracts and leases needed to conduct business and manage day-to-day operations of those Assets were included in the transaction. ***Third***, the Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

51.     Accordingly, the assumption and assignment of the Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of the Debtors' business judgment.

**B.     Defaults Under the Assumed Contracts Will Be Cured in Connection with any Sale.**

52.     Upon finding that a debtor has exercised its business judgment in deciding to assume an executory contract, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or

provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

53.      The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults.  The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

### C.      Non-Debtor Parties Will Be Adequately Assured of Future Performance.

54.      Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective

assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

55.     The Debtors will demonstrate that the requirements for assumption and assignment of the Contracts to the Winning Bidder will be satisfied.  The Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Winning Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Contracts assigned to the Winning Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Winning Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed cure amounts.  The Court therefore will have a sufficient basis to authorize the Debtors to reject or assume and assign the Contracts as set forth in the definitive purchase agreement of the Winning Bidder.

## Emergency Consideration

56.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The requested relief will save costs and avoid undue administrative burden and confusion only if granted immediately.  The Debtors have satisfied the "immediate and irreparable harm" standard and request that the Court approve the Motion on an emergency basis.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

57.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

58.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

59.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local

Rules, and is sufficient under the circumstances.  The Debtors will provide notice to parties-in-interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Debtors' prepetition credit facility lender and DIP agent; (d) counsel to the Debtors' majority prepetition equityholder; (e) counsel to Stalking horse Bidder; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; (i) all parties who have expressed a written interest in the Assets; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice is needed.

The Debtors request that the Court enter the Order, respectively, and grant such other and further relief as is appropriate under the circumstances.

Houston, Texas
June 12, 2023

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4200
Facsimile:        (713) 752-4221
Email:              mcavenaugh@jw.com
                         jwertz@jw.com
                         mstull@jw.com
                         vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors-in-Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher T. Greco, P.C. (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900
Email:              christopher.greco@kirkland.com
                         allyson.smith@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors-in-Possession*

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

## Certificate of Service

I certify that on June 12, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh