**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER FOR AUTISM AND RELATED | ) | Case No. 23-90709 (DRJ) |
| DISORDERS, LLC, *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No.** |

**ORDER (I) APPROVING THE BIDDING PROCEDURES,**
**(II) APPROVING BID PROTECTIONS, (III) SCHEDULING CERTAIN DATES**
**WITH RESPECT THERETO, (IV) APPROVING THE FORM AND MANNER**
**OF NOTICE THEREOF, (V) APPROVING CONTRACT ASSUMPTION AND**
**ASSIGNMENT PROCEDURES, (VI) AUTHORIZING THE DEBTORS TO ENTER INTO**
**DEFINITIVE PURCHASE AGREEMENTS, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (a) authorizing and approving Bidding Procedures, attached hereto as **Exhibit 1**, (b) scheduling certain related dates and deadlines, (c) authorizing the Debtors to select the Stalking Horse Bidder and provide the Stalking Horse Bidder with bid protections and expense reimbursements, (d) approving the form and manner of notice of the Auction and potential Asset Sales, attached hereto as **Exhibit 2**, (e) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with any sale and approving the form and manner of notice thereof,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192).  The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion, the Bidding Procedures, or the Plan, as applicable.

attached as **Exhibit 3** hereto, and (f) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration and the Greenwood Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court, if any, and this Court having determined that the legal and factual bases set forth in support of the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **FOUND AND DETERMINED THAT**:

1.      Jurisdiction and Venue.  The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Findings and Conclusions.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

3.     <u>Bases for Relief</u>.  The bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006(a), 9007, and 9014.  The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion.

4.     <u>Notice of the Bidding Procedures Motion</u>.  Good and sufficient notice of the Motion, the Bidding Procedures, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein and in the Bidding Procedures.  The notice of the Motion and opportunity for hearing is reasonable and sufficient in light of the circumstances and nature of the relief requested in the Motion, and no other or further notice is necessary.  A reasonable and fair opportunity to object to the Motion and the relief granted in this Order has been afforded under the circumstances.

5.     <u>Bidding Procedures</u>.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest.  The Debtors, with the assistance of their advisors, engaged in a robust marketing and sale process to solicit and develop the highest or otherwise best offer for the Assets.  The Bidding Procedures are designed to build on that robust and extensive marketing and sale process following entry of this Order.  The Bidding Procedures and all such steps and expenses incurred by the Debtors in connection with the implementation of the Bidding Procedures and this Order shall be deemed reasonable and appropriate and within the sound business judgment of the Debtors pursuant to section 363(b) of the Bankruptcy Code.

6.     <u>Bid Protections and Expense Reimbursement</u>.  Subject to the noticing requirements set forth in this Order, the Bid Protections and Expense Reimbursement provided to the Stalking

Horse Bidder (i) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder, (iii) are fair, reasonable, and appropriate, including in light of the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Bidder. The Bid Protections and Expense Reimbursement are material inducements for, and a condition of, the Stalking Horse Bidder to be bound by the Stalking Horse Agreement.

7.      _Sale Notice_.   The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is reasonably calculated to provide interested parties with timely and proper notice of the Auction and potential Asset Sales proposed Asset Sale(s), including, without limitation:  (a) the date, time, and place of the Auction (if any); (b) the Bidding Procedures; (c) reasonably specific identification of the Assets to be sold; and (d) a description of the Asset Sale(s) as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the applicable purchase agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Asset Sale proceeds, and no other or further notice of the Auction or Asset Sale(s) shall be required.

8.      _Assumption and Assignment Procedures_.   The Potential Assumption Notice, substantially in the form attached hereto as **Exhibit 3**, is reasonably calculated to provide all non-Debtor counterparties to the Debtors' Contracts with proper notice of the potential assumption and assignment of their Contract, the proposed cure amounts relating thereto, and the related Assumption Procedures, and no other or further notice of such intention, the cure amounts, or the Assumption and Assignment Procedures shall be required; _provided_ that the mere listing of any Contract on the Potential Assumption Notice does not require or guarantee that such Contract will

be assumed and assigned, and all rights of the Debtors with respect to such Contracts are reserved. The Assumption Procedures are reasonable and appropriate.

**IT IS HEREBY ORDERED THAT**:

## I.  Important Dates and Deadlines.

9.     The following dates and deadlines are approved, subject to the right of the Debtors to modify the following dates and applicable consent rights in the Stalking Horse Agreement, provided notice is given in accordance with the terms of this Order:

| Event or Deadline | Date and Time (all times in Central Time) |
|---|---|
| Cure Objection Deadline[3] | Friday, July 14, 2023, at 4:00 p.m. |
| General Bid Deadline | Friday, July 14, 2023, at 4:00 p.m. |
| Auction (If Required) | Monday, July 17, 2023, at 9:00 a.m. |
| Deadline for Objections to Approval of any Winning Bid (including Back-Up Bids), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline. | Wednesday, July 19, 2023, at 4:00 p.m. |
| Confirmation and Sale Hearing | Thursday, July 20, 2023, subject to Court availability |

10.     All objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court so as to be *actually received* no later than the Cure Objection Deadline or Sale Objection Deadline, as applicable, by Clerk of Court the following parties:

---

[3]     The Debtors will provide notice of proposed cure amounts as soon as reasonably practicable after entry of the Bidding Procedures Order

| Proposed Co-Counsel to the Debtors | Proposed Co-Counsel to the Debtors |
|---|---|
| Kirkland & Ellis LLP<br>601 Lexington Ave<br>New York, New York 10022<br>Attn.: Christopher T. Greco, P.C., Allyson B. Smith | Jackson Walker LLP<br>1401 McKinney Street, Suite 1900,<br>Houston, Texas 77010<br>Attn.: Matthew D. Cavenaugh, Jennifer F. Wertz, J. Machir Stull, Victoria N. Argeroplos |
| **Proposed Co-Counsel to the Stalking Horse Bidder** | |
| Locke Lord LLP<br>One California Plaza<br>300 S Grand Ave, Suite 2600<br>Attn: David Kupetz<br><br>- and-<br><br>200 Vesey Street, 20th Floor<br>New York, NY 10281<br>Attn: Sean A. Feener | |
| Proposed Co-Counsel to the DIP Lender | Proposed Co-Counsel to the DIP Lender |
| Latham & Watkins LLP<br>330 N Wabash Ave #2800<br>Chicago, IL 60611<br>Attn: James Ktsanes, Asif Attarwala<br><br>-and-<br><br>Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Attn: Nacif Taousse | Hunton Andrews Kurth LLP<br>600 Travis Street<br>Suite 4200<br>Houston, TX 77002<br>Attn: Ashley L. Harper |
| **Office of the United States Trustee (Region 7)** | |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | |

11.     If any party fails to timely file a Cure Objection or Sale Objection by the Cure

Objection Deadline or Sale Objection Deadline, as applicable, or otherwise abide by the

procedures set forth in the Bidding Procedures regarding an objection to the Asset Sale (s), such

party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Asset Sale (s), including the transfer of the Assets to the Winning Bidder, free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" for the purposes of section 363(f) of the Bankruptcy Code.

12.      The Debtors shall present the results of the Auction (if any) or otherwise present any Winning Bidders to the Court in advance of the Sale Hearing.

**II.   Auction, Bidding Procedures, and Related Relief.**

13.      The Bidding Procedures, substantially in the form attached hereto as **<u>Exhibit 1</u>**, are approved in their entirety and incorporated by reference as though fully set forth herein. The Debtors are authorized to solicit bids and conduct an Auction, if necessary, on the terms set forth in the Bidding Procedures and to take all actions as are necessary or appropriate to implement the Bidding Procedures.

14.      Each bidder participating at the Auction, if any, shall be required to confirm that it has not engaged in any collusion with respect to the bidding or any Asset Sale, as set forth in the Bidding Procedures; and the Auction, if any, shall be transcribed or recorded.

15.      Pursuant to the Bidding Procedures, including any applicable consultation and consent rights therein, the Debtors may (a) determine which Qualified Bid is the highest or otherwise best offer for some or all of the Assets, (b) reject any bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors, and (c) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases.

16.     If the Debtors, in consultation with the Consultation Parties, determine not to conduct an Auction, then the Debtors shall file a notice with the Court of such determination within two business days of such determination.

17.     No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature in connection with such bid, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

### III. Designation of Stalking Horse Bidder(s), Bid Protections, and Expense Reimbursements.

18.     The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Assets.  Any party desiring to bid on the Assets or a portion thereof shall comply with the Bidding Procedures and this Order in all respects.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

19.     The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse Agreement is deemed a Qualified Bid.

20.     If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid):  (a) the Debtors will not hold the Auction; (b) the Stalking Horse Bidder will be deemed the Winning Bidder for the Assets; and (c) the Debtors shall be authorized to seek approval of the Stalking Horse Agreement at the Sale Hearing.

21.     If the Debtors receive one or more Qualified Bids from Qualified Bidders (other than the Stalking Horse Bidder), then the Debtors shall conduct the Auction in accordance with the Bidding Procedures.

22.     If one or more Qualified Bid(s) exist for acquiring specific sub-groups of the Assets, then the Debtors may, in the exercise of their reasonable business judgment (in consultation with the Consultation Parties), first conduct a sub-Auction for each of the Assets that has at least one Qualified Bid pursuant to the Bid Procedures.

23.     Pursuant to Local Rule 6004-1(c)(ii):  (a) each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale Process, as set forth in the Bidding Procedures; (b) the Auction shall be conducted openly; and (c) the Auction shall be transcribed or videotaped.

24.     The Debtors may, subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), (a) determine which Qualified Bid is the highest or otherwise best offer; (b) reject, at any time before entry of an Order of the Bankruptcy Court approving the Winning Bid, any bid (other than the Stalking Horse Bid) that, in the discretion of the Debtors, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale Process, (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders; and (c) at or before the conclusion of the Auction, may impose additional terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases.

25.     The Bid Protections and Expense Reimbursements are approved in their entirety and are payable in accordance with, and subject to the terms of, the Stalking Horse Agreement.

The Debtors' obligation to pay the Bid Protections and Expense Reimbursement shall survive termination of the Stalking Horse Agreement, dismissal or conversion of any of the Chapter 11 Cases, and confirmation of any plan of reorganization or liquidation. No person or entity other than the Stalking Horse Bidder shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

26.     Except as otherwise provided in this Order, the Debtors, in their business judgment and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), further reserve the right, as they may reasonably determine to be in the best interests of their estates, subject to the terms and conditions under the Bid Procedures: (i) determine which Potential Bidders are Qualified Bidders; (ii) determine which Bids are Qualified Bids; (iii) determine which Qualified Bid is the highest or otherwise best proposal, the Winning Bid, and which is the next highest or otherwise best proposal, or the Back-Up Bid; (iv) reject any bid that is (A) not in conformity with the requirements of the Bid Procedures or the requirements of this Order or the Bankruptcy Code, or (B) contrary to the best interests of the Debtors and their estates; (v) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under this Order or the Bid Procedures; (vi) impose additional terms and conditions with respect to all Qualified Bidders other than the Stalking Horse Bidder; and (vii) modify the Bid Procedures or withdraw the request to sell the Assets, as applicable, to the Successful Bidder or Backup Bidder, as applicable, at any time with or without prejudice.

27.     The Stalking Horse Bidder and its counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Bidder's negotiation of the Bid Protections, the Expense Reimbursement, the Bidding Procedures, and the entry into the Stalking Horse Agreement.

28.     The deposit provided by the Stalking Horse Bidder or other Qualified Bidder shall be held in escrow by the Debtors or their agent and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the Bidding Procedures, the applicable escrow agreement, or order of this Court.

**IV.     Sale Notice.**

29.     The Sale Notice, substantially in the form attached hereto as **<u>Exhibit 2</u>**, is approved. Within three (3) business days of the entry of this Order, the Debtors shall cause the Sale Notice to be served upon parties in interest and posted on the Debtors' restructuring webpage at <u>https://cases.stretto.com/CARD</u> (or such other applicable URL) (the "<u>Case Webpage</u>").

30.     Within five (5) business days after entry of this Order, the Debtors shall place a publication version of the Sale Notice for one day in *The New York Times* (national edition) and the *Financial Times* (global edition). Such notice shall be deemed sufficient and proper notice of the Asset Sale(s) with respect to any potential interested parties.

