IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CENTER FOR AUTISM AND RELATED DISORDERS, LLC, *et al.*,[1] | ) ) ) ) | Case No. 23-90709 (DRJ) |
| Debtors. | ) ) ) | (Jointly Administered) (Emergency Hearing Requested) |

**DECLARATION OF JOSEPH GREENWOOD
IN SUPPORT OF DEBTORS' <u>EMERGENCY</u> MOTION FOR
ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES,
(II) APPROVING BID PROTECTIONS, (III) SCHEDULING CERTAIN DATES WITH
RESPECT THERETO, (IV) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT
PROCEDURES, (VI) AUTHORIZING THE DEBTORS TO ENTER INTO
DEFINITIVE PURCHASE AGREEMENTS, AND (VII) GRANTING RELATED RELIEF**

I, Joseph Greenwood, declare under penalty of perjury:

1. I am a Partner at Livingstone Partners LLC ("<u>Livingstone</u>"), an internationally recognized, middle-market investment banking firm with over 80 professionals located across offices in Chicago, Los Angeles, Amsterdam, Dusseldorf, Stockholm, Madrid and Beijing. Livingstone is the proposed investment banker for the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>").

2. I submit this declaration (this "<u>Declaration</u>") in support of the relief requested in the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192). The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

*and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, (VI) Authorizing the Debtors to Enter into Definitive Purchase Agreements, and (VII) Granting Related Relief* (the "Motion"), filed contemporaneously herewith.[2]

3. Although Livingstone is being compensated for its work as the investment banker proposed to be retained by the Debtors, I am not being compensated separately for this Declaration or testimony. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Livingstone professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors or their other advisors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am over the age of 18 years and authorized to submit this Declaration.

## Professional Qualifications

4. I am a Partner and the head of the Special Situations practice at Livingstone. I have over 23 years of financial advisory experience, of which 20 years have involved advising debtors, creditors, and equity holders on a wide variety of recapitalization and restructuring transactions, both inside and outside of chapter 11. The vast majority of my experience over the last 20 years has involved advising distressed clients in M&A and financing transactions.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the *Declaration of Steven Shenker, Chief Restructuring Officer of CARD Holdings, LLC, in Support of Chapter 11 Petitions, First Day Motions, and DIP Motion* (the "First Day Declaration"), filed contemporaneously herewith, the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Order"), filed contemporaneously herewith, and the *Joint Chapter 11 Plan of Center for Autism and Related Disorders, LLC and its Debtor Affiliates* (the "Plan"), filed contemporaneously herewith. The material terms of the Bidding Procedures are set forth in detail in the Motion and the DIP Order.

5. I have been involved in numerous chapter 11 matters, including those of Gissing North America, Aztec Shaffer, Arro Foods, Maurice Sporting Goods, Quadrant 4 Systems Corp., Lectrus Corporation, Cardiac Science, IPC International, LB Steel, Hartmarx Corporation, Robbins Bros. Corporation, Renew Energy, Key Lime Cove Resort, Waterworks Holding Corp., American IronHorse Motorcycles, Gateway Ethanol, Budget Group, Inc., Kmart Corp., and UAL Corporation. Prior to joining Livingstone in April 2010, I held various positions, including being one of three founding members of William Blair's Restructuring Group and serving as a Vice President within KPMG's Corporate Recovery practice. I am a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor.

6. I received a BBA in Accounting from the University of Wisconsin-Madison and an MBA with High Distinction from Georgetown University. I am principally responsible for overseeing the day-to-day activities of the Livingstone deal team in this engagement.

## Livingstone Retention

7. On October 25, 2022, the Debtors retained Livingstone as their proposed investment banker. Since commencing its engagement, Livingstone has, among other things, led the Debtors' marketing processes for the sale of its business and for debtor-in-possession financing facility. Through this period of advising the Debtors, members of the Livingstone team and I are familiar with the Debtors' capital structure, liquidity needs, and business operations.

## Prepetition Marking Process

8. Prior to our engagement in October 2022, I understand that the Debtors had been working for some time to evaluate paths forward and strategic alternatives that would bridge the Debtors to a full recovery from the significant financial stress caused by the COVID-19 pandemic. I understand that the Debtors engaged in a number of operational restructuring efforts including

lease restructuring efforts, the adoption of a revised business plan and governance initiatives and entered into several bridge financings to generate liquidity.  I understand that, though the Debtors' initiatives generated significant cost savings that will benefit the Debtors' go-forward business, such initiatives were insufficient to fully address the Debtors' strained liquidity position and ensure that each of the Debtors' patients will experience uninterrupted care.  Accordingly, I understand that the Debtors pivoted to a full marketing and sale process and retained Livingstone to guide their marketing efforts.