**V.     Assumption and Assignment Procedures.**

31.     The Assumption and Assignment Procedures set forth in the Motion are approved.

     a.     **<u>Potential Assumption Notice</u>**.  As soon as reasonably practicable after entry of this Order, the Debtors shall file with the Court and serve via first class mail, electronic mail, or overnight delivery, the Potential Assumption Notice, attached hereto as **<u>Exhibit 3</u>**, on certain non-Debtor Contract counterparties (collectively, the "<u>Contract Counterparties</u>," and each, a "<u>Contract Counterparty</u>"), and post the Potential Assumption Notice to the case website:  <u>https://cases.stretto.com/CARD</u>.

b.  **Content of Potential Assumption Notice**.  The Potential Assumption Notice shall notify the applicable Contract Counterparties that the Contracts may be subject to assumption and assignment in connection with an Asset Sale, and contain the following information: (i) a list of the applicable Contracts that may be assumed and assigned in connection with an Asset Sale; (ii) the applicable Contract Counterparties; (iii) the Debtors' good faith estimate of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Contract (the "Cure Costs"); and (iv) the deadline by which any Contract Counterparty to a Contract on the Potential Assumption Notice must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto (the "Cure Objection"); *provided* that service of a Potential Assumption Notice does not constitute an admission that such Contract is an executory contract or unexpired lease or that such Contract will be assumed at any point by the Debtors or assumed and assigned pursuant to any Winning Bid.

c.  **Cure Objections**.  Cure Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court prior to **Friday, July 14, 2023, at 4:00 p.m. (prevailing Central Time)** (the "Cure Objection Deadline"); *provided* that the Debtors may extend the Cure Objection Deadline by filing a notice of such extension on the Court's docket.

d.  **Effects of Filing a Cure Objection**.  A properly filed Cure Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment of the Contract at issue, and/or objection to the accompanying Cure Costs, as set forth in the Cure Objection, but will not constitute an objection to the remaining relief requested in the Motion.

e.  **Dispute Resolution**.  Any Cure Objection to the proposed assumption and assignment of a Contract or Cure Costs that remains unresolved after the Sale Hearing, shall be heard at such later date as may be agreed upon by the parties or fixed by the Court.  To the extent that any Cure Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Objection, to be determined in the applicable Winning Bidder's reasonable discretion.  To the extent a Cure Objection remains unresolved, the Contract may be conditionally assumed and assigned, subject to the consent of the applicable Winning Bidder, pending a resolution of the Cure Objection after notice and a hearing.  If a Cure Objection is not satisfactorily resolved, the applicable Winning Bidder may determine that such Contract should be rejected and not assigned, in

12

which case the Winning Bidder will not be responsible for any Cure Costs in respect of such contract.  Notwithstanding the foregoing, if a Cure Objection relates solely to the Cure Costs (any such objection, a "Cure Dispute"), the applicable Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.      **Supplemental Potential Assumption Notice**.  If the Debtors discover Contracts inadvertently omitted from the Potential Assumption Notice or the Winning Bidder identifies other Contracts that it desires to assume or assume and assign in connection with an Asset Sale, the Debtors may, after consultation with the Winning Bidder, at any time before the closing of the Asset Sale supplement the Potential Assumption Notice with previously omitted Contracts or modify a previously filed Potential Assumption Notice or Supplemental Potential Assumption Notice, including by modifying the previously stated Cure Costs associated with any Contracts (the "Supplemental Potential Assumption Notice").  The Debtors shall serve such Supplemental Potential Assumption Notice on the Contract Counterparties to Contracts that were added or removed or to the Contract Counterparties to Contracts for which the Cure Costs were changed.

g.      **Objection to the Supplemental Potential Assumption Notice**.  Any Contract Counterparty listed on the Supplemental Potential Assumption Notice may file an objection (a "Supplemental Cure Objection") only to the proposed assumption or assumption and assignment of the applicable Contracts or the proposed Cure Costs included in the Supplemental Potential Assumption Notice, if any.  All Supplemental Cure Objections must:  (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (ii) include appropriate documentation in support thereof; and (iii) be filed no later than 4:00 p.m. (prevailing Central Time) on the date that is 14 days following the date of service of such Supplemental Potential Assumption Notice, which date will be set forth in the Supplemental Potential Assumption Notice.

h.      **Dispute Resolution of Supplemental Cure Objection**.  If a Contract Counterparty files a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Costs, if any, and approve the assumption of the relevant Contracts.  If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption of any Contract listed on a Supplemental Potential Assumption Notice.  Notwithstanding the foregoing, if a

Supplemental Cure Objection relates solely to a Cure Dispute, the applicable Contract may be assumed by the Debtors and assigned to the Winning Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i.    **No Cure Objections**. If there are no Cure Objections or Supplemental Cure Objections, or if a Contract Counterparty does not file and serve a Cure Objection or a Supplemental Cure Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Potential Assumption Notice (or Supplemental Potential Assumption Notice) shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption or assumption and assignment of such Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Contract against the Debtors or the Winning Bidder, or the property of any of them.

j.    **Other Assumption Objections**.  All other assumption objections ("Assumption Objections") shall be made by the Sale Objection Deadline. If there are no Assumption Objections, or if a Contract Counterparty does not file and serve an Assumption Objection in a manner that is consistent with the requirements set forth above for Cure Objections, and absent a subsequent order of the Court, (i) the assumption shall be effective, notwithstanding anything to the contrary in any Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption or assumption and assignment of the Contract, and will be forever barred from asserting any other claims related to such Contract against the Debtors or the Winning Bidder, or the property of any of them.

32.    The inclusion of a Contract in a Potential Assumption Notice or Supplemental Potential Assumption Notice will not:  (a) obligate any Debtor to assume such Contract or a Winning Bidder to take assignment of such Contract or (b) constitute any admission or agreement of the Debtors that such contract is an Executory Contract.  Only those Contracts that are included on a schedule of assumed and assigned contracts attached to the executed definitive asset purchase

agreement with a Winning Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the applicable Winning Bidder.

**VI. Miscellaneous.**

33.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

34.     Notwithstanding anything to the contrary herein or in the Bidding Procedures, the Debtors may determine in their reasonable business judgment, subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders, and in consultation with the Consultation Parties to suspend or cancel the Sale Process with respect to all or any portion of the Assets.

35.     The requirements set forth in Local Rules and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas are satisfied by the contents of the Motion.

36.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

37.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

38.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

39.     Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies, or defenses that the Debtors have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, or any rights, remedies or defenses of the

15

Debtors with respect thereto, including seeking relief from the Court with regard to the Auction, the Bidding Procedures, the Asset Sale, and any related items.

40.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: _____, 2023

                                           _____

                                           DAVID R. JONES
                                           UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER FOR AUTISM AND RELATED | ) | Case No. 23-90709 (DRJ) |
| DISORDERS, LLC, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**BIDDING PROCEDURES**

On June 11, 2023 (the "Petition Date"), Center for Autism and Related Disorders, LLC and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

On the Petition Date, the Debtors filed the *Joint Chapter 11 Plan of Center for Autism and Related Disorders, LLC and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan").[2] The Plan contemplates that the Debtors will continue their prepetition marketing and bidding process pursuant to the following procedures (the "Bidding Procedures") and consummate one or more Asset Sales as part of the Debtors' restructuring.

On [●], 2023, the Court entered the *Order (I) Approving the Bidding Procedures, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Debtors to Enter into Definitive Purchase Agreements, and (VII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"), approving these Bidding Procedures. These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing and auction process (the "Sale Process") for the sale of substantially all of the Debtors' assets as a going concern in one or more asset packages (collectively, the "Assets") in furtherance of an asset sale transaction (an "Asset Sale").

On November 22, 2022, the Debtors' proposed investment bank, Livingstone Partners ("Livingstone"), commenced the distribution of teaser and other promotional materials to

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192).  The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

[2]   Unless otherwise specified herein, terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

potentially interested parties advising them of the opportunity to acquire the Debtors' Assets, in whole or in part.  The Debtors' representatives, including Livingstone, shall oversee the Sale Process.

For the avoidance of doubt, the Debtors, in the exercise of their business judgment, in consultation with the Consultation Parties and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (each as defined below), may elect to exclude any Assets from the Bidding Procedures and sell such Assets at either a private or public sale, subject to Court approval of any alternative sale method.  Further, the Debtors may determine in their discretion, in consultation with the Consultation Parties, whether to proceed with any Asset Sale(s) pursuant to the Bidding Procedures.

---

**Copies of the Bidding Procedures Order and other related documents are available at https://cases.stretto.com/CARD.**

---

| DEBTOR REPRESENTATIVES AND CONTACT INFORMATION | |
|---|---|
| **Proposed Investment Banker to the Debtors** | |
| Livingstone Partners | ProjectACE@livingstonepartners.com |
| **Proposed Co-Counsel to the Debtors** | |
| Kirkland & Ellis LLP | SaleKE-CARD@kirkland.com |
| Jackson Walker LLP | JW-CARD@jw.com |

## I.      STALKING HORSE PROCEDURES

### A.      The Stalking Horse Bidder

On June 9, 2023, the Debtors entered into an asset purchase agreement with Pantogran LLC (the "Stalking Horse Bidder" and such asset purchase agreement, the "Stalking Horse Agreement" or "Stalking Horse Bid"), whereby the Stalking Horse Bidder will serve as the stalking horse bidder for the Assets.  Pursuant to the Bidding Procedures Order, the Debtors obtained approval of the Stalking Horse Agreement.  The Stalking Horse Agreement is attached hereto as **Exhibit 1**.

## I.      KEY DATES AND DEADLINES.

| Event or Deadline | Date and Time (all times in Central Time) |
|---|---|
| Cure Objection Deadline | Friday, July 14, 2023, at 4:00 p.m. |
| General Bid Deadline | Friday, July 14, 2023, at 4:00 p.m. |
| Auction (If Required) | Monday, July 17, 2023, at 9:00 a.m. |
| Deadline for Objections to Approval of any Winning Bid (including Back-Up Bids), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline. | Wednesday, July 19, 2023, at 4:00 p.m. |
| Confirmation and Sale Hearing | Thursday, July 20, 2023, subject to Court availability |

Within five (5) business days after entry of the Bidding Procedures Order, or as soon thereafter as is reasonably practicable, the Debtors will publish a notice of the Sale Process and potential Auction (the "Sale Notice") in *The New York Times* (national edition) and *Financial Times* (national edition) to provide notice to any potential interested parties.

## II.      SUBMISSIONS TO THE DEBTORS; CONSULTATION PARTIES.

All submissions to the Debtors required or permitted to be made under the Bidding Procedures (including bids) must be directed to each of the following persons or entities unless otherwise provided (collectively, the "Notice Parties").  Unless specifically provided otherwise herein, e-mail shall be sufficient.

A.      Debtors:  Center for Autism and Related Disorders, LLC, 9089 S Pecos Rd., Suite 3600, Henderson, NV 89074, Attn: Michelle Rapoport.

B.      Debtors' Proposed Counsel: (1) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Christopher T. Greco, P.C. (christopher.greco@kirkland.com) & Allyson B. Smith (allyson.smith@kirkland.com); and (2) Jackson Walker LLP, 1401 McKinney

Street, Suite 1900, Houston, Texas 77010, Attn.: Matthew D. Cavenaugh (mcavenaugh@jw.com), Jennifer F. Wertz (jwertz@jw.com), J. Machir Stull (mstull@jw.com), and Victoria N. Argeroplos (vargeroplos@jw.com).

C.   Debtors' Proposed Investment Banker: Livingstone Partners LLC, 443 N. Clark St., Chicago, Illinois 60654, Attn.: Jim Moskal (moskal@livingstonepartners.com), Joseph Greenwood (greenwood@livingstonepartners.com), Mark Carl (carl@livingstonepartners.com), and Adam Green (green@livingstonepartners.com)

D.   Debtors' Proposed Financial Advisor: Portage Point Partners, 1330 Avenue of the Americas, 22nd Floor New York, New York 10019, Attn.: Steven Shenker (sshenker@ppplic.com) and Portage Point Partners, 200 Crescent Court, Suite 1300, Dallas, Texas 75201, Attn: Tom Cole (tcole@ppplic.com).

Pursuant to the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures"), the "Consultation Parties" are (A) secured lenders with liens on the Assets being sold, including, for the avoidance of doubt, the Credit Facility Lenders and the DIP Lenders (as defined below) and (B) any official committee appointed in these chapter 11 cases; *provided* that, to the extent that any party in clause (A) or (B) is a Potential Bidder in connection with any Asset Sale(s), such party shall not be a Consultation Party. The "Credit Facility Lenders" are the lenders from time to time party to that certain amended and restated facility agreement, dated as of November 21, 2018, by and among certain of the Debtors, as borrowers or guarantors, such lenders, and the agent thereunder, as amended, amended and restated, supplemented, or otherwise modified from time to time. The "DIP Lenders" are the lenders from time to time party to that certain definitive superpriority senior secured debtor-in-possession credit agreement dated as of June [●], 2023, by and among the Debtors, such lenders, and the agent thereunder, as amended, amended and restated, supplemented, or otherwise modified from time to time.