9. In November 2022, the Debtors, with the assistance of Livingstone, commenced a marketing process to solicit interest for the sale of the Debtors' entire business, or subsets of the Debtors' clinics.  Livingstone reached out to 58 potential strategic and financial buyers; all of which either have a platform investment in the behavioral health space or a stated interest in acquiring a business in the behavioral space.  Fifty of the interested parties entered into confidentiality agreements with the Debtors.  Parties who executed a confidentiality agreement received significant financial, operational and legal diligence information, including a confidential information presentation (CIP) and detailed financial model.  In addition, potential buyers were offered the opportunity to participate in telephone conferences with the Debtors' management team as well as to request additional due diligence information.  In early January 2023, Livingstone had received 13 indications of interest from potential buyers and the Debtors' management team hosted virtual management presentations with ten of those interested parties.  Livingstone received five letters of intent by the end of January 2023.

10. Ultimately, on March 13, 2023, the Debtors selected the bid from a bidder (the "Exclusive Bidder") and executed an exclusivity agreement which the Exclusive Bidder.  The bid from the Exclusive Bidder contemplated the sale of the Debtors' entire business and conditioned

such bid on the consummation of the sale through an out-of-court process.

11. In late April 2023, the Exclusive Bidder unexpectedly amended the terms of its bid, reducing the purchase price significantly and indicating that it was only willing to act as a stalking horse for an in-court sale process. Two and a half weeks later and after exclusivity expired, the Exclusive Bidder further reduced its bid. The Debtors, in consultation with their advisors, deemed the revised bid from the Exclusive Bidder as unactionable and reopened the sale process by reengaging with interested parties from the initial phase of the marketing process.

12. The Debtors engaged in extensive negotiations with several interested parties that spanned approximately five weeks. Livingstone worked with each interested party to answer numerous requests for additional information, coordinated telephonic meetings with the Debtors' management team and facilitated meaningful third-party due diligence. The Debtors requested that interested parties submit stalking horse proposals for the sale of all or part of the Debtors' business by June 6, 2023.

13. The Debtors' reengagement with interested parties bore fruit and yielded several proposals. When analyzing proposals received from interested parties, the Debtors and their advisors considered the risks and benefits associated with each proposed transaction, including overall value delivered, timing considerations, and execution risks. After deliberation, the Debtors selected the Stalking Horse Bid for the sale of substantially all of the Debtors' assets. Pursuant to the Stalking Horse Agreement, and in the absence of any topping bids received in the continuing marketing process and auction, an entity owned by Dr. Doreen Granpeesheh, the Debtors' founder, will purchase the entirety of the Debtors' business and continue to operate the Debtors' current footprint of treatment facilities. Critically, the Stalking Horse Bid ensures that the Debtors' business will continue to operate without disruption post-emergence and that the Debtors' patients

will continue to receive the treatment and services they need. The Debtors also secured a $18 million DIP Facility to fund the Debtors' operations during the pendency of these chapter 11 cases.[3] The liquidity provided by the DIP Facility will facilitate a fulsome postpetition "market check" for the Stalking Horse Bid through the process contemplated by the bid procedures.

14. I believe the Debtors' robust prepetition marketing process provided a meaningful head-start on a potential transaction, paving the way for an expeditious in-court process to advance the Debtors' prepetition efforts and ensure that the Debtors receive the highest or otherwise best offer(s) for their assets. The Debtors are prepared to continue their prepetition marketing efforts and conduct a robust postpetition marketing process on an expedited basis that aligns with the milestones provided in the DIP Facility. To date, Livingstone, with the assistance of the Debtors, has identified several interested parties with bona fide interest in acquiring assets of the Debtors and financial wherewithal to consummate such a transaction and will continue work to cultivate interest among these parties. Additional parties that may be interested in subsets of the Debtors assets may become aware of the potential sale through the chapter 11 process, thus driving even more interest in the Debtors' assets. Ultimately, Livingstone and the Debtors' prepetition efforts will enable the Debtors to commence a postpetition marketing process immediately after the commencement of these chapter 11 cases.

---

[3] A detailed description of the DIP Facility is contained in *Declaration of Joseph Greenwood in Support of Debtors'* <u>Emergency</u> *Motion Seeking Entry of Interim and Final Orders (Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition First Lien Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, filed contemporaneously herewith.

**The Bidding Procedures**

15. As set forth in the Sale Motion, the Debtors are seeking approval of the Bidding Procedures to establish a clear and transparent process for the solicitation, receipt, and evaluation of bids on a court-approved timeline that allows the Debtors to timely consummate a sale of their Assets.