## III.   MARKETING PROCESS.

The Debtors, in consultation with Livingstone, developed a list of buyers whom they believe may be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, one or more Asset Sale(s) as part of an asset sale transaction. The list of potential buyers includes parties the Debtors or their advisors previously contacted regarding a possible transaction, regardless of whether these parties expressed any interest in pursuing a transaction (collectively, the "Contact Parties"). The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

The Debtors may distribute (if not already distributed) to each Contact Party and any other Potential Bidder an "Information Package" consisting of:

(i)   a copy of the Bidding Procedures and Bidding Procedures Order;

(ii)   a form confidentiality agreement; and

(iii)   any other materials appropriate under the circumstances.

4

## IV.     PARTICIPATION REQUIREMENTS.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in consummating an Asset Sale must deliver or have previously delivered to the Notice Parties an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"). Such person or entity that has delivered an executed Confidentiality Agreement shall be considered a potential bidder (a "Potential Bidder").

## V.     DUE DILIGENCE.

### A.     Bidder Diligence.

Only Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room (the "Data Room") and to additional nonpublic information regarding the Debtors.  All due diligence requests must be directed to Livingstone.  The Debtors will make reasonable efforts to address all reasonable requests for additional information and due diligence access, and the Debtors will endeavor to post substantially all written due diligence provided to any Potential Bidder to the Data Room.

The Debtors may refuse any party access to due diligence information, including access to the Data Room, in whole or in part and at any time, if the Debtors determine in their reasonable business judgment, in consultation with counsel, that (i) access by such party may be harmful to the Debtors or their estates (including due to commercial sensitivity) or (ii) such party has not established, or has raised doubt, that it intends or has the capacity to consummate the proposed Asset Sale(s) in good faith.

The due diligence period and the Data Room shall be open until the Bid Deadline.  After the Bid Deadline, the Debtors shall have no obligation to furnish due diligence information. The Debtors may, in their discretion, following consultation with the Consultation Parties, extend a party's time to conduct due diligence.

The Debtors make no representation or warranty as to the information provided through this due diligence process or otherwise, including the documents in the Data Room, except as set forth in any Definitive Sale Documents (as defined below).  Nothing herein shall obligate the Debtors or their representatives to furnish information of any kind whatsoever to any person.

Potential Bidders shall not, directly or indirectly, contact any customer, supplier, or contractual counterparty of the Debtors in respect of matters relating to the Debtors or a potential transaction with the Debtors (or otherwise initiate, participate in, or engage in such discussions with such parties) without the prior written consent of the Debtors.

### B.     Debtor Information Requests.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate its contemplated Asset Sale(s).  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, after consultation with the Consultation Parties, to determine that such

bidder may no longer participate in diligence (including access to the Data Room) or that a bid made by such bidder is not a Qualified Bid.

## VI.     RESTRICTIONS ON COMMUNICATIONS.

There shall be no communications between or among Potential Bidders, or between Potential Bidders and the Consultation Parties, unless the Debtors' advisors have authorized such communication in writing.  Should any Potential Bidder attempt to communicate directly with a Consultation Party, such Consultation Party shall immediately direct the Potential Bidder to Livingstone.

The Debtors reserve the right, in their reasonable business judgment, subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), and following consultation with the Consultation Parties, to disqualify any Potential Bidders that have communications between or amongst themselves without the prior authorization of the Debtors' advisors.  The Debtors further reserve their right, in their business judgment and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), to disqualify any Potential Bidders that have communications with a Consultation Party, and to strip any Consultation Party that violates this provision of its consultation rights hereunder.

For the avoidance of doubt, to the extent any Potential Bidders are interested in joining bids, the Debtors' advisors will facilitate the communications between such parties and the potential joining of bids.

## VII.    BID DEADLINES.

All bids must be transmitted via e-mail (in .pdf or similar format) to the Debtors and their advisors specified herein so as to be **actually received** on or before **July 14 2023, at 4:00 p.m. (prevailing Central Time)** (the "Bid Deadline").

## VIII.   BID REQUIREMENTS.

Only bids and bidders that satisfy the following requirements as determined by the Debtors in their business judgment and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders) (collectively, the "Bid Requirements") will be permitted to participate in the bidding (and Auction, if applicable) and be considered for one or more Asset Sale(s):

A.      **Written, Binding Bid.**  Each bid must be timely and properly submitted in accordance with the bid submission process set forth herein, including successful and timely delivery of the Good Faith Deposit (as defined below).  All bids must be binding and irrevocable unless and until the Debtors accept a higher bid and such bidder is not selected as the Back-Up Bidder (as defined below).

B.      **Identity:**  Each bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in

connection with such bid, and the complete terms of any such participation, along with sufficient evidence that the bidder is legally empowered to complete the transactions on the terms contemplated by the parties.  "Participation" in a bid includes persons or entities that are equity holders in an entity specially formed for the purpose of effectuating any Asset Sale(s).  Each bid must also include contact information for the specific person(s) whom the Debtors (and their advisors) should contact regarding such bid.  Each such person or entity shall have delivered an executed Confidentiality Agreement to the Debtors in accordance with the instructions set forth above.

C.  **Proposed Sale Transaction.**  Each bid must clearly state which Assets the bidder seeks to acquire and which liabilities of the applicable Debtor the bidder agrees to assume.  Each bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any, including any assumption of liabilities (collectively, the "Proposed Purchase Price").  The Proposed Purchase Price should be a single point value in U.S. Dollars for the total value of the Assets the Potential Bidder seeks to acquire on a cash-free, debt-free basis.

D.  **Deposit.**  Each bid must be accompanied by a cash deposit equal to ten percent (10%) of the Proposed Purchase Price of such bid, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors (the "Good Faith Deposit").  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the Proposed Purchase Price contemplated by such Qualified Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent (10%) of the increased Proposed Purchase Price; *provided*, *however*, that the Debtors may, following consultation with the other Consultation Parties, on a case-by-case basis, elect to waive the requirement that a Qualified Bidder deliver the initial Good Faith Deposit if such Qualified Bidder otherwise provides the Debtors with sufficient evidence satisfactory to the Debtors, in their business judgment, that such Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Asset Sale(s) and to fully satisfy the Qualified Bidder's obligations under its bid.

E.  **Minimum Bid for Stalking Horse Assets.**  Each bid submitted in connection with Assets that are the subject of the Stalking Horse Bid (any such Assets, the "Stalking Horse Assets") must either (a) (i) be a bid for all of the Stalking Horse Assets, (ii) include cash consideration of not less than the sum of the purchase price set forth in the Stalking Horse Agreement (excluding, for the avoidance of doubt, any "Assumed Liabilities" to be assumed by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement) *plus* (A) all "Obligations" outstanding under the DIP Documents (as defined in the DIP Motion) which are not included in the purchase price set forth in the applicable Stalking Horse Agreement, *plus* (B) the any applicable termination payment and/or expense reimbursement, *plus* (C) an Initial Bid Increment (as defined below), and (iii) assume the Assumed Liabilities (as defined in the Stalking Horse Agreement) or (b) propose an alternative transaction

7

that, in the Debtors' business judgment and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), provides higher value or better terms than the applicable Stalking Horse Bid, including by exceeding the purchase price of such Stalking Horse Bid *plus* any applicable termination payment and/or expense reimbursement *plus* any applicable Initial Bid Increment, and after taking into account, among other things, in light of all the Bids submitted for the Assets or any combination of Assets, whether there is sufficient cash to pay (x) any applicable termination payment and/or expense reimbursement, (y) any amounts necessary to fund a wind-down of the Debtors estate and, if determined by the Debtors to be in the best interests of the Debtors' estates, confirmation and administration of a liquidating plan, in an amount not to exceed any amounts necessary to fund a wind-down of the Debtors estate, (z) and any DIP financing amount (the "DIP Financing Amount"), in each case, as applicable.   For the avoidance of doubt, as to clause (b) in this Section VI.A.4, the Debtors may evaluate each Bid in light of each of the factors set forth therein, but a Bid is not required to meet each factor in order to be determined a Qualified Bid.

The Debtors may consider a Bid for a portion of any applicable Stalking Horse Assets (each such bid, a "Partial Bid") if (a) the Debtors receive one or more other Partial Bids for the applicable Stalking Horse Assets such that, when taken together, and after considering the risks associated with consummating several individual Bids, the Partial Bids collectively constitute a higher or otherwise better bid than the applicable Stalking Horse Bid (taking into account any applicable termination payment, expense reimbursement, and the Initial Bid Increment) or (b) the Partial Bid proposes a purchase price for the Stalking Horse Assets that, when taken together with the liquidation or alternative sale value of the remaining applicable Stalking Horse Assets, as determined by the Debtors in good faith with the advice of their legal and financial advisors, exceeds the purchase price in the Stalking Horse Bid *plus* any applicable termination payment and/or expense reimbursement *plus* any applicable Initial Bid Increment, and after taking into account, among other things, in light of all the Bids submitted for the Assets or any combination of Assets, whether there is sufficient cash to pay (x) any applicable termination payment and/or expense reimbursement, (y) any amounts necessary to fund a wind-down of the Debtors estate, and (z) and the DIP Financing Amount, in each case, as applicable.

If the value of a competing Qualified Bid (whether such Qualified Bid is for all of the Stalking Horse Assets or is a Partial Bid) relative to the Stalking Horse Bid includes additional non-cash components (such as fewer contingencies than are in the Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtors in better evaluating the competing Qualified Bid.

"Initial Bid Increment" shall mean $500,000.

F.     **Transaction Documents.**  Each bid must be accompanied by an executed purchase agreement with respect to the proposed Asset Sale(s), including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such bid.  In addition, if a person or entity submitting a bid has received a form purchase agreement from the Debtors or their advisors, or for which there is a Stalking Horse Agreement, the executed purchase agreement accompanying such bidder's bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to such form purchase agreement or Stalking Horse Agreement, as applicable.

G.     **Back-Up Bidder Commitment.**  Each bid must include a written commitment by the bidder to serve as a Back-Up Bidder in the event that such bidder's bid is not selected as the Winning Bid but is the next highest or otherwise best bid.

H.     **Proof of Financial Ability to Perform.**  Each bid must include written evidence sufficient for the Debtors to reasonably conclude, in consultation with the Consultation Parties, that the bidder has the necessary financial ability to close the proposed Asset Sale(s).  Such information must include the following:

1.     contact names and telephone numbers for verification of financing sources;

2.     evidence of the bidder's internal resources and, if applicable, proof of unconditional, fully executed, and effective financing commitments from one or more reputable sources in an aggregate amount equal to the Cash portion of such bid (including, if applicable, the payment of cure amounts), in each case, as are needed to close the Asset Sale(s);

3.     a description of the bidder's pro forma capital structure; and

4.     any other financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors to demonstrate that such bidder has the ability to close the proposed Asset Sale(s).

I.      **Contingencies; No Financing or Diligence Outs.**  Each bid shall not be conditioned on the obtaining of, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence.  Each bid must identify with particularity each and every condition to closing, including the executory contracts and unexpired leases for which assumption and assignment is required.  Bidders are expected to have completed all of their due diligence by the Bid Deadline, including all business, legal, accounting, and other confirmatory diligence.  The extent and nature of any remaining due diligence should be set forth in a specific list attached to each bid.

J.      **Regulatory and Third-Party Approvals.**  Each bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Asset Sale(s), if any, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a

description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals, and those actions the bidder will take to ensure receipt of such approvals as promptly as possible.  Each bid must further set forth (i) an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Asset Sale(s), and (ii) the basis for such estimate.

K.  **Authorization.**  Each bid must contain evidence acceptable to the Debtors that the bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its bid and the consummation of the Asset Sale(s) contemplated by such bid.

L.  **Contracts and Leases.**  Each bid must identify each and every executory contract and unexpired lease to be assumed and assigned in connection with the proposed Asset Sale(s) (collectively, the "Assumed Contracts").  Each bid must be accompanied by adequate assurance of future performance under all Assumed Contracts, which shall include audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtors may request (the "Adequate Assurance Package").  The Adequate Assurance Package should be submitted in its own compiled PDF document.

M.  **Management and Employee Obligations.**  Each bid must indicate whether the bidder intends to hire all or some of the employees who are primarily employed in connection with the Assets to be included in the Asset Sale(s) and, if yes, specify which employees.

N.  **As-Is, Where-Is.**  Each bid must include a written acknowledgement and representation that the bidder:  (1) has had an opportunity to conduct any and all due diligence regarding the Asset Sale(s) prior to making its offer; (2) has relied solely upon its own independent review, investigation, or inspection of any documents and/or Assets in making its bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the Asset Sale(s) or the completeness of any information provided in connection therewith or the Auction (if any).

O.  **No Fees.**  Each bidder will bear its own costs and expenses (including legal fees) in connection with the proposed Asset Sale. Each bid shall indicate that such bidder will not seek any transaction break-up fee, termination fee, expense reimbursement, working fee or similar type of payment.