16. I have reviewed the Bidding Procedures. Generally speaking, the Bidding Procedures establish, among other things:

- access to diligence information for Potential Bidders;

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the terms and conditions that must be satisfied and the deadline that must be met by any bidder to be considered a "Qualified Bidder" and to participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors;

- the conditions for having the Auction and procedures for conducting the Auction, if any;

- the bid protections provided to the Stalking Horse Bidder pursuant to the terms and conditions of the Stalking Horse Agreement; and

- various other matters relating to the sale process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights.

17. In addition, the Bidding Procedures propose the following key dates and deadlines:

| Event or Deadline | Date and Time (all times in Central Time) |
|---|---|
| Cure Objection Deadline | Friday, July 14, 2023, at 4:00 p.m. |
| General Bid Deadline | Friday, July 14, 2023, at 4:00 p.m. |
| Auction (If Required) | Monday, July 17, 2023, at 9:00 a.m. |
| Deadline for Objections to Approval of any Winning Bid (including Back-Up Bids), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline. | Wednesday, July 19, 2023, at 4:00 p.m. |
| Confirmation and Sale Hearing | Thursday, July 20, 2023, subject to Court availability |

18. Based on my experience, I believe that the processes provided in the Bidding Procedures will facilitate a fair and competitive bidding process where Potential Bidders are encouraged to participate, and will be given sufficient information, access and time to submit competing bids within the specified time frame. As described in the Sale Motion, the proposed Bid Deadline requires bids for the purchase of the Assets to be delivered no later than Friday, July 14, 2023. The Bid Deadline thus provides parties with approximately five (5) weeks from the filing of the Sale Motion to obtain information and formulate and submit a timely and informed competing bid to purchase some or all of the Assets. For most, if not all, Potential Bidders, the period between the Petition Date and the Bid Deadline will be a continuation of substantial diligence efforts that began prepetition.

19. Given the significant outreach prior the Petition Date, the postpetition outreach process to be launched by Livingstone for the Assets, the potential publicity surrounding these chapter 11 cases, the ability of Potential Bidders to use the Stalking Horse Bid as a reference against which to formulate competing bids, and the timeline proposed by the Debtors, it is my

view, based on my experience and in light of the circumstances, that the proposed postpetition sale process set forth in the Bidding Procedures is reasonable and appropriate under the circumstances. The Bidding Procedures seek to balance the Debtors' interests in consummating the Sale Transactions on an expedited timeline while simultaneously preserving the opportunity to attract the highest or otherwise best offer available. At the Auction (if necessary), as set forth in the proposed Bidding Procedures, the Debtors will have an opportunity to consider all competing offers and select the offers that they deem to be the highest or otherwise best offer for the Assets.

### The Stalking Horse Bids and the Bid Protections are Fair and Reasonable

20. As described above, in May and June 2023, the Debtors entered into arm's-length negotiations with all interested parties on the terms of a stalking horse bid for the Debtors' assets. The terms of the Stalking Horse Bid and Stalking Horse Agreement are customary, reasonable, and were negotiated in good faith and at arm's length. Negotiations were hard-fought and ongoing until immediately prior to the parties agreeing to enter into the Stalking Horse Agreement substantially in the form attached to the Bidding Procedures as <u>Exhibit 1</u>, which is attached as <u>Exhibit 1</u> to the Bidding Procedures Order. I believe that there was no guarantee that the Stalking Horse Bidder would bid the price of the Stalking Horse Bid at the auction without the Stalking Horse Agreement. Moreover, the Stalking Horse Agreement provides the Debtors with a minimum purchase price of the Assets and clear terms and conditions for such purchase at the Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest by providing a framework for third-party participation in the sale and bidding process.

21. Additionally, I understand that the Stalking Horse Agreement includes an Expense Reimbursement capped at $350,000 and a Breakup Fee of $750,000. In my experience, the

9

Expense Reimbursement and Breakup Fee provisions are customary, usual, and consistent with bid protections offered to stalking horse parties in similar contexts. I believe that the Bid Protections and Expense Reimbursement were necessary to induce the Stalking Horse Bidder to enter into the Stalking Horse Agreement.

22. Accordingly, for all the foregoing reasons, I believe that the Bidding Procedures and the timeline set forth therein: (a) will encourage bidding for the Debtors' assets; (b) are generally consistent with other procedures previously approved in chapter 11 cases of similar size and complexity; and (c) are appropriate under the circumstances. Given the details described above and based on my experience as a restructuring professional and involvement in other sales transactions, I believe that the Bidding Procedures are appropriate and should be approved.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 12, 2023
Chicago, Illinois

/s/ Joseph Greenwood
Name:  Joseph Greenwood
Title:   Partner, Livingstone Partners LLC
*Proposed Investment Banker to the Debtors*