P.  **Commitment to Close.**  Each bid must provide a commitment to close as soon as practicable, but in no event later than August 10, 2023.

Q.    **Joint Bids:**  The Debtors will be authorized to approve joint bids in their reasonable discretion on a case-by-case basis; *provided* that the foregoing is subject to the restrictions on communications between Potential Bidders set forth herein.

R.    **Compliance with Bidding Procedures, Bankruptcy Code, and Non-Bankruptcy Law; Acknowledgment.**  Each bid must comply in all respects with these Bidding Procedures, the Bankruptcy Code, and any applicable non-bankruptcy law.  Each bid must also include a written acknowledgment that the bidder agrees to all of the terms of the Asset Sale(s) set forth in these Bidding Procedures and that it has not engaged in any collusion, coordination, or unfair competitive practices with respect to its bid.  By submitting its bid, each bidder agrees not to submit a bid or seek to reopen the Sale Process or the Auction (if held) after conclusion of the selection of the Winning Bidder (as defined below).

S.    **Consent to Jurisdiction.**  Each bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of bids, the Auction (if held), the construction and enforcement of these Bidding Procedures, any Definitive Sale Documents, and consummation of one or more Asset Sale(s) (including confirmation of chapter 11 plan in connection therewith), as applicable.

---

**The submission of a bid shall constitute a binding and irrevocable offer (a) for the Winning Bidder(s) and Back-Up Bidder(s), until consummation of the Asset Sale(s) and (b) for any bidder other than the Winning Bidder(s) and Back-Up Bidder(s), until two business days after entry of the order approving the Winning Bid(s) and (if applicable) the Back-Up Bid(s) for the applicable Assets, and each bid must include a written acknowledgement and representation to such effect.**

---

## IX.    QUALIFIED BIDS, QUALIFIED BIDDERS, AND BID PAIRING.

A bid is "Qualified Bid" if the Debtors, in the Debtors' business judgment and in consultation with the Consultation Parties, determine that such bid (A) satisfies the Bid Requirements set forth above; and (B) is reasonably likely to be consummated if selected as the Winning Bid (or Back-Up Bid, as applicable) (as defined below) for the applicable Assets, no later than the Applicable Outside Date.  The "Applicable Outside Date" is **August 10, 2023**.  A Potential Bidder that submits a Qualified Bid is a "Qualified Bidder" with respect to the Assets to which such Qualified Bid relates.

Prior to the Auction (if held), the Debtors shall determine, after consultation with the Consultation Parties, which bidders are Qualified Bidders and will notify the bidders whether bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction (if held).  Any bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided*, *however*, that if the Debtors receive a bid that does not satisfy the requirements of a Qualified Bid, the Debtors may, in their discretion following consultation with the Consultation Parties, provide the applicable bidder with the opportunity to remedy any deficiencies prior to the Auction.

As soon as reasonably practicable after the Bid Deadline, the Debtors will notify each Potential Bidder whether such party is a Qualified Bidder and shall provide the Consultation Parties' counsel with a copy of each Qualified Bid.

Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the date set for the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Proposed Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction (if any) as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bidding Procedures.

Notwithstanding anything herein to the contrary, the Debtors reserve the right to work with (A) Potential Bidders to aggregate two or more bids into a single consolidated bid prior to the Bid Deadline and (B) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any).  The Debtors reserve the right to cooperate with any Potential Bidder to cure any deficiencies in a bid that is not initially deemed to be a Qualified Bid.

For the avoidance of doubt, the Credit Facility Lenders, the DIP Lenders, and the Stalking Horse Bidder shall be deemed to be Qualified Bidders, the Stalking Horse Bid shall be deemed a Qualified Bid, and the Credit Facility Lenders, the DIP Lenders, and the Stalking Horse Bidder may participate in the Auction; *provided* that, to the extent that any of the foregoing is a Potential Bidder in connection with any Asset Sale(s), such party shall not be a Consultation Party.

## X.    NO QUALIFIED BIDS.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Debtors, after consultation with the Consultation Parties, may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, to designate the Stalking Horse Bid as the Winning Bid, and pursue approval of the Asset Sale to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement.  The Debtors shall promptly file notice of any cancellation of the Auction and designation of the Stalking Horse Bid as the Winning Bid with the Court.

## XI.    AUCTION.

If the Debtors receive two or more Qualified Bids with respect to any Assets, the Debtors may, in consultation with the Consultation Parties, conduct an auction to determine the Winning Bidder (or Back-Up Bidder, as applicable) with respect to such Assets (any such auction, an "Auction").  In such event, the Debtors will (A) notify all Qualified Bidders of the highest or otherwise best Qualified Bid with respect to the applicable Assets, as determined by the Debtors in their business judgment, in consultation with the Consultation Parties and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders) (each such Qualified Bid, a "Baseline Bid") and (B) provide copies of the documents supporting the Baseline Bid(s) to all Qualified Bidders and the Consultation Parties

and their respective advisors (if any), in each case, as soon as reasonably practicable after the Bid Deadline. The Debtors' determination of which Qualified Bid(s) constitute the Baseline Bid(s) shall take into account any factors the Debtors, in their business judgment and in consultation with the Consultation Parties, deem relevant to the value of the Qualified Bid to the Debtors' estates and the Debtors' patient care mandate.

The Auction (if any) shall take place on **Monday, July 17, 2023, at 9:00 a.m. (prevailing Central Time)**, via remote video or in person at the Debtors' election, and shall be conducted in a timely fashion according to the following procedures (the "Auction Procedures"):

## AUCTION PROCEDURES

A.     **The Debtors Shall Conduct the Auction; General Provisions.** The Debtors, with the assistance of their advisors, shall direct and preside over any Auction. At the commencement of the Auction, the Debtors (1) may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit any successive bid(s); and (2) shall describe the terms of the Baseline Bid(s). Only incremental bids that comply with the terms set forth in section XI.B of the Bidding Procedures shall be considered "Overbids." All material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors, in consultation with the Consultation Parties, shall determine in their reasonable business judgment whether an incremental bid is an "Overbid." The Debtors shall maintain a written transcript of all bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid(s) (or Back-Up Bid(s), as applicable) (as defined below).

Only Qualified Bidders, the Debtors, the Consultation Parties, the respective legal and financial advisors of the foregoing, and any other parties specifically invited or permitted to attend by the Debtors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction remotely or in person in accordance with the Debtors' directions and may speak or bid themselves or through duly authorized representatives. Except as otherwise permitted by the Debtors, only Qualified Bidders shall be entitled to bid at the Auction.

The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any bid made by a Qualified Bidder during the Auction.

B.     **Terms of Overbids.** Each Overbid must comply with the following terms:

    1.     Minimum Overbid Increment. At the commencement of the initial solicitation of Overbids, the Debtors, in consultation with the Consultation Parties, shall announce the minimum increment by which any Overbid must exceed the applicable Baseline Bid (the "Bidding Increment"). At the

commencement of each subsequent round of solicitation of Overbids, the Debtors shall announce the Bidding Increment by which any Overbid must exceed the Prevailing Highest Bid (as defined below) at such time. The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), announce increases or reductions to the Bidding Increment at any time during the Auction.

2.    _Stalking Horse Breakup Fee Credit_. When bidding at the Auction, the Stalking Horse Bidder will receive a cash credit in the amount of the Stalking Horse Bidder's breakup fee and will be allowed to bid the Stalking Horse Bidder's breakup fee.

3.    _Conclusion of Each Overbid Round_. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors (an "Overbid Round Deadline"); _provided_ that the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, may extend any Overbid Round Deadline.

4.    _Overbid Alterations_. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of the Bidding Procedures.

5.    _Announcing Highest Bid_. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best bid (the "Prevailing Highest Bid"). The Debtors shall describe to all applicable Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value the Debtors attribute to such Prevailing Highest Bid.

C.    **Consideration of Overbids.** The Debtors reserve the right, in their business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things (1) facilitate discussions between the Debtors and Qualified Bidders, (2) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent financing commitments to consummate the proposed Asset Sale(s) at the prevailing Overbid amount.

14

D.     **No Round-Skipping.**  To remain eligible to participate in the Auction, in each round of bidding, each Qualified Bidder, other than the Qualified Bidder that submitted the Prevailing Highest Bid, must submit an Overbid with respect to such round of bidding and to the extent a Qualified Bidder fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction; *provided* that the Debtors may, after consultation with the Consultation Parties, waive such requirement in their business judgment.

E.     **Closing the Auction.**  The Auction shall continue until the Debtors, in their business judgment and in consultation with their advisors and the Consultation Parties and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), designate a Qualified Bid to be the highest or otherwise best Qualified Bid for the applicable Assets.  Such Qualified Bid shall be designated the winning bid (the "Winning Bid" and such bidder, the "Winning Bidder") for such Assets, at which time the Auction with respect to such Assets shall be closed; *provided* that (1) such Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid to the then Prevailing Highest Bid; and (2) the Debtors' designation of a Qualified Bid as a Winning Bid (or Back-Up Bid, as applicable) shall be subject to and conditioned on the Court's approval of such Winning Bid (or Back-Up Bid, as applicable) and the Asset Sale(s) contemplated thereby (but, for the avoidance of doubt, any Winning Bid(s) and Back-Up Bid(s) shall be binding and irrevocable pending Court approval).  Notwithstanding the foregoing, the Debtors may, after consultation with the Consultation Parties, require last and final "blind" bids in their discretion.

F.     **No Collusion; Good Faith Offer.**  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (1) it has not engaged in any collusion, coordination, or unfair competitive practices with respect to the bidding process and (2) its Qualified Bid is a good faith, irrevocable, bona fide offer and it intends to consummate the Asset Sale(s) contemplated by its Qualified Bid if such Qualified Bid is the Winning Bid (or Back-Up Bid, as applicable) for the applicable Assets; *provided*, *however*, that two or more Qualified Bidders may coordinate to the extent they wish to provide a combined bid if the Debtors, after consultation with the Consultation Parties, approve such coordination in their reasonable discretion.

G.     **Rejection of Bids.**  The Debtors, in their business judgment, in consultation with the Consultation Parties and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders), may reject, at any time before entry of an order of the Court approving a Winning Bid (or Back-Up Bid, as applicable), any bid that the Debtors determine is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code and/or the Bidding Procedures, or (3) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

15

* * * * *

For the avoidance of doubt, nothing in the Auction Procedures (if an Auction is held) shall prevent the Debtors from exercising their respective fiduciary duties under applicable law (as determined in good faith by the Debtors).  Further, if the Debtors determine that that it is not in the best interest of their estates to pursue an Auction, then the Debtors, after consultation with the Consultation Parties, may cancel the Auction.  If the Auction is cancelled, the Debtors shall file a notice of cancellation of the Auction with the Court.

## XII.  DESIGNATION OF A BACK-UP BIDDER.

The Qualified Bidder(s) with the second highest or otherwise best bid(s) or combination(s) of bids (each, a "Back-Up Bid," and such bidder, a "Back-Up Bidder") to purchase any or all of the applicable Assets  will be determined by the Debtors, after consultation with the Consultation Parties and subject to the reasonable consent of the DIP Lenders and the Credit Facility Lenders (to the extent such parties are not Potential Bidders),, at the conclusion of the Auction and will be announced at that time to all the Qualified Bidders participating in the Auction.  Each Back-Up Bidder shall be required to keep its Qualified Bid open and irrevocable until the closing of the transaction with the applicable Winning Bidder.  The Back-Up Bidder's Good Faith Deposit shall be held in escrow until the closing of the transaction with the applicable Winning Bidder.  If for any reason a Winning Bidder fails to timely consummate the purchase of such Assets, then the Back-Up Bidder will automatically be deemed to have submitted the Winning Bid for such Assets, and the Back-Up Bidder shall be deemed a Winning Bidder for such Assets.  The Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid.  If the Back-Up Bid has already been approved by the Court, then the Debtors shall be authorized to close without further order of the Court upon at least twenty-four hours' advance notice, which notice will be filed with the Court.

## XIII.  APPROVAL OF SALE.

The Debtors will present the results of the Auction to the Court for approval at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that: (A) the Auction was conducted, and the Winning Bidder or Winning Bidders were selected, in accordance with the Bidding Procedures; (B) the Auction was fair in substance and procedure; (C) the Winning Bid or Winning Bids were Qualified Bids as defined in the Bidding Procedures; and (D) consummation of any Sale(s) as contemplated by the Winning Bid(s) in the Auction will provide the highest or otherwise best offer for the Debtors and the Debtors' Assets and is in the best interests of the Debtors and their estates.

The Sale Hearing is presently scheduled to commence on July 20, 2023, at [●] a./p.m. (prevailing Central Time), or as soon thereafter as counsel may be heard, before Judge David R. Jones, United States Bankruptcy Court for the Southern District of Texas.

## XIV.  FIDUCIARY OUT.

Notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by the Court, nothing in the Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to

take any action or to refrain from taking any action with respect to any Asset Sale(s) or the Bidding Procedures to the extent such Debtor or governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in the Bidding Procedures or any document filed with or entered by the Court, until the closing of the Auction (if any), the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (A) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each, an "Alternate Proposal"); (B) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (C) maintain or continue discussions or negotiations with respect to Alternate Proposals; (D) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (E) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposals.

## XV.   "AS IS, WHERE IS," FREE-AND-CLEAR SALE.

Consummation of any Asset Sale(s) will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted or agreed to by the Debtors in the executed definitive documentation for the Asset Sale(s) ("Definitive Sale Documents"). Consummation of any Asset Sale(s) will be without any representations or warranties whatsoever by the Debtors' representatives or advisors. Unless otherwise specifically accepted or agreed to by the Debtors in Definitive Sale Documents, all of the Debtors' right, title, and interest in and to the Assets disposed of in an Asset Sale will be transferred to the Winning Bidder (or Back-Up Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code. All bidders who submit a bid shall be deemed to be bound by this paragraph, regardless of whether the bid submitted satisfies the Bid Requirement to include an express statement to that effect.

## XVI.   COMMISSIONS.

The Debtors shall be under no obligation to pay any commissions, fees, or expenses to any bidder's agent, advisor, or broker. All commissions, fees, or expenses for any such agents, advisors, or brokers may be paid by bidders at such bidders' discretion. In no case shall any commissions, fees, or expenses for any bidder's agent, advisor, or broker be deducted from any proceeds derived from any Asset Sale(s).

## XVII.  RESERVATION OF RIGHTS.

The Debtors shall be entitled to modify the Bidding Procedures in their business judgment, after consultation with the Consultation Parties, in any manner that will best promote the goals of the Bidding Procedures, or impose, at or prior to the Auction (if any), additional customary terms and conditions on any Asset Sale(s), including: (A) extending the deadlines set forth in the Bidding Procedures; (B) adjourning the Auction at the Auction; (C) adding procedural rules that are

reasonably necessary or advisable under the circumstances for conducting the Auction (if any); (D) canceling the Auction; and (E) rejecting any or all bids or Qualified Bids.

## XVIII. CONSENT TO JURISDICTION.

All bidders who submit a bid shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of the Bidding Procedures, regardless of whether the bid submitted satisfies the Bid Requirement to include an express statement to that effect.

## XIX. RETURN OF DEPOSIT.

Any Good Faith Deposits provided by Qualified Bidders shall be held in one or more escrow accounts on terms acceptable to the Debtors.  Any such Good Faith Deposits will be returned to Qualified Bidders that are not Winning Bidders (or Back-Up Bidders, as applicable) on the date that is three business days after the Auction (if any).  Any Good Faith Deposit provided by a Winning Bidder (or Back-Up Bidder, as applicable) shall be applied to the purchase price for the applicable Asset Sale(s) at closing.

If a Winning Bidder (or Back-Up Bidder, as applicable) fails to consummate the Asset Sale(s) contemplated by its Winning Bid(s) (or Back-Up Bid(s), as applicable) because of a breach by such Winning Bidder (or Back-Up Bidder, as applicable), the Debtors will not have any obligation to return any Good Faith Deposit provided by such Winning Bidder (or Back-Up Bidder, as applicable), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates.

## Exhibit 1

**Stalking Horse Agreement**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JUNE 9, 2023**

**BY AND AMONG**

**PANTOGRAN LLC, AS PURCHASER,**

**AND**

**CARD HOLDINGS, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES**.................................................................................1
1.1        Purchase and Sale of the Acquired Assets ..................................1
1.2        Excluded Assets ...........................................................................3
1.3        Assumption of Certain Liabilities ...............................................5
1.4        Excluded Liabilities .....................................................................6
1.5        Assumption/Rejection of Certain Contracts ...............................6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ...............................................8
2.1        Consideration; Payment ...............................................................8
2.2        Deposit .........................................................................................8
2.3        Closing .........................................................................................9
2.4        Closing Deliveries by Sellers ......................................................9
2.5        Closing Deliveries by Purchaser ..................................................9
2.6        Withholding ................................................................................10

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ..................................10
3.1        Organization and Qualification..................................................10
3.2        Authorization of Agreement ......................................................10
3.3        Conflicts; Consents ....................................................................10
3.4        Intentionally Omitted. ................................................................11
3.5        Financial Statements ..................................................................11
3.6        Title to Properties ......................................................................11
3.7        Contracts ....................................................................................11
3.8        No Litigation ..............................................................................13
3.9        Permits; Compliance with Laws .................................................13
3.10      Environmental Matters ...............................................................13
3.11      Intellectual Property...................................................................13
3.12      Tax Matters ................................................................................14
3.13      Assumed Benefit Plans ..............................................................15
3.14      Employees..................................................................................15
3.15      Affiliate Transactions ................................................................16
3.16      Brokers.......................................................................................16
3.17      No Other Representations or Warranties ...................................16

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ..............................17
4.1        Organization and Qualification..................................................17
4.2        Authorization of Agreement ......................................................17
4.3        Conflicts; Consents ....................................................................17
4.4        Financing....................................................................................18
4.5        Brokers.......................................................................................18
4.6        No Litigation ..............................................................................18
4.7        Investment Representation; Investigation...................................18
4.8        Certain Arrangements ................................................................18
4.9        Solvency.....................................................................................19
4.10      Tax Matters ................................................................................19

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| 4.11 | No Additional Representations or Warranties | 19 |
| 4.12 | No Outside Reliance | 19 |

**ARTICLE V BANKRUPTCY COURT MATTERS** .......... **20**
| | | |
|---|---|---|
| 5.1 | Bankruptcy Actions | 20 |
| 5.2 | Cure Costs | 21 |
| 5.3 | Confirmation Order | 22 |
| 5.4 | Approval | 22 |

**ARTICLE VI COVENANTS AND AGREEMENTS** .......... **22**
| | | |
|---|---|---|
| 6.1 | Conduct of Business of Sellers | 22 |
| 6.2 | Access to Information | 24 |
| 6.3 | Employee Matters | 25 |
| 6.4 | Regulatory Approvals | 27 |
| 6.5 | Reasonable Efforts; Cooperation | 28 |
| 6.6 | Further Assurances | 28 |
| 6.7 | Insurance Matters | 28 |
| 6.8 | Receipt of Misdirected Assets; Liabilities | 28 |
| 6.9 | Acknowledgment by Purchaser | 29 |
| 6.10 | Guaranty | 31 |

**ARTICLE VII CONDITIONS TO CLOSING** .......... **32**
| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 32 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 32 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 33 |
| 7.4 | Waiver of Conditions | 33 |

**ARTICLE VIII TERMINATION** .......... **33**
| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 33 |
| 8.2 | Effect of Termination | 34 |

**ARTICLE IX TAXES** .......... **35**
| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 35 |
| 9.2 | Cooperation | 36 |

**ARTICLE X MISCELLANEOUS** .......... **36**
| | | |
|---|---|---|
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 36 |
| 10.2 | Expenses | 37 |
| 10.3 | Notices | 37 |
| 10.4 | Binding Effect; Assignment | 38 |
| 10.5 | Amendment and Waiver | 38 |
| 10.6 | Third Party Beneficiaries | 38 |
| 10.7 | Non-Recourse | 38 |
| 10.8 | Severability | 39 |
| 10.9 | Construction | 39 |

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 10.10 | Schedules | 39 |
| 10.11 | Complete Agreement | 40 |
| 10.12 | Specific Performance | 40 |
| 10.13 | Jurisdiction and Exclusive Venue | 40 |
| 10.14 | Governing Law; Waiver of Jury Trial | 41 |
| 10.15 | No Right of Set-Off | 42 |
| 10.16 | Counterparts and PDF | 42 |
| 10.17 | Publicity | 42 |
| 10.18 | Bulk Sales Laws | 42 |
| 10.19 | Fiduciary Obligations | 42 |
| 10.20 | Release | 43 |
| 10.21 | Sellers' Representative | 43 |

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** .......................**44**

| | | |
|---|---|---|
| 11.1 | Certain Definitions | 44 |
| 11.2 | Index of Defined Terms | 51 |
| 11.3 | Rules of Interpretation | 52 |

## INDEX OF EXHIBITS

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT B   FORM OF TRADEMARK ASSIGNMENT AGREEMENT

EXHIBIT C   FORM OF BIDDING PROCEDURES ORDER

EXHIBIT D   FORM OF PLAN

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of June 9, 2023, is made by and among Pantogran LLC, a Delaware limited liability company ("Purchaser"), Doreen Granpeesheh ("Granpeesheh"), Sangam Pant ("Pant", and together with Granpeesheh, the "Guarantors") and Card Holdings, LLC a Delaware limited liability company ("Holdings") and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, within 3 days following the date hereof, Sellers shall commence voluntary cases (collectively, the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes; and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Plan and subject to the entry and terms of the Confirmation Order and the effectiveness of the Plan;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Confirmation Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)     subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party, including the Contracts listed on <u>Schedule 1.1(a)</u>, and all purchase orders, to the extent assignable under applicable Law (the "<u>Assigned Contracts</u>");

(b)     all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

(c)     all Documents and data, including (without limitation) all rights, interests, assets, Intellectual Property, and data associated with Skills Global and Skill;

(d)     all Patient Records;

(e)     the Leased Real Property listed on <u>Schedule 1.1(e)</u> (including the leases related thereto, the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(f)     all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller;

(g)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(h)     to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(i)     the sponsorship of, and all rights, interests and assets associated with, the Seller Plans (collectively, the "<u>Assumed Benefit Plans</u>");

(j)     all Intellectual Property of Sellers, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including (without limitation) all Intellectual Property and all other rights, interests, and assets associated with Institute for Behavioral Training;

(k)     all inventory and supplies of the Sellers;

2

(l)     all goodwill, payment intangibles and general intangible assets and rights of Sellers; and

(m)     (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law of the Sellers or their estates and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller (including in its capacity as the managing member or manager of another Person) or its estate against any member of the Seller Group or Sangam Pant (other than in his capacity as a Guarantor hereunder) and The Sangam Pant and Supriya Pande Irrevocable Trust dated December 18, 2015, The Sangam Pant and Supriya Pande Revocable Trust dated June 28, 2012, and Sangam Pant and Supriya Pande Charitable Remainder Trust, in each case, arising out of or relating to events occurring on or prior to the Closing Date, other than any claim under this Agreement or any Transaction Agreement (the claims and causes of action set forth in this Section 1.1(m) "Transferred Claims") (which Transferred Claims against any member of the Seller Group are for the avoidance of doubt Released Claims pursuant to Section 10.20).

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):

(a)     all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)     the Contracts of Sellers listed on Schedule 1.2(b)(ii) (the "Excluded Contracts");

(c)     all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, or (iii) that any Seller is required by Law to retain; provided that Purchaser shall have the right to make copies of any portions of such Documents to the extent not prohibited by applicable Law and Sellers shall provide Purchaser access to such Documents;

(d)     all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers'

3

businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(e)      all current and prior insurance policies of any Seller that are not Assumed Benefit Plans, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)      all Equity Interests of any Seller or any of their respective Subsidiaries;

(g)      (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (other than Transferred Claims), and (iii) all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)      Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)      all Tax refunds, Tax attributes and Tax assets;

(j)      every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(k)      all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date; and

(l)      all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries.

1.3      <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Confirmation Order, effective as of the Closing, in addition to the payment

4

of the Cash Payment in accordance with <u>Section 2.1</u>, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)     all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;

(d)     all Liabilities, including all accounts payable and trade payables arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;

(e)     all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)     without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; and (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period as limited to the amount incurred after the Closing Date;

(g)     all Liabilities related to the Transferred Employees, except for any Liabilities with regard to compensation prior to the Closing Date and/or arising under retention and/or severance agreements entered into prior to the Closing Date and except as otherwise set forth herein;

(h)     the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Assumed Benefit Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;

(i)     all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement; and

(j)     all other Liabilities to the extent related to the Acquired Assets that arise after the Closing.

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").  For the avoidance of doubt, Purchaser shall have no liability or responsibility to any employee of Sellers who is not a Transferred Employee and Purchaser's assumption of liability to Transferred Employees is limited as set forth above and as otherwise set forth in this Agreement.

1.5     Assumption/Rejection of Certain Contracts.

(a)     Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of the motion seeking entry of the Confirmation Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Confirmation Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Confirmation Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs as part of the Cash Payment (as defined below) and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than purchase orders or the Acquired Leased Real Property) that it does not wish to assume or a Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract (other than those Contracts set forth on Schedule 1.2(b)(ii) as of the date hereof) up to one Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), and (i) any such previously considered Assigned Contract (other than purchase orders or the Acquired Leased Real Property) that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract (other than those Contracts set forth on Schedule

1.2(b)(ii) as of the date hereof) that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price. Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

        (c)    <u>Non-Assignment</u>.

        (i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

        (ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Confirmation Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this <u>Section 1.5(c)(ii)</u>, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s), if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Confirmation Order. Notwithstanding anything herein to the contrary, no Seller will be obligated to pay any consideration therefor

to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment.

(a)     The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $25,000,000 (the "Cash Payment").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller an amount in cash (the "Closing Date Payment") equal to the Cash Payment minus an amount equal to the Deposit.

(c)     The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2     Deposit.

(a)     Purchaser has, on or prior to the date hereof, made an earnest money deposit with Acquiom Clearinghouse LLC  (the "Escrow Agent") in the amount equal to $2,500,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the escrow agreement entered into on the date hereof among Holdings, Purchaser, and the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)     If this Agreement has been terminated by Holdings pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(b) or 8.1(c), in each case in circumstances where Holdings would be entitled to terminate this Agreement pursuant to Section 8.1(d) or 8.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)     If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.

(d)     The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the

8

consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

        (e)     If the Closing occurs, the Deposit shall be transferred to Seller.

    2.3    <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities in accordance with this Agreement and the Confirmation Order (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>."

    2.4    <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser:

        (a)     a bill of sale and assignment and assumption agreement substantially in the form of <u>Exhibit A</u> (the "<u>Assignment and Assumption Agreement</u>") duly executed by the applicable Sellers;

        (b)     a short-form trademark assignment agreement substantially in the form of <u>Exhibit B</u> (the "<u>Trademark Assignment Agreement</u>"), duly executed by the applicable Sellers;

        (c)     an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; and

        (d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Holdings certifying that the conditions set forth in <u>Sections 7.2(a)</u> and <u>7.2(b)</u> have been satisfied.

    2.5    <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

        (a)     the Closing Date Payment;

        (b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

        (c)     the Trademark Assignment Agreement, duly executed by Purchaser; and

        (d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in <u>Sections 7.3(a)</u> and <u>7.3(b)</u> have been satisfied.

2.6     <u>Withholding</u>. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under <u>Section 2.4(c)</u>.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (ii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to <u>Section 10.10</u>, Sellers represent and warrant to Purchaser as follows.

3.1     <u>Organization and Qualification</u>. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation.

3.2     <u>Authorization of Agreement</u>. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3     <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 3.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the Transactions, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Seller,

except, in the case of <u>clauses (ii)</u> and <u>(iii)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    <u>Intentionally Omitted</u>.

3.5    <u>Financial Statements</u>. Attached to <u>Schedule 3.5</u> are Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries audited consolidated balance sheets as of December 31, 2021 and as of December 31, 2020, and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for each fiscal year then ended (collectively, the "<u>Audited Financial Statements</u>"). The Audited Financial Statements have been prepared in all material respects in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present in all material respects the consolidated financial position of Center for Autism and Related Disorders, LLC and its respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

3.6    <u>Title to Properties</u>.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, one or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers which constitutes an Acquired Asset (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances). None of the Sellers owns any real property.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Sellers hold good title to, or a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Sellers and the Acquired Assets, taken as a whole.

3.7    <u>Contracts</u>.

(a)    <u>Schedule 3.7</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $10,000, other than letters of credit;

(iii)     relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $10,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $10,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Sellers);

(iv)     is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, inventory, Equipment, or other assets pursuant to which Sellers would reasonably be expected to make payments of more than $10,000 during any fiscal year; or

(v)     contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property that is material to Sellers, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) and (B), other than (1) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (2) Contracts entered into in the Ordinary Course granting exclusive rights to certain of Sellers, services or containing "most favored nation" provisions with respect to certain of Seller's, products or (z) any provision in any license agreements for Intellectual Property limiting Seller's, use of such Intellectual Property to specified fields of use or specified territories.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases and (iii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller (other than with respect to late payments) under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

12

3.8     No Litigation. Except as set forth in Schedule 3.8, there are no material Actions pending or, to Sellers' knowledge, threatened in writing against or affecting any of the Sellers that will materially adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the Transactions.

3.9     Permits; Compliance with Laws. Except as set forth in Schedule 3.9, each Seller is, and has been since January 1, 2023, in compliance in all material respects with all state or federal laws, statutes, or regulations ("Laws") or Orders, applicable to such Seller, and each Seller holds all licenses, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of its respective business (collectively, "Permits"), except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2023, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and regulations promulgated thereunder.

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws, (b) since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Sellers possesses and are in compliance with all Permits required under Environmental Laws for the operation of their businesses as currently conducted ("Environmental Permits"), (d) except as set forth in Schedule 3.10, there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, and (f) no Seller has released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Sellers to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers own all of the rights, title and interest in and to the Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property is subsisting, valid and enforceable.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Sellers with respect to the Acquired Assets as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual

Property with respect to the Acquired Assets; provided that nothing in this Section 3.11(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(d).

(c)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person, in each case with respect to the Acquired Assets.

(d)     Except as set forth on Schedule 3.11(d), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2022, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to Sellers and (ii) the operation of the business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person, in each case with respect to the Acquired Assets.

3.12     Tax Matters.

(a)     Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns with respect to the Acquired Assets required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are correct and complete in all material respects.

(b)     All material Taxes owed by a Seller with respect to the Acquired Assets that are due and payable on any Tax Return have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)     There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)     None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(e)     Except to the extent that doing so would not adversely impact the Acquired Assets or the Purchaser's ownership of the Acquired Assets, none of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(f)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 and Section 3.13 (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    <u>Assumed Benefit Plans</u>.

(a)    With respect to each material Assumed Benefit Plan, Sellers have made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the material terms thereof, including any amendments thereto, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description and (v) each current material related insurance Contract or trust agreement.

(b)    Each Assumed Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to Purchaser.

(c)    None of the Sellers maintains, contributes to, or has any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d)    No Assumed Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(e)    The consummation of the Transactions will not (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Assumed Benefit Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by Purchaser or any of its Affiliates.

3.14    <u>Employees</u>. None of the Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any employees of a Seller. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) no demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union and (ii) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work

stoppage by or with respect to the employees of any Seller. Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

3.15    Affiliate Transactions. Except as set forth on Schedule 3.16, no Affiliate of any Seller, or, to the Knowledge of Sellers, any officer or director of any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.16    Brokers. Except for Livingstone, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Livingstone) (the "Information Presentation") or in that certain datasite administered by SmartRoom (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1     <u>Organization and Qualification</u>. Purchaser is a Delaware limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Assuming that (i) requisite Bankruptcy Court approvals are obtained and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (A)</u> through <u>(D)</u>, as would not, individually

17

or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)　　　Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

4.4　　　Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5　　　Brokers. Except for Calex Partners, all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.6　　　No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

4.7　　　Investment Representation; Investigation. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which the Acquired Assets operate and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded appropriate access to the books and records, facilities and personnel of the Acquired Assets and Assumed Liabilities for purposes of conducting a due diligence investigation and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8　　　Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of managers (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9    Solvency. Purchaser is, and immediately after giving effect to the Transactions shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

4.10    Tax Matters. No person who is or has been treated as a partner of Holdings, for US federal income tax purposes is or is reasonably expected to become a partner of Purchaser (or its direct or indirect regarded parent, if applicable), for US federal income tax purpose.

4.11    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

4.12    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the Transactions. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller, or the quality, quantity or condition of any Seller's assets (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not

19

relying on, and will not rely on, any Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1     Bankruptcy Actions.

(a)     As promptly as practicable after the date hereof, Sellers shall file with the Bankruptcy Court (i) the petitions to commence the Bankruptcy Cases, (ii) a motion seeking approval of (A) the Bidding Procedures Order; and (B) the form of this Agreement and Sellers' authority to enter into this Agreement (the "Bidding Procedures Motion") and (iii) the Plan and the Plan Solicitation Motion; provided that Sellers may modify the Bidding Procedures Motion and the Plan Solicitation Motion pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications to the Bidding Procedures Motion being acceptable to Purchaser in its commercially reasonable discretion.

(b)     The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(c)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order and the Confirmation Order.

(d)     The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures Order, the Plan Solicitation Order, and the Confirmation Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist obtaining Bankruptcy Court approval of the Confirmation Order, and any other Order reasonably necessary in connection with the Transactions, as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(e)     Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement.

(f)     If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the later of (i) 45 days following the hearing to consider the Confirmation Order and (ii) such other date as this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Sellers may consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(g)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(h)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining Bankruptcy Court approval of the Confirmation Order and a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(i)     Nothing in this Section 5.1 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

5.2     Cure Costs. Subject to entry of the Confirmation Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs (as part of the Cash Payment) and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3     <u>Confirmation Order</u>. The Confirmation Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability.

5.4     <u>Approval</u>. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Confirmation Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1     <u>Conduct of Business of Sellers</u>.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their commercially reasonable efforts to carry on their business in the Ordinary Course except as would not reasonably be expected to be material to Sellers; <u>provided</u> that no action by any Seller or one of its Subsidiaries with respect to matters specifically addressed by <u>Section 6.1(b)</u> shall be deemed to be a breach of this <u>Section 6.1(a)</u> unless such action would constitute a breach of <u>Section 6.1(b)</u>.

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an

22

Excluded Asset or an Excluded Liability or (v) as set forth on <u>Schedule 6.1</u>, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to <u>Article VIII</u>), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not:

      (i)      sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets for consideration, individually or in the aggregate, in excess of $10,000, except (A) Ordinary Course dispositions of inventory and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Sellers, (B) transfers among the Sellers or their Subsidiaries, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

      (ii)      except as permitted under <u>Section 6.1(b)(ii)</u>, and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger), except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to include acquisitions of inventory in the Ordinary Course);

      (iii)      except (A) in the Ordinary Course or (B) pursuant to the terms of any Seller Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $75,000 per annum, (5) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (6) take any action to accelerate any rights or benefits under any Assumed Benefit Plan; <u>provided</u> that the foregoing shall not restrict any Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

      (iv)      make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

      (v)      grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under <u>Section 6.1(b)(i)</u>;

(vi)     settle any pending or threatened Action against any Seller that would result in an Assumed Liability in an amount in excess of $50,000; or

(vii)     authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)     Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by any Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 and (ii) any action taken, or omitted to be taken, by a Seller to protect the business of such Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its sole and reasonable discretion (any action or inaction described in clauses (i) or (ii) of this Section 6.1(c), a "COVID-19 Response"), shall in no event be deemed to constitute a breach of this Section 6.1.

6.2     Access to Information.

(a)     From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Sellers will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the Transactions, (iii) all requests for access will be directed to Livingstone or such other Person(s) as Sellers may designate in writing from time to time, and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the Transactions are not consummated, (B) would require any Seller to disclose any financial or proprietary information of or regarding the Affiliates of any Seller (other than Sellers themselves) or otherwise disclose information regarding the Affiliates of any Seller (other than Sellers themselves) that such Seller deems to be commercially sensitive, (C) would waive any legal privilege, or (D) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty. Notwithstanding anything to the contrary contained herein, no COVID-19 Response by any Seller shall be deemed to violate or breach this Section 6.2 in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

(b)      The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of consummating the Transactions, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)      From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)      Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the Transactions without the prior written consent of Seller for each such contact. Notwithstanding the foregoing, Seller agrees that Purchaser's representatives shall be provided reasonable access to and shall be allowed to meet with and interview Seller's employees for the purposes set forth in <u>Section 6.3</u> commencing the first business day following the date of this Agreement and Seller shall provide reasonable assistance in arranging and facilitating such meetings and interviews, in each case which shall be upon reasonable advance notice and during normal business hours and conducted in a manner which does not unreasonably interfere with the ongoing operations of the business of the Sellers or the bankruptcy proceedings or Auction.

6.3      <u>Employee Matters</u>.

(a)      At least 10 Business Days prior to Closing, Purchaser shall extend to each employee of Sellers (other than those employees set forth on <u>Schedule 6.3</u>), a written offer of employment providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing (including level of responsibility, primary location of

employment and authority) on the terms set forth in this <u>Section 6.3</u> ("<u>Transfer Offer</u>") and that, if accepted, shall become effective immediately after the Closing. Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this <u>Section 6.3(a)</u> shall be referred to herein as "<u>Transferred Employees</u>." Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates. Notwithstanding the foregoing or anything else set forth in this Agreement, Purchaser is not required to provide written offers to executive employees (VP and up) that are as favorable as existing arrangements with regard to pay, bonuses, severance, and any other agreements with such executives. Further, notwithstanding the foregoing or anything else set forth in this Agreement, Purchaser may amend Schedule 6.3 by adding or subtracting those employees set forth on <u>Schedule 6.3</u> at any time prior to ten (10) Business Days prior to the Closing by written notice to Sellers.

(b)     For a period of one (1) year from and after the Closing Date, Purchaser intends to provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is not lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii) cash bonus opportunities that are no less favorable in the aggregate than those provided to such Transferred Employee as of immediately prior to the Closing; and (iii) other employee benefits that are no less favorable in the aggregate than those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date, Purchaser intends that each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date and shall

26

otherwise be solely responsible for paying, providing and satisfying when due all compensation accruing, incurred or arising as a result of employment on or after the Closing Date with respect to the Transferred Employees.

(e)     The provisions of this <u>Section 6.3</u> are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this <u>Section 6.3</u> or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this <u>Section 6.3</u>, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment. Following the Closing, Sellers shall not enforce non-competition or non-solicitation restrictive covenants against any Transferred Employee (which for the avoidance of doubt do not include restrictive covenants with respect to confidentiality and non-disparagement) and any such restrictive covenants which are not Transferred Assets shall be deemed terminated and cancelled as of the Closing (for the avoidance of doubt this sentence shall not apply to any restrictive covenants referenced in or set forth in the Side Letter).

(f)     Effective as of the Closing, Purchaser and Purchaser's Affiliates shall be responsible for all obligations, liabilities and commitments in respect of claims arising after the Closing made by any Transferred Employee and solely based on events, actions or conduct occurring after the Closing.

(g)     Purchaser shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

6.4     <u>Regulatory Approvals</u>.

(a)     Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any material filings required to be made by the Purchaser Group pursuant to <u>Section 6.4(b)</u>, if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings required to be made pursuant to this <u>Section 6.4(a)</u> or <u>Section 6.4(b)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> and

(B) use reasonable best efforts to take all actions necessary to obtain all required clearances. For the avoidance of doubt, Purchaser shall be responsible for all filings pursuant to <u>Sections 6.4(a)</u> and <u>6.4(b)</u>, except where Sellers are obligated in accordance with submission guidelines to file on behalf of Purchaser.

6.5     <u>Reasonable Efforts; Cooperation</u>.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Closing to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of Sellers pursuant to this Agreement, including this <u>Section 6.5</u>, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order, the Plan Solicitation Order and the Confirmation Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     <u>Further Assurances</u>. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.7     <u>Insurance Matters</u>. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.8     <u>Receipt of Misdirected Assets; Liabilities</u>.

(a)     From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller

for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)     From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

6.9     <u>Acknowledgment by Purchaser</u>.

(a)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, and the Acquired Assets and the Assumed Liabilities and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, or the quality, quantity or condition of any Seller's assets, are, in each case, specifically disclaimed

29

by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Sellers, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "<u>Projections</u>"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this <u>Section 6.9</u>, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this <u>Section 6.9</u> (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this <u>Section 6.9</u>, Seller would not enter into this Agreement.

30

6.10    <u>Guaranty</u>.

(a)    The Guarantors collectively hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to <u>Sections 2.1</u> (the matters set forth in <u>clauses (i)</u>, <u>(ii)</u>, and <u>(iii)</u>, collectively, "<u>Guaranteed Obligations</u>"). Doreen Granpeesheh shall have responsibility allocated and limited to 60% of the Guaranteed Obligations. Sangam Pant shall have responsibility allocated and limited to 40% of the Guaranteed Obligations.

(b)    If Purchaser fails to perform any of the Guaranteed Obligations, then each Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)    Notwithstanding any other provision of this <u>Section 6.10</u>, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless the Seller against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this <u>Section 6.10</u>, including <u>Section 6.10(f)</u> and <u>6.10(h)</u>.

(d)    The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this <u>Section 6.10</u> and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this <u>Section 6.10</u>.

(e)    The Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to the Guarantors but not available to Purchaser, and each Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)    The guarantee by the Guarantors contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser of all of the Guaranteed Obligations and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and the Guarantors shall stand discharged of all of its obligations under this guarantee. The Guarantors shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this <u>Section 6.10</u>, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. The Guarantors' obligations under this <u>Section 6.10</u> shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)     The liability of the Guarantors under this <u>Section 6.10</u> shall be unlimited (except as set forth above with regard to the allocation to and between Guarantors) and unconditional, and this <u>Section 6.10</u> shall be a continuing guaranty.

(h)     Each Guarantor hereby makes the representations and warranties set forth in <u>Article IV</u> as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)     the Bankruptcy Court shall have entered the Confirmation Order and the Plan shall become effective in accordance with its terms.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> or in <u>Section 3.7</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.16</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)     Sellers shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Sellers under this Agreement on or prior to Closing; and

(c)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3    Conditions Precedent to the Obligations of Sellers. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)    Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

7.4    Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VIII
## TERMINATION

8.1    Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Holdings and Purchaser;

(b)    by written notice of either Purchaser or Holdings, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Holdings, if the Closing shall not have occurred on or before September 15, 2023 (the "Outside Date") (or such later date as provided in Section 5.1(f)); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

33

(d)      by written notice from Holdings to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Holdings may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Holdings at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)      by written notice from Purchaser to Holdings, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Holdings of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)      by written notice from Holdings to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(g)      by written notice from Holdings to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)      by written notice of either Purchaser or Holdings, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(i)      by written notice from either Purchaser or Sellers, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction or (ii) is the Backup Bidder at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder.

8.2      Effect of Termination.

(a)      In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses

(which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to Section 8.1(g), 8.1(h), or 8.1(i), Seller shall pay to Purchaser a break-up fee in an amount equal to $750,000 (the "Breakup Fee") and an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement, which amount will shall not exceed $350,000 ("Expense Reimbursement"); provided that the Breakup Fee and the Expense Reimbursement shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Seller.

(c)     Subject in all cases to Section 10.12, prior to the Closing, in the event of any breach by Seller of this Agreement, whether or not a Willful Breach, or any failure of the Transactions to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1 and, if applicable, to receive the Expense Reimbursement and/or the Breakup Fee, as applicable, in accordance with Section 8.2(b), if payable thereunder. Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of the Bidding Procedures Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against the Seller under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case.

(d)     Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2 are an integral part of this Agreement and that the Breakup Fee and the Expense Reimbursement are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Breakup Fee and Expense Reimbursement, as applicable, are payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

## ARTICLE IX
## TAXES

9.1     Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this

Agreement or the Transactions (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

      9.2    <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

**ARTICLE X**
**MISCELLANEOUS**

      10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions. Purchaser, for itself and on behalf of the Purchaser Group, acknowledge and agree that to the fullest extent permitted under applicable Law, including by contractually shortening the applicable statute of limitation, any and all rights, claims and causes of action, whether known or unknown, it may have against any member of the Seller Group relating to the Acquired Assets, the Assumed Liabilities, the operation of the Sellers and their respective Subsidiaries or their respective businesses or relating to the subject matter of this Agreement or the Schedules, whether arising under, or based upon, any Law (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages or any other recourse or remedy, including as may arise under common law or any other Law) are hereby irrevocably waived. Furthermore, without limiting the generality of this Section 10.1, no claim shall be brought or maintained by, or on behalf of, Purchaser or any member of the Purchaser Group against any member of the Seller Group, and no recourse shall be sought or granted against any member of the Seller Group, by virtue of, or based upon, any alleged misrepresentation or inaccuracy in, or breach of, any of the representations, warranties, covenants or agreements of the Seller or any other Person set forth or contained in this Agreement, the

36

Schedules, any certificate, instrument, opinion, agreement or other document of a Seller or any other Person delivered hereunder, the subject matter of this Agreement or the Schedules, the business or the ownership, operation, management, use or control of the business of any of the Sellers or their Subsidiaries, including the Acquired Assets and Assumed Liabilities, any of their assets, or any actions or omissions at, or prior to, the Closing. Nothing set forth in this Section 10.1 shall limit Section 10.20.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 9.1 and (b) all Cure Costs will be allocated to the Purchaser pursuant to Sections 1.3(b), 2.1(b), and 5.2.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

**Pantogran LLC**
Attention:      **Dr. Doreen Granpeesheh**
                **Sangam Pant**
Email:          **drgranpeesheh@gmail.com**
                **sangampant@gmail.com**

with a copy to (which shall not constitute notice):

**Locke Lord LLP**
**300 S. Grand Avenue, Suite 2600**
**Los Angeles, CA 90071**
Attention:      **David S. Kupetz**
Email:          **David.kupetz@lockelord.com**
                **Sean Feener**
                **sean.feener@lockelord.com**

37

<u>Notices to Sellers</u>:

Card Holdings, LLC
c/o Center for Autism and Related Disorders, LLC
9089 S Pecos Rd., Suite 3600
Henderson, NV 89074
Attention:     **Michelle Rapoport, General Counsel**
Email:         **MichelleRapoport@centerforautism.com**

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Lauren M. Colasacco, P.C.
               Christopher T. Greco, P.C.
               Steve Toth
               Allyson B. Smith
Email:         lauren.colasacco@kirkland.com
               cgreco@kirkland.com
               steve.toth@kirkland.com
               Allyson.smith@kirkland.com

10.4   <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Confirmation Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5   <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6   <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7   <u>Non-Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement or any document delivered hereto, this Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as

38

a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any of the foregoing (collectively, a "Non-Recourse Party") will have any Liability and there will be no right of recovery or any claims against any Non-Recourse Party (in each case whether in contract, tort, equity, through piercing or attempted piercing of the corporate veil, or otherwise, whether known or unknown, contingent or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute, and each of the Non-Recourse Parties are intended third party beneficiaries of this Section 10.7 and shall be entitled to enforce this Section 10.7 as if a party directly hereto.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan,

39

arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether

sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES

HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Confirmation Order and the Plan. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20   <u>Release</u>. Effective as of the Closing, each of Purchaser and the Guarantors (on behalf of themselves and the other Releasing Parties) (and, from and after the Closing, shall cause their respective Subsidiaries and Affiliates and each of its and their respective current and former officers, directors, employees, equityholders, partners, members, Advisors, successors and assigns (collectively with Purchaser and the Guarantors, the "<u>Releasing Parties</u>") to) hereby irrevocably and unconditionally releases and forever discharges each member of the Seller Group (collectively, the "<u>Released Parties</u>") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, obligations, liabilities, counterclaims, defenses, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever of any kind, nature or description, whether known or unknown or arising in law or equity, which the Releasing Parties may have against each of the Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to any of the Released Parties, the Acquired Assets, the Assumed Liabilities or otherwise occurring or arising on or prior to the Closing Date (collectively, the "<u>Released Claims</u>"), and each of the Releasing Parties hereby agrees not to sur or bring any action in respect of the Released Claims. The Released Claims shall include, but are not limited to, those actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts, covenants, claims and demands arising out of, or relating to, the organization, management or operation of the businesses of the Sellers or of their respective Subsidiaries relating to any matter, occurrence, action or activity on or prior to the Closing Date including the businesses associated with the Acquired Assets and their capital structure;

(b)     relating to this Agreement and the transactions contemplated hereby (including Article V hereto and the transactions contemplated thereby or which occur in connection therewith);

(c)     arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement contained in this Agreement, the Schedules, exhibits and annexes hereto, in any document delivered in connection herewith or contemplated hereby or in any certificate contemplated hereby and delivered in connection herewith; and

(d)     relating to any information (whether written or oral), documents or materials furnished by or on behalf of the Sellers and their Subsidiaries and/or Affiliates.

The Released Parties to whom this <u>Section 10.20</u> applies shall be express third party beneficiaries of this <u>Section 10.20</u>. The releases contemplated in this <u>Section 10.20</u> is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties.

10.21   <u>Sellers' Representative</u>. Each Party agrees that Holdings has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Holdings on behalf of the Sellers.

**ARTICLE XI**
**ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**

11.1   <u>Certain Definitions</u>.

(a)   "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b)   "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)   "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)   "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires a material portion of the Acquired Assets or equity of the Sellers, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, none of a liquidation or wind-down of Sellers' estates or the Plan shall be an Alternative Transaction.

(e)   "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)   "<u>Bidding Procedures Order</u>" means an Order substantially in the form attached hereto as <u>Exhibit D</u>.

(g)   "<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

44

(h)  "<u>Cash and Cash Equivalents</u>" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(i)  "<u>Confidentiality Agreement</u>" means those certain confidentiality agreements, dated as of November 10, 2022, and May 13, 2023, by and between Sangam Pant and Investor Group and Holdings and Yasoca Partners, LP and Holdings, respectively.

(j)  "<u>Confirmation Order</u>" mean an Order of the Bankruptcy Court (i) pursuant to section 1129 of the Bankruptcy Code confirming the Plan in a form reasonably acceptable to Seller and, solely to the extent related to this Agreement and the Transactions, Purchaser, as may have been amended, supplemented or otherwise modified with the consent of Seller and, solely to the extent related to this Agreement and the Transactions, Purchaser (such consent not to be unreasonably withheld, delayed or conditioned), (ii) approving this Agreement in a form reasonably acceptable to the Parties and (iii) authorizing Seller to undertake the Transactions, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code in a form reasonably acceptable to the Parties.

(k)  "<u>Consent</u>" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(l)  "<u>Contract</u>" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

(m)  "<u>Disclosure Statement</u>" means the disclosure statement for the Plan approved by the Bankruptcy Court pursuant to the Plan Solicitation Order (including all exhibits and schedules thereto).

(n)  "<u>Documents</u>" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(o)  "<u>Encumbrance</u>" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title

retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(p)　　"Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(q)　　"Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(r)　　"Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(s)　　"ERISA" means the Employee Retirement Income Security Act of 1974.

(t)　　"GAAP" means United States generally accepted accounting principles as in effect from time to time.

(u)　　"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(v)　　"Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether federal or, state, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(w)　　"Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(x)　　"Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property.

(y)　　"Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Michelle Rapoport and Jennifer Webster, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(z)     "Law" means any federal or state, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, regulation, or Order, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(aa)    "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(bb)    "Livingstone" means Livingstone Partners LLC.

(cc)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(dd)    "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any Equipment or supplies necessary to or used in the provision of services by any Seller; (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for

the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in <u>Section 6.1</u> or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets, Assumed Liabilities, or employees, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xv)(A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Plan Solicitation Order, the Plan, the Confirmation Order or the reorganization or liquidation of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith.

(ee)   "<u>Order</u>" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Confirmation Order).

(ff)   "<u>Ordinary Course</u>" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and past practice in light of the current pandemic, epidemic or disease outbreak; <u>provided</u> that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the ordinary course of business.

(gg)   "<u>Patient Records</u>" means any of the Sellers' written and electronic patient files for all patients that were created as a result of services provided by the Sellers or clinical providers acting on behalf of the Sellers, including, but not limited to, treatment records and plans, observations, medical and behavioral history, progress summaries, clinical documentation, forms, authorizations, consents, notes, client data, insurance information, personally identifying

48

information, discharge plans, and all other documentation required to be stored or kept in accordance with applicable laws and payor agreements.

(hh) "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on Schedule 11.1(hh), and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Confirmation Order.

(ii) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(jj) "Plan" means a plan of reorganization of Sellers in the form attached hereto as Exhibit E, together with such changes as are approved by Sellers and, solely to the extent related to this Agreement and the Transactions, approved by Purchaser in its reasonable discretion.

(kk) "Plan Solicitation Motion" means Sellers' motion for an Order, (i) approving the Disclosure Statement (including approving the Disclosure Statement as containing "adequate information" (as that term is used by section 1125 of the Bankruptcy Code)), (ii) establishing a voting record date for the Plan, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the forms of ballots, (v) establishing procedures for voting on the Plan, (vi) establishing notice and objection procedures for the confirmation of the Plan and (vii) establishing procedures for the assumption or assignment of executory Contracts and unexpired leases under the Plan.

(ll) "Plan Solicitation Order" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Plan Solicitation Motion, which Order shall, among other things, approve the relief sought in the Plan Solicitation Motion, including (i) the Disclosure Statement and (ii) the commencement of a solicitation of votes to accept or reject the Plan.

(mm) "Purchaser Group" means Purchaser, any Affiliate of Purchaser, and each of their respective direct and indirect equityholders, and each of their respective former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, agents, Advisors, successors or permitted assigns.

(nn)     "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(oo)     "Seller Group" means each Seller and any of its Affiliates and funds or partnerships managed or advised by it or its respective Affiliates, including Cardinal Buyer, LLC, and each of their respective direct and indirect equityholders, former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, investment vehicles, agents, Advisors, predecessors, successors or permitted assigns.

(pp)     "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by any Seller that is an Acquired Asset.

(qq)     "Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(rr)     "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(ss)     "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(tt)     "Side Letter" means that certain letter agreement, dated as of the date hereof, by and among Holdings, Center for Autism and Related Disorders, LLC, Cardinal Buyer, LLC, Donisocha, Inc., Doreen Granpeesheh Living Trust, DG Charitable Remainder Trust, Haftchance LLC, YASOCA Partners, LP and Dr. Doreen Granpeesheh.

(uu)     "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(vv)     "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment,

disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ww)  "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(xx)  "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(yy)  "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement, including the Side Letter.

(zz)  "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(aaa)  "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2    Index of Defined Terms.

Acquired Assets ...........................................2
Acquired Leased Real Property ..................2
Agreement....................................................1
Agreement Dispute .....................................44
Assigned Contracts ......................................2
Assignment and Assumption Agreement ..11
Assumed Benefit Plans ...............................3
Assumed Liabilities .....................................5
Audited Financial Statements....................13
Backup Bidder ...........................................23
Bankruptcy Cases ........................................1
Bankruptcy Code .........................................1
Bankruptcy Court.........................................1
Bidding Procedures Motion ......................22
Breakup Fee ...............................................38
Cash Payment ..............................................9
Chosen Courts............................................44
Closing.......................................................10
Closing Date ..............................................10
Closing Date Payment .................................9
COVID-19 Response .................................26
Cure Costs....................................................5
Dataroom ...................................................18
Deposit ......................................................10

Effect..........................................................50
Enforceability Exceptions..........................12
Environmental Permits ..............................15
Escrow Agent.............................................10
Excluded Assets...........................................3
Excluded Contracts......................................3
Excluded Liabilities.....................................7
Expense Reimbursement ...........................38
Express Representations ............................18
Fundamental Representations....................35
Guaranteed Obligations ............................34
Guarantor .....................................................1
Holdings.......................................................1
Information Presentation ...........................18
Laws............................................................15
Material Contract .......................................14
Outside Date ..............................................36
Parties ..........................................................1
Party .............................................................1
Permits ......................................................15
Projections .................................................33
Purchase Price..............................................9
Purchaser......................................................1
Responsible Person Liabilities....................6

| | | | |
|---|---|---|---|
| Seller | 1 | Transfer Offer | 28 |
| Sellers | 1 | Transfer Taxes | 39 |
| Successful Bidder | 23 | Transferred Employees | 28 |
| Trademark Assignment Agreement | 11 | WARN Act | 30 |

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)    The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)    Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; underlined provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**PANTOGRAN LLC**

By:     Donisocha, Inc.
Its:    Manager

By:     _____
Name:   Doreen Granpeesheh, Ph.D.
Title:  President

DocuSign Envelope ID: 6C4B3642-CD13-44B7-A651-A379E8335A35

**GUARANTORS:**

Doreen Granpeesheh

_____

Sangam Pant

_____

**GUARANTORS:**

Doreen Granpeesheh

_____

Sangam Pant

_____

**SELLERS:**

Card Holdings, LLC

By: _____
Name:   Jennifer Webster
Title:    Authorized Signatory


Card Intermediate Holdings I, LLC

By: _____
Name:   Jennifer Webster
Title:    Authorized Signatory


Card Intermediate Holdings II, LLC

By: _____
Name:   Jennifer Webster
Title:    Authorized Signatory


Center for Autism and Related Disorders, LLC

By: _____
Name:   Jennifer Webster
Title:    Authorized Signatory


SKILLS Global, LLC

By: _____
Name:   Jennifer Webster
Title:    Authorized Signatory


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**<u>Exhibit 2</u>**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENTER FOR AUTISM AND RELATED | ) | Case No. 23-90709 (DRJ) |
| DISORDERS, LLC, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF AUCTION FOR THE**
**SALE OF THE DEBTORS' ASSETS FREE AND**
**CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Debtors to Enter into Definitive Purchase Agreements, and (VII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct a marketing and sale process, potentially including an auction (the "Auction"), to sell the Assets.  The Sale Process and Auction, if any, will be governed by the bidding procedures approved pursuant to the Order and attached to the Order as Exhibit 1 (the "Bidding Procedures").  **All interested bidders should carefully read the Bidding Procedures and the Order**.  To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Order, the Bidding Procedures or the Order, as applicable, shall govern in all respects.

Copies of the Order, the Bidding Procedures, or other documents related thereto are available on the Debtors' restructuring website at https://cases.stretto.com/CARD.

Any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192).  The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Bidding Procedures, as applicable.

Procedures.  The General Bid Deadline is **Friday, July 14, 2023 at 4:00 p.m. (prevailing Central Time)**.  The Auction, if required, will be [Monday, July 17], 2023 at 9:00 a.m. (prevailing Central Time).

The Debtors expect to seek approval of any Sales at the Sale Hearing, which is presently scheduled to commence on **Thursday, July 20, 2023 at [●] a/p.m (prevailing Central Time)**, before the Judge Jones in the United States Courthouse, 515 Rusk Street, 4th Floor Courtroom 400, Houston, Texas 77002.

The Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment in accordance with the Bidding Procedures.

Except as otherwise set forth in the Order with respect to objections to proposed cure amounts, objections, if any, to a proposed Asset Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court so as to be *actually received* no later than **Wednesday, July 19, 2023 at 4:00 p.m. (prevailing Central Time)**.

## <u>CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION</u>

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT(S).**

Houston, Texas
[_____], 2023

/s/ *DRAFT*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                mstull@jw.com
                vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors-in-Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher T. Greco, P.C. (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          christopher.greco@kirkland.com
                allyson.smith@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors-in-Possession*

## **Exhibit 3**

**Potential Assumption Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER FOR AUTISM AND RELATED | ) | Case No. 23-90709 (DRJ) |
| DISORDERS, LLC, *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY**
**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU**
**OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN**
**EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE**
**OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.**

---

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

On [●], 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving the Bidding Procedures, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Debtors to Enter into Definitive Purchase Agreements, and (VII) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures for the assumption and assignment of executory contracts and unexpired leases and granted related relief, as set forth in the Order.

Pursuant to the Bidding Procedures and the terms of any Winning Bid, the Debtors **may** assume and assign to the Winning Bidder certain of the Contracts listed on **<u>Exhibit A</u>** hereto (the "Potential Assumption List"), which include Contracts to which you are a counterparty, upon approval of a sale or other transaction (including, as the case may be, confirmation of a chapter 11 plan). The Debtors have conducted a review of their books and records and have included in the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192).  The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Motion, as applicable.

Potential Assumption List the amount of unpaid monetary obligations under each Contract set forth therein (the "Cure Costs").

If you disagree with the proposed Cure Costs for the Contract(s) to which you are a counterparty, your objection must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and **actually received** by the following parties **no later than Friday, July 14, 2023** at **4:00 p.m. (prevailing Central Time)** (the "**Cure Objection Deadline**") by the following parties:  (a) proposed co-counsel for the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Christopher T. Greco, P.C. (christopher.greco@kirkland.com) and Allyson B. Smith (allyson.smith@kirkland.com) and (ii) Jackson Walker LLP ("Jackson Walker"), 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn.: Matthew D. Cavenaugh (mcavenaugh@jw.com), Jennifer F. Wertz (jwertz@jw.com), J. Machir Stull (mstull@jw.com), and Victoria N. Argeroplos (vargeroplos@jw.com); and (b) the United States Trustee for the Southern District of Texas, Attn.: Jana Whitworth.

Notwithstanding the foregoing, if the Debtors file one or more revised versions of this Potential Assumption Notice (a "Supplemental Potential Assumption Notice"), as set forth in the Order, any counterparty to a Contract that is (a) added to the Potential Assumption List pursuant to a Supplemental Potential Assumption Notice or (b) that is subject to an amended proposed cure amount shall have twenty-one calendar days following the service of such Supplemental Potential Assumption Notice to file an objection.  Objections to the proposed assignment of any Contract to the applicable Winning Bidder (other than Cure Objections) shall (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection; and (iv) be filed with the Court and **actually received** by the parties listed above **no later than Wednesday, July 19, 2023** at **4:00 p.m. (prevailing Central Time).**

Absent a timely objection, the assumption of each executory contract or unexpired lease may become effective on the date set forth in **Exhibit A**, or such other date as the Debtors and the counterparty or counterparties to such Contract may agree.  If an objection is timely filed and not withdrawn or resolved, such objection will be heard at the Sale Hearing or such other date and time as agreed to by the Debtors and the objecting party or ordered by the Court.  If such objection is overruled or withdrawn, the applicable Contract shall be assumed as of the date set forth in **Exhibit A** or such other date as the Debtors and the counterparty or counterparties to such Contract may agree.

Houston, Texas
[_____], 2023

/s/ *DRAFT*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria N. Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                mstull@jw.com
                vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors-in-Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher T. Greco, P.C. (*pro hac vice* pending)
Allyson B. Smith (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          christopher.greco@kirkland.com
                allyson.smith@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors-in-Possession*