United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 27, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CENTER FOR AUTISM AND RELATED | ) | Case No. 23-90709 (DRJ) |
| DISORDERS, LLC, *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 249** |

## ORDER (I) AUTHORIZING
## THE SALES OF THE DEBTORS'
## ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
## ENCUMBRANCES, AND INTERESTS, (II) APPROVING
## THE ASSET PURCHASE AGREEMENTS, (III) AUTHORIZING
## THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Sale Order"): (a) authorizing the proposed sales (the "Sales") of certain assets (the "Acquired Assets") of the Debtors free and clear of all liens, claims, encumbrances, and interests; (b) approving the Pantogran APA, a copy of which is attached hereto as **Exhibit 1(a)**; (c) approving the Audax APA, a copy of which is attached hereto as **Exhibit 1(b)**; (d) approving the Lorient Backup Bidder APA, a copy of which is attached hereto as **Exhibit 1(c)**; (e) authorizing the assumption and assignment to the respective Purchaser of the Assigned Contracts; and (f) granting related relief; and this Court

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Center for Autism and Related Disorders, LLC (1512); CARD Holdings, LLC (1453); CARD Intermediate Holdings I, LLC (N/A); CARD Intermediate Holdings II, LLC (3953); and SKILLS Global, LLC (4192). The location of the Debtors' principal place of business is 9089 S Pecos Rd., Suite 3600, Henderson, Nevada 89074.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

having entered an order on June 16, 2023 [Docket No. 134] (the "<u>Bidding Procedures Order</u>") approving, among other things, the Bidding Procedures, the Sale Notice, and the Assumption and Assignment Procedures; and the Court having reviewed and considered the Motion and all relief related thereto and any objections thereto; and upon the full record in support of the relief requested by the Debtors in the Motion; and this Court having found that the relief requested is in the best interests of the Debtors' estates, their creditors, and all other parties in interest; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court on July 26, 2023 (the "<u>Sale Hearing</u>"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS AS FOLLOWS**:[3]

     A.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

     B.    <u>Bases for Relief</u>.  The statutory and other legal bases for the relief provided herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") 6004, 6006, 9007, 9008, and 9014.  The consummation of the transactions contemplated by the APAs and this Sale Order is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>"), and the Debtors and the Purchasers have

---

[3]    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052 made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

complied with all of the applicable requirements of such sections and rules in respect of such transactions.

C.  <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

D.  <u>Notice of the Motion</u>.  As evidenced by the affidavits or certificates of service and publication notice filed with the Court, proper, timely, adequate, and sufficient notice of the Bidding Procedures, the Auction, the Sales (and all transactions contemplated in connection therewith), the assumption and assignment of the Assigned Contracts specified as of the date hereof to the Purchasers pursuant to the APAs, the Cure Costs, the Sale Hearing, and all deadlines related thereto, has been provided, as relevant, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, Bankruptcy Local Rules 2002-1 and 4002-1, and in compliance with the Bidding Procedures Order, to all interested persons and entities, including, without limitation, the Notice Parties.

E.  The Sale Notice [Docket No. 134, Ex. 2] was served on all parties required to receive such notice under the Bidding Procedures Order and applicable rules and published in *The New York Times* (national edition) and the *Financial Times* (global edition) in accordance with the Bidding Procedures Order and was sufficient and proper notice to any other interested parties, including those parties whose identities are unknown to the Debtors.  Service of the Sale Notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the identity of the Stalking Horse Bidder and the terms of the Stalking

Horse Agreement, including the Bid Protections and Expense Reimbursement.  With respect to any parties that may have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors, the publication of the Sale Notice was sufficient and reasonably calculated under the circumstances to reach such parties.

F.     The Debtors served the Cure Notice, identifying, among other things, the Cure Costs, on each of the Contract Counterparties to the Assigned Contracts.  The service of the Cure Notice was good, sufficient, and appropriate under the circumstances and in full compliance with the Bidding Procedures Order, and no further notice need be provided in respect of the Debtors' assumption and assignment to the respective Purchaser of the Assigned Contracts, including with respect to adequate assurance of future performance or the Cure Costs.  All Contract Counterparties to the Assigned Contracts have had an adequate opportunity to object to the assumption and assignment of the Assigned Contracts and the Cure Costs (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Contract Counterparty from accepting performance by, or rendering performance to, the Purchasers for purposes of section 365(c)(1) of the Bankruptcy Code).

G.     The Debtors filed and published notice substantially in the form of the *Notice of Successful Bidder and Backup Bidder with Respect to the Auction of the Debtors' Assets* [Docket No. 235] (the "Notice of Successful Bidder") on the case website in accordance with the Bidding Procedures Order and applicable rules.  Publication of the Notice of Successful Bidder was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the conclusion of the Auction and the identities of the Successful Bidders and Backup Bidders.  For the avoidance of doubt, the Backup Bidder APA shall be consummated only to the

extent that the Closing of the Successful Bid in accordance with the Pantogran APA and Audax APA does not occur.

H.      The notice described in the foregoing Paragraphs D–G is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Bidding Procedures, the Auction, the Sales (and all transactions contemplated in connection therewith), the assumption and assignment of the Assigned Contracts specified as of the date hereof to the Purchasers pursuant to the APAs, the Cure Costs, the Sale Hearing, and all deadlines related thereto is or shall be required.

I.      <u>Marketing and Sale Process</u>.  The Sales of the Acquired Assets to the Purchasers pursuant to the Bidding Procedures are duly authorized under sections 363(b)(1) and 363(f) of the Bankruptcy Code, Bankruptcy Rule 6004(f), and Bankruptcy Local Rules 2002-1 and 4002-1.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors and their professionals, agents and other representatives engaged in a robust and extensive marketing and sale process and have marketed the Acquired Assets and conducted all aspects of the sale process in good faith and in compliance with the Bidding Procedures and the Bidding Procedures Order.  The marketing process undertaken by the Debtors and their professionals, agents and other representatives with respect to the Acquired Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders.  The Bidding Procedures and the Auction were duly noticed, were substantively and procedurally fair to all parties, and were conducted in a diligent, non-collusive, fair and good-faith manner.

J.     The Bid Deadline passed at 4:00 p.m. (prevailing Central Time), on July 13, 2023, in accordance with the Bidding Procedures and Bidding Procedures Order.  Pursuant to the terms of the Bidding Procedures, the transaction contemplated by the consortium bid of Behavior Frontiers, LLC in conjunction with SH Varsity Acquisition Sub, LLC, Your Life ABA VA, LLC, Proud Moments MSO, LLC, and Proud Moments Licensed Behavior Analysts PLLC was designated as the Starting Bid.  The Debtors conducted an Auction beginning on July 17, 2023, at 9:00 a.m. (prevailing Central Time) in accordance with the Bidding Procedures and Bidding Procedures Order and concluded the Auction on July 21, 2023.  As established by the record of the Sale Hearing, the bidding and related procedures established by the Bidding Procedures Order have been complied with in all material respects by the Debtors and the Purchasers.  The Bidding Procedures afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Acquired Assets, and the APAs constitute the best and highest offer for the Acquired Assets.

K.     <u>Corporate Authority</u>.  The Debtors are the sole and lawful owners of the Acquired Assets.  The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code.  The Debtors (i) have full corporate power and authority to execute the APAs, and the Sales to the Purchasers have been duly and validly authorized by all necessary corporate action, (ii) have all of the corporate power and authority necessary to consummate the Sales and all transactions contemplated by the APAs, (iii) have taken all corporate action necessary to authorize and approve the APAs and the consummation by the Debtors of the Sales and all transactions contemplated thereby, and (iv) require no consents or approvals, other than those expressly provided for in the APAs, to consummate such transactions.

L.    Highest and Best Offer; Business Judgment.   The Debtors have demonstrated sufficient basis to enter into the APAs, sell the Acquired Assets on the terms outlined therein and assume and assign the Assigned Contracts to the Purchasers under sections 363 and 365 of the Bankruptcy Code.  All such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their creditors, their estates and other parties in interest. Approval of the Sales pursuant to the APAs at this time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

M.    The offer of the Purchasers, upon the terms and conditions set forth in the APAs, including the total consideration to be realized by the Debtors thereunder, (i) is the highest and best offer received by the Debtors after extensive marketing, including through the Bidding Procedures, (ii) is in the best interests of the Debtors, their creditors, their estates and all other parties in interest and (iii) constitutes full and adequate consideration, is fair and reasonable and constitutes reasonably equivalent value, fair consideration, and fair value for the Acquired Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.  Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates.

N.    Neither the Debtors nor the Purchasers (i) have entered into the APAs or proposes to consummate the Sales for the purposes of hindering, delaying, or defrauding the Debtors' present or future creditors or (ii) are entering into the APAs or proposing to consummate the Sales fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United

States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

O.      Good and sufficient reasons for approval of the APAs have been articulated by the Debtors.  The Debtors have demonstrated compelling circumstances for the Sales outside (i) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (ii) a plan of reorganization or liquidation (as the case may be), in that, among other things, the immediate consummation of the Sales to the Purchasers is necessary and appropriate to preserve and to maximize the value of the Debtors' estates.  To maximize the value of the Acquired Assets, it is essential that the consummation of the Sales occurs promptly.

P.      The Sales of the Acquired Assets outside of a chapter 11 plan pursuant to the APAs neither impermissibly restructures the rights of the Debtors' creditors or equity interest holders nor impermissibly dictates the terms of a chapter 11 plan of the Debtors.  The APAs and the Sales do not constitute a sub rosa chapter 11 plan.

Q.      Opportunity to Object.  A reasonable opportunity to object or be heard with respect to the Bidding Procedures, the Auction, the Sales (and all transactions contemplated in connection therewith), the assumption and assignment of the Assigned Contracts specified as of the date hereof to the Purchasers pursuant to the APAs, the Cure Costs, the Sale Hearing, and all deadlines related thereto has been afforded to all interested persons and entities, including, without limitation:  (i) the United States Trustee for the Southern District of Texas; (ii) counsel to the Debtors' prepetition credit facility lender and DIP Agent; (iii) counsel to the Debtors' majority prepetition equityholder; (iv) counsel to the Stalking Horse Bidder; (v) the United States Attorney's Office for the Southern District of Texas; (vi) the Internal Revenue Service; (vii) the state attorneys general for states in which the Debtors conduct business; (viii) all parties

who have expressed a written interest in the Acquired Assets; (ix) all known holders of liens, encumbrances, and other claims secured by the Acquired Assets; (x) each governmental agency that is an interested party with respect to the Sales and transactions proposed thereunder; and (xi) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

R.      Good Faith Purchasers; Arm's Length Sales.   The APAs were negotiated, proposed, and entered into by the Debtors and the Purchasers without collusion, in good faith, and from arm's length bargaining positions.  Neither the Debtors, nor the Purchasers, nor any affiliate of the Purchasers have engaged in any conduct that would cause or permit the APAs or the Sales to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

S.      The Purchasers are good-faith purchasers under section 363(m) of the Bankruptcy Code and, as such, are entitled to all of the protections afforded thereby.  In particular, (i) the Purchasers recognize that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets; (ii) the Purchasers in no way induced or caused the chapter 11 filing by the Debtors; (iii) the Purchasers have not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, officers, or controlling stakeholders exists between the Purchasers and any of the Debtors; (v) the Purchasers agreed to subject their bid to the competitive bid procedures set forth in the Bidding Procedures Order; (vi) all payments to be made by the Purchasers and other agreements or arrangements entered into by the Purchasers in connection with the Sales have been disclosed; and (vii) the Purchasers have not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among third parties.

T.    The Purchasers' professionals, agents and other representatives have complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the APAs.  The APAs comply with the Bidding Procedures Order and all other applicable orders of this Court.

U.    <u>Free and Clear Transfer Required by the Purchasers</u>.  The Purchasers would not have entered into the APAs and would not have consummated the Sales, thus adversely affecting the Debtors, their estates, and their creditors, if each of (i) the Sales and (ii) the assumption and assignment of the Assigned Contracts to the Purchasers were not free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of any Permitted Encumbrances and Assumed Liabilities) as more fully set forth in Paragraph 11 of this Sale Order, or if the Purchasers would, or in the future could, be liable for any Encumbrances, obligations, or liabilities of the Excluded Assets (collectively, the "<u>Excluded Liabilities</u>").  For the avoidance of doubt, the Purchasers shall have no responsibility whatsoever with respect to the Excluded Liabilities, which shall remain the responsibility of the Debtors before, on, and after the closing of the Sales (the "<u>Closing</u>").

V.    As of the Closing, pursuant and subject to the terms of the APAs, the transfer of the Acquired Assets and of the Assumed Liabilities and the Sales will effect a legal, valid, enforceable, and effective transfer of the Acquired Assets and will vest the Purchasers with all of the Debtors' rights, title, and interests in the Acquired Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of any Permitted Encumbrances and Assumed Liabilities), including (i) liens, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions

on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, subleases, leases, conditional sale arrangements, or other title retention arrangements, other liens (including mechanic's, materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, charges of any kind or nature, if any, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, any dedication under any gathering, transportation, treating, purchasing or similar agreement that is not assumed by or assigned to the Purchasers, or any rights that purport to give any party a right of first refusal or consent with respect to the Debtor's interest in the Acquired Assets or any similar rights; (ii) all claims as defined in Bankruptcy Code section 101(5), including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, claims for reimbursement, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, indentures, loan agreements, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, labor, employment and pension claims, and debts arising in any way in connection with any agreements, acts, or failures to act, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed,

contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise; (iv) any rights based on any successor or transferee liability, (v) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Purchasers' interest in the Acquired Assets, or any similar rights; (vi) any rights under labor or employment agreements; (vii) any rights under mortgages, deeds of trust, and security interests; (viii) any rights related to intercompany loans and receivables between the Debtors and any non-Debtor subsidiary or affiliate; (ix) any rights under pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (x) any other employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law

(collectively, "<u>COBRA</u>"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101 *et seq.*) (the "<u>WARN Act</u>"); (xi) any bulk sales or similar law; (xii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing, including, without limitation, any *ad valorem* taxes assessed by any applicable taxing authority; (xiii) any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Sale Order and the APAs; and (xiv) any other Excluded Liabilities as provided in the APAs.

W.     <u>Satisfaction of Section 363(f)</u>.  The Debtors may sell the Acquired Assets free and clear of any and all Liens, Claims, and Interests (each as defined herein) of any kind or nature whatsoever, including any rights or claims based on any putative successor or transferee liability, as set forth herein, because, in each case, one or more of the standards set forth in sections 363(f)(1)–(5) of the Bankruptcy Code has or have been satisfied.  All parties in interest, including, without limitation, any holders of Liens, Claims, and/or Interests and any Contract Counterparty to the Assigned Contracts, who did not object, or who withdrew their objection, to the Sales, the assumption and assignment of the applicable Assigned Contract or the associated Cure Cost are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.  Those (i) holders of Liens, Claims, or Interests and (ii) non-Debtor parties to Assigned Contracts that did not object are adequately protected by having their Liens, Claims, or Interests, if any, attach to the portion of the purchase price ultimately attributable to

the Acquired Assets against or in which they claim an interest, in the order of their priority, with the same validity, force and effect, if any, which they now have against such Acquired Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.

X.      No Successorship.    Neither the Purchasers nor any of their affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Purchasers nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the APAs.  The Purchasers (i) have not, de facto or otherwise, merged with or into one or more of the Debtors, (ii) are not a continuation or substantial continuation, and are not holding themselves out as mere continuations, of any of the Debtors or of their respective estates, businesses or operations, or any enterprise of the Debtors, and (iii) do not have a common identity of incorporators, directors, or equity holders with any of the Debtors.

Y.      The Assigned Contracts.  The Debtors have demonstrated (i) that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchasers in each case in connection with the consummation of the Sales and (ii) that the assumption and assignment of the Assigned Contracts to the Purchasers is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.  The Assigned Contracts being assigned to the Purchasers is an integral part of the Acquired Assets being purchased by the Purchasers and, accordingly, such assumption, assignment and cure of any defaults under the Assigned Contracts are reasonable and enhance the value of the Debtors' estates.  Any Contract Counterparty to an Assigned Contract that has not actually filed with the Court an objection to such assumption and assignment in accordance with the terms of the Bidding Procedures Order is deemed to have consented to such assumption and assignment.

Z.     <u>Cure Costs and Adequate Assurance</u>.   The Debtors and the Purchasers, as applicable, have, including by way of entering into the APAs, and agreeing to the provisions relating to the Assigned Contracts therein, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assigned Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code and the Purchasers have, based upon the record of these proceedings, including the evidence proffered by the Debtors at the Sale Hearing, provided adequate assurance of their future performance of and under the Assigned Contracts pursuant to sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Purchasers' promise under the APAs to perform the obligations under the Assigned Contracts after the Closing shall constitute adequate assurance of future performance under the Assigned Contracts being assigned to the Purchasers within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The Cure Costs are hereby deemed to be the sole amounts necessary to cure any and all defaults under the Assigned Contracts under section 365(b) of the Bankruptcy Code.

AA.     <u>Time Is of the Essence; Waiver of Stay</u>.  Time is of the essence in consummating the Sales.  In order to maximize the value of the Acquired Assets, it is essential that the sale and assignment of the Acquired Assets occur within the time constraints set forth in the APAs.  Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**I.** **The Sales Are Approved.**

1.      The Sales of the Acquired Assets contemplated by the APAs are hereby approved, as set forth herein.

**II.** **Objections Overruled.**

2.      All objections to the entry of this Sale Order or to the relief granted herein, whether filed, stated on the record before this Court or otherwise, which have not been withdrawn, waived, or settled, and all reservations of rights included therein, are denied and overruled on the merits.  All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.      The AmeriHealth Caritas Louisiana, Inc.'s Objection to Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases [Docket No. 201] (the "ACLA Cure Objection") is resolved by and between the Debtors, the Purchasers, and AmeriHealth Caritas Louisiana, Inc. ("ACLA") as set forth in this paragraph.  Notwithstanding other provisions of this Sale Order, the certain Ancillary Services Agreement, dated February 1, 2018, as amended (the "ACLA Agreement") entered into between ACLA and Debtor Center for Autism and Related Disorders, LLC shall only be assumed and assigned on the following conditions, unless otherwise agreed to by ACLA on or before the Closing Date:  (a) the applicable Purchaser shall be enrolled as a Louisiana Medicaid provider as of the Closing Date and/or the transfer to applicable Purchaser of the Debtors' Medicaid provider enrollment status is permitted by the Louisiana Department of Health; (b) the Purchasers shall provide to ACLA ownership disclosure information, and all other information required by ACLA, to the satisfaction of ACLA and relevant statutory, regulatory, and/or contractual requirements; and

(c) upon the Closing Date, the Purchasers will be ACLA's counterparty under the ACLA Agreement, and the relationship between the Purchasers and ACLA will continue in accordance with the terms of the ACLA Agreement, including indemnification obligations set forth under section 5.3 of the ACLA Agreement.  Should any of the foregoing conditions not be met, ACLA reserves the right to decline consenting to the proposed assumption and assignment of the ACLA Agreement.  For the avoidance of doubt, if the ACLA Agreement is assumed and assigned to the Purchasers, it shall not be free and clear of the indemnification obligations owed to ACLA under section 5.3 of the ACLA Agreement.  For the avoidance of doubt, (y) the ACLA explicitly reserves the right to file a claim in the Debtors' bankruptcy case for all prepetition amounts owed under the ACLA Agreement, and the Debtors and their estates explicitly reserve any and all rights with respect to disputing any such prepetition claims and (z) the ACLA explicitly reserves the right to assert any and all postpetition claims against the Debtors and their estates on account of services provided by ACLA to the Debtors and/or indemnification obligations owed to ACLA under section 5.3 of the ACLA Agreement prior to the Closing Date (collectively, "ACLA Postpetition Claims"), and the Debtors and their estates explicitly reserve any and all rights with respect to disputing any such ACLA Postpetition Claims.

4.      Notice of the Bidding Procedures, the Auction, the Sales (and all transactions contemplated in connection therewith), the assumption and assignment of the Assigned Contracts specified as of the date hereof to the Purchasers pursuant to the APAs, the Cure Costs, the Sale Hearing, and all deadlines related thereto was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

### III.   **Approval of the APAs.**

5.      The APAs and all other ancillary documents and all of the terms and conditions thereof, including the releases set forth in section 10.20 of each of the Pantogran APA, the Audax APA, and the Lorient Backup Bidder APA, are hereby approved.   Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized and directed to take any and all actions necessary to fulfill their obligations under, and comply with the terms of, the APAs and to consummate the Sales pursuant to and in accordance with the terms and conditions of the APAs and this Sale Order, without further leave of the Court.  The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs that are required to be paid in order to consummate the transactions contemplated by the APAs or perform their obligations under the APAs.

6.      The Debtors are authorized, in accordance with the APAs, to execute and deliver, and empowered to perform under, consummate, and implement, the APAs, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the APAs, and to take all further actions as may be reasonably requested by the Purchasers for the purpose of assigning, transferring, granting, conveying and conferring to the Purchasers or reducing to possession, the Acquired Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APAs.

7.      To the extent that the Closing of the Successful Bid does not occur, the Debtors shall file with the Court a notice of intent to close the Backup Bid.  For the avoidance of doubt, the Debtors may consummate the Backup Bid in accordance with terms of the Backup Bidder APAs and this Sale Order following filing of such notice and without further leave of the Court.

8.      The Backup Bidders' expense reimbursements are approved and are payable in accordance with, and subject to the terms of, the Backup Bidder APA.

## IV.      **Binding Effect of Order.**

9.      This Sale Order and the APAs shall be binding upon all creditors of, and equity holders in, the Debtors and any and all other parties in interest, including, without limitation, any and all holders of Liens, Claims, and Interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever, all Contract Counterparties to the Assigned Contracts, the Purchasers, all successors and assigns of the Purchasers, the Debtors and their affiliates and subsidiaries, and any trustee or successor trustee appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.  Nothing contained in this Sale Order shall conflict with or derogate from the provisions of the APAs.  To the extent of any such conflict or derogation, the terms of this Sale Order shall govern.

## V.      **Amendments to the APAs.**

10.      The APAs and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto, in consultation with the Consultation Parties, in a writing signed by both parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement or restatement (i) is subject to the reasonable consent of the Credit Facility Agent (as defined in the Plan) and (ii) does not have a material adverse effect on the Debtors' estates.  The APAs shall not be altered, amended, rejected, discharged or otherwise affected without the prior written consent of the respective Purchaser.

**VI.**   **Transfer of the Acquired Assets Free and Clear.**

11.    The Purchasers shall assume and be liable for only those liabilities expressly assumed pursuant to the respective APAs, and, for the avoidance of doubt, shall not include any Excluded Liabilities as defined in the respective APAs.   Except as expressly permitted or otherwise specifically provided for in the APAs or this Sale Order, pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the Closing, the Acquired Assets shall be transferred to the Purchasers free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, with the sole exception of any Permitted Encumbrances and Assumed Liabilities.   For purposes of this Sale Order, "Liens," "Claims," and "Interests" shall mean:

> a.    any and all charges, liens (statutory or otherwise), claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledge, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of setoff, successor liability, easements, servitudes, restrictive covenants, interests or rights under any operating agreement, encroachments, encumbrances, third-party interests or any other restrictions or limitations of any kind with respect to the Acquired Assets including all the restrictions or limitations set forth in Paragraph V above (collectively, "Liens");

> b.    any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under any labor, employment or pension laws, (ii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, and (iii) any and all other claims, causes of action, rights, remedies, obligations, liabilities, counterclaims, cross-claims, third party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, agents, successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and bidding process with respect to the Acquired Assets, the Assigned Contracts, or the transactions contemplated

by the APAs including all the claims set forth in Paragraph V above (collectively, "Claims"); and

c.   any and all equity or other interests of any kind or nature whatsoever in or with respect to (x) any of the Debtors or their respective affiliates, subsidiaries, successors or assigns, (y) the Acquired Assets, or (z) the Assigned Contracts, including all the interests set forth in Paragraph V above (collectively, "Interests");

whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing. Any and all such Liens, Claims, and Interests shall attach to the portion of the purchase price ultimately attributable to the Acquired Assets against or in which they claim an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Acquired Assets, subject to any claims, defenses and objections, if any, that the Debtors or their estates may possess with respect thereto. On the Closing, the Purchasers shall take title to and possession of the Acquired Assets subject only to any Permitted Encumbrances and Assumed Liabilities.

## VII.   **Distribution of Assets.**

12.   The proceeds of the Sales shall be distributed solely in accordance with and pursuant to the Plan.

## VIII.   **Vesting of Assets in the Purchasers.**

13.   The transfer of the Acquired Assets to the Purchasers pursuant to the APAs shall constitute a legal, valid, and effective transfer of the Acquired Assets on the Closing, and shall vest the Purchasers with all of the Debtors' rights, title, and interests in the Acquired Assets free

and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of any Permitted Encumbrances and Assumed Liabilities).

## IX.   Release of Liens.

14.   If any person or entity that has filed any financing statements, mortgages, mechanic's liens, *lis pendens*, or any other documents or agreements evidencing a Lien on any of the Acquired Assets conveyed pursuant to the APAs and this Sale Order shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to the Acquired Assets, then (a) the Debtors are hereby authorized, at their expense, to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets, and (b) the Purchasers are hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Acquired Assets of any kind or nature whatsoever. Upon releasing of any Liens, the Liens will attach to the proceeds of the Sales in the order and priority that existed prior to such releases.

## X.   Assumption and Assignment of Assigned Contracts.

15.   Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtors' assumption and assignment to the Purchasers of the Assigned Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

16.   The Debtors are hereby authorized, in accordance with the APAs, and in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (i) assume and assign to the

Purchasers the Assigned Contracts, effective upon and subject to the occurrence of the Closing, free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of any permitted Encumbrances and Assumed Liabilities), which Assigned Contracts, by operation of this Sale Order, shall be deemed assumed and assigned to the Purchasers effective as of the Closing, and (ii) execute and deliver to the Purchasers such documents or other instruments as the Purchasers may deem necessary to assign and transfer the Assigned Contracts to the Purchasers.

17.     Subject to Paragraph 17 hereof:

a.     The Debtors are authorized to and may assume all of the Assigned Contracts in accordance with section 365 of the Bankruptcy Code.

b.     The Debtors are authorized to and may assign each Assigned Contract to the Purchasers in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract on the consent of the counterparty thereto or allow the non-Debtor party to such Assigned Contract to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and void and of no force and effect.

c.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assigned Contracts by the Debtors to the Purchasers have been satisfied.

d.     Upon the Closing, the Assigned Contracts shall be transferred and assigned to, and remain in full force and effect for the benefit of, the Purchasers in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2), 365(e)(1) and 365(f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer.

e.     After the Debtors' transfer and assignment of the Assigned Contracts to the Purchasers, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchasers shall be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.

f.     Any portion of any Assigned Contract which purports to permit a landlord thereunder to cancel the remaining term of such Assigned Contact if the Debtors discontinue their use or operation of the leased premises is void and of no force and effect, and shall not be enforceable against the Purchasers, or their assignees and sublessees; and the landlords under any such Assigned Contract shall not have the right to cancel or otherwise modify the Assigned Contract or increase the rent, assert any claim or impose any penalty by reason of such discontinuation, the Debtors' cessation of operations, the assignment of such Assigned Contract to the Purchasers, or the interruption of business activities at any of the leased premises.

18.    All defaults of the Debtors under the Assigned Contracts occurring or arising prior to the assignment thereof to the Purchasers at Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured or satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract in the amounts set forth on the schedule of Cure Costs attached to the Cure Notice or any supplement thereto (or any other cure cost reached by agreement after an objection to the proposed cure cost by a counterparty to an Assigned Contract), which was served in compliance with the Bidding Procedures Order, and as set forth on the schedule of Cure Costs attached to the Cure Notice, and which Cure Costs were satisfied, or shall be satisfied as soon as practicable, by the Debtors or by the Purchasers, as the case may be, as provided in the APAs; *provided*, *however*, notwithstanding anything to the contrary in this Order or the APAs, with respect to any unexpired lease of nonresidential real property that constitutes an Assigned Contract, the assumption and assignment of such Assigned Contracts shall not be free and clear of all obligations arising thereunder in accordance with their terms, and (z) the Purchaser(s) shall be and will remain liable for all accrued, but unbilled or not yet due obligations arising or accruing under the Assigned Contracts when due and billed in the ordinary course solely for such obligations attributable to the period after the Closing and (y) the Debtor(s) shall be and will remain liable for all accrued,

but unbilled or not yet due obligations arising or accruing under the Assigned Contracts when due and billed in the ordinary course for such obligations attributable to the period prior to the Closing, in each case subject to the terms of the Assigned Contracts, including, but not limited to:  (a) amounts owed under the an assumed and assigned unexpired lease of nonresidential real property that are unbilled or not yet due as of the effective date of the assignment, regardless of when such amounts accrued, such as common area maintenance, insurance, taxes, and similar charges; (b) any regular or periodic adjustment or reconciliation of charges under the an assumed and assigned unexpired lease of nonresidential real property that are not due or have not been determined as of the date of the effective date of the assignment; (c) any percentage rent that may come due under the Assigned Contract; (d) indemnification obligations, if any, following the date of the effective date of the assignment; and (e) any unpaid Cure Costs under the unexpired lease of nonresidential real property that constitutes an Assigned Contract, calculated in accordance with the terms of any applicable amendment to such unexpired lease of nonresidential real property or other agreement of the parties; *provided*, *further*, that except as provided in the Purchaser's applicable APA, in any and all cases any and all obligations arising or accruing prior to the Closing shall be the obligation of the Debtors, and shall not be the obligation of the Purchasers; *provided*, *further*, that the Debtors shall establish a sufficient reserve to pay any such obligations and Cure Costs that are the responsibility of the Debtors and that become due and owing to SOCAL Industrial Holdings, LLC in an amount to be reasonably agreed to with SOCAL Industrial Holdings, LLC (with the reasonable consent of the Credit Facility Lenders) and consistent with historical accrual estimates.  For all Assigned Contracts for which a Cure Notice was served, the Debtors and the Purchasers, as applicable, are each authorized and directed to pay their respective portion of all Cure Costs required to be paid by

such parties in accordance with the APAs upon the later of (a) the Closing and (b) for any Assigned Contracts for which an objection has been filed to the assumption and assignment of such agreement or the Cure Costs relating thereto and such objection remains pending as of the date of this Sale Order, the resolution of such objection by settlement or order of this Court.

19.     Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of or obligations under any Assigned Contract following the effective date of such assumption and assignment to the Purchasers, subject to the payment of the Cure Costs, if any; *provided*, *however*, notwithstanding anything contrary in this Order or the APAs, that any Lease Counterparty may seek to recover from the Debtors for indemnification obligations, if any, arising from third-party claims asserted with respect to or arising from the Debtors' use and occupancy of the leased premises prior to the Closing Date for which the Debtors has a duty to indemnify such Lease Counterparty pursuant to any Lease, solely with respect to available insurance coverage; provided further, that the Buyer shall not have any obligations to reimburse or indemnify the Debtors or the Debtors' insurer for any such recovery.

**XI.    Modification of the Automatic Stay.**

20.     The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the APAs and the provisions of this Sale Order.  Purchasers shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any remedies under the APAs or any other documents related to the Sales.

**XII.** **Release of Liens by Creditors; Collection of Acquired Assets.**

21.      Except as expressly provided to the contrary in this Sale Order or in the APAs, the holder of any valid Lien, Claim or Interest in the Acquired Assets, shall, as of the Closing, be deemed to have waived and released such Lien, Claim or Interest, without regard to whether such holder has executed or filed any applicable release, and such Lien, Claim or Interest shall automatically, and with no further action by any party, attach to the portion of the purchase price ultimately attributable to the Acquired Assets against or in which they claim an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Acquired Assets, subject to any claims, defenses and objections, if any, that the Debtors or their estates may possess with respect thereto.  Notwithstanding the foregoing, any such holder of such a Lien, Claim or Interest is authorized and directed to execute and deliver any waivers, releases, or other related documentation, as reasonably requested by the Debtors (which shall be at the expense of the Debtors in the case of the Credit Facility Agent and the DIP Agent).

22.      All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the applicable Purchaser in accordance with the APAs on the Closing Date or at such time thereafter as Purchasers may request.  As of the Closing, the Purchasers and their successors and assigns shall be designated and appointed as the Debtors' true and lawful attorney with full power of substitution in the Debtors' name and stead on behalf of and for the benefit of the Purchasers, and their successors and assigns, for the following sole and limited purposes: to have the power to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and

prosecute against third parties for the benefit of the Purchasers, their successors and assigns, proceedings at law, in equity or otherwise, which the Purchasers, and their successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets.

## XIII.  Effect of Recordation of Order.

23.     This Sale Order, once filed, registered, or otherwise recorded, (a) shall be effective as a conclusive determination that, upon the Closing, all Liens, Claims, and Interests of any kind or nature whatsoever (with the sole exception of any Permitted Encumbrances and Assumed Liabilities) existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local officials, notaries, protonotaries, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Acquired Assets.   Each and every federal, state, local or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APAs, including, without limitation, recordation of this Sale Order.

XIV.   **Administrative Priority Status.**

24.   Any amounts that become payable by the Debtors to the Purchasers pursuant to the APAs and any related agreements executed in connection therewith shall (a) be entitled to administrative expense claim status under sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) not be subordinate to any other administrative expense claim against the Debtors other than allowed claims granted pursuant to the DIP Order, (c) not be altered, amended, discharged or affected without the prior written consent of the Purchasers, and (d) be paid by the Debtors in the time and manner provided for in the APAs without further order of this Court.

XV.   **Prohibition of Actions Against the Purchasers.**

25.   Except for any Permitted Encumbrances and Assumed Liabilities or as expressly permitted or otherwise specifically provided for in the APAs or this Sale Order, the Purchasers and their affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors' arising under or related to the Acquired Assets or otherwise, and upon Closing all entities or persons are permanently and forever prohibited, barred, estopped, and enjoined from asserting against the Purchasers and its permitted successors, designees, and assigns, or property, or the Acquired Assets conveyed in accordance with the APAs, any Lien, Claim or Interest of any kind whatsoever arising prior to Closing including, without limitation, under any theory of successor or transferee liability, de facto merger or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.   Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APAs, the Purchasers and their affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchasers and their affiliates shall have no successor or vicarious liabilities of

any kind or character, including but not limited to any liability pertaining to any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, liquidated or unliquidated, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors.

26.     Purchasers may elect, as of the Closing Date or any time thereafter, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets, except to the extent not permitted by applicable law.

27.     The Court hereby orders that commencing on and after the Closing Date, each state agency administering a state Medicaid program that has made payments to Debtor shall pay all sums owed to the Debtors on account of services rendered to Medicaid beneficiaries directly to the Purchasers, whether those services were rendered before or after the Closing Date.

28.     In order to facilitate the Purchasers' purchase of the Debtors' accounts receivable, the Debtors are hereby authorized and ordered to establish one or more lockbox accounts pursuant to which on and after the Closing Date the proceeds of purchased accounts receivable will be placed under the custody, control and ownership of the applicable Purchaser in accordance with applicable laws.

## XVI.   No Interference.

29.     Following the Closing, no holder of a Lien, Claim, and/or Interest in or against the Debtors or the Acquired Assets shall interfere with the Purchasers' title to or use and enjoyment of the Acquired Assets based on or related to such Lien, Claim, and/or Interest or any actions that the Debtors may take in their bankruptcy cases or any successor cases.

## XVII.  Retention of Jurisdiction.

30.     This Court retains jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the APAs, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to:   (a) compel delivery of the Acquired Assets or performance of other obligations owed to the Purchasers; (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors; (c) resolve any disputes arising under or related to the APAs, except as otherwise provided therein; (d) interpret, implement, and enforce the provisions of this Sale Order; and (e) protect the Purchasers and their affiliates against (i) any Liens, Claims and Interests in or against the Debtors or the Acquired Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Acquired Assets that may be in their possession.

## XVIII. No Stay of Order.

31.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchasers are free to close the Sales under the APAs at any time pursuant to the terms thereof.

## XIX.   **Good Faith Purchaser.**

32.     The Sales contemplated by the APAs are undertaken by the Purchasers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sales shall not affect the validity of the Sales to the Purchasers (including the assumption and assignment by the Debtors of any of the Assigned Contracts), unless such authorization is duly stayed pending such appeal.   The Purchasers are good faith purchasers of the Acquired Assets, and are entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

## XX.   **Reservation of Rights**

33.     *Texas Taxing Authorities*.   The Debtors, the Wind-Down Debtors, and the Purchasers, as applicable, shall be responsible for their respective pro-rated portion of the 2023 taxes in accordance with the Plan and the Asset Purchase Agreement, as applicable.   The Texas Taxing Authorities[4] shall retain their statutory liens against the taxable property (including all related sale proceeds to the extent specified in the applicable sale order), and their existing lien priority, until the Texas Tax Claims are paid in full including statutory penalty and interest, if applicable, as provided by the Texas Tax Code.

34.     Notwithstanding anything herein to the contrary, upon assumption or assumption and assignment of an Assigned Contract that constitutes a lease of non-residential real property (an "Unexpired Lease"), Debtors or Purchasers, as applicable, shall be obligated to pay or perform any accrued, but unbilled and not yet due to be paid or performed, obligations as of the applicable deadline to file objections or disputes to the Cure Costs for such Unexpired Lease

---

[4]     The Texas Taxing Authorities include:  Bell County Tax Appraisal District, Bexar County, Cypress-Fairbanks ISD, Fort Bend County, Fort Bend Co WCID #02, Frisco ISD, Harris County, Hays CISD, Hays County, Nueces County, Plano ISD, Tarrant County, and Williamson County.

under such assumed or assumed and assigned Unexpired Lease, including, but not limited to, common area maintenance charges, taxes, year-end adjustments, indemnity obligations, and repair and maintenance obligations, under the Unexpired Lease, regardless of whether such obligations arose before or after the Effective Date, on the date upon which such obligations become due in the ordinary course; provided that all rights of the parties to any such assumed or assumed and assigned Unexpired Lease to dispute amounts asserted thereunder are fully preserved; provided, further, that nothing herein shall relieve the Debtors or Purchasers, as applicable, from any amounts that come due between (a) the applicable deadline to file objections or disputes to the Cure Costs for such Unexpired Lease and (b) the effective date of assumption or assumption and assignment for such Unexpired Lease.

## XXI.  Inconsistencies with Prior Orders, Pleadings or Agreements.

35.     To the extent of any conflict between the APAs and this Sale Order, the terms of this Sale Order shall govern.  To the extent this Sale Order is inconsistent or conflicts with any prior order or pleading in these chapter 11 cases, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sales.

## XXII.  Failure to Specify Provisions.

36.     The failure to specifically reference any particular provisions of the APAs or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APAs and other related documents be authorized and approved.

**Signed:  July 27, 2023.**

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1(a)**

**Pantogran APA**

**Execution Version**
**CONFIDENTIAL**

---

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**

**DATED AS OF JULY 25, 2023**

**BY AND AMONG**

**PANTOGRAN LLC, AS PURCHASER,**

**AND**

**CARD HOLDINGS, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

---

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ............................................................................................ 2
1.1       Purchase and Sale of the Acquired Assets .................................................. 2
1.2       Excluded Assets .......................................................................................... 3
1.3       Assumption of Certain Liabilities ............................................................... 5
1.4       Excluded Liabilities .................................................................................... 6
1.5       Assumption/Rejection of Certain Contracts ................................................ 6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ....................................................... 8
2.1       Consideration; Payment .............................................................................. 8
2.2       Deposit ....................................................................................................... 9
2.3       Closing ....................................................................................................... 9
2.4       Closing Deliveries by Sellers ................................................................... 10
2.5       Closing Deliveries by Purchaser .............................................................. 10
2.6       Withholding .............................................................................................. 10

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ............................... 10
3.1       Organization and Qualification ................................................................ 11
3.2       Authorization of Agreement ..................................................................... 11
3.3       Conflicts; Consents .................................................................................. 11
3.4       Intentionally Omitted. .............................................................................. 11
3.5       Financial Statements ................................................................................ 11
3.6       Title to Properties .................................................................................... 12
3.7       Contracts .................................................................................................. 12
3.8       No Litigation ............................................................................................ 13
3.9       Permits; Compliance with Laws ............................................................... 13
3.10      Environmental Matters ............................................................................. 14
3.11      Intellectual Property ................................................................................. 14
3.12      Tax Matters .............................................................................................. 15
3.13      Assumed Benefit Plans ............................................................................ 15
3.14      Employees ................................................................................................ 16
3.15      Affiliate Transactions .............................................................................. 16
3.16      Brokers .................................................................................................... 17
3.17      No Other Representations or Warranties ................................................... 17

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ......................... 17
4.1       Organization and Qualification ................................................................ 17
4.2       Authorization of Agreement ..................................................................... 18
4.3       Conflicts; Consents .................................................................................. 18
4.4       Financing ................................................................................................. 18
4.5       Brokers .................................................................................................... 19
4.6       No Litigation ............................................................................................ 19
4.7       Investment Representation; Investigation .................................................. 19
4.8       Certain Arrangements .............................................................................. 19
4.9       Solvency .................................................................................................. 19
4.10      Tax Matters .............................................................................................. 19

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.11 | No Additional Representations or Warranties | 19 |
| 4.12 | No Outside Reliance | 20 |

**ARTICLE V BANKRUPTCY COURT MATTERS** .......................................................... **21**
| | | |
|---|---|---|
| 5.1 | Bankruptcy Actions | 21 |
| 5.2 | Cure Costs | 22 |
| 5.3 | Sale Order | 22 |
| 5.4 | Approval | 22 |

**ARTICLE VI COVENANTS AND AGREEMENTS** ........................................................ **23**
| | | |
|---|---|---|
| 6.1 | Conduct of Business of Sellers | 23 |
| 6.2 | Access to Information | 25 |
| 6.3 | Employee Matters | 26 |
| 6.4 | Regulatory Approvals | 28 |
| 6.5 | Reasonable Efforts; Cooperation | 28 |
| 6.6 | Further Assurances | 29 |
| 6.7 | Insurance Matters | 29 |
| 6.8 | Receipt of Misdirected Assets; Liabilities | 29 |
| 6.9 | Acknowledgment by Purchaser | 30 |
| 6.10 | Guaranty | 31 |

**ARTICLE VII CONDITIONS TO CLOSING** ............................................................... **32**
| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 32 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 33 |
| 7.3 | Conditions Precedent to the Obligations of Seller | 33 |
| 7.4 | Waiver of Conditions | 34 |

**ARTICLE VIII TERMINATION** ............................................................................... **34**
| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 34 |
| 8.2 | Effect of Termination | 35 |

**ARTICLE IX TAXES** ........................................................................................... **36**
| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 36 |
| 9.2 | Cooperation | 36 |

**ARTICLE X MISCELLANEOUS** ............................................................................. **36**
| | | |
|---|---|---|
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 36 |
| 10.2 | Expenses | 37 |
| 10.3 | Notices | 37 |
| 10.4 | Binding Effect; Assignment | 39 |
| 10.5 | Amendment and Waiver | 39 |
| 10.6 | Third Party Beneficiaries | 39 |
| 10.7 | Non-Recourse | 39 |
| 10.8 | Severability | 40 |
| 10.9 | Construction | 40 |

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 10.10 | Schedules | 40 |
| 10.11 | Complete Agreement | 40 |
| 10.12 | Specific Performance | 41 |
| 10.13 | Jurisdiction and Exclusive Venue | 41 |
| 10.14 | Governing Law; Waiver of Jury Trial | 42 |
| 10.15 | No Right of Set-Off | 43 |
| 10.16 | Counterparts and PDF | 43 |
| 10.17 | Publicity | 43 |
| 10.18 | Bulk Sales Laws | 43 |
| 10.19 | Fiduciary Obligations | 43 |
| 10.20 | Release | 44 |
| 10.21 | Sellers' Representative | 44 |

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS .... 45**

| | | |
|---|---|---|
| 11.1 | Certain Definitions | 45 |
| 11.2 | Index of Defined Terms | 51 |
| 11.3 | Rules of Interpretation | 52 |

## INDEX OF EXHIBITS

EXHIBIT A   FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT
EXHIBIT B   FORM OF TRADEMARK ASSIGNMENT AGREEMENT
EXHIBIT C   BIDDING PROCEDURES ORDER

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

This Amended and Restated Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of July [●], 2023, is made by and among Pantogran LLC, a Delaware limited liability company ("<u>Purchaser</u>"), Doreen Granpeesheh ("<u>Granpeesheh</u>"), Sangam Pant ("<u>Pant</u>", and together with Granpeesheh, the "<u>Guarantors</u>") and Card Holdings, LLC a Delaware limited liability company ("<u>Holdings</u>") and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "<u>Seller</u>" and collectively "<u>Sellers</u>"). Purchaser and Sellers are referred to herein individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>." Capitalized terms used herein shall have the meanings set forth herein or in <u>Article XI</u>.

WHEREAS, on June 11, 2023, Sellers commenced voluntary cases (collectively, the "<u>Bankruptcy Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), which cases are jointly administered for procedural purposes under Case No. 23-90709 (Bankr. S.D.TX);

WHEREAS, the Parties, together with the Guarantors party thereto, entered into that certain Asset Purchase Agreement, dated as of June 9, 2023 (the "<u>Original Effective Date</u>"), as amended by that First Amendment thereto dated as of July 16, 2023 (the "<u>First Amendment</u>") (collectively, the "<u>Original APA</u>") pursuant to which Purchaser agreed to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers agreed to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court;

WHEREAS, concurrently with the execution of this Agreement, the Sellers are entering into an Asset Purchase Agreement (the "<u>Other APA</u>") with SH Varsity Acquisition Sub LLC, Your Life ABA VA, LLC, Proud Moments Licensed Behavioral Analysts PLLC, Proud Moments MSO, LLC (collectively, the "<u>Other Purchaser</u>"), SBH Intermediate Holdings, L.P. and Proud Moments Intermediate Holdings, LP, as the guarantors thereto, pursuant to which the Other Purchaser will purchase the Acquired Assets (as defined in the Other APA, the "<u>Other APA Acquired Assets</u>") and assume the Assumed Liabilities (as defined in the Other APA, the "<u>Other APA Assumed Liabilities</u>") from Sellers, and Sellers will sell, convey, assign, and transfer to Purchaser the Other APA Acquired Assets and the Other APA Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court;

WHEREAS, the Parties desire to amend and restate the Original APA in its entirety in accordance with the terms of the Original APA to incorporate the terms of the First Amendment and the other changes set forth herein;

WHEREAS, Section 10.5 (Amendment and Waiver) of the Original APA provides that the Original APA be amended only in a writing signed by Purchaser and the Sellers.

NOW, THEREFORE, the parties hereto hereby agree that effective on and as of the date hereof, the Original APA is hereby amended and restated to read in its entirety as follows:

In consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365, 1129, 1141 and 1142 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the Original Effective Date and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets and the Other APA Acquired Assets:

(a)    subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party set forth on <u>Schedule 1.1(a)</u> (other than, for the avoidance of doubt any Assigned Contracts (as defined in the Other APA) under the Other APA), and all purchase orders, to the extent assignable under applicable Law  (the "<u>Assigned Contracts</u>");

(b)    all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto and security deposits for rent with respect to Acquired Leased Real Property;

(c)    all Documents and data, including (without limitation) all rights, interests, assets, Intellectual Property, and data associated with Skills Global and Skill;

(d)    all Patient Records;

(e)    the Leased Real Property listed on <u>Schedule 1.1(d)</u> (including the leases related thereto, the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements and all permanent fixtures, improvements, and appurtenances thereto;

(f)    all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller;

(g)      all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

(h)      all confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof;

(i)      to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor;

(j)      the sponsorship of, and all rights, interests and assets associated with, the Seller Plans (collectively, the "Assumed Benefit Plans");

(k)      all Intellectual Property of Sellers, all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including (without limitation) all Intellectual Property and all other rights, interests, and assets associated with Institute for Behavioral Training;

(l)      all inventory and supplies of the Sellers;

(m)      all goodwill, payment intangibles and general intangible assets and rights of Sellers; and

(n)      (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law of the Sellers or their estates and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller (including in its capacity as the managing member or manager of another Person) or its estate against any member of the Seller Group or Sangam Pant (other than in his capacity as a Guarantor hereunder) and The Sangam Pant and Supriya Pande Irrevocable Trust dated December 18, 2015, The Sangam Pant and Supriya Pande Revocable Trust dated June 28, 2012, and Sangam Pant and Supriya Pande Charitable Remainder Trust, in each case, arising out of or relating to events occurring on or prior to the Closing Date, other than any claim under this Agreement or any Transaction Agreement (the claims and causes of action set forth in this Section 1.1(m) "Transferred Claims") (which Transferred Claims against any member of the Seller Group are for the avoidance of doubt Released Claims pursuant to Section 10.20).

1.2      Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain

all right, title and interest to, in and under the Other APA Acquired Assets or the following properties, rights, interests and other assets of Sellers (collectively, the "Excluded Assets"):

(a) all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers, other than security deposits for rent with respect to Acquired Leased Real Property;

(b) the Contracts of Sellers listed on Schedule 1.2(b)(ii) (the "Excluded Contracts");

(c) all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the Excluded Assets, Other APA Acquired Assets, Excluded Liabilities, or Other APA Assumed Liabilities (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates or other Equity Interests instrument, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks, or (iii) that any Seller is required by Law to retain; provided that Purchaser shall have the right to make copies of any portions of such Documents to the extent not prohibited by applicable Law and Sellers shall provide Purchaser access to such Documents;

(d) all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, and (v) any other files or records to the extent relating exclusively to any Excluded Assets, Other APA Acquired Assets, Excluded Liabilities, Other APA Assumed Liabilities or the Bankruptcy Case;

(e) all current and prior insurance policies of any Seller that are not Assumed Benefit Plans, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f) all Equity Interests of any Seller or any of their respective Subsidiaries;

(g) (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (other than Transferred Claims), and (iii) all claims

4

that any Seller may have against any Person with respect to any other Excluded Assets, any Other APA Acquired Assets, any Excluded Liabilities or any Other APA Assumed Liabilities;

(h)    Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the Original Effective Date;

(i)    all Tax refunds, Tax attributes and Tax assets;

(j)    every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the Original Effective Date until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(k)    all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date; and

(l)    all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries.

1.3    <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with <u>Section 2.1</u>, Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing, but excluding in all cases the Other APA Assumed Liabilities (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(b)    all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "<u>Cure Costs</u>");

(c)    all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;

(d)    all Liabilities, including all accounts payable and trade payables arising out of the conduct of the business or the ownership or operation of the Acquired Assets from and after the Closing Date;

(e)    all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)    without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; and (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period as limited to the amount incurred after the Closing Date;

(g)    all Liabilities related to the Transferred Employees, except for any Liabilities with regard to compensation prior to the Closing Date and/or arising under retention and/or severance agreements entered into prior to the Closing Date and except as otherwise set forth herein;

(h)    the sponsorship of and all Liabilities at any time arising under, pursuant to or in connection with the Assumed Benefit Plans and all Liabilities for compliance with the requirements of section 4980B of the Tax Code and the rules and regulations thereunder with respect to all individuals who are "M&A qualified beneficiaries" as such term is defined in 26 C.F.R. § 54.4980B-9;

(i)    all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement; and

(j)    all other Liabilities to the extent related to the Acquired Assets that arise after the Closing.

1.4    Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, Purchaser shall have no liability or responsibility to any employee of Sellers who is not a Transferred Employee and Purchaser's assumption of liability to Transferred Employees is limited as set forth above and as otherwise set forth in this Agreement.

1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers

and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(b). At the Closing, Purchaser shall (i) pay all Cure Costs as part of the Cash Payment (as defined below) and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     Excluding or Adding Assigned Contracts Prior to Closing. Purchaser shall have the right to notify Sellers in writing of any Assigned Contract (other than purchase orders or the Acquired Leased Real Property) that it does not wish to assume or a Contract to which any Seller is a party that Purchaser wishes to add as an Assigned Contract (other than those Contracts set forth on Schedule 1.2(b)(ii) as of the Original Effective Date or those Contracts which are Other APA Acquired Assets) up to one Business Day prior to the Bid Deadline (as defined in the Bidding Procedures Order), provided, that, Purchaser's notification right with respect to the addition of Contracts as Assigned Contracts shall be exercisable until five Business Days prior to the Closing Date to the extent that any Cure Costs associated with such Contracts are accounted for in the Incremental Cure Cost Amount and increase the Closing Date Payment, and (i) any such previously considered Assigned Contract (other than purchase orders or the Acquired Leased Real Property) that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts and automatically deemed added to the Schedules related to Excluded Contracts, in each case, without any adjustment to the Purchase Price, and (ii) any such previously considered Excluded Contract (other than those Contracts set forth on Schedule 1.2(b)(ii) as of the Original Effective Date or those Contracts which are Other APA Acquired Assets) that Purchaser wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price (other than with respect to the Incremental Cure Cost Amount as set forth above). Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(c)     Non-Assignment.

(i)     Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or terminated

by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)      Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this Section 1.5(c)(ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s), if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment.

(a)      The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of $37,427,568 (the "Cash Payment").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller an amount in cash (the "Closing Date Payment") equal to the Cash Payment plus the Incremental Cure Cost Amount plus the Security Deposit Amount minus an amount equal to the Deposit.

(c)     The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2     Deposit.

(a)     Purchaser has, on or prior to the date hereof, made an earnest money deposit with Acquiom Clearinghouse LLC  (the "Escrow Agent") in the amount equal to $3,742,757 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the escrow agreement entered into on the Original Effective Date among Holdings, Purchaser, and the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)     If this Agreement has been terminated by Holdings pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(b) or 8.1(c), in each case in circumstances where Holdings would be entitled to terminate this Agreement pursuant to Section 8.1(d) or 8.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)     If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.

(d)     The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)     If the Closing occurs, the Deposit shall be transferred to Seller.

2.3     Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities in accordance with this Agreement and the Sale Order (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on August 25, 2023 unless extended in writing by the Parties (email shall suffice) (provided that as of such date there has been full satisfaction or due

waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII, other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4     Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by the applicable Sellers;

(b)     a short-form trademark assignment agreement substantially in the form of Exhibit B (the "Trademark Assignment Agreement"), duly executed by the applicable Sellers;

(c)     an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; and

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Holdings certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

2.5     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)     the Closing Date Payment;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)     the Trademark Assignment Agreement, duly executed by Purchaser; and

(d)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6     Withholding. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from a Seller's failure to satisfy its obligations under Section 2.4(e).

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (ii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to Section 10.10, Sellers represent and warrant to Purchaser as follows.

3.1     Organization and Qualification. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation.

3.2     Authorization of Agreement. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3     Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the Transactions, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of any Seller, except, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4     Intentionally Omitted.

3.5     Financial Statements. Attached to Schedule 3.5 are Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries audited consolidated balance sheets as of December 31, 2021 and as of December 31, 2020, and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for each fiscal year then ended (collectively, the "Audited Financial Statements"). The Audited Financial Statements have been prepared in all material respects in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present in

all material respects the consolidated financial position of Center for Autism and Related Disorders, LLC and its respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

3.6    Title to Properties.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, one or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers which constitutes an Acquired Asset (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). None of the Sellers owns any real property.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Sellers hold good title to, or a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Sellers and the Acquired Assets, taken as a whole.

3.7    Contracts.

(a)    Schedule 3.7 sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "Material Contract" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $10,000, other than letters of credit;

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $10,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $10,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Sellers), in each case solely to the extent relating to the Acquired Assets;

(iv)    is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, inventory, Equipment, or other assets pursuant to

12

which Sellers would reasonably be expected to make payments of more than $10,000 during any fiscal year to the extent such assets would be Acquired Assets; or

(v)     contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property that is material to Sellers, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) and (B) to the extent relating to the Acquired Assets and other than (1) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, (2) Contracts entered into in the Ordinary Course granting exclusive rights to certain of Sellers, services or containing "most favored nation" provisions with respect to certain of Seller's products or (3) any provision in any license agreements for Intellectual Property limiting Seller's, use of such Intellectual Property to specified fields of use or specified territories.

(b)     Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases and (iii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller (other than with respect to late payments) under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.8     No Litigation. Except as set forth in Schedule 3.8, there are no material Actions pending or, to Sellers' knowledge, threatened in writing against or affecting any of the Sellers that will materially adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the Transactions.

3.9     Permits; Compliance with Laws. Except as set forth in Schedule 3.9, each Seller (solely with respect to the Acquired Assets) is, and has been since January 1, 2023, in compliance in all material respects with all state or federal laws, statutes, or regulations ("Laws") or Orders, applicable to such Seller, and each Seller holds all licenses, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of its respective business (collectively, "Permits"), except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Seller and each of their respective directors, officers and employees acting in such capacity and,

13

to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2023, in compliance in all material respects with the Foreign Corrupt Practices Act of 1977 and regulations promulgated thereunder.

3.10    Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws, (b) since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved, (c) Sellers possesses and are in compliance with all Permits required under Environmental Laws for the operation of their businesses as currently conducted ("Environmental Permits"), (d) except as set forth in Schedule 3.10, there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller, (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller, and (f) no Seller has released any Hazardous Substances at the Leased Real Property in quantities or concentrations that currently require Sellers to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

3.11    Intellectual Property.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Sellers own all of the rights, title and interest in and to the Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the Seller Intellectual Property is subsisting, valid and enforceable.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the business of Sellers with respect to the Acquired Assets as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property with respect to the Acquired Assets; provided that nothing in this Section 3.11(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.11(d).

(c)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person, in each case with respect to the Acquired Assets.

14

(d)     Except as set forth on Schedule 3.11(d), except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, since January 1, 2022, (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to Sellers and (ii) the operation of the business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person, in each case with respect to the Acquired Assets.

3.12    Tax Matters.

(a)     Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns with respect to the Acquired Assets required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are correct and complete in all material respects.

(b)     All material Taxes owed by a Seller with respect to the Acquired Assets that are due and payable on any Tax Return have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)     There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)     None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(e)     Except to the extent that doing so would not adversely impact the Acquired Assets or the Purchaser's ownership of the Acquired Assets, none of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(f)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.12 and Section 3.13 (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.13    Assumed Benefit Plans.

(a)     With respect to each material Assumed Benefit Plan, Sellers have made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the material terms thereof, including any amendments thereto, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description and (v) each current material related insurance Contract or trust agreement.

(b)     Each Assumed Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Assumed Benefit Plan which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Assumed Benefit Plans comply in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA, except as would not reasonably be expected to be material to Purchaser.

(c)     None of the Sellers maintains, contributes to, or has any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d)     No Assumed Benefit Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(e)     The consummation of the Transactions will not (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Assumed Benefit Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Assumed Benefit Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by Purchaser or any of its Affiliates.

3.14     <u>Employees</u>. None of the Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any Business Employees. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) no demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union in respect of Business Employees and (ii) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the Business Employees. Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health, in each case with respect of the Business Employees.

3.15     <u>Affiliate Transactions</u>. Except as set forth on <u>Schedule 3.16</u>, no Affiliate of any Seller, or, to the Knowledge of Sellers, any officer or director of any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related

purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.16    Brokers. Except for Livingstone, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Livingstone) (the "Information Presentation") or in that certain datasite administered by SmartRoom (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1    Organization and Qualification. Purchaser is a Delaware limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to

consummate the Transactions. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Assuming that (i) requisite Bankruptcy Court approvals are obtained and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3(a)</u> are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (A)</u> through <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)     Except as set forth on <u>Schedule 4.3(a)</u>, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

4.4     <u>Financing</u>. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Purchaser is and shall be capable of

satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5     <u>Brokers</u>. Except for Calex Partners, all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.6     <u>No Litigation</u>. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

4.7     <u>Investment Representation; Investigation</u>. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which the Acquired Assets operate and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded appropriate access to the books and records, facilities and personnel of the Acquired Assets and Assumed Liabilities for purposes of conducting a due diligence investigation and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8     <u>Certain Arrangements</u>. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of managers (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9     <u>Solvency</u>. Purchaser is, and immediately after giving effect to the Transactions shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

4.10     <u>Tax Matters</u>. No person who is currently treated as a regarded partner of Holdings, for US federal income tax purposes is or is reasonably expected to become a regarded partner of Purchaser, for US federal income tax purpose.

4.11     <u>No Additional Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Article IV</u>, Sellers acknowledge that neither Purchaser nor any other

Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

     4.12    <u>No Outside Reliance</u>. Notwithstanding anything contained in this <u>Article IV</u> or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the Transactions. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller, or the quality, quantity or condition of any Seller's assets (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1     Bankruptcy Actions.

(a)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(b)     The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist obtaining Bankruptcy Court approval of the Sale Order, and any other Order reasonably necessary in connection with the Transactions, as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(c)     Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement.

(d)     It is acknowledged that the Purchaser is the prevailing party at the conclusion of the Auction (the "Successful Bidder"). If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the next highest bidder at the Auction serving as a back-up bidder (the "Backup Bidder") will be deemed to have the new prevailing bid, and Sellers may consummate the Transactions with such Backup Bidder on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction, including those changes agreed with such Backup Bidder).

(e)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, and providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(f)     Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining Bankruptcy Court approval of

the Sale Order and a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(g)    Nothing in this <u>Section 5.1</u> shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

5.2    <u>Cure Costs</u>. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to <u>Section 1.5</u>, on or prior to the date of such assignment), pay the Cure Costs (as part of the Cash Payment) and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

5.3    <u>Sale Order</u>. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability.

5.4    <u>Approval</u>. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

6.1     Conduct of Business of Sellers.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or Other APA Acquired Asset or Other APA Assumed Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their commercially reasonable efforts to carry on their business in the Ordinary Course except as would not reasonably be expected to be material to Sellers; provided that no action by any Seller or one of its Subsidiaries with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iv) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or Other APA Acquired Asset or Other APA Assumed Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not:

(i)     sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets which are Acquired Assets for consideration, individually or in the aggregate, in excess of $10,000, except (A) Ordinary Course dispositions of inventory and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Sellers, (B) transfers among the Sellers or their Subsidiaries, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(ii)     except as permitted under Section 6.1(b)(ii), and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger) to the extent exclusively related to the Acquired Assets, except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to include acquisitions of inventory in the Ordinary Course);

23

(iii)     except (A) in the Ordinary Course or (B) pursuant to the terms of any Seller Plan, (1) grant to any Business Employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former Business Employees any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any Business Employees whose base salary exceeds $75,000 per annum, (5) establish, adopt, enter into, materially amend or terminate any material Assumed Benefit Plan or (6) take any action to accelerate any rights or benefits under any Assumed Benefit Plan; provided that the foregoing shall not restrict any Seller from entering into or making available, to newly hired Business Employees or to Business Employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(iv)     make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(v)     grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i);

(vi)     settle any pending or threatened Action against any Seller that would result in an Assumed Liability in an amount in excess of $50,000; or

(vii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)     Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations. Notwithstanding anything to the contrary contained herein, (i) any action taken, or omitted to be taken, by any Seller pursuant to any Law, Order, directive, pronouncement or guideline issued by any Governmental Body or industry group providing for business closures, "sheltering-in-place" or other restrictions that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall in no event be deemed to constitute a breach of this Section 6.1 and (ii) any action taken, or omitted to be taken, by a Seller to protect the business of such Seller that is responsive to any pandemic, epidemic or disease outbreak, as determined by Seller in its sole

24

and reasonable discretion (any action or inaction described in <u>clauses (i)</u> or <u>(ii)</u> of this <u>Section 6.1(c)</u>, a "<u>COVID-19 Response</u>"), shall in no event be deemed to constitute a breach of this <u>Section 6.1</u>.

      6.2    <u>Access to Information</u>.

      (a)    From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Sellers will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Sellers, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; <u>provided</u> that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the Transactions, (iii) all requests for access will be directed to Livingstone or such other Person(s) as Sellers may designate in writing from time to time, and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the Transactions are not consummated, (B) would require any Seller to disclose any financial or proprietary information of or regarding the Affiliates of any Seller (other than Sellers themselves) or otherwise disclose information regarding the Affiliates of any Seller (other than Sellers themselves) that such Seller deems to be commercially sensitive, (C) would waive any legal privilege, or (D) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty. Notwithstanding anything to the contrary contained herein, no COVID-19 Response by any Seller shall be deemed to violate or breach this <u>Section 6.2</u> in any way or serve as a basis for Purchaser to terminate this Agreement or assert that any of the conditions to Closing contained herein have not been satisfied.

      (b)    The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of consummating the Transactions, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

      (c)    From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Other APA Acquired Assets, the Assumed Liabilities, the Other APA Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and

properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the Transactions without the prior written consent of Seller for each such contact. Notwithstanding the foregoing, Seller agrees that Purchaser's representatives shall be provided reasonable access to and shall be allowed to meet with and interview Seller's employees for the purposes set forth in Section 6.3 commencing the first business day following the date of this Agreement and Seller shall provide reasonable assistance in arranging and facilitating such meetings and interviews, in each case which shall be upon reasonable advance notice and during normal business hours and conducted in a manner which does not unreasonably interfere with the ongoing operations of the business of the Sellers or the bankruptcy proceedings or Auction.

6.3     Employee Matters.

(a)     At least 10 Business Days prior to Closing, Purchaser shall extend to each employee of Sellers (other than those employees set forth on Schedule 6.3 or those employees subject to the Other APA), (such employees, the "Business Employees"), a written offer of employment providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") and that, if accepted, shall become effective immediately after the Closing. Business Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees."  Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates. Notwithstanding the foregoing or anything else set forth in this Agreement, Purchaser is not required to provide written offers to executive employees (VP and up) that are as favorable as existing arrangements with regard to pay, bonuses, severance, and any other agreements with such executives. Further, notwithstanding the foregoing or anything else set forth in this Agreement, Purchaser may amend Schedule 6.3 by adding or subtracting those employees set forth

on Schedule 6.3 at any time prior to ten (10) Business Days prior to the Closing by written notice to Sellers.

(b)     For a period of one (1) year from and after the Closing Date, Purchaser intends to provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is not lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii)  cash bonus opportunities that are no less favorable in the aggregate than those provided to such Transferred Employee as of immediately prior to the Closing; and (iii) other employee benefits that are no less favorable in the aggregate than those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date, Purchaser intends that each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)     Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d)     Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date and shall otherwise be solely responsible for paying, providing and satisfying when due all compensation accruing, incurred or arising as a result of employment on or after the Closing Date with respect to the Transferred Employees.

(e)     The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment. Following the

Closing, Sellers shall not enforce non-competition or non-solicitation restrictive covenants against any Transferred Employee (which for the avoidance of doubt do not include restrictive covenants with respect to confidentiality and non-disparagement) and any such restrictive covenants which are not Transferred Assets shall be deemed terminated and cancelled as of the Closing (for the avoidance of doubt this sentence shall not apply to any restrictive covenants referenced in or set forth in the Side Letter).

(f)     Effective as of the Closing, Purchaser and Purchaser's Affiliates shall be responsible for all obligations, liabilities and commitments in respect of claims arising after the Closing made by any Transferred Employee and solely based on events, actions or conduct occurring after the Closing.

(g)     Purchaser shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

6.4     <u>Regulatory Approvals</u>.

(a)     Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any material filings required to be made by the Purchaser Group pursuant to <u>Section 6.4(b)</u>, if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings required to be made pursuant to this <u>Section 6.4(a)</u> or <u>Section 6.4(b)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this <u>Section 6.4(b)</u> or <u>Section 6.4(a)</u> and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances. For the avoidance of doubt, Purchaser shall be responsible for all filings pursuant to <u>Sections 6.4(a)</u> and <u>6.4(b)</u>, except where Sellers are obligated in accordance with submission guidelines to file on behalf of Purchaser.

6.5     <u>Reasonable Efforts; Cooperation</u>.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Closing to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any

Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of Sellers pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

(c)     Sellers shall reasonably cooperate in good faith with Purchaser with respect to the transition of data, systems and operations of the Sellers to Purchaser as may be necessary to transition the Acquired Assets, including Assigned Contracts, to Purchaser.

6.6     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.7     Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.8     Receipt of Misdirected Assets; Liabilities.

(a)     From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset or an Other APA Acquired Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)     From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to

the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

       6.9    <u>Acknowledgment by Purchaser</u>.

       (a)    Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, and the Acquired Assets and the Assumed Liabilities and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, or the quality, quantity or condition of any Seller's assets, are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations and (y) any warranty or representation (whether in written, electronic or

oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of Sellers, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.9, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.9 (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this Section 6.9, Seller would not enter into this Agreement.

6.10    Guaranty.

(a)     The Guarantors collectively hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to Sections 2.1 (the matters set forth in clauses (i), (ii), and (iii), collectively, "Guaranteed Obligations"). Doreen Granpeesheh shall have responsibility allocated and limited to 60% of the Guaranteed Obligations. Sangam Pant shall have responsibility allocated and limited to 40% of the Guaranteed Obligations.

31

(b)       If Purchaser fails to perform any of the Guaranteed Obligations, then each Guarantor shall itself be jointly and severally liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)       Notwithstanding any other provision of this Section 6.10, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless the Seller against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this Section 6.10, including Section 6.10(f) and 6.10(h).

(d)       The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Section 6.10 and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this Section 6.10.

(e)       The Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to the Guarantors but not available to Purchaser, and each Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)       The guarantee by the Guarantors contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser of all of the Guaranteed Obligations and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and the Guarantors shall stand discharged of all of its obligations under this guarantee. The Guarantors shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this Section 6.10, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. The Guarantors' obligations under this Section 6.10 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)       The liability of the Guarantors under this Section 6.10 shall be unlimited (except as set forth above with regard to the allocation to and between Guarantors) and unconditional, and this Section 6.10 shall be a continuing guaranty.

(h)       Each Guarantor hereby makes the representations and warranties set forth in Article IV as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1       Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)     the Bankruptcy Court shall have entered the Sale Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> or in <u>Section 3.7</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u> and <u>Section 3.16</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)     Sellers shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by Sellers under this Agreement on or prior to Closing; and

(c)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.4</u>.

7.3     <u>Conditions Precedent to the Obligations of Sellers</u>. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)     Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

7.4     Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

## ARTICLE VIII
## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Holdings and Purchaser;

(b)     by written notice of either Purchaser or Holdings, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)     by written notice of either Purchaser or Holdings, if the Closing shall not have occurred on or before September 15, 2023 (the "Outside Date") (or such later date as provided in Section 5.1(f)); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)     by written notice from Holdings to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Holdings may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Holdings at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)     by written notice from Purchaser to Holdings, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by

the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Holdings of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Holdings to Purchaser, if all of the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by <u>Section 2.3</u>;

(g)     by written notice from Holdings to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(h)     by written notice of either Purchaser or Holdings, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(i)     by written notice from either Purchaser or Sellers, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction or (ii) is the Backup Bidder at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder.

8.2     <u>Effect of Termination</u>.

(a)     In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; <u>provided</u> that <u>Section 2.2</u>, <u>Section 6.2(b)</u>, this <u>Section 8.2</u> and <u>Article X</u> shall survive any such termination; <u>provided</u> <u>further</u> that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to <u>Section 10.12</u>, nothing in this <u>Section 8.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, if this Agreement is terminated pursuant to <u>Section 8.1(g)</u>, <u>8.1(h)</u>, or <u>8.1(i)</u>, Seller shall pay to Purchaser a break-up fee in an amount equal to $750,000 (the "<u>Breakup Fee</u>") and an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser in connection with the negotiation, diligence, execution, performance and

35

enforcement of this Agreement, which amount will shall not exceed $350,000 ("Expense Reimbursement"); provided that the Breakup Fee and the Expense Reimbursement shall be payable concurrently with the consummation of, and only out of the cash proceeds of, an Alternative Transaction, to an account designated by Purchaser in writing to Seller.

(c)     Subject in all cases to Section 10.12, prior to the Closing, in the event of any breach by Seller of this Agreement, whether or not a Willful Breach, or any failure of the Transactions to be consummated for whatever reason whatsoever, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1 and, if applicable, to receive the Expense Reimbursement and/or the Breakup Fee, as applicable, in accordance with Section 8.2(b), if payable thereunder. Pursuant to the Bidding Procedures Order and subject to approval by the Bankruptcy Court and entry of the Bidding Procedures Order, the claim of Purchaser in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against the Seller under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case.

(d)     Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2 are an integral part of this Agreement and that the Breakup Fee and the Expense Reimbursement are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Purchaser in the circumstances in which such Breakup Fee and Expense Reimbursement, as applicable, are payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

## ARTICLE IX
## TAXES

9.1     Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2     Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

## ARTICLE X
## MISCELLANEOUS

10.1     Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty,

covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with respect to any environmental, health or safety matters, including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the Transactions. Purchaser, for itself and on behalf of the Purchaser Group, acknowledge and agree that to the fullest extent permitted under applicable Law, including by contractually shortening the applicable statute of limitation, any and all rights, claims and causes of action, whether known or unknown, it may have against any member of the Seller Group relating to the Acquired Assets, the Assumed Liabilities, the operation of the Sellers and their respective Subsidiaries or their respective businesses or relating to the subject matter of this Agreement or the Schedules, whether arising under, or based upon, any Law (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages or any other recourse or remedy, including as may arise under common law or any other Law) are hereby irrevocably waived. Furthermore, without limiting the generality of this Section 10.1, no claim shall be brought or maintained by, or on behalf of, Purchaser or any member of the Purchaser Group against any member of the Seller Group, and no recourse shall be sought or granted against any member of the Seller Group, by virtue of, or based upon, any alleged misrepresentation or inaccuracy in, or breach of, any of the representations, warranties, covenants or agreements of the Seller or any other Person set forth or contained in this Agreement, the Schedules, any certificate, instrument, opinion, agreement or other document of a Seller or any other Person delivered hereunder, the subject matter of this Agreement or the Schedules, the business or the ownership, operation, management, use or control of the business of any of the Sellers or their Subsidiaries, including the Acquired Assets and Assumed Liabilities, any of their assets, or any actions or omissions at, or prior to, the Closing. Nothing set forth in this Section 10.1 shall limit Section 10.20.

10.2   <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (b) all Cure Costs will be allocated to the Purchaser pursuant to <u>Sections 1.3(b)</u>, <u>2.1(b)</u>, and <u>5.2</u>.

10.3   <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this

Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

<u>Notices to Purchaser</u>:

**Pantogran LLC**
Attention:     **Dr. Doreen Granpeesheh**
                      **Sangam Pant**
Email:          **drgranpeesheh@gmail.com**
                      **sangampant@gmail.com**

with a copy to (which shall not constitute notice):

**Locke Lord LLP**
**300 S. Grand Avenue, Suite 2600**
**Los Angeles, CA 90071**
Attention:     **David S. Kupetz**
Email:          **David.kupetz@lockelord.com**
                      **Sean Feener**
                      **sean.feener@lockelord.com**

<u>Notices to Sellers</u>:

Card Holdings, LLC
c/o Center for Autism and Related Disorders, LLC
9089 S Pecos Rd., Suite 3600
Henderson, NV 89074
Attention:     **Michelle Rapoport, General Counsel**
Email:          **MichelleRapoport@centerforautism.com**

with copies to (which shall not constitute notice):

38

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attention:     Lauren M. Colasacco, P.C.
>                Christopher T. Greco, P.C.
>                Steve Toth
>                Allyson B. Smith
> Email:         lauren.colasacco@kirkland.com
>                cgreco@kirkland.com
>                steve.toth@kirkland.com
>                Allyson.smith@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document delivered hereto, this Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any of the foregoing (collectively, a "Non-Recourse Party") will have any Liability and there will be no right of recovery or any claims against any Non-Recourse Party (in each case whether in contract, tort, equity, through piercing or attempted piercing of the corporate veil, or otherwise, whether known or unknown, contingent or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any

Agreement Dispute, and each of the Non-Recourse Parties are intended third party beneficiaries of this <u>Section 10.7</u> and shall be entitled to enforce this <u>Section 10.7</u> as if a party directly hereto.

10.8   <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9   <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>provided</u> that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed

Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions (including, for the avoidance of doubt, the Original APA). In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.  Notwithstanding the foregoing, nothing is this Agreement supersedes, alters, or controls the terms of the Side Letter; the Side Letter remains in full force and effect in accordance with its terms following the entry into this Agreement.  All references to the "Asset Purchase Agreement" or "APA" in the Side Letter shall be deemed to refer to this Agreement, as amended and restated as of the date hereof, and as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

10.12   <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any

questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14   Governing Law; Waiver of Jury Trial.

(a)   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the

extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20    Release. Effective as of the Closing, each of Purchaser and the Guarantors (on behalf of themselves and the other Releasing Parties) (and, from and after the Closing, shall cause their respective Subsidiaries and Affiliates and each of its and their respective current and former officers, directors, employees, equityholders, partners, members, Advisors, successors and assigns (collectively with Purchaser and the Guarantors, the "Releasing Parties") to) hereby irrevocably and unconditionally releases and forever discharges each member of the Seller Group (collectively, the "Released Parties") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, obligations, liabilities, counterclaims, defenses, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever of any kind, nature or description, whether known or unknown or arising in law or equity, which the Releasing Parties may have against each of the Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to any of the Released Parties, the Acquired Assets, the Assumed Liabilities or otherwise occurring or arising on or prior to the Closing Date (collectively, the "Released Claims"), and each of the Releasing Parties hereby agrees not to sur or bring any action in respect of the Released Claims. The Released Claims shall include, but are not limited to, those actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts, covenants, claims and demands arising out of, or relating to, the organization, management or operation of the businesses of the Sellers or of their respective Subsidiaries relating to any matter, occurrence, action or activity on or prior to the Closing Date including the businesses associated with the Acquired Assets and their capital structure;

(b)    relating to this Agreement and the transactions contemplated hereby (including Article V hereto and the transactions contemplated thereby or which occur in connection therewith);

(c)    arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement contained in this Agreement, the Schedules, exhibits and annexes hereto, in any document delivered in connection herewith or contemplated hereby or in any certificate contemplated hereby and delivered in connection herewith; and

(d)    relating to any information (whether written or oral), documents or materials furnished by or on behalf of the Sellers and their Subsidiaries and/or Affiliates.

The Released Parties to whom this Section 10.20 applies shall be express third party beneficiaries of this Section 10.20. The releases contemplated in this Section 10.20 is in addition to and shall not in any way limit any other release, covenant not to sue, or waiver by the Releasing Parties in favor of the Released Parties.

10.21    Sellers' Representative. Each Party agrees that Holdings has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and

determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Holdings on behalf of the Sellers.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires a material portion of the Acquired Assets or equity of the Sellers, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, none of a liquidation or wind-down of Sellers' estates shall be an Alternative Transaction.

(e)    "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)    "Bidding Procedures Order" means an Order substantially in the form attached hereto as Exhibit C.

(g)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(h)    "Cash and Cash Equivalents" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account

balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(i)     "Confidentiality Agreement" means those certain confidentiality agreements, dated as of November 10, 2022, and May 13, 2023, by and between Sangam Pant and Investor Group and Holdings and Yasoca Partners, LP and Holdings, respectively.

(j)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(k)     "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

(l)     "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(m)     "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(n)     "Environmental Laws" all applicable Laws concerning pollution or protection of the environment.

(o)     "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(p)     "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(q)     "ERISA" means the Employee Retirement Income Security Act of 1974.

(r)      "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(s)      "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(t)      "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether federal or, state, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(u)      "Hazardous Substance" means any toxic or hazardous material, substance or waste regulated under any Environmental Laws.

(v)      "Incremental Cure Cost Amount" means any Cure Costs as a result of the Purchaser's assumption of a contract, and or designation as an Assigned Contract any contract, which is not set forth on Exhibit B (ii) Amended Assumed and Assigned Stalking Horse Bidder Executory Contracts and Unexpired Leases Schedules of the *Notice of Filing of First Amended Plan Supplement* [Docket No. 208] filed on July 13, 2023 in the Seller's Bankruptcy Cases jointly administered under *In re Center for Autism and Related Disorders, LLC, Case No. 23-90709*.

(w)      "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property.

(x)      "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Michelle Rapoport and Jennifer Webster, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(y)      "Law" means any federal or state, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, regulation, or Order, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(z)      "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(aa)      "Livingstone" means Livingstone Partners LLC.

47

(bb)   "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(cc)   "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or any Equipment or supplies necessary to or used in the provision of services by any Seller; (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets, Assumed Liabilities, or employees, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) Effects in, arising from, or

relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the Original Effective Date, including any matter set forth in the Schedules; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xv)(A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order or the reorganization or liquidation of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith.

(dd)    "Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(ee)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and past practice in light of the current pandemic, epidemic or disease outbreak; provided that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the ordinary course of business.

(ff)    "Patient Records" means any of the Sellers' written and electronic patient files for all patients that were created as a result of services provided by the Sellers or clinical providers acting on behalf of the Sellers, including, but not limited to, treatment records and plans, observations, medical and behavioral history, progress summaries, clinical documentation, forms, authorizations, consents, notes, client data, insurance information, personally identifying information, discharge plans, and all other documentation required to be stored or kept in accordance with applicable laws and payor agreements.

(gg)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens

49

incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vii) any Encumbrances set forth on <u>Schedule 11.1(gg)</u>, and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

        (hh)    "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

        (ii)    "<u>Purchaser Group</u>" means Purchaser, any Affiliate of Purchaser, and each of their respective direct and indirect equityholders, and each of their respective former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, agents, Advisors, successors or permitted assigns.

        (jj)    "<u>Sale Order</u>" mean an Order of the Bankruptcy Court (i) approving this Agreement in a form reasonably acceptable to the Parties and (ii) authorizing Seller to undertake the Transactions, including pursuant to sections 363 and 365, of the Bankruptcy Code in a form reasonably acceptable to the Parties.

        (kk)    "<u>Securities Act</u>" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

        (ll)    "<u>Security Deposit Amount</u>" means $958,230.95.

        (mm)    "<u>Seller Group</u>" means each Seller and any of its Affiliates and funds or partnerships managed or advised by it or its respective Affiliates, including Cardinal Buyer, LLC, and each of their respective direct and indirect equityholders, former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, investment vehicles, agents, Advisors, predecessors, successors or permitted assigns.

        (nn)    "<u>Seller Intellectual Property</u>" means all Intellectual Property owned or purported to be owned by any Seller that is an Acquired Asset.

        (oo)    "<u>Seller Parties</u>" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

        (pp)    "<u>Seller Plan</u>" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each

50

case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(qq)     "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(rr)     "Side Letter" means that certain letter agreement, dated as of the Original Effective Date, by and among Holdings, Center for Autism and Related Disorders, LLC, Cardinal Buyer, LLC, Donisocha, Inc., Doreen Granpeesheh Living Trust, DG Charitable Remainder Trust, Haftchance LLC, YASOCA Partners, LP and Dr. Doreen Granpeesheh.

(ss)     "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(tt)     "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(uu)     "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(vv)     "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(ww)     "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement, including the Side Letter.

(xx)     "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(yy)     "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

11.2    Index of Defined Terms.

Acquired Assets ........................................ 2

Acquired Leased Real Property ................. 2

Agreement ................................................... 1

Agreement Dispute ................................... 41

51

| | | | |
|---|---|---|---|
| Assigned Contracts | 2 | Guaranteed Obligations | 31 |
| Assignment and Assumption Agreement | 10 | Guarantor | 1 |
| Assumed Benefit Plans | 3 | Holdings | 1 |
| Assumed Liabilities | 5 | Information Presentation | 17 |
| Audited Financial Statements | 12 | Laws | 14 |
| Backup Bidder | 21 | Material Contract | 12 |
| Breakup Fee | 35 | Original Effective Date | 1 |
| Cash Payment | 9 | Other APA | 1 |
| Chosen Courts | 41 | Other APA Acquired Assets | 1 |
| Closing | 10 | Other APA Assumed Liabilities | 1 |
| Closing Date | 10 | Other Purchaser | 1 |
| COVID-19 Response | 25 | Outside Date | 34 |
| Cure Costs | 5 | Parties | 1 |
| Dataroom | 17 | Party | 1 |
| Deposit | 9 | Permits | 14 |
| Effect | 47 | Projections | 31 |
| Enforceability Exceptions | 11 | Purchase Price | 9 |
| Environmental Permits | 14 | Purchaser | 1 |
| Escrow Agent | 9 | Seller | 1 |
| Excluded Assets | 4 | Sellers | 1 |
| Excluded Contracts | 4 | Successful Bidder | 21 |
| Excluded Liabilities | 6 | Trademark Assignment Agreement | 10 |
| Expense Reimbursement | 35 | Transfer Offer | 26 |
| Express Representations | 17 | Transfer Taxes | 36 |
| Fundamental Representations | 33 | Transferred Employees | 26 |

11.3 <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a) Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b) The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c) Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)     A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**PANTOGRAN LLC**


By: _____

Name: _____

Title: _____

**GUARANTORS:**

Doreen Granpeesheh

_____

Sangam Pant

_____

**SELLERS:**

Card Holdings, LLC

By: _____
Name: _____
Title: _____

Card Intermediate Holdings I, LLC

By: _____
Name: _____
Title: _____

Card Intermediate Holdings II, LLC

By: _____
Name: _____
Title: _____

Center for Autism and Related Disorders, LLC

By: _____
Name: _____
Title: _____

SKILLS Global, LLC

By: _____
Name: _____
Title: _____

## <u>EXHIBIT A</u>

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

*See attached.*

**EXHIBIT A**

**FORM OF**
**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of [●], 2023, by and between Pantogran LLC, a Delaware limited liability company ("Purchaser"), Card Holdings, LLC, a Delaware limited liability company ("Holdings") and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "Seller" and collectively "Sellers").

WHEREAS, reference is hereby made to that certain Asset Purchase Agreement, dated as of June 9, 2023 (the "APA"), by and between Purchaser and Sellers and the Guarantors party thereto, pursuant to which each Seller has agreed to sell, contribute and assign to Purchaser, and Purchaser has agreed to purchase and accept from each Seller, the Acquired Assets, and to assume the Assumed Liabilities, for good and valuable consideration and in accordance with the terms, and subject to the conditions, set forth in the APA; and

WHEREAS, Sellers desire to deliver to Purchaser such instruments of contribution, transfer, conveyance, assignment and delivery as are required to vest in Buyer all rights in, to and under the Acquired Assets, in each case, free and clear of any Encumbrances, other than Permitted Encumbrances, and Purchaser desires to deliver to Sellers such instruments as are required in order to effectuate and evidence the assumption by Buyer of the Assumed Liabilities.

NOW, THEREFORE, pursuant to the APA and in consideration of the mutual promises contained therein, and for other good and valuable consideration, the receipt and sufficiency of which Sellers and Purchaser acknowledge, the parties hereto agree as follows:

1.      Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such terms in the APA.

2.      Effective as of the Closing, in accordance with the terms, and subject to the conditions, set forth in the APA, each Seller hereby sells, conveys, assigns, transfers and delivers to Buyer all of such Seller's right, title and interest in and to the Acquired Assets, in each case, free and clear of any Encumbrances, other than Permitted Encumbrances. Purchaser hereby purchases, acquires, and accepts the Acquired Assets.

3.      Effective as of the Closing, in accordance with the terms, and subject to the conditions, set forth in the APA and the Sale Order, Purchaser hereby assumes and agrees to pay, perform or discharge when due or required to be performed, as the case may be, the Assumed Liabilities.

4.      Nothing in this Agreement shall be deemed to supersede, limit, qualify, enlarge or modify any of the provisions of the APA, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the APA. If any conflict exists between the terms of this Agreement and the terms of the APA, the terms of the APA shall govern and control.

5.      This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by each of the parties hereto. No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party or such holder under or by reason of this Agreement.

6.      This Agreement and all rights, interests or obligations hereunder, by or on behalf of any of the parties hereto, shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by any Seller, without the prior written consent of Purchaser, and neither this Agreement nor any rights, interests or obligations hereunder may be assigned or delegated by Purchaser (other than to an Affiliate of Purchaser) without the prior written consent of each Seller. Any attempted assignment in violation of this Section 6 shall be void *ab initio*. This Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

7.      This Agreement, and all claims, disputes or causes of action (whether in contract or in tort, at law or in equity or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance or enforcement of this Agreement, shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State that would cause the application of the laws of any jurisdiction other than the State of Delaware.

8.      This Agreement shall be effective as of the Closing.

9.      From time to time following the date hereof, if any further action is reasonably necessary to carry out the purposes of this Agreement, each of the parties hereto will take such further action (including the execution and delivery of such further instruments and documents) that is reasonably necessary or appropriate to effectuate and perform the provisions of this Agreement.

10.      This Agreement may be executed in two or more counterparts (including by means of email in .pdf format), each of which shall be deemed an original, and all of which shall be considered one and the same agreement, and shall become effective when two or more such counterparts have been signed by each of the parties and delivered to the other party (it being understood that all parties need not sign the same counterpart).

**[*Remainer of this page is intentionally left blank*]**

      IN WITNESS WHEREOF, Sellers and Purchaser have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**SELLERS**:

CARD HOLDINGS, LLC

By: _____
Name:
Title:

CARD INTERMEDIATE HOLDINGS I, LLC

By: _____
Name:
Title:

CARD INTERMEDIATE HOLDINGS II, LLC

By: _____
Name:
Title:

CENTER FOR AUTISM AND RELATED DISORDERS, LLC

By: _____
Name:
Title:

SKILLS GLOBAL, LLC

By: _____
Name:
Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**PURCHASER:**

PANTOGRAN, LLC

By: _____
Name:
Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

## **EXHIBIT B**

### **FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

*See attached.*

## <u>TRADEMARK ASSIGNMENT</u>

This Trademark Assignment ("<u>Assignment</u>") is made and entered into as of [●] (the "<u>Effective Date</u>") by and between CENTER FOR AUTISM AND RELATED DISORDERS, LLC ("<u>Assignor</u>") and Pantogran LLC ("<u>Assignee</u>"). Assignor and Assignee are referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

WHEREAS, Card Holdings, LLC, the parent of Assignor ("<u>Parent</u>"), and Assignee are among the parties to that certain Asset Purchase Agreement, dated as of June 9, 2023 (as amended, supplemented or modified, the "<u>Purchase Agreement</u>"); and

WHEREAS, pursuant to the Purchase Agreement, Parent has agreed to cause Assignor  to assign to Assignee, and Assignee has agreed to acquire from Assignor, all of Assignee's right, title and interest in, to and under the trademark registrations and applications set forth on <u>Schedule A</u> together with all goodwill associated therewith (the "<u>Trademarks</u>"), and the Parties wish to record such acquisition in the applicable governmental authorities in any applicable jurisdiction;

NOW, THEREFORE, in consideration of the foregoing and in consideration of the mutual promises, covenants, representations, warranties and agreements contained herein and in the Purchase Agreement, Assignor hereby agrees as follows:

1.      Assignor hereby irrevocably assigns to Assignee, and Assignee hereby accepts from Assignor, all of Assignor's right, title and interest, in and to the Trademarks, together with all of the goodwill associated with and symbolized by the Trademarks, and together with all income, royalties, damages and payments due or payable as of the Effective Date or thereafter, including all damages and payments for past, present or future infringements or misappropriations thereof, the right to sue and recover for past, present, or future infringements or misappropriations thereof and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including rights to register, prosecute, maintain or record any of the foregoing, and all copies and tangible embodiments of any such rights (in whatever form or medium), for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment had not been made.

2.      Assignor shall at Assignee's expense execute, and provide to Assignee, Assignee's successors, assigns or other legal representatives, all assignments or other instruments reasonably requested by Assignee to more fully and effectively effectuate the assignment of Assignor's rights for purposes of this Assignment.

3.      This Assignment has been executed and delivered by Assignor to Assignee for the purpose of recording this Assignment with any applicable governmental authorities, and the Parties hereby authorize any such governmental authorities to record this Assignment.

4.      This Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  This Assignment, together with the Purchase Agreement, sets forth the entire agreement of the parties with respect to the subject matter hereof, and supersedes all other prior or contemporaneous representations, agreements, or understandings.

5.      Except to the extent the mandatory provisions of the Bankruptcy Code (as defined in the Purchase Agreement) apply, this Agreement and any dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

**6.**      This Assignment is being entered into pursuant to and as a requirement of the Purchase Agreement.  Nothing herein modifies the Purchase Agreement, or otherwise expands or limits the rights and obligations of any party thereto, and in the event of any conflict or inconsistency between this Assignment and the Purchase Agreement, the Purchase Agreement shall control.  ***Without limiting the foregoing, neither Parent nor Assignor make any representations or warranties regarding the Trademarks or otherwise with respect to this Assignment or the subject matter hereof, and, except for any express representation or warranties set forth in the Purchase Agreement, each of Parent and Assignor hereby disclaim any and all representations or warranties, whether express or implied, including any implied warranties of title, merchantability, fitness for a particular purpose, or non-infringement.***

*     *     *     *     *

**IN WITNESS WHEREOF,** Assignor and Assignee have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

<u>**ASSIGNOR**</u>:

CENTER FOR AUTISM AND RELATED DISORDERS, LLC

By: _____
Name:
Title:

<u>**ASSIGNEE**</u>:

PANTOGRAN LLC

By: _____
Name:
Title:

*[Signature Page to Trademark Assignment]*

## SCHEDULE A

| Mark | Jurisdiction | Serial No. Filing Date | Registration No. Registration Date | Status | Assignor |
|---|---|---|---|---|---|
| CENTER FOR AUTISM & RELATED DISORDERS | United States | 88633693 27-SEP-2019 | 6002701 03-MAR-2020 | Registered | Center for Autism and Related Disorders, LLC |
| AUTISMLIVE | United States | 88590085 23-AUG-2019 | 6105647 21-JUL-2020 | Registered | Center for Autism and Related Disorders, LLC |
| AUTISM LIVE | United States | 88588674 22-AUG-2019 | 6122745 11-AUG-2020 | Registered | Center for Autism and Related Disorders, LLC |
| SKILLS GLOBAL and design  | United States | 87511340 29-JUN-2017 | 5668183 05-FEB-2019 | Registered | Center for Autism and Related Disorders, LLC |
| CENTER FOR AUTISM & RELATED DISORDERS | United States | 87344345 21-FEB-2017 | 5482871 29-MAY-2018 | Registered | Center for Autism and Related Disorders, LLC |
|  | United States | 87344365 21-FEB-2017 | 5532810 07-AUG-2018 | Registered | Center for Autism and Related Disorders, LLC |
| CARD | United States | 87344388 21-FEB-2017 | 5532811 07-AUG-2018 | Registered | Center for Autism and Related Disorders, LLC |

| Mark | Jurisdiction | Serial No. Filing Date | Registration No. Registration Date | Status | Assignor |
|---|---|---|---|---|---|
| SKILLS and design  | United States | 76704925 18-OCT-2010 | 3963925 24-MAY-2011 | Registered | Center for Autism and Related Disorders Inc.[1] |
| CARD | United States | 76112091 18-AUG-2000 | 2473724 31-JUL-2001 | Registered | Center for Autism and Related Disorders, LLC |

---

[1] **Note to Draft**: Mark is in the process of being assigned to the correct entity, Center for Autism and Related Disorders, LLC.

*[Signature Page to Trademark Assignment]*

.**EXHIBIT C**

**BIDDING PROCEDURES ORDER**

[On File at Docket No. 134]

**Exhibit 1(b)**

**Audax APA**

**CONFIDENTIAL**
**Execution Version**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JULY 25, 2023**

**BY AND AMONG**

**SH VARSITY ACQUISITION SUB, LLC,**

**YOUR LIFE ABA VA, LLC,**

**PROUD MOMENTS MSO, LLC,**

**PROUD MOMENTS LICENSED BEHAVIOR ANALYSTS PLLC,**

**AND**

**CARD HOLDINGS, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

# TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES**................................................................................1
1.1    Purchase and Sale of the Acquired Assets ........................................1
1.2    Excluded Assets ................................................................................3
1.3    Assumption of Certain Liabilities .....................................................4
1.4    Excluded Liabilities ..........................................................................5
1.5    Assumption/Rejection of Certain Contracts .....................................5

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ..................................7
2.1    Consideration; Payment ....................................................................7
2.2    Deposit ..............................................................................................7
2.3    Closing ..............................................................................................8
2.4    Closing Deliveries by Sellers ...........................................................8
2.5    Closing Deliveries by Purchaser .......................................................8
2.6    Withholding .......................................................................................9
2.7    Allocation of Purchase Price .............................................................9

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ........9
3.1    Organization and Qualification ........................................................10
3.2    Authorization of Agreement .............................................................10
3.3    Conflicts; Consents ...........................................................................10
3.4    Financial Statements .........................................................................10
3.5    Title to Properties .............................................................................11
3.6    Contracts ...........................................................................................12
3.7    No Litigation .....................................................................................12
3.8    Permits; Compliance with Laws .......................................................12
3.9    Environmental Matters ......................................................................13
3.10   Intellectual Property .........................................................................13
3.11   Tax Matters .......................................................................................14
3.12   Seller Plans .......................................................................................15
3.13   Employees .........................................................................................16
3.14   Affiliate Transactions .......................................................................17
3.15   Brokers ..............................................................................................17
3.16   Educational Approvals; Compliance with Educational Requirements ..................17
3.17   No Other Representations or Warranties ..........................................18

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ...............18
4.1    Organization and Qualification ........................................................18
4.2    Authorization of Agreement .............................................................18
4.3    Conflicts; Consents ...........................................................................19
4.4    Financing ...........................................................................................19
4.5    Brokers ..............................................................................................19
4.6    No Litigation .....................................................................................19
4.7    Investigation ......................................................................................20
4.8    Certain Arrangements .......................................................................20
4.9    Solvency ............................................................................................20

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 4.10 | No Additional Representations or Warranties | 20 |
| 4.11 | No Outside Reliance | 20 |

**ARTICLE V BANKRUPTCY COURT MATTERS** ........................................................ **21**
| | | |
|---|---|---|
| 5.1 | Bankruptcy Actions | 21 |
| 5.2 | Cure Costs | 22 |
| 5.3 | Sale Order | 23 |
| 5.4 | Approval | 23 |

**ARTICLE VI COVENANTS AND AGREEMENTS** ...................................................... **23**
| | | |
|---|---|---|
| 6.1 | Conduct of the Business | 23 |
| 6.2 | Access to Information | 25 |
| 6.3 | Employee Matters | 26 |
| 6.4 | Regulatory Approvals | 26 |
| 6.5 | Reasonable Efforts; Cooperation | 27 |
| 6.6 | Further Assurances | 27 |
| 6.7 | Insurance Matters | 27 |
| 6.8 | Receipt of Misdirected Assets; Liabilities | 27 |
| 6.9 | Acknowledgment by Purchaser | 28 |
| 6.10 | Guaranty | 30 |
| 6.11 | Restrictive Covenants | 31 |

**ARTICLE VII CONDITIONS TO CLOSING** .............................................................. **31**
| | | |
|---|---|---|
| 7.1 | Conditions Precedent to the Obligations of Purchaser and Seller | 31 |
| 7.2 | Conditions Precedent to the Obligations of Purchaser | 31 |
| 7.3 | Conditions Precedent to the Obligations of Sellers | 32 |
| 7.4 | Waiver of Conditions | 32 |

**ARTICLE VIII TERMINATION** ................................................................................. **32**
| | | |
|---|---|---|
| 8.1 | Termination of Agreement | 32 |
| 8.2 | Effect of Termination | 34 |

**ARTICLE IX TAXES** ................................................................................................ **34**
| | | |
|---|---|---|
| 9.1 | Transfer Taxes | 34 |
| 9.2 | Cooperation | 34 |

**ARTICLE X MISCELLANEOUS** ................................................................................ **35**
| | | |
|---|---|---|
| 10.1 | Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers | 35 |
| 10.2 | Expenses | 36 |
| 10.3 | Notices | 36 |
| 10.4 | Binding Effect; Assignment | 37 |
| 10.5 | Amendment and Waiver | 38 |
| 10.6 | Third Party Beneficiaries | 38 |
| 10.7 | Non-Recourse | 38 |
| 10.8 | Severability | 38 |

## <u>TABLE OF CONTENTS</u>

**Page**

| | | |
|---|---|---|
| 10.9 | Construction | 38 |
| 10.10 | Schedules | 38 |
| 10.11 | Complete Agreement | 39 |
| 10.12 | Specific Performance | 39 |
| 10.13 | Jurisdiction and Exclusive Venue | 40 |
| 10.14 | Governing Law; Waiver of Jury Trial | 40 |
| 10.15 | No Right of Set-Off | 41 |
| 10.16 | Counterparts and PDF | 41 |
| 10.17 | Publicity | 41 |
| 10.18 | Bulk Sales Laws | 42 |
| 10.19 | Fiduciary Obligations | 42 |
| 10.20 | Release | 42 |
| 10.21 | Sellers' Representative | 44 |
| 10.22 | Attorney-Client Privilege | 44 |

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS**............................**44**

| | | |
|---|---|---|
| 11.1 | Certain Definitions | 44 |
| 11.2 | Index of Defined Terms | 54 |
| 11.3 | Rules of Interpretation | 54 |

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of July 25, 2023, is made by and among SH Varsity Acquisition Sub, LLC, a Delaware limited liability company ("NS School Purchaser"), Your Life ABA VA, LLC, a Delaware limited liability company ("NS Clinic Purchaser" and, together with NS School Purchaser, "NS Purchaser"), SBH Intermediate Holdings, L.P., a Delaware limited partnership ("NS Guarantor"), Proud Moments Licensed Behavioral Analysts PLLC, a New York limited liability company ("PM Clinic Purchaser"), Proud Moments MSO, LLC, a New York limited liability company ("PM Non-Clinic Purchaser" and, together with PM Clinic Purchaser, "PM Purchaser" and together with NS Purchaser, "Purchaser"), Proud Moments Intermediate Holdings, LP, a Delaware limited partnership ("PM Guarantor" and together with NS Guarantor, "Guarantor"), and Card Holdings, LLC a Delaware limited liability company ("Holdings"), and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on June 11, 2023, Sellers commenced voluntary cases (collectively, the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-90709 (Bankr. S.D.TX); and

WHEREAS, (i) NS School Purchaser desires to purchase the NS School Assets and assume the NS School Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to NS School Purchaser the NS School Assets together with the NS School Liabilities, (ii) NS Clinic Purchaser desires to purchase the NS Clinic Assets and assume the NS Clinic Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to NS Clinic Purchaser the NS Clinic Assets together with the NS Clinic Liabilities, (iii) PM Non-Clinic Purchaser desires to purchase the PM Non-Clinic Assets and assume the PM Non-Clinic Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to PM Non-Clinic Purchaser the PM Non-Clinic Assets together with the PM Non-Clinic Liabilities, and (iv) PM Clinic Purchaser desires to purchase the PM Clinic Assets and assume the PM Clinic Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to PM Clinic Purchaser the PM Clinic Assets together with the PM Clinic Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

# ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1     <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to each Purchaser, and each Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title, and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means all of the properties, rights, interests, and other assets of each Seller as of the Closing solely to the extent exclusively related to the NS Business, in the case of NS Purchaser, the PM Business, in the case of PM Purchaser whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing solely to the extent exclusively related to such Business, and including Sellers' right, title, and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

(a)     subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party to the extent exclusively related to the Business, as designated on <u>Schedule 1.1(a)</u> and all purchase orders exclusively related to the Business, including that certain national contract set forth on <u>Schedule 1.1(a)</u> notwithstanding the fact that it is not exclusively related to the Business and including for the avoidance of doubt the payor contracts exclusively related to the State of New York, to the extent assignable under applicable Law (the "<u>Assigned Contracts</u>");

(b)     all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, in each case to the extent exclusively related to the Business;

(c)     all Documents and data to the extent exclusively related to the Business;

(d)     all Patient Records;

(e)     the Leased Real Property listed on <u>Schedule 1.1(e)</u> (including the leases related thereto, the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements, security deposits and all permanent fixtures, improvements, and appurtenances thereto in each case with respect to such Acquired Leased Real Property;

(f)     all tangible assets (including Equipment, inventory and supplies) of Sellers to the extent exclusively related to the Business, including the tangible assets of Sellers located at any Acquired Leased Real Property and any such tangible assets on order to be delivered to any Seller to the extent exclusively related to such Acquired Leased Real Property;

(g)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract) to the extent exclusively related to the Business, including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other

than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date solely to the extent with respect to any of the other specifically listed Acquired Assets or Assumed Liabilities (in each case, other than against any Seller or its Affiliates);

(h)      to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor, in each case to the extent exclusively related to the Business;

(i)      all inventory and supplies of the Sellers to the extent exclusively related to the Business;

(j)      all goodwill, payment intangibles and general intangible assets and rights of Sellers to the extent exclusively related to the Business; and

(k)      (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law of the Sellers or their estates to the extent related to the Business and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller (including in its capacity as the managing member or manager of another Person) or its estate against any member of the Seller Group, in each case, to the extent related to the Business, arising out of or relating to events occurring on or prior to the Closing Date, other than any claim under this Agreement or any Transaction Agreement (the claims and causes of action set forth in this Section 1.1(k) "Transferred Claims") (which Transferred Claims against any member of the Seller Group are for the avoidance of doubt Released Claims pursuant to Section 10.20).

    1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under (x) any properties, rights, interests and other assets of the Sellers that are not exclusively related to the Business and (y) the following properties, rights, interests and other assets of Sellers (including to the extent related to the Business) (collectively, the "Excluded Assets"):

(a)      all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for rent (other than security deposits for rent related to Acquired Leased Real Property), electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)      all Contracts of Sellers other than the Assigned Contracts (the "Excluded Contracts");

(c)      all Documents and data other than to the extent exclusively related to the Business;

(d)      all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with

the sale of the Acquired Assets and the Transactions, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records of any Seller, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating to any Excluded Assets, Excluded Liabilities, or the Bankruptcy Case;

(e)      all current and prior insurance policies or Seller Plans, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)      all Equity Interests of any Seller or any of their respective Subsidiaries;

(g)      all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (other than Transferred Claims), and all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)      Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)      all Intellectual Property of Sellers;

(j)      all Tax refunds due any Seller or Affiliate of any Seller;

(k)      Tax attributes and Tax assets of any Seller;

(l)      all tangible assets (including Equipment, inventory, and supplies) to the extent not exclusively related to the Business;

(m)      every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the Ordinary Course, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(n)      all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date; and

(o)     all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries.

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, each Purchaser shall irrevocably assume from each Seller (or with respect to Taxes, if applicable, from such Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to each Purchaser, only the following Liabilities solely to the extent exclusively related to the NS Business, in the case of the NS Purchaser, the PM Business in the case of the PM Purchaser, without duplication, and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(b)     all cure costs required to be paid under the terms of this Agreement and pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)     all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets or the Business from and after the Closing Date;

(d)     all current Liabilities of Sellers to the extent related to the Business or the Acquired Assets incurred with respect to dates of service from and after the Closing Date;

(e)     all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)     all Taxes with respect to the Acquired Assets or the Business for any taxable period (or portion thereof) beginning after the Closing Date;

(g)     all Liabilities related to the Business Employees (including, but not limited to, accrued but unpaid paid time off for such employees);

(h)     all Liabilities for which Purchaser has agreed to be responsible in accordance with this Agreement; and

(i)     all other Liabilities to the extent exclusively related to the Acquired Assets or the Business.

1.4     Excluded Liabilities. Neither Purchaser shall assume, be obligated to pay, perform, or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising,

whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, including Liabilities relating to Excluded Taxes (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

      1.5    Assumption/Rejection of Certain Contracts.

(a)    Assumption and Assignment of Executory Contracts. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing.  The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to Section 1.5(a). At the Closing, Purchaser shall (i) pay all Cure Costs as part of the Cash Payment (as defined below)  and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)    Intentionally Omitted.

(c)    Non-Assignment.

        (i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

        (ii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an

6

Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this Section 1.5(c)(ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s), if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration; Payment.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a cash payment of $11,049,458, which will be allocated to the purchase by NS Purchaser of its portion of the Acquired Assets (the "NS Cash Payment"), and (iii) a cash payment of $1.00, which will be allocated to the purchase by PM Purchaser of its portion of the Acquired Assets  (the "PM Cash Payment" and together with the NS Cash Payment, the "Cash Payment"), which for the avoidance of doubt includes the Nevada Business (in the event Purchaser is acting as the Successful Bidder).  Notwithstanding anything to the contrary set forth herein, the NS School Purchaser and the NS Clinic Purchaser shall be jointly and severally liable for the NS Cash Payment, and any other payment or obligation of NS Purchaser under this Agreement and the Purchasers shall be jointly and severally liable for the Security Deposit Amount (without duplication).

(b)      At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller an amount in cash (the "Closing Date Payment") equal to the Cash Payment plus the Security Deposit Amount minus an amount equal to the Deposit.  For the avoidance of doubt, the Cure Costs will be paid from the Cash Payment and will be deducted from the Cash Payment if paid directly to the Assigned Contracts counterparty.

(c)      The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

        2.2      Deposit.

(a)      NS Purchaser has, on or prior to the date hereof, made an earnest money deposit with Acquiom Clearinghouse LLC (the "Escrow Agent") in the amount equal to $750,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the escrow agreement entered into on the date hereof among Holdings, Purchaser, and the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date, retained by Sellers or returned to NS Purchaser as provided herein.

(b)      If this Agreement has been terminated by Holdings pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(b) or 8.1(c), in each case in circumstances where Holdings would be entitled to terminate this Agreement pursuant to Section 8.1(d) or 8.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)      If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five Business Days after such termination.

(d)      The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)      If the Closing occurs, the Deposit shall be transferred to Sellers and credited against the Purchase Price.

        2.3      Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities in accordance with this Agreement and the Sale Order (the "Closing") will take place by telephone conference and/or electronic exchange of documents at 10:00 a.m. Eastern Time on August 25, 2023 unless Purchaser is required to serve as a Backup Bidder upon notification by Holdings in

accordance with Section 5.1(e) in which case it shall be such later date as requested in writing (email shall suffice) by the Sellers (provided that as of such date there has been full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII, other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4    Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A-1 (the "NS Assignment and Assumption Agreement"), duly executed by the applicable Sellers;

(b)    a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A-2 (the "PM Assignment and Assumption Agreement"), duly executed by the applicable Sellers;

(c)    an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or if any Seller is a disregarded entity for U.S. federal income Tax purposes, such  Seller's regarded owner for U.S. federal income Tax purposes; and

(d)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Holdings certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

2.5    Closing Deliveries by Purchaser. At the Closing, each Purchaser shall deliver to (or at the direction of) Sellers:

(a)    the Closing Date Payment;

(b)    the Assignment and Assumption Agreement, duly executed by NS School Purchaser (with respect to the NS School Assets and the NS School Liabilities) and by NS Clinic Purchaser (with respect to the NS Clinic Assets and the NS Clinic Liabilities) (provided, that Sellers shall have no responsibility with respect to the allocation of assets and liabilities as between the NS School Assets and NS School Liabilities, on the one hand, and the NS Clinic Assets and the NS Clinic Liabilities, on the other hand);

(c)    the Assignment and Assumption Agreement, duly executed by PM Non-Clinic Purchaser (with respect to the PM Non-Clinic Assets and the PM Non-Clinic Liabilities) and by PM Clinic Purchaser (with respect to the PM Clinic Assets and the PM Clinic Liabilities) (provided, that Sellers shall have no responsibility with respect to the allocation of assets and liabilities as between the PM Non-Clinic Assets and PM Non-Clinic Liabilities, on the one hand, and the PM Clinic Assets and the PM Clinic Liabilities, on the other hand);

9

(d)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of NS Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied; and

(e)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of PM Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6      Withholding. Notwithstanding anything in this Agreement to the contrary, Purchaser shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement any amounts required to be deducted and withheld under applicable Law. To the extent that amounts are so deducted or withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of whom such deduction or withholding was made. If Purchaser determines that any payment hereunder is subject to deduction and/or withholding, then Purchaser shall use commercially reasonable efforts to (i) provide notice to the person in respect of whom such deduction or withholding is to be made as soon as reasonably practicable after such determination and (ii) cooperate with such person to reduce or eliminate any such deduction and/or withholding, except, in each case, where Sellers fail to deliver to Purchaser a properly completed and duly executed IRS Form W-9 or W-8, as applicable (or in the case of any Seller that is a disregarded entity for U.S. federal and income tax purposes, its regarded owner).

2.7      Allocation of Purchase Price. Schedule 2.7 sets forth the methodology for the allocation of the Purchase Price (as finally determined) and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Allocation"). The Allocation shall be delivered by Purchaser to Sellers within 90 days after the Closing. Sellers will have the right to raise reasonable objections to the Allocation within 30 days after Purchaser's delivery thereof, in which event Purchaser and Sellers will negotiate in good faith to resolve such dispute. If Purchaser and Sellers cannot resolve any dispute with respect to the Allocation, each Party may adopt its own Allocation and shall have no liability with respect to the Allocation adopted by the other Party. To the extent the Parties agree on an Allocation, Purchaser and Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation absent a change in Law; provided, however, that nothing contained herein shall prevent Purchaser or any Seller from settling any proposed deficiency or adjustment by any Tax authority based upon or arising out of the Allocation, and neither Purchaser nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Tax authority challenging such Allocation.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court, or (ii) set forth in the Schedules delivered by Sellers concurrently herewith and subject to Section 10.10, Sellers represent and warrant to Purchaser as follows.

3.1      Organization and Qualification. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing,

and in good standing under the laws of the jurisdiction of its incorporation or formation. Each Seller possesses all requisite power and authority necessary to own and operate the Acquired Assets and to carry on the Business as currently conducted except as would not, individually or in the aggregate, reasonably be expected to be material to the Business.

3.2     <u>Authorization of Agreement</u>. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery, and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3     <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained, and (b) all required notices, authorizations, approvals, Orders, Permits or consents set forth in <u>Schedule 3.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the Transactions, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any of the Acquired Assets except, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to be material to the Business.

3.4     <u>Financial Statements</u>.

(a)     Attached to <u>Schedule 3.4(a)</u> are Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries (i) audited consolidated balance sheets as of December 31, 2021 and as of December 31, 2020, and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for each fiscal year then ended (collectively, the "<u>Audited Financial Statements</u>"), (ii) unaudited consolidated income statement and balance sheet of Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries for the 12 month period

ended December 31, 2022 (the "2022 Financial Statements"), and (iii) unaudited consolidated income statement and balance sheet of Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries for the five-month period ended May 31, 2023 (the "Interim Financial Statements" and together with the Audited Financial Statements and the 2022 Financial Statements, the "Financial Statements").

(b)     The Audited Financial Statements and the 2022 Financial Statements have been prepared in all material respects in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto), and the Financial Statements fairly present in all material respects the consolidated financial position of Center for Autism and Related Disorders, LLC and its respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto; provided, that the Interim Financial Statements do not include year-end audit adjustments and the notes thereto and do not include the impact of accounting for income Taxes or other customary audit adjustments.

3.5     Title to Properties.

(a)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, one or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers which constitutes an Acquired Asset (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). None of the Sellers owns any real property. Sellers have delivered to the Purchaser a correct and complete copy of each real property lease for the Leased Real Property (the "Real Property Leases").  With respect to each Leased Real Property as of the date hereof:  (i) Sellers' possession and quiet enjoyment of the real property under each such Real Property Lease is not being disturbed by the landlord, and there are no material disputes or defaults with respect to each such Real Property Lease between the landlord and tenant, and there exists no event, occurrence, condition or act, that with the giving of notice, the lapse of time or the happening of any further event or condition, would constitute a breach or default by Sellers under each such Real Property Lease, or permit the termination, modification or acceleration of rent by the landlord under such Lease, in each case other than with respect to payment defaults; (ii) no security deposit or portion thereof deposited with respect to any such Real Property Lease has been applied in respect of a breach or default under any such Real Property Lease; (iii) the other party to each such Real Property Lease is not an Affiliate of, and otherwise does not have any economic interest in, Sellers; (iv) Sellers have not subleased, licensed, or otherwise granted any Person the right to use or occupy the real property subject to any such Real Property Lease or any portion thereof; (v) Sellers have not collaterally assigned or granted any other security interest in any such Real Property Lease or any interest therein; (vi) Sellers do not owe any brokerage commissions or finder's fees with respect to any such Real Property Lease; (vii) the transactions contemplated by this Agreement do not require the consent of any other party to such Real Property Lease; (viii) the Leased Real Property is in compliance in all material respects with all applicable Laws, including the Americans with Disability Act and all Laws with respect to zoning, building, fire, safety, health codes and sanitation; and (ix) all buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the applicable Leased Real Property are in good condition and repair (ordinary wear and tear excepted) and sufficient for the operation of the Business as conducted thereon in all material respects.

(b)      Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, Sellers hold good and transferable title to, or a valid leasehold interest in, all of the material tangible property necessary in the conduct of the Business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances The Acquired Assets are free from any defects, have been maintained in accordance with normal industry practice, are in an operating condition and repair (subject to normal wear and tear), and are adequate and suitable for the purposes for which such assets are presently used in all material respects.

3.6      Contracts.

(a)      For purposes of this Agreement, "Material Contract" means any Contract that is an Assigned Contract set forth on Schedule 1.1(a).

(b)      Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Purchaser of any applicable Cure Costs as provided in this Agreement) and except (i) as a result of the commencement of the Bankruptcy Cases, and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller under any Material Contract (other than with respect to late payment), (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E)  Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to be material to the Business.

3.7      No Litigation. Except as set forth on Schedule 3.7, there are no material Actions pending or, to Sellers' knowledge, threatened in writing against or affecting the Acquired Assets or the Business, at law or at equity, or before or by any Governmental Body.

3.8      Permits; Compliance with Laws. Except as set forth on Schedule 3.8, each Seller (solely with respect to the Business) is, and has been since January 1, 2023, in compliance in all material respects with all statutes, laws, codes, ordinances, regulations, rules, orders, judgments, writs, injunctions, acts, and decrees of any Governmental Body ("Laws") or Orders, applicable to such Seller (solely with respect to the Business), and each Seller holds all permits, approvals, registrations, licenses, certificates, accreditations, and other authorizations of all Governmental Bodies (collectively, "Permits") necessary for the lawful conduct of the Business, except where the failure to hold the same would not, individually or in the aggregate, reasonably be expected to be material to the Business. Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2023, in compliance in all

13

material respects with the Foreign Corrupt Practices Act of 1977 and regulations promulgated thereunder.

3.9    <u>Environmental Matters</u>. Except as would not be material, individually or in the aggregate with respect to the Business:

(a)    Sellers are, and have been since January 1, 2023, in compliance with all applicable Environmental Laws with respect to the Business.

(b)    Since January 1, 2023, Sellers have not received any written notice alleging that any Seller is in violation of or liable under, any Environmental Law that is unresolved with respect to the Business.

(c)    Sellers possess and are in compliance with all Environmental Permits required under Environmental Laws for the operation of the Business as currently conducted.

(d)    There is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in writing against any Seller with respect to the Business.

(e)    Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller with respect to the Business.

(f)    There has been no release of Hazardous Substances in contravention of Environmental Law with respect to the Business or the Acquired Assets or any real property currently or formerly owned, leased or operated by Sellers in connection with the Business, in quantities or concentrations that currently require Sellers to conduct remedial activities, or that have given rise to any Action against Seller, under Environmental Laws.

(g)    None of the Business or the Acquired Assets or any real property currently or formerly owned, leased or operated by Seller in connection with the Business is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(h)    Seller has not retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

3.10    <u>Intellectual Property</u>.

(a)    Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the Business with respect to the Acquired Assets as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances), and Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property with respect to the Acquired Assets; provided that nothing in this <u>Section 3.10(a)</u> shall be interpreted or construed as a representation or warranty

with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of <u>Section 3.10(c)</u>.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller in respect of the Business or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person in the operation of the Business, in each case with respect to the Acquired Assets.

(c)     Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to Sellers in respect of the Business, and the operation of the Business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person, in each case with respect to the Acquired Assets.

     3.11   <u>Tax Matters</u>.

(a)     Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all federal Tax Returns and other material Tax Returns, in each case, with respect to the Acquired Assets, required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are correct and complete in all material respects.

(b)     All material Taxes owed by a Seller (including Taxes relating to any Acquired Asset or the Business) that are due and payable (whether or not shown as payable on any Tax Return) have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)     No Contract that is an Acquired Asset includes a Tax Sharing Agreement.

(d)     There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(e)     No audits or other Actions are ongoing or, to the Knowledge of Sellers, threatened with respect to any material Tax Return or material Taxes of any Seller relating to the Acquired Assets or the Business.  No Governmental Body has made a claim that a Seller is obligated to pay material Taxes or file material Tax Returns as a result of conducting the Business, owning the Acquired Assets or employing any employees in a jurisdiction in which such Seller, is not filing such Tax Returns and paying such Taxes. None of the Sellers has a request for a private letter ruling, a request for administrative relief, a request for a change in any method of accounting, a request for technical advice or other request pending with any Governmental Body that relates to the Taxes or Tax Returns of the Sellers relating to the Acquired Assets or the Business.  None of the Sellers has commenced a voluntary disclosure proceeding relating to the Acquired Assets or the Business in any state or local or non-U.S. jurisdiction that has not been fully resolved.  No power of attorney granted by a Seller with respect to any material Taxes is currently in force.  None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired

Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(f)     Except to the extent that doing so would not adversely impact the Acquired Assets or the Purchaser's ownership of the Acquired Assets, none of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(g)     No Seller is subject to a Tax holiday or Tax incentive or grant in any jurisdiction with respect to Taxes relating to the Business, the Acquired Assets or any Business Employees.

(h)     None of the Acquired Assets is tax-exempt use property under Section 168(h) of the Code. No portion of the cost of any Acquired Asset has been financed directly or indirectly from the proceeds of any tax-exempt state or local government obligation described in Section 103(a) of the Code.

     3.12   <u>Seller Plans</u>.

(a)     With respect to each Seller Plan, to the extent such Seller Plan is exclusively related to the Business Employees, Sellers have made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the material terms thereof, including any amendments thereto, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description and (v) each current material related insurance Contract or trust agreement.

(b)     There are no pending, or to the Knowledge of Sellers, threatened claims (other than routine claims for benefits) by, on behalf of or against any Seller Plan, to the extent such Seller Plan is exclusively related to the Business Employee, which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan.

(c)     No Seller Plan, to the extent such Seller Plan is exclusively related to the Business Employees, provides benefits or coverage for Transferred Employees in the nature of health or life insurance following retirement or other termination of employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(d)     The consummation of the Transactions will not (i) accelerate the time of payment or vesting, or materially increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Seller Plan that is exclusively related to the Business Employees, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Seller Plan that is exclusively related to the Business Employees or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by Purchaser or any of its Affiliates.

3.13   <u>Employees</u>.

(a)   <u>Section 3.13(a)</u> of the Disclosure Schedules contains a list of all current employees of the Sellers (including any employee on furlough and/or temporary layoff status) who is exclusively engaged in the Business (together with any other employees exclusively engaged in the conduct of the Business as of the Closing, each a "<u>Business Employee</u>").

(b)   None of Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any Business Employees. Except as would not, individually or in the aggregate, reasonably be expected to material to the Business, (i) no written demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union in respect of Business Employees, and (ii) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the Business Employees.

(c)   Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, collective bargaining, wages, and hours, benefits, leave from work, non-discrimination in employment, workers compensation, exempt and non-exempt employee and individual independent contractor classification, and ,occupational safety and health, and the Workers ' Adjustment and Retraining Notification Act of 1988 (the "<u>WARN Act</u>") and any similar Law relating to plant closings and mass layoffs/terminations of employees, in each case with respect of the Business Employees. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, no suits, charges, or administrative proceedings relating to any such Laws or regulation are pending, and, to the Knowledge of Sellers, no suit, charge, or administrative investigation alleging a violation of any such applicable Law has been threatened, in each case with respect to the Business Employees.

3.14   <u>Affiliate Transactions</u>. Except pursuant to any other transactions pending or planned in connection with the Bankruptcy Case, no Affiliate of any Seller, or, to the Knowledge of Sellers, any employee, officer, or director of any Seller, (a) is a party to any Contract that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $100,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course, and (iii) the Seller Plans, or (b) has any interest in any Acquired Asset.

3.15   <u>Brokers</u>. Except for Livingstone, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

3.16   <u>Educational Approvals; Compliance with Educational Requirements</u>.

(a)   Sellers are in compliance in all material respects with the applicable Educational Requirements and as of the date hereof have not received written notices that any such party is in

material violation of any applicable Educational Requirements, in each case with respect to the Business;

(b)     (i) Sellers maintain all material Educational Approvals required to conduct their operations as currently conducted, (ii) each material Educational Approval held by Sellers is in full force and effect, and (iii) to the knowledge of Sellers, no event or action has occurred that limits or would reasonably be expected to result in the revocation, suspension, lapse, or limitation of the continuation of any such material Educational Approval, in each case with respect to the Business; and

(c)     Sellers are not subject to and have not received written notice of any non-routine review, evaluation, audit, or investigation, seeking information concerning Sellers' compliance with any Educational Requirements which has had, or would reasonably be expected to have, a materially impact on the Business, nor has any such review, evaluation, audit or investigation resulted in the imposition of any material liability, financial or otherwise, affecting the Business.

3.17    No Other Representations or Warranties. Except for the representations and warranties expressly contained in this Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) and the other Transaction Agreements (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Acquired Assets, the Business, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Livingstone) (the "Information Presentation") or in that certain datasite administered by SmartRoom (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Each of NS Purchaser and PM Purchaser, severally on behalf of themselves and not jointly, represents and warrants to Sellers as follows.

4.1     Organization and Qualification. Each NS Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has

all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Each PM Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New York and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the Transactions. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2   <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3   <u>Conflicts; Consents</u>.

(a)   Assuming that requisite Bankruptcy Court approvals are obtained, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (i) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (ii) violate any Law or Order applicable to Purchaser, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (i)</u> through <u>(iv)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)      Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

4.4      Financing. Each Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Each Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5      Brokers. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.6      No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

4.7      Investigation. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which the Business and the Acquired Assets operate and is capable of evaluating the merits and risks of the Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded appropriate access to the books and records, facilities, and personnel of the Business, the Acquired Assets and Assumed Liabilities for purposes of conducting a due diligence investigation and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.8      Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of managers (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9      Solvency. Purchaser is, and immediately after giving effect to the Transactions shall be, solvent and at all times shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a

reasonable estimate of the amount of all contingent Liabilities) and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

4.10    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

4.11    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the Transactions. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller or the Business or the quality, quantity or condition of any Seller's assets (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Business or the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Business or the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers and the Business, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose

21

or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1   <u>Bankruptcy Actions</u>.

(a)      The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(b)      From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)      The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order. Purchaser shall promptly take all actions as are reasonably requested by Sellers to assist obtaining Bankruptcy Court approval of the Sale Order, and any other Order reasonably necessary in connection with the Transactions, as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(d)      Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement.

(e)      It is acknowledged that Purchaser is a prevailing party at the conclusion of the Auction along with a second purchaser (such other prevailing party, the "<u>Other Successful Bidder</u>") but that Purchaser is also a part of the consortium making up the next highest bidder at the Auction, and Purchaser shall be required to serve as a back-up bidder (the "<u>Backup Bidder</u>") upon notification by Holdings that it shall serve as such, and keep Purchaser's bid to consummate the Transactions as the Backup Bidder on the terms and conditions set forth in this Agreement open and irrevocable until the earlier of (i) 45 days following the initial hearing to consider the Sale Order and (ii) such other date as this Agreement is otherwise terminated. If the Other Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Purchaser will be deemed the Backup Bidder and together with the other member of the backup consortium will be deemed to have the new prevailing bid, and Sellers may consummate the Transactions on the terms and conditions set forth

in this Agreement with the changes indicated herein to the extent the Purchaser is the Backup Bidder.

(f)      Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(g)      Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining Bankruptcy Court approval of the Sale Order and a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(h)      Nothing in this Section 5.1 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

        5.2      Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), pay the Cure Costs (as part of the Cash Payment) and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement.

        5.3      Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption

23

of the Assigned Contracts, and (f) find that Purchaser shall have no Liability for any Excluded Liability.

5.4     Approval. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

<div align="center">

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

</div>

6.1     Conduct of the Business.

(a)     Except (i) as required by applicable Law, Order, or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required, or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability, or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned, or delayed), Sellers shall use their commercially reasonable efforts to carry on the Business in the Ordinary Course, except, in each case, as would not reasonably be expected to be material to the Business; provided that no action by any Seller or one of its Subsidiaries with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required, or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed, or conditioned), Sellers shall not with respect to the Business:

        (i)     sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets which are Acquired Assets for consideration, individually or in the aggregate, in excess of $20,000, except (A) Ordinary Course dispositions of inventory and dispositions of obsolete, surplus, or worn out assets or assets that are no longer used or useful in the conduct of the business of Sellers, (B) transfers among the Sellers or their Subsidiaries, in each case, that are Party to this Agreement, and (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or

<div align="center">24</div>

surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser;

(ii)       except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities, or business (including by merger) to the extent exclusively related to the Business and which would be Acquired Assets, except for acquisitions of inventory in the Ordinary Course;

(iii)      except (A) in the Ordinary Course, or (B) pursuant to the terms of any Seller Plan, (1) grant to any Business Employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former Business Employee any material increase in severance, retention, or termination pay, (3) grant or amend any equity or other incentive awards, (4) hire any Business Employee whose base salary exceeds $75,000 per annum, or (5) take any action to accelerate any rights or benefits under any Seller Plan with respect to a Business Employee; provided that the foregoing shall not restrict any Seller from entering into or making available, to newly hired Business Employee or to Business Employee in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the Ordinary Course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(iv)      grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms);

(v)       settle any pending or threatened Action against any Seller related to the Business that would result in an Assumed Liability in an amount in excess of $20,000; or

(vi)      authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)       Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

6.2    Access to Information.

(a)       From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Sellers will provide Purchaser and its authorized Advisors with

reasonable access and upon reasonable advance notice and during regular business hours to the books and records, premises, property, Contracts, documents, employees, officers, Advisors, accountants, offices, and properties of Sellers to the extent related to the Business in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such Advisors will be under obligations of confidentiality with respect to such access as set forth in Section 6.2(b), (iii) all requests for access will be directed to Livingstone or such other Person(s) as Sellers may designate in writing from time to time, and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege, (B) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty or (C) would require the Seller to disclose information which is not related to the Business, the Acquired Assets and the Assumed Liabilities.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the Transactions, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will direct its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities, or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records), in each case, solely for the purpose of performing the duties necessary for the liquidation of the Sellers' estate or other reasonable business or tax purpose, including litigation defense. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support, and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims); provided, that such assistance, support, and cooperation will not unreasonably interfere with the conduct of the Business by Purchaser.

(d)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the Transactions without the prior written consent of Seller for each such contact.

6.3     Employee Matters.

(a)     At least 10 Business Days prior to the Closing, Purchaser shall extend to each Business Employee a written offer of employment providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this Section 6.3 ("Transfer Offer") and that, if accepted, shall become effective immediately after the Closing. Business Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees." Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Following the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates; provided, that Purchaser shall bear all cost and liability related to any such change or action.

(b)     Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser (or any Affiliate of Purchaser) to terminate, reassign, promote, or demote any of the Transferred Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, future benefits, other compensation or terms or conditions of Purchaser's (or Affiliate's) employment of such employees.

6.4     Regulatory Approvals.

(a)     Sellers will use commercially reasonable efforts to (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any material filings required to be made by the Purchaser Group pursuant to Section 6.4(b), if any, and in providing such notices and obtaining such consents as are reasonably necessary to transition the governmental payor relationships to Purchaser subject to the filing obligations pursuant to Section 6.4(b), (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings required to be made pursuant to this Section 6.4(a) or Section 6.4(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings, and (iii) promptly following the approval of the Bankruptcy Court of this Agreement notify the Virginia Department of Education, the Virginia State Executive Council for Children's Services (if required), and the Virginia Office of Children's Services of the change of ownership resulting from the transactions contemplated by this Agreement.

(b)     Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any,  and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(b) or Section 6.4(a) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances. For the avoidance of doubt, Purchaser shall be responsible for all filings pursuant to Sections 6.4(a) and 6.4(b), except where Sellers are obligated in accordance with submission guidelines to file on behalf of Purchaser.

6.5     Reasonable Efforts; Cooperation.

(a)     Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Closing to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

(b)     The obligations of Sellers pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.6     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.7     Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.8     Receipt of Misdirected Assets; Liabilities.

(a)     From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property, or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property, or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property, or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)      From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

6.9      Acknowledgment by Purchaser.

(a)      Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts, or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties, and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls, or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks, and prospects of Sellers, or the quality, quantity, or condition of any Seller's assets, are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties. Purchaser, on its own behalf and on behalf of the Purchaser Group: (1) disclaims reliance on the items in clause (ii) in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or

they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations or the Business, and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Sellers and the Business, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute, or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.9, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures, or materials in the Information Presentation, the Dataroom, or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information.

(d)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.9 (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this Section 6.9, Seller would not enter into this Agreement.

6.10    Guaranty.

(a)     The Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Sellers (i) the due and punctual performance, when and as due, of all obligations, covenants and agreements of Purchaser arising under or pursuant to this Agreement; (ii) the accuracy of Purchaser's representations and warranties set forth herein; and (iii) the punctual payment of all sums, if any, now or hereafter owed by Purchaser under and in accordance with the terms of this Agreement, including the payment obligations of the Purchaser pursuant to Sections 2.1 (the

matters set forth in clauses (i), (ii), and (iii), collectively, "Guaranteed Obligations"). Notwithstanding anything in this Section 6.10 to the contrary, (x) NS Guarantor is solely guaranteeing the obligations of NS Purchaser, and (y) PM Guarantor is solely guaranteeing the obligations of PM Purchaser, in each case on the terms as set forth in this Section 6.10.

(b)          If Purchaser fails to perform any of the Guaranteed Obligations, then the Guarantor shall itself be liable for the Guaranteed Obligations and shall perform or take whatever steps as may be necessary to procure performance of the same.

(c)          Notwithstanding any other provision of this Section 6.10, nothing herein shall be construed as imposing greater obligations or Liabilities on Guarantor than for which Purchaser itself would be liable under this Agreement or obliging Guarantor to indemnify and hold harmless the Seller against any losses, costs, or expenses for which Purchaser itself would not be liable under this Agreement, except as set forth in this Section 6.10, including Section 6.10(f) and 6.10(g).

(d)          The obligations of Sellers under this Agreement shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Section 6.10 and all dealings between Sellers and Purchaser shall likewise be conclusively presumed to have been consummated in reliance upon this Section 6.10.

(e)          The Guarantor's obligations hereunder shall not be affected by any facts or circumstances that might constitute a legal or equitable bar, discharge or defense to any Guaranteed Obligations available to the Guarantors but not available to Purchaser, and each Guarantor hereby expressly waives and renounces any and all such bars, discharges and defenses.

(f)          The guarantee by the Guarantors contained herein shall remain in full force and effect and shall continue to be enforceable by Sellers until the performance by Purchaser of all of the Guaranteed Obligations and that upon completion of all of the Guaranteed Obligations, this guarantee shall terminate automatically and the Guarantors shall stand discharged of all of its obligations under this guarantee. The Guarantors shall indemnify Sellers for any costs and expenses incurred by Sellers in enforcing this Section 6.10, including the fees and expenses of counsel and other Advisors of Sellers in the investigation and prosecution of any Action with respect hereto. The Guarantor's obligations under this Section 6.10 shall not be terminated, modified, affected or impaired by reason of any relief or discharge of Purchaser from any of Purchaser's respective obligations in bankruptcy or similar proceedings, or by liquidation or dissolution.

(g)          The liability of the Guarantors under this Section 6.10 shall be unlimited (except as set forth above with regard to the allocation to and between Guarantors) and unconditional, and this Section 6.10 shall be a continuing guaranty.

(h)          The Guarantor hereby makes the representations and warranties set forth in Article IV as to itself, and such representations and warranties shall apply *mutatis mutandis* as if Guarantor were substituted for Purchaser therein.

(i)          Sellers will have no liability with respect to the allocation of the assets of the Nevada Business between the various Purchaser entities, and Purchaser shall instruct Sellers after

the date hereof which Purchaser entity shall acquire such assets, provided that the foregoing shall not limit any of Purchaser's obligations hereunder with respect to the Nevada Business.

6.11    <u>Restrictive Covenants</u>. Notwithstanding anything in this Agreement or in the Schedules to the contrary, Sellers agree that as part of Purchaser assuming the the Assigned Contracts that Purchaser will assume at the Closing, any confidentiality, non-competition, non-solicitation, non-hire, or similar provisions in such Assigned Contracts containing similar restrictive covenants binding on Sellers, any Affiliates of Sellers, or the Business Employees, in each case, to the extent related to the Business or the Acquired Assets, solely to the extent set forth in an Assigned Contract.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Sale Order.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    (i) the representations and warranties made by Sellers in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date, and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.5</u> (Title to Properties) or in <u>Section 3.6</u> (Contracts))), and (ii) the representations and warranties set forth in <u>Section 3.1</u> (Organization and Qualification), <u>Section 3.2</u> (Authorization of Agreement), and <u>Section 3.15</u> (Brokers) (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)      Sellers shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants, agreements, and obligations required to be performed or complied with by Sellers under this Agreement on or prior to Closing;

(c)      no Material Adverse Effect shall have occurred and be continuing; and

(d)      Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3      Conditions Precedent to the Obligations of Sellers. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)      Purchaser shall not have breached in a manner that is material with respect to the Transactions, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)      Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

7.4      Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

<div align="center">

**ARTICLE VIII**
**TERMINATION**

</div>

8.1      Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Holdings and Purchaser;

(b)      by written notice of either Purchaser or Holdings, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding, and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)     by written notice of either Purchaser or Holdings, if the Closing shall not have occurred on or before September 15, 2023 (the "Outside Date") (or such later date as provided in Section 5.1(e)); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)     by written notice from Holdings to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided, that (i) if such breach is curable by Purchaser then Holdings may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two Business Days prior to the Outside Date, and (B) 30 days after Sellers notify Purchaser of such breach, and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Holdings at any time that Sellers are in material breach of, any covenant, representation, or warranty hereunder;

(e)     by written notice from Purchaser to Holdings, upon a breach of, failure to observe, or failure to perform any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Holdings of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)     by written notice from Holdings to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(g)     by written notice from Purchaser to Holdings, if all of the conditions set forth in Sections 7.1 and 7.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Sellers fail to complete the Closing at the time required by Section 2.3;

(h)     by written notice from Holdings to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(i)     by written notice of either Purchaser or Holdings, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

34

(j)      by written notice from either Purchaser or Sellers, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction, or (ii) is the Backup Bidder at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder.

8.2      Effect of Termination.

(a)      In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)      Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2 are an integral part of this Agreement.

## ARTICLE IX
## TAXES

9.1      Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser and Purchaser shall timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

9.2      Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes; provided, that in providing such information, assistance and access, each Party shall be entitled to redact information that is not exclusively related to the Business.

## ARTICLE X
## MISCELLANEOUS

10.1      Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to

the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing Date, or if less, the maximum applicable statute of limitations under Delaware Law, and nothing in this Section 10.1 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this Section 10.1 (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years, and (b) are an integral part of the Transactions and that, without the agreements set forth in this Section 10.1, none of the Parties would enter into this Agreement. Purchaser, for itself and on behalf of the Purchaser Group, acknowledges and agrees that to the fullest extent permitted under applicable Law, including by contractually shortening the applicable statute of limitation, any and all rights, claims and causes of action, whether known or unknown, it may have against any member of the Seller Group relating to the Business, the Acquired Assets, the Assumed Liabilities, the operation of the Sellers and their respective Subsidiaries or their respective businesses or relating to the subject matter of this Agreement or the Schedules, whether arising under, or based upon, any Law (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages or any other recourse or remedy, including as may arise under common law or any other Law) are hereby irrevocably waived; provided, however, that the foregoing will not apply to any rights of the Purchaser against the Sellers pursuant to this Agreement prior to the occurrence of the Closing. Furthermore, without limiting the generality of this Section 10.1, no claim shall be brought or maintained by, or on behalf of, Purchaser or any member of the Purchaser Group against any member of the Seller Group, and no recourse shall be sought or granted against any member of the Seller Group, by virtue of, or based upon, any alleged misrepresentation or inaccuracy in, or breach of, any of the representations, warranties, covenants, or agreements of the Seller or any other Person set forth or contained in this Agreement, the Schedules, any certificate, instrument, opinion, agreement, or other document of a Seller or any other Person delivered hereunder, the subject matter of this Agreement or the Schedules, the business or the ownership, operation, management, use or control of the business of any of the Sellers or their Subsidiaries, including the Business, the Acquired Assets and Assumed Liabilities, any of their assets, or any actions or omissions at, or prior to, the Closing; provided, however, that the foregoing will not apply to any rights of the Purchaser against the Sellers pursuant to this Agreement prior to the occurrence of the Closing. Nothing set forth in this Section 10.1 (x) shall limit Section 10.20, or (y) will be deemed to limit or modify Purchaser's right to recover under any insurance policies or any other recourse that may be available with respect to this Agreement, and the transactions contemplated hereby and thereby.

10.2    Expenses. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, Section 8.2), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid

36

by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u>, and (b) all Cure Costs will be allocated to Purchaser pursuant to <u>Sections 1.3(b)</u>, <u>2.1(b)</u>, and <u>5.2</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address, or street address, as applicable, set forth below, or at such other number, electronic mail address, or street address as such Party may specify by written notice to the other Party.

<div style="margin-left:2em">

Notices to NS Purchaser:

c/o SH Varsity Acquisition Sub, LLC
23 Walker Avenue
Baltimore, MD 21208
Attention:     Jonathan Bicknell
Email:          Jonathan.Bicknell@newstory.com

and

with a copy to (which shall not constitute notice):

Fredrikson & Byron, P.A.
60 South Sixth Street
Minneapolis, MN 55402
Attention:     Sean P. Kearney
                    Ryan G. Miest
                    Clinton E. Cutler
Email:          skearney@fredlaw.com;
                    rmiest@fredlaw.com;
                    ccutler@fredlaw.com

and

Audax Management Company, LLC
101 Huntington Avenue
Boston, MA 02199
Attention:     Deputy General Counsel
Email:          jaronson@audaxgroup.com

</div>

Notices to PM Purchaser:

c/o Proud Moments MSO, LLC
1449 37th St.
Brooklyn, NY 11218
Attention:      Matt Henn
Email:           mhenn@proudmomentsaba.com

and

with a copy to (which shall not constitute notice):

Fredrikson & Byron, P.A.
60 South Sixth Street
Minneapolis, MN 55402
Attention:      Sean P. Kearney
                    Ryan G. Miest
                    Clinton E. Cutler
Email:           skearney@fredlaw.com;
                    rmiest@fredlaw.com;
                    ccutler@fredlaw.com

and

Audax Management Company, LLC
101 Huntington Avenue
Boston, MA 02199
Attention:      Deputy General Counsel
Email:           jaronson@audaxgroup.com

Notices to Sellers:

Card Holdings, LLC
c/o Center for Autism and Related Disorders, LLC
9089 S Pecos Rd., Suite 3600
Henderson, NV 89074
Attention:      Michelle Rapoport, General Counsel
Email:           MichelleRapoport@centerforautism.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Lauren M. Colasacco, P.C.
              Christopher T. Greco, P.C.
              Steve Toth
              Allyson B. Smith
Email:        lauren.colasacco@kirkland.com
              cgreco@kirkland.com
              steve.toth@kirkland.com
              Allyson.smith@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void. Notwithstanding the foregoing, each of Purchaser may assign, (a) in whole or in part, its respective rights and obligations pursuant to this Agreement or the other Transaction Agreements to one or more of its respective Affiliates, (b) this Agreement or the other Transaction Agreements and its rights and obligations under this Agreement or the other Transaction Agreements in connection with a merger or consolidation involving such party or its Affiliates, or in connection with a sale of substantially all of the equity or assets of such party or its Affiliates, or other disposition of substantially all of the Business, and (c) any or all of its rights pursuant to this Agreement or the other Transaction Agreements, including its rights to indemnification, to any of its lenders as collateral security; provided, that, any such assignment described in the foregoing clauses (a) – (c) shall not relieve any Purchaser of its obligations under this Agreement.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers, or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document delivered hereto, this Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set

39

forth in this Agreement, no past, present, or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent, or Advisor of any Party or any past, present, or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent, or Advisor of any of the foregoing (collectively, a "Non-Recourse Party") will have any Liability and there will be no right of recovery or any claims against any Non-Recourse Party (in each case whether in contract, tort, equity, through piercing or attempted piercing of the corporate veil, or otherwise, whether known or unknown, contingent or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute, and each of the Non-Recourse Parties are intended third party beneficiaries of this Section 10.7 and shall be entitled to enforce this Section 10.7 as if a party directly hereto.

10.8   Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9   Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement, to the extent that the relevant of such disclosure is reasonably apparent on the face of such disclosure. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan,

40

arrangement, or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, may not be an adequate remedy, may occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to seek an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13   Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether

sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

      10.14   Governing Law; Waiver of Jury Trial.

(a)      Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)      EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES

HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchase Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld, or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided, that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20   <u>Release</u>.

(a)     Effective as of the Closing, Purchaser (on behalf of itself and the other Purchaser Releasing Parties) (and, from and after the Closing, shall cause their respective Subsidiaries and Affiliates and each of its and their respective current and former officers, directors, employees, equityholders, partners, members, Advisors, successors and assigns (collectively with Purchaser, the "<u>Purchaser Releasing Parties</u>") to) hereby irrevocably and unconditionally releases and forever discharges each member of the Seller Group (collectively, the "<u>Purchaser Released Parties</u>") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, obligations, liabilities, counterclaims, defenses, debts, dues, accounts, bonds, contracts, and covenants (whether express or implied), and claims and demands whatsoever of any kind, nature or description, whether known or unknown, whether in law or equity, which the Purchaser Releasing Parties may have against each of the Purchaser Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to any of the Purchaser Released Parties, the Business, the Acquired Assets, the Assumed Liabilities, or otherwise occurring or arising on or prior to the Closing Date (collectively, the "<u>Purchaser Released Claims</u>"), and each of the Purchaser Releasing Parties hereby agrees not to sue or bring any action in respect of the Purchaser Released Claims. The Purchaser Released Claims shall include, but are not limited to, those actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts, covenants, claims and demands:

(i)     arising out of, or relating to, the organization, management or operation of the businesses of Sellers or of their respective Subsidiaries, including the Business, relating to any matter, occurrence, action or activity on or prior to the Closing Date;

(ii)     relating to this Agreement and the Transactions contemplated hereby (including <u>Article V</u> hereto and the transactions contemplated thereby or which occur in connection therewith);

(iii)     arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement contained in this Agreement, the Schedules, exhibits and annexes hereto, in any document delivered in connection herewith or contemplated hereby or in any certificate contemplated hereby and delivered in connection herewith; and

(iv)     relating to any information (whether written or oral), documents or materials furnished by or on behalf of Sellers and their Subsidiaries and/or Affiliates.

The Purchaser Released Parties to whom this <u>Section 10.20(a)</u> applies shall be express third party beneficiaries of this <u>Section 10.20(a)</u>. The releases contemplated in this <u>Section 10.20(a)</u> are in addition to and shall not in any way limit any other release, covenant not to sue, or waiver in favor of the Purchaser Released Parties.

(b)     Effective as of the Closing, Sellers hereby irrevocably and unconditionally releases and forever discharges each member of the Purchaser Group (collectively, the "<u>Seller Released Parties</u>") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, obligations, liabilities, counterclaims, defenses, debts, dues, accounts, bonds, contracts, and covenants (whether express or implied), and claims and demands whatsoever of any kind, nature, or description, whether known or unknown, whether in law or equity, which the Seller may have against each of the Seller Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to any of the Seller Released Parties, the Business, the Excluded Assets, the Excluded Liabilities, or otherwise occurring or arising on or prior to the Closing Date (collectively, the "<u>Seller Released Claims</u>"), and Seller hereby agrees not to sue or bring any action in respect of the Seller Released Claims. The Seller Released Claims shall include, but are not limited to, those actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts, covenants, claims and demands:

> (i)     arising out of, or relating to, the organization, management or operation of the businesses of Purchaser or its Affiliates, relating to any matter, occurrence, action, or activity on or prior to the Closing Date;

> (ii)     relating to this Agreement and the Transactions contemplated hereby (including <u>Article V</u> hereto and the transactions contemplated thereby or which occur in connection therewith);

> (iii)     arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement contained in this Agreement, the Schedules, exhibits, and annexes hereto, in any document delivered in connection herewith or contemplated hereby or in any certificate contemplated hereby and delivered in connection herewith; and

> (iv)     relating to any information (whether written or oral), documents or materials furnished by or on behalf of Purchaser and its Subsidiaries and/or Affiliates.

The Seller Released Parties to whom this <u>Section 10.20(b)</u> applies shall be express third party beneficiaries of this <u>Section 10.20(b)</u>.

10.21  <u>Sellers' Representative</u>. Each Party agrees that Holdings has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Holdings on behalf of the Sellers.

10.22   <u>Attorney-Client Privilege</u>. The Parties intend that, at all times after the Closing, Purchaser will have the right in its discretion to assert or waive any attorney work product protections, attorney-client privileges, and similar protections and privileges relating to the Acquired Assets and Assumed Liabilities, solely to the extent such protections and/or privileges are an Acquired Asset.

# ARTICLE XI
# ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   <u>Certain Definitions</u>.

(a)   "<u>Accreditation</u>" means the status of public recognition, affiliation, membership or listing granted by an Accrediting Body to Sellers, or to any educational program or service offered thereby, reflecting the Accrediting Body's determination that the Sellers, or the educational program or service, as applicable, satisfies the published standards and requirements of the Accrediting Body.

(b)   "<u>Accrediting Body</u>" means any non-governmental entity or non-governmental organization that engages in the granting or withholding of Accreditation.

(c)   "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(d)   "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(e)   "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(f)   "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires a material portion of the Acquired Assets or equity of the Sellers, in each case whether by merger, sale or liquidation of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, none of a liquidation or wind-down of Sellers' estates shall be an Alternative Transaction.

(g)   "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(h)     "Business" means, as context may require, (i) the NS Business, with respect to NS Purchaser and NS Guarantor, and (ii) the PM Business, with respect to PM Purchaser and PM Guarantor.

(i)     "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York and Boston, Massachusetts are authorized or required by Law to be closed.

(j)     "Cash and Cash Equivalents" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(k)     "Clinic Assets" means that portion of the Acquired Assets relating to the clinics being acquired by Purchaser as part of the Business, as identified by Purchaser to Sellers no later than 10 Business Days prior to the Closing.

(l)     "Clinic Liabilities" means that portion of the Assumed Liabilities relating to the clinics being acquired by Purchaser as part of the Business, as identified by Purchaser to Sellers no later than 10 Business Days prior to the Closing.

(m)     "Confidentiality Agreement" means that certain confidentiality agreement, dated as of December 15, 2022, by and between Audax Management Company, LLC and Holdings.

(n)     "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(o)     "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property.

(p)     "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(q)     "Educational Agency" means any Accrediting Body, the United States Department of Education, any Local Education Agency, and State Educational Agency, or other entity or organization, whether Governmental Body or a private or quasi-private organization, that: (i) engages in granting or withholding approvals for, or otherwise regulates, elementary or secondary schools or educational programs provided by such schools, or private providers of elementary or secondary school educational programs or services, in accordance with standards relating to the

performance, operation, financial condition or academic standards of such entities or the provision of Educational Agency Funding by such entities; (ii) grants any Educational Agency Funding to elementary or secondary schools or educational programs provided by such schools, or private providers of elementary or secondary school educational programs or services or (iii) has jurisdiction to enforce Laws concerning misrepresentation; unfair, deceptive or abusive acts and practices; consumer fraud; or other consumer protection Laws as applicable to elementary or secondary schools or educational programs, or private providers of educational programs or services.

(r)      "Educational Agency Consent" means any consent, license, authorization, certification, waiver, registration or approval, including any interim or temporary approval, required to be issued to Sellers either before or after the Closing in connection with the transactions contemplated hereby in order to maintain, continue or reinstate any Educational Approval presently held by Sellers pursuant to an applicable Educational Requirement.

(s)      "Educational Agency Funding" means (i) any funds received from any Educational Agency, whether directly or indirectly, in connection with the operation of an elementary or secondary school, or in connection with the operation of educational programs or services in an elementary or secondary school, including funds allocated or administered by ED, any State Educational Agency or Local Educational Agency under the ESEA, the IDEA or Section 504; (ii) any funds received, whether directly or indirectly, through any program of emergency education assistance pursuant to Coronavirus Legislation

(t)      "Educational Approval" means any license, authorization, certification, program participation agreement, contract, Accreditation or other approval issued by an Educational Agency to Sellers for which an Educational Agency Consent is required for the continued operation.

(u)      "Educational Requirement" means any Law, standard or requirement administered or promulgated by any Educational Agency that is applicable to legally operate the Seller as currently operated, including material compliance with the ESEA, FERPA, the IDEA, the PPRA, and Section 504, as applicable.

(v)      "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(w)      "Environmental Laws" means any applicable Law, and any binding agreement with any Governmental Body: (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient or indoor air, soil, surface water or groundwater, or subsurface strata); or (ii) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Substances. The term "Environmental Law"

48

includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act of 1910, as amended, 7 U.S.C. §§ 136 et seq.; the Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

(x)      "Environmental Permit" means any permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, give, authorized by or made pursuant to Environmental Law.

(y)      "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles, and all other fixed assets.

(z)      "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(aa)      "ERISA" means the Employee Retirement Income Security Act of 1974.

(bb)      "Excluded Taxes" shall mean (i) all Taxes of any Seller or any Affiliate of any Seller or for which any Seller or any Affiliate of any Seller is liable, for any taxable period, (ii) all Taxes relating to the Acquired Assets, the Business, or Assumed Liabilities arising from or related to a Pre-Closing Tax Period; (iii) any Taxes imposed on or with respect to any Excluded Assets or Excluded Liabilities for any taxable period; (iv) Taxes that arise out of failure of any Seller or any Affiliate of any Seller to comply with the requirements and provisions of any bulk sales, bulk transfer, or similar laws of any jurisdiction arising from or related to a Pre-Closing Tax Period; and (v) other Taxes of any Seller or any Affiliate of any Seller of any kind or description (including any Liability for Taxes of any Seller or any Affiliate of any Seller) that becomes a Liability of Purchaser under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of Contract or Law.

(cc)      "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(dd)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification, or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(ee)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether federal or, state, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(ff)    "Hazardous Substance" means: (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls and per- and poly-fluoroalkyl substances (PFAS) and other emerging contaminants.

(gg)    "Intellectual Property" means all of the following: (i) patents (including continuations, divisionals, continuations-in-part, re-issues, re-exams, provisionals), patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights and works of authorship; (iv) registrations and applications for any of the foregoing; (v) trade secrets; (vi) computer software; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property rights.

(hh)    "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge of Jennifer Webster, Frank Keim, Dennis Dixon, Jeffrey Cho, Jordan Maya, and Chris Boult, after reasonable inquiry, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(ii)    "Law" means any federal or state, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, regulation, or Order, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(jj)    "Leasehold Improvements" means all buildings, structures, improvements and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(kk)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ll)    "Livingstone" means Livingstone Partners LLC.

(mm)   "Local Educational Agency" means any public authority legally constituted within a state for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a state, or for a combination of school districts or counties as are recognized in a state as an administrative agency for its public elementary or secondary schools.

(nn)    "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise), or assets of the Business (including the Acquired Assets), taken as a whole; provided, that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any Effect in, arising from, or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from, or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from, or relating to the decline or rise in price of any currency or any Equipment or supplies necessary to or used in the provision of services by any Seller; (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action required by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets, Assumed Liabilities, or employees, including the impact thereof on the

relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix)  Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules; (x)  Effects that arise from any seasonal fluctuations in the business; (xi) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xiii) the matters set forth in the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xiv) (A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2)  the Sale Order or the reorganization or liquidation of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith.

(oo)    "Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(pp)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement, and pendency of the Bankruptcy Cases; provided, that any action taken, or omitted to be taken, that relates to, or arises out of any pandemic, epidemic or disease outbreak shall be deemed to be in the ordinary course of business.

(qq)    "Nevada Business" means the operation of the business of Sellers in the State of Nevada.

(rr)    "New York Excluded Locations" means the Sellers operations in the State of New York at its Mamaroneck, NY facility and its Bayside, NY facility.

(ss)    "NS Business" means the operation of the business of Sellers in the Commonwealth of Virginia.

(tt)    "NS Clinic Assets" means that portion of the Acquired Assets relating to the clinics being acquired by NS Purchaser as part of the NS Business.

(uu)    "NS Clinic Liabilities" means that portion of the Assumed Liabilities relating to the clinics being acquired by NS Purchaser as part of the NS Business.

(vv)    "NS School Assets" means that portion of the Acquired Assets relating to the schools being acquired by NS Purchaser as part of the NS Business.

(ww)    "NS School Liabilities" means that portion of the Assumed Liabilities relating to the schools being acquired by NS Purchaser as part of the NS Business.

(xx)    "Patient Records" means, to the extent exclusively related to the Business, any of the Sellers' written and electronic patient files for all patients that were created as a result of services provided by the Sellers or clinical providers acting on behalf of the Sellers, including, but not limited to, treatment records and plans, observations, medical and behavioral history, progress summaries, clinical documentation, forms, authorizations, consents, notes, client data, insurance information, personally identifying information, discharge plans, and all other documentation required to be stored or kept in accordance with applicable laws and payor agreements.

(yy)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary encumbrances which do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis in the Ordinary Course, (vi) any Encumbrances set forth on Schedule 11.1(ss), and (vii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(zz)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(aaa)    "Personal Information" means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual. This includes, without limitation, information covered by any Laws relating to the security, privacy, or Processing of personal information in any form.

(bbb)    "Personal Information Obligations" means each of the Company's privacy policies or notices, other policies, terms of use, terms and conditions, Contracts, representations to any Persons, and any binding guidance or industry standards (including Payment Card Industry Data Security Standards), in each case, regarding Processing of Personal Information, privacy, or data security.

(ccc)    "PM Business" means the operation of the business of Sellers in the States of New York and New Jersey and Nevada; provided, that, unless Purchaser is acting in the capacity as the Backup Bidder, with respect to the State of New York such business shall exclude the operation of the business of Sellers solely to the extent exclusively related to the New York Excluded Locations and to the extent Purchaser is acting in the capacity as the Backup Bidder, the Nevada Business shall be excluded.

(ddd)   "PM Clinic Assets" means that portion of the Acquired Assets relating to the clinics being acquired by PM Clinic Purchaser as part of the PM Business and, to the extent Purchaser is acting in the capacity as the Successful Bidder, the Nevada Business.

(eee)   "PM Clinic Liabilities" means that portion of the Assumed Liabilities relating to the clinics being acquired by PM Clinic Purchaser as part of the PM Business and, to the extent Purchaser is acting in the capacity as the Successful Bidder, the Nevada Business.

(fff)   "PM Non-Clinic Assets" means that portion of the Acquired Assets relating to the PM Business and, to the extent Purchaser is acting in the capacity as the Successful Bidder, the Nevada Business other than the PM Clinic Assets, in each case being acquired by PM Non-Clinic Purchaser.

(ggg)   "PM Non-Clinic Liabilities" means that portion of the Assumed Liabilities relating to the PM Business and, to the extent Purchaser is acting in the capacity as the Successful Bidder, the Nevada Business, other than the PM Clinic Liabilities, in each case being acquired by PM Non-Clinic Purchaser.

(hhh)   "Pre-Closing Tax Period" means any Tax period (or portion thereof) ending on or before the Closing Date.

(iii)   "Privacy Laws" means all applicable Laws that relate to data privacy, data protection, data security, data transfer, confidentiality, breach notification, marketing, or the Processing of Personal Information, as applicable from time to time, including without limitation, the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act, as amended.

(jjj)   "Process," "Processed," or "Processing" means the collection, recording, use, organization, structuring, interception, alteration, modification, storage, receipt, purchase, sale, maintenance, transmission, transfer, disclosure, dissemination, consultation, combination, erasure, destruction, processing of Personal Information or other data, or any other operation or set of operations that is performed on Personal Information or other data.

(kkk)   "Purchaser Group" means Purchaser, any Affiliate of Purchaser, and each of their respective direct and indirect equityholders, and each of their respective former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, agents, Advisors, successors or permitted assigns.

(lll)   "Sale Order" mean an Order of the Bankruptcy Court (i) approving this Agreement in a form reasonably acceptable to the Parties and (ii) authorizing Seller to undertake the Transactions, including pursuant to sections 363 and 365, of the Bankruptcy Code in a form reasonably acceptable to the Parties.

(mmm)"School Assets" means that portion of the Acquired Assets relating to the schools being acquired by Purchaser as part of the Business.

(nnn)   "School Liabilities" means that portion of the Assumed Liabilities relating to the schools being acquired by Purchaser as part of the Business.

(ooo)  "<u>Securities Act</u>" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(ppp)  "<u>Security Deposit Amount</u>" means the actual amount of the security deposits in respect of the Acquired Leased Real Property, up to a maximum of $225,590.91, provided that if Purchaser is acting in the capacity as the Backup Bidder, such maximum amount shall be $233,281.96.

(qqq)  "<u>Seller Group</u>" means each Seller and any of its Affiliates and funds or partnerships managed or advised by it or its respective Affiliates, including Cardinal Buyer, LLC, and each of their respective direct and indirect equityholders, former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, investment vehicles, agents, Advisors, predecessors, successors or permitted assigns.

(rrr)  "<u>Seller Parties</u>" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(sss)  "<u>Seller Plan</u>" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(ttt)  "<u>State Educational Agency</u>" means any state governmental authority with primary responsibility for the supervision of elementary and/or secondary education in a state, and/or which has primary responsibility for the issuance of any licenses, permits, consents, approvals, certificates, program participation agreements, written exemptions or other necessary approvals for the provision of elementary or secondary school educational programs or services, or the granting and use of Educational Agency Funding, in that state in accordance with standards relating to the performance, operation, financial condition and/or academic standards of elementary or secondary schools, educational programs in such schools, or providers of elementary or secondary school educational services.

(uuu)  "<u>Straddle Period</u>" means any taxable period that includes but does not end on the Closing Date.

(vvv)  "<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other

business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(www) "Tax" or "Taxes" means any federal, state, local, foreign taxes, charges, fees, duties, levies or other assessments, including gross income, net income, gross receipts, net receipts, capital gains, gross proceeds, net proceeds, license, payroll, employment, severance, lease, occupation, equalization, premium, windfall profits, environmental, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, unclaimed or abandoned property, escheat, gaming, stamp, excise, occupation, sales, use, privilege, transfer, registration, value added, import, export, custom duties, alternative minimum, estimated or other tax, charges or fees of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

(xxx)    "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(yyy)    "Tax Return" means any return (including estimated), declaration, claim for refund, report, statement or information return relating to Taxes filed, or required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(zzz)    "Tax Sharing Agreement" means any agreement including any provision pursuant to which a Seller is obligated to indemnify any Person for, or otherwise pay, any Tax of another Person or share any Tax benefit with another Person.

(aaaa)  "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(bbbb) "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(cccc)  "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

   11.2    Index of Defined Terms.

| | |
|---|---|
| Acquired Assets ........................................... 1 | Bankruptcy Court......................................... 1 |
| Acquired Leased Real Property ................. 2 | Business Employee .................................... 16 |
| Agreement.................................................... 1 | Cash Payment............................................... 7 |
| Agreement Dispute ................................... 40 | Chosen Courts .......................................... 40 |
| Allocation.................................................... 9 | Clinic Purchaser .......................................... 1 |
| Assigned Contracts ..................................... 2 | Closing ......................................................... 8 |
| Assignment and Assumption Agreement.... 8 | Closing Date................................................. 8 |
| Assumed Liabilities .................................... 4 | Closing Date Payment................................. 7 |
| Backup Bidder ......................................... 22 | Cure Costs .................................................... 5 |
| Bankruptcy Cases....................................... 1 | Dataroom.................................................... 18 |
| Bankruptcy Code ........................................ 1 | Deposit ......................................................... 7 |

Effect ................................................. 49
Enforceability Exceptions ........................ 10
Escrow Agent ...................................... 7
Excluded Assets ................................... 3
Excluded Contracts ................................ 3
Excluded Liabilities ............................... 5
Express Representations ......................... 18
Fundamental Representations ................. 32
Guaranteed Obligations ........................ 30
Holdings ............................................ 1
Information Presentation ........................ 18
Laws ................................................. 12
Material Contract ................................. 12
Outside Date ....................................... 33
Parties ............................................... 1
Party ................................................. 1
Permits .............................................. 12

Projections ......................................... 29
Purchase Price ..................................... 7
Purchaser ........................................... 1
Purchaser Released Claims ..................... 42
Purchaser Released Parties ..................... 42
Purchaser Releasing Parties .................... 42
School Purchaser .................................. 1
Seller ................................................ 1
Seller Released Claims .......................... 43
Seller Released Parties .......................... 43
Sellers ............................................... 1
Successful Bidder ................................. 22
Transfer Offer ..................................... 26
Transfer Taxes .................................... 34
Transferred Employees .......................... 26
WARN Act .......................................... 16

11.3 <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement, or other document contemplated hereby or delivered hereunder.

(a) Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b) The terms "hereof," "herein," and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c) Whenever the words "include," "includes," or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d) The words "to the extent" shall mean "the degree by which" and not simply "if."

(e) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)      Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)      The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)      All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)      Any document or item will be deemed "delivered," "provided," or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) uploaded to the Dataroom at least three Business Days prior to the Closing, or (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors.

(k)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      Each reference to NS Purchaser shall be deemed to refer to each of the NS School Purchaser and the NS Clinic Purchaser, and each of the NS School Purchaser and the NS Clinic Purchaser shall be jointly and severally liable for all obligations of NS Purchaser hereunder.

(n)      Each reference to PM Purchaser shall be deemed to refer to each of the PM Non-Clinic Purchaser and the PM Clinic Purchaser, and each of the PM Non-Clinic Purchaser and the PM Clinic Purchaser shall be jointly and severally liable for all obligations of PM Purchaser hereunder.

(o)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(p)      A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow.*]

58

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

**SH VARSITY ACQUISITION SUB, LLC**

By: _____
Name: Jonathan Bicknell
Title:   President and Chief Executive Officer

**YOUR LIFE ABA VA, LLC**

By: _____
Name: Jonathan Bicknell
Title:   President and Chief Executive Officer

**GUARANTOR:**

**SBH INTERMEDIATE HOLDINGS, L.P.**


By:   _____
Name:  Jonathan Bicknell
Title:   President and Chief Executive Officer

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

**PROUD MOMENTS MSO, LLC**

By: _____
Name: Matt Henn
Title:   Chief Executive Officer

**PROUD MOMENTS LICENSED BEHAVIOR ANALYSTS, PLLC**

By: _____
Name: Matt Henn
Title:   Chief Executive Officer

**GUARANTOR:**

**PROUD MOMENTS INTERMEDIATE HOLDINGS, LP**

By: _____
Name: Will Sorin
Title: Vice President

**SELLERS:**

Card Holdings, LLC

By: _____
Name: _____
Title: _____

Card Intermediate Holdings I, LLC

By: _____
Name: _____
Title: _____

Card Intermediate Holdings II, LLC

By: _____
Name: _____
Title: _____

Center for Autism and Related Disorders, LLC

By: _____
Name: _____
Title: _____

SKILLS Global, LLC

By: _____
Name: _____
Title: _____

## **EXHIBIT A**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

*[See attached.]*

## FORM OF
## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of [●], 2023, by and between [Purchaser], a [●] ("Purchaser"), Card Holdings, LLC, a Delaware limited liability company ("Holdings") and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "Seller" and collectively "Sellers").

WHEREAS, reference is hereby made to that certain Asset Purchase Agreement, dated as of [●] (the "APA"), by and between Purchaser and Sellers and the Guarantors party thereto, pursuant to which each Seller has agreed to sell, contribute and assign to Purchaser, and Purchaser has agreed to purchase and accept from each Seller, the Acquired Assets, and to assume the Assumed Liabilities, for good and valuable consideration and in accordance with the terms, and subject to the conditions, set forth in the APA; and

WHEREAS, Sellers desire to deliver to Purchaser such instruments of contribution, transfer, conveyance, assignment and delivery as are required to vest in Purchaser all rights in, to and under the Acquired Assets, in each case, free and clear of any Encumbrances, other than Permitted Encumbrances, and Purchaser desires to deliver to Sellers such instruments as are required in order to effectuate and evidence the assumption by Purchaser of the Assumed Liabilities.

NOW, THEREFORE, pursuant to the APA and in consideration of the mutual promises contained therein, and for other good and valuable consideration, the receipt and sufficiency of which Sellers and Purchaser acknowledge, the parties hereto agree as follows:

1.      Each capitalized term used, but not otherwise defined herein, shall have the meaning ascribed to such terms in the APA.

2.      Effective as of the Closing, in accordance with the terms, and subject to the conditions, set forth in the APA, each Seller hereby sells, conveys, assigns, transfers and delivers to Purchaser all of such Seller's right, title and interest in and to the Acquired Assets, in each case, free and clear of any Encumbrances, other than Permitted Encumbrances. Purchaser hereby purchases, acquires, and accepts the Acquired Assets.

3.      Effective as of the Closing, in accordance with the terms, and subject to the conditions, set forth in the APA and the Sale Order, Purchaser hereby assumes and agrees to pay, perform or discharge when due or required to be performed, as the case may be, the Assumed Liabilities.

4.      Nothing in this Agreement shall be deemed to supersede, limit, qualify, enlarge or modify any of the provisions of the APA, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the APA. If any conflict exists between the terms of this Agreement and the terms of the APA, the terms of the APA shall govern and control.

5.      This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by each of the parties hereto. No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party or such holder under or by reason of this Agreement.

6.      This Agreement and all rights, interests or obligations hereunder, by or on behalf of any of the parties hereto, shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by any Seller, without the prior written consent of Purchaser, and neither this Agreement nor any rights, interests or obligations hereunder may be assigned or delegated by Purchaser (other than to an Affiliate of Purchaser) without the prior written consent of each Seller. Any attempted assignment in violation of this Section 6 shall be void *ab initio*. This Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

7.      This Agreement, and all claims, disputes or causes of action (whether in contract or in tort, at law or in equity or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance or enforcement of this Agreement, shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State that would cause the application of the laws of any jurisdiction other than the State of Delaware.

8.      This Agreement shall be effective as of the Closing.

9.      From time to time following the date hereof, if any further action is reasonably necessary to carry out the purposes of this Agreement, each of the parties hereto will take such further action (including the execution and delivery of such further instruments and documents) that is reasonably necessary or appropriate to effectuate and perform the provisions of this Agreement.

10.     This Agreement may be executed in two or more counterparts (including by means of email in .pdf format), each of which shall be deemed an original, and all of which shall be considered one and the same agreement, and shall become effective when two or more such counterparts have been signed by each of the parties and delivered to the other party (it being understood that all parties need not sign the same counterpart).

**[*Remainer of this page is intentionally left blank*]**

2

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**SELLERS**:

CARD HOLDINGS, LLC

By: _____
Name:
Title:

CARD INTERMEDIATE HOLDINGS I, LLC

By: _____
Name:
Title:

CARD INTERMEDIATE HOLDINGS II, LLC

By: _____
Name:
Title:

CENTER FOR AUTISM AND RELATED DISORDERS, LLC

By: _____
Name:
Title:

SKILLS GLOBAL, LLC

By: _____
Name:
Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**PURCHASER:**

[●]

By: _____
Name:
Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**Exhibit 1(c)**

**Lorient Backup Bidder APA**

**Execution**
CONFIDENTIAL

**ASSET PURCHASE AGREEMENT**

**DATED AS OF JULY 25, 2023**

**BY AND AMONG**

**BEHAVIOR FRONTIERS, LLC, AS PURCHASER,**

**AND**

**CARD HOLDINGS, LLC**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

# TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS;  ASSUMPTION OF ASSUMED LIABILITIES**................................................................................................1
1.1        Purchase and Sale of the Acquired Assets ........................................1
1.2        Excluded Assets ................................................................................3
1.3        Assumption of Certain Liabilities .....................................................5
1.4        Excluded Liabilities ..........................................................................5
1.5        Assumption/Rejection of Certain Contracts .....................................6

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ....................................................7
2.1        Consideration; Payment ....................................................................7
2.2        Deferred Payments............................................................................8
2.3        Deposit ............................................................................................10
2.4        Closing ............................................................................................11
2.5        Closing Deliveries by Sellers..........................................................11
2.6        Closing Deliveries by Purchaser .....................................................12
2.7        Withholding .....................................................................................12

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ............................12
3.1        Organization and Qualification .......................................................12
3.2        Authorization of Agreement ............................................................12
3.3        Conflicts; Consents .........................................................................13
3.4        Real Property ..................................................................................13
3.5        Contracts .........................................................................................14
3.6        No Litigation ...................................................................................16
3.7        Permits; Compliance with Laws ......................................................16
3.8        Environmental Matters ....................................................................17
3.9        Intellectual Property ........................................................................17
3.10      Tax Matters .....................................................................................19
3.11      Employees .......................................................................................19
3.12      Affiliate Transactions......................................................................20
3.13      Brokers ............................................................................................21
3.14      Intentionally Omitted. .....................................................................21
3.15      Financial Statements .......................................................................21
3.16      No Other Representations or Warranties ..........................................21

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ........................22
4.1        Organization and Qualification........................................................22
4.2        Authorization of Agreement.............................................................22
4.3        Conflicts; Consents .........................................................................23
4.4        Financing..........................................................................................23
4.5        Brokers ............................................................................................23
4.6        No Litigation ...................................................................................23
4.7        Certain Arrangements......................................................................23
4.8        Solvency..........................................................................................24
4.9        No Additional Representations or Warranties ..................................24
4.10      No Outside Reliance ........................................................................24

i

# TABLE OF CONTENTS

**Page**

ARTICLE V BANKRUPTCY COURT MATTERS ......................................................**25**
5.1      Bankruptcy Actions ..................................................................25
5.2      Cure Costs ...............................................................................26
5.3      Sale Order ...............................................................................27
5.4      Approval .................................................................................27

ARTICLE VI COVENANTS AND AGREEMENTS .........................................**27**
6.1      Conduct of the Business...........................................................27
6.2      Access to Information ..............................................................29
6.3      Employee Matters ...................................................................30
6.4      Regulatory Approvals ..............................................................32
6.5      Reasonable Efforts; Cooperation .............................................33
6.6      Further Assurances..................................................................34
6.7      Insurance Matters ...................................................................34
6.8      Receipt of Misdirected Assets; Liabilities ..............................34
6.9      Acknowledgment by Purchaser ...............................................34

ARTICLE VII CONDITIONS TO CLOSING ......................................................**36**
7.1      Conditions Precedent to the Obligations of Purchaser and Seller ..........36
7.2      Conditions Precedent to the Obligations of Purchaser .............36
7.3      Conditions Precedent to the Obligations of Seller....................37
7.4      Waiver of Conditions ..............................................................37

ARTICLE VIII TERMINATION ...............................................................**37**
8.1      Termination of Agreement.......................................................37
8.2      Effect of Termination ..............................................................39

ARTICLE IX TAXES ...............................................................................**39**
9.1      Transfer Taxes ........................................................................39
9.2      Cooperation ............................................................................39

ARTICLE X MISCELLANEOUS ................................................................**40**
10.1     Non-Survival of Representations and Warranties and Certain Covenants;
         Certain Waivers ......................................................................40
10.2     Expenses .................................................................................40
10.3     Notices ....................................................................................41
10.4     Binding Effect; Assignment.....................................................42
10.5     Amendment and Waiver ..........................................................42
10.6     Third Party Beneficiaries ........................................................42
10.7     Non-Recourse .........................................................................43
10.8     Severability .............................................................................43
10.9     Construction ............................................................................43
10.10    Schedules ................................................................................43
10.11    Complete Agreement ..............................................................44
10.12    Specific Performance ..............................................................44
10.13    Jurisdiction and Exclusive Venue ............................................45

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 10.14 | Governing Law; Waiver of Jury Trial | 45 |
| 10.15 | No Right of Set-Off | 46 |
| 10.16 | Counterparts and PDF | 46 |
| 10.17 | Publicity | 46 |
| 10.18 | Bulk Sales Laws | 47 |
| 10.19 | Fiduciary Obligations | 47 |
| 10.20 | Release | 47 |
| 10.21 | Sellers' Representative | 48 |
| **ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** | | **49** |
| 11.1 | Certain Definitions | 49 |
| 11.2 | Index of Defined Terms | 57 |
| 11.3 | Rules of Interpretation | 58 |

## INDEX OF EXHIBITS

EXHIBIT A    CONTRIBUTION MARGIN CALCULATION METHODOLOGY

EXHIBIT B    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of July 25, 2023, is made by and among Behavior Frontiers, LLC, a California limited liability company ("Purchaser"), and Card Holdings, LLC a Delaware limited liability company ("Holdings") and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on June 11, 2023, Sellers commenced voluntary cases (collectively, the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. 23-90709 (Bankr. S.D.TX);

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order; and

WHEREAS, in connection with the Auction, the Sellers also entered into that certain Asset Purchase Agreement with respect to assets and liabilities in the States of Virginia, New York and New Jersey (in the form provided to Purchaser as of the date hereof, the "Other APA"), which will also apply in the event that the Purchaser hereunder is called upon to act as Backup Bidder in the event the Successful Bidder fails to consummate the transactions.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "Acquired Assets" means all of the properties, rights, interests and other assets of each Seller as of the Closing solely to the extent exclusively or primarily related to the Business (unless otherwise specified herein), whether tangible or intangible, real, personal, or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared

in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by any Seller after the date hereof and prior to the Closing, solely to the extent exclusively or primarily related to the Business (unless otherwise specified herein), and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets and the assets expressly included as "acquired assets" pursuant to the Other APA:

(a)    subject to <u>Section 1.5</u>, all Contracts to which any Seller is a party to the extent exclusively or primarily related to the Business as set forth on <u>Schedule 1.1(a)</u>, including national payor Contracts if in part related to the Business (other than the Tricare East national payor Contract, which shall be an Excluded Asset), including all purchase orders related to the Business, to the extent assignable under applicable Law (the "<u>Assigned Contracts</u>");

(b)    all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, in each case to the extent exclusively or primarily related to the Business;

(c)    all Documents and data to the extent exclusively or primarily related to the Business;

(d)    all Patient Records to the extent exclusively or primarily related to the Business;

(e)    the Leased Real Property listed on <u>Schedule 1.1(e)</u> (including the leases related thereto the "<u>Acquired Leased Real Property</u>"), including any security deposits, Leasehold Improvements and all fixtures, improvements, and appurtenances thereto in each case with respect to such Acquired Leased Real Property, including as set forth on <u>Schedule 1.1(e)</u>;

(f)    all tangible assets (including Equipment, inventory, furniture, electronics, phones, tablets, computers, and supplies) of the Sellers to the extent exclusively or primarily related to the Business, including the tangible assets of Sellers located at or otherwise used (including by patients or employees) in connection with any Acquired Leased Real Property and any such tangible assets on order to be delivered to any Seller to the extent exclusively related to such Acquired Leased Real Property, including as set forth on <u>Schedule 1.1(f)</u>;

(g)    all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract) to the extent exclusively or primarily related to the Business, including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case arising out of or relating to events or circumstances occurring from and after the Closing Date solely to the extent with respect to any of the other specifically listed Acquired

2

Assets or Assumed Liabilities (in each case, other than against any Seller or its Affiliates), including as set forth on <u>Schedule 1.1(g)</u>;

(h)  to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor, in each case to the extent exclusively or primarily related to the Business, including as set forth on <u>Schedule 1.1(h)</u>;

(i)  all Intellectual Property of the Sellers, all rights to use and collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including as set forth on <u>Schedule 1.1(i)</u>;

(j)  all inventory and supplies of the Sellers to the extent exclusively related to the Business;

(k)  all goodwill, payment intangibles and general intangible assets and rights of Sellers to the extent exclusively related to the Business;

(l)  (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law of the Sellers or their estates against (1) any member of the Seller Group or (2) to the extent related to the Business, any other person and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller (including in its capacity as the managing member or manager of another Person) or its estate against any member of the Seller Group, in each case, arising out of or relating to events occurring on or prior to the Closing Date, other than any claim under this Agreement or any Transaction Agreement (the claims and causes of action set forth in this <u>Section 1.1(l)</u> "<u>Transferred Claims</u>") (which Transferred Claims against any member of the Seller Group are for the avoidance of doubt Purchaser Released Claims pursuant to <u>Section 10.20(a)</u>); and

(m)  to the extent transferable, all active service authorizations, credentialing, and related documentation to the extent exclusively or primarily related to Business and necessary to ensure continuity of care and operations of the Business with respect to any acquired Governmental Authorizations (if any) and Third Party Payor contracts to the extent related to the Business.

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under (x) any properties, rights, interests and other assets of the Sellers that are not exclusively related to the Business and (y) the following properties, rights, interests and other assets of Sellers (including to the extent related to the Business) (collectively, the "<u>Excluded Assets</u>"):

(a)  all Cash and Cash Equivalents, all bank accounts, and all deposits (including maintenance deposits, and security deposits for electricity, telephone or otherwise,

other than security deposits for rent related to Acquired Leased Real Property) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)  all Contracts of Sellers other than the Assigned Contracts (the "Excluded Contracts");

(c)  all Documents and data other than to the extent exclusively or primarily related to the Business;

(d)  all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the Transactions, or the Bankruptcy Case, consisting of or related to (i) bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (ii) privileged materials, documents and records of any Seller or any of its Affiliates solely relating to this Agreement, the other Transaction Agreements, the Transactions, or the Bankruptcy Case, (iii) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, or (vi) any other files or records to the extent relating to any Excluded Assets, Excluded Liabilities, or the Bankruptcy Case;

(e)  all current and prior insurance policies or employee benefit plans of any Seller, including for the avoidance of doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)  all Equity Interests of any Seller or any of their respective Subsidiaries;

(g)  (i) all rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (other than Transferred Claims), and (iii) all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)  Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document executed and delivered between any Seller and Purchaser in connection with the Transactions, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(i)  all Tax refunds, Tax attributes and Tax assets;

(j)  all tangible assets (including Equipment, inventory and supplies) to the extent not exclusively related to the Business; and

(k)  all Liabilities or other amounts owing from any Sellers or any of their respective Subsidiaries.

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)   all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing Date;

(b)   all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs"), subject to Section 2.1(a);

(c)   all Liabilities (including all government charges or fees) that become due or arising out of the ownership or operation of the Acquired Assets incurred in connection with dates of service from and after the Closing Date;

(d)   Liabilities for vacation, sick leave and other paid time off related to the Transferred Employees in accordance with Article VI (which estimated amount as of the date hereof and estimated as of September 15, 2023 is set forth on Schedule 1.3(d), which estimates for the avoidance of doubt do not limit the Liabilities assumed pursuant to this Section 1.3(a));

(e)   all current Liabilities, including all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable) of Sellers to the extent related to the Business or the Acquired Assets incurred in connection with dates of service from and after the Closing Date; and

(f)   all Taxes with respect to the Acquired Assets or the Business for any taxable period (or portion thereof) beginning after the Closing Date and 100% of all Transfer Taxes.

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, Purchaser shall have no liability or responsibility to any employee of Sellers who is not a Transferred Employee and Purchaser's assumption of liability to Transferred Employees is limited as set forth above and as otherwise set forth in this Agreement.

1.5     <u>Assumption/Rejection of Certain Contracts</u>.

(a)     <u>Assumption and Assignment of Executory Contracts</u>. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases to which any Seller is a party that are Assigned Contracts and take all other actions reasonably necessary to cause such Contracts to be assumed by Sellers and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts at Closing. The Sale Order shall provide that as of and conditioned on the occurrence of the Closing, the applicable Sellers shall assume and assign or cause to be assigned to Purchaser, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, all included in a notice filed with the Bankruptcy Court. Such notice shall also set forth Sellers' good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by Sellers based on their books and records or as otherwise determined by the Bankruptcy Court. At the Closing, Sellers shall, pursuant to the Sale Order, and the Assignment and Assumption Agreement(s) assume and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by any such Seller to Purchaser pursuant to sections 363 and 365 of the Bankruptcy Code, subject to adjustment pursuant to <u>Section 1.5(b)</u>. At the Closing, Purchaser shall (i) subject to <u>Section 2.1(a)</u>, pay all Cure Costs as part of the Cash Payment (as defined below) and (ii) assume, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code.

(b)     <u>Excluding or Adding Assigned Contracts Prior to Closing</u>. Purchaser shall have the right to notify Sellers in writing if Purchaser wishes to add Contracts to which any Seller is a party as an Assigned Contract (other than those Contracts set forth on <u>Schedule 1.2(b)(ii)</u> or the "assigned contracts" pursuant to the Other APA (in the event the purchaser thereunder is acting as "backup bidder")) up to five (5) Business Days prior to Closing; provided, that, any Cure Costs associated with such Contracts are accounted for in the Incremental Cure Cost Amount, and if Purchaser so wishes to add any such Contracts, then such Contracts shall be automatically deemed added to the Schedules related to Assigned Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by the applicable Seller to sell and assign to Purchaser, in each case, without any adjustment to the Purchase Price (other than with respect to the Incremental Cure Cost Amount as set forth above). Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable solely after the Closing.

(c)     <u>Non-Assignment</u>.

(i)     Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller or terminated by a Seller or any other party thereto, or terminates or expires by its terms, on or prior to

such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(ii)     Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this Section 1.5(c)(ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases or dissolution of the applicable Seller(s), if shorter), Sellers and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

**ARTICLE II**
**CONSIDERATION; PAYMENT; CLOSING**

2.1     Consideration; Payment.

(a)   The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities, (ii) a cash payment of $30,267,138 (the "Cash Payment"), and (iii) the Deferred Payments, to the extent earned in accordance with Section 2.2. Notwithstanding anything to the contrary in this Agreement, all Cure Costs will be paid solely from the Cash Payment.

(b)   At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller an amount in cash (the "Closing Date Payment") equal to the Cash Payment plus the Security Deposit Amount plus the Incremental Cure Cost Amount (if any) minus an amount equal to the Deposit.

(c)   The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

2.2      Deferred Payments.

(a)   If the Acquired Business Performance meets or exceeds the Contribution Margin for the twelve (12) month period ending on the first anniversary of the Closing (the "First Measurement Period"), then the Purchaser will pay to Sellers a cash amount equal to $5,000,000 (the "First Deferred Payment"). If the Acquired Business Performance meets or exceeds the Contribution Margin for the twelve (12) month period ending on the second anniversary of the Closing (the "Second Measurement Period" and, together with the First Measurement Period, the "Measurement Periods" and each, a "Measurement Period"), then the Purchaser will pay to the Sellers a cash amount equal to $15,000,000 (the "Second Deferred Payment" and, together with the First Deferred Payment, the "Deferred Payments" and each, a "Deferred Payment"). For the avoidance of doubt, the payment of the Deferred Payment with respect to a particular Measurement Period is contingent upon the Acquired Business Performance equaling or exceeding the Contribution Margin for such Measurement Period.

(b)   Within sixty (60) days of the end of each Measurement Period, Purchaser will prepare and deliver to Sellers a statement setting forth the Purchaser's calculation of the Acquired Business Performance for such Measurement Period (each, an "Acquired Business Performance Statement"), in each case supported by back-up calculations and data which are reasonably similar in degree of detail to the calculations set forth on Exhibit A. If the Sellers have any objections to an Acquired Business Performance Statement prepared by Purchaser, then Sellers shall deliver to Purchaser within thirty (30) days after delivery of such Acquired Business Performance Statement (such thirty (30) day period, the "Review Period") a detailed written statement (the "Objection Statement") describing (a) which items contained in such Acquired Business Performance Statement have not been prepared in accordance with this Agreement, (b) the basis for Sellers' disagreement with the calculation of such items and (c) Sellers' proposed resolution for each item in dispute. If Sellers fail to deliver an Objection Statement within the Review Period, then the Acquired Business Performance Statement shall become final and binding on all Parties. Sellers shall be deemed to have agreed with all amounts and items contained or reflected in such Acquired Business Performance Statement to the extent such amounts or items are not disputed in the Objection Statement. If Sellers deliver an Objection Statement within the Review Period, then Sellers and Purchaser will use commercially reasonable efforts to resolve any disputes set forth therein, but if a final resolution is not obtained within thirty (30) days after the delivery of any Objection Statement, then any remaining matters which are in dispute will be resolved by an independent accounting firm (the "Accounting Referee"), selected by mutual agreement of the Sellers and Purchaser (and in each

case for the benefit of the Parties) (provided, that, if the parties cannot so agree, then the Accounting Referee shall be selected among third party independent accounting firms decided by mutual agreement of the firm selected by the Purchaser, on the one hand, and the firm selected by the Sellers, on the other hand). The Accounting Referee will prepare and deliver a written report to Purchaser and Sellers and will submit a proposed resolution of such unresolved disputes promptly, but in any event within thirty (30) days after the dispute is submitted to the Accounting Referee. The Accounting Referee's determinations shall be based solely on the submissions by the Parties (and not by independent review), this Agreement and the applicable defined terms set forth in this Agreement. None of Sellers or the Purchaser, or their respective representatives, will have any ex parte communications or meetings with the Accounting Referee concerning the subject matter hereof without the prior written consent of the other Party. The Accounting Referee's determination of such unresolved disputes will be final and binding upon all Parties and not subject to review by a court or other tribunal; provided, however, that no such determination shall be any more favorable to Purchaser than is set forth in the Acquired Business Performance Statement nor any more favorable to Sellers than is proposed in the Objection Statement. The costs, expenses and fees of the Accounting Referee shall be borne by Purchaser, on the one hand, and Sellers, on the other hand, in proportion to the amounts by which the proposals of Purchaser and Sellers, respectively, differed from the final determination of the Acquired Business Performance as determined by the Accounting Referee under this Section 2.2(b), and the Accounting Referee shall determine such proportions in the Accounting Referee's final determination of the Acquired Business Performance.

(c)    Any Deferred Payment that Purchaser is required to pay pursuant to Section 2.2(a) shall be paid in full no later than five (5) Business Days following the date upon which the determination of the Acquired Business Performance in relation to the Contribution Margin becomes final and binding upon the Parties as provided in Section 2.2(b); provided, that for the avoidance of doubt, if Sellers inform Purchaser in writing prior to the end of the Review Period that they have no objections to the Contribution Margin Statement (a "No Objection Statement"), then the determination of the Contribution Margin shall be deemed final and binding as of the date of receipt of such No Objection Statement and the applicable Deferred Payment (if earned and payable) shall be paid in full no later than five (5) Business Days following the date of receipt of such No Objection Statement. Any Deferred Payment payable hereunder shall be paid in cash via wire transfer to an account or accounts designated in writing by Sellers.

(d)    During the Review Period and at all times until the determination of the Acquired Business Performance for each Measurement Period, respectively, is final and binding in accordance with the terms hereof, Purchaser shall provide the Sellers and their representatives with access to information, records and personnel related to the Business (or the amounts set forth in an Acquired Business Performance Statement) sufficient for the Sellers and such representatives to review in full the calculation of Acquired Business Performance, in each case upon reasonable advance written notice and at normal business hours.

(e)    The Parties acknowledge and agree that (i) the contingent rights of the Sellers to receive any Deferred Payment shall be unsecured, shall not be represented by any form of certificate or other instrument, and do not constitute an equity or ownership interest in Purchaser, (ii) Sellers shall not have any rights as a securityholder of Purchaser as a result of

the Sellers' contingent rights to receive any Deferred Payment hereunder, (iii) no interest is payable with respect to any Deferred Payment, and (iv) there is no assurance that Sellers will receive any Deferred Payment and Purchaser has not promised or projected any Deferred Payment, in each case, unless earned and payable pursuant to the terms of this Agreement. Notwithstanding the foregoing, Purchaser will operate the Business in good faith from and after the Closing, and shall not take any action the intent of which is to reduce the likelihood that Sellers will achieve the Deferred Payments hereunder.

(f)    Tax Treatment of Payments. Any Deferred Payment shall be treated as an adjustment to the Cash Payment for all Tax purposes.

(g)    "Acquired Business Performance" means, for a given period, an amount equal to (i) the aggregate amount of revenue received by the Business during the applicable Measurement Period (including without limitation revenue received in respect of operations at each Acquired Leased Real Property or remote service location, revenues received in respect of patients being treated at an Acquired Leased Real Property or remote service location (or any replacement or consolidated location for any of the foregoing as it pertains to patients of such closed or consolidated location as of the time of such replacement or consolidation), minus (ii) the aggregate amount of direct costs associated with or attributable to the Business during such Measurement Period, as expensed consistent with past practice of the Business and including administrative and "bad debt" expenses associated with the Business (but excluding any overhead costs or other costs of the type which are not included in the calculation of "Contribution Margin" by the Sellers as of the date hereof). An example calculation (for illustrative purposes only) of Acquired Business Performance for the twelve-month period ending May 2023 is attached hereto as Exhibit A.

(h)    "Contribution Margin" means $18,250,000.

2.3    Deposit.

(a)    Purchaser has, on or prior to the date hereof, made an earnest money deposit with Acquiom Clearinghouse LLC (the "Escrow Agent") in the amount equal to $2,000,000 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Escrow Agent in accordance with the escrow agreement entered into on the date hereof among Holdings, Purchaser, and the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)    If this Agreement has been terminated by Holdings pursuant to Section 8.1(d) or 8.1(f) (or by Purchaser pursuant to Section 8.1(b) or 8.1(c), in each case in circumstances where Holdings would be entitled to terminate this Agreement pursuant to Section 8.1(d) or 8.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any.

(c)    If this Agreement has been terminated by any Party, other than as contemplated by Section 2.3(b), then the Deposit, together with all received investment income,

10

if any, shall be returned to Purchaser as soon as practicable, but in no event later than five (5) Business Days after such termination.

(d)    The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 2.3(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to Seller; provided, that if Purchaser is named the Backup Bidder, the Deposit shall be returned to Purchaser within one (1) Business Day after the entry of the Sale Order; provided, further, that in the event that Purchaser is called upon to act as Backup Bidder to consummate the transactions hereunder in accordance with Section 5.1(e), Purchaser will fund the Deposit (in accordance with Section 2.3(a)) within three (3) Business Days after written notice thereof.

2.4    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement and the Sale Order (the "Closing") will take place by telephone conference and electronic exchange of documents at 10:00 a.m. Eastern Time on the second (2nd) Business Day following full satisfaction or due waiver (in writing by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.5    Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)    a bill of sale and assignment and assumption agreement in substantially the form of Exhibit B attached hereto (the "Assignment and Assumption Agreement") duly executed by the applicable Sellers;

(b)    an IRS Form W-9 or IRS Form W-8, as applicable, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; and

(c)    an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Holdings certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied; and

(d)    in the event that Sellers transfer, or make any notifications or filings with respect to the transfer of, any of the Acquired Assets to the Successful Bidder after the date hereof, and Purchaser is subsequently called upon to act as Backup Bidder in accordance with the terms of this Agreement, evidence reasonably satisfactory to Purchaser that (i) any such transfer has been unwound and any such transferred Acquired Assets have been returned to the

11

Sellers and (ii) any such notifications or filings with respect to such Acquired Assets have been updated to reflect Purchaser as the transferee thereof.

2.6     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)   the Closing Date Payment;

(b)   the Assignment and Assumption Agreement, duly executed by Purchaser; and

(c)   an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.7     Withholding. Notwithstanding any other provision in this Agreement, Purchaser shall have the right to deduct and withhold any required Taxes from any payments to be made hereunder. To the extent that amounts are so withheld and paid to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to the applicable Seller or any other recipient of payment in respect of which such deduction and withholding was made.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered by Sellers concurrently herewith and subject to Section 10.10, Sellers represent and warrant to Purchaser as follows.

3.1     Organization and Qualification. Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation.

3.2     Authorization of Agreement. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is

subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3     Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are timely made, given or obtained (as applicable), neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the Transactions, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Material Contract or accelerate any Seller's obligations under any such Material Contract or (iii) conflict with or violate, in any material respect, any Laws applicable to any Seller or any Subsidiary of any Seller or by which any of its or their assets are bound or any of the Permits held by any Seller or any Subsidiary of any Seller, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify any Permit, (iv) alter or impair the ability of any Seller or any Subsidiary of any Seller to conduct their respective business as presently conducted, or (v)result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any material properties or assets of any Seller, except in the case of clauses (ii) - (v), as would not, individually or in the aggregate, reasonably be expected to be material to the Business.

3.4     Real Property.

(a)   One or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers which constitutes an Acquired Asset as set forth on Schedule 1.1(e) (the "Leased Real Property"), free and clear of all Encumbrances (other than Permitted Encumbrances). None of the Sellers owns any interest in any real property (other than leasehold, subleasehold, or license interests).

(b)   Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs, subject to Section 2.1(a)) and except as a result of the commencement of the Bankruptcy Case, Sellers hold good title to, or a valid leasehold interest in, all of the material tangible property (including, without limitation, all trade fixtures, machinery, equipment, inventory, supplies, tools, and other articles of personal property) necessary in the conduct of the Business as now conducted, free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property that is not material to Sellers and the Acquired Assets, taken as a whole.

(c)   The Leased Real Property comprises all of the real property that is occupied or used in connection with the Acquired Assets.

3.5    <u>Contracts</u>.

(a)   <u>Schedule 3.5</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets or to the extent exclusively or primarily related to the Business (in each case, excluding any Seller Plan), in each case which is an Assigned Contract, that:

(i)    relates to loans to or from a representative or Affiliate of any Seller;

(ii)    is between any Seller, on the one hand, and, on the other hand, any owner, officer or director of such Seller or any entity in which any Immediate Family Member of any such Person owns any material beneficial interest;

(iii)    involves annual payments or consideration furnished by or to any Seller of more than $100,000.00 which are not cancelable (without penalty, cost or other liability) by giving notice of thirty (30) days or less (other than purchase orders with suppliers or customers entered into in the Ordinary Course);

(iv)    involves capital expenditures under which any Seller has remaining obligations in excess of $150,000.00, individually or in the aggregate;

(v)    relates to any material license of material Intellectual Property used or owned by any Seller other than any (i) "shrink wrap" or other licenses for commercially available off-the-shelf software with a replacement cost or annual license, maintenance or subscription fees of less than $50,000.00 per year or (ii) licenses granted by or to suppliers, distributors and vendors in the Ordinary Course;

(vi)    under which any Person (other than an employee of a Seller) has developed Intellectual Property for any Seller that is used in and material to the Business or operations of such Seller or any of its Subsidiaries;

(vii)    was entered into to settle or resolve any Intellectual Property-related dispute or litigation under which any Seller has current material obligations, including settlement agreements, coexistence agreements, covenant not to sue agreements, and consent to use agreements;

(viii)    relates to indebtedness (whether incurred, assumed, guaranteed, or secured by any asset);

(ix)    relates to guarantees, or performance, bid or completion bonds, or surety agreements;

(x)    under which any Seller, individually or in the aggregate, has advanced or loaned any Person amounts involving an amount in excess of $150,000.00 individually, or $200,000.00 in the aggregate;

14

(xi)    is an employment, independent contractor, or consulting Contract with individual service providers of any Seller providing for annual base compensation in excess of $200,000.00 and which may not be terminated by such Seller without payment of severance (other than accrued compensation and benefits);

(xii)    provides for severance, retention, change of control, or other similar payments or any compensation arising or accelerating as a result of the consummation of the Transactions;

(xiii)    is an advertising or marketing Contract or any similar such agreements which provide for annual payments in excess of $50,000.00;

(xiv)    is a collective bargaining, labor-related, or other Contract with any union, works council or other labor organization covering employees of any Seller;

(xv)    is a Contract with a Third Party Payor Program with respect to the Business;

(xvi)    requires any Seller to purchase all or substantially all of its requirements of a particular product from a supplier;

(xvii)    relates to the formation, creation, governance, economics, or control of any joint venture, partnership or other similar arrangement;

(xviii) contains covenants regarding non-competition or otherwise prohibiting any Seller from engaging in any line of business or freely conducting its business or competing anywhere in the world;

(xix)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract pursuant to which any earn-out, indemnification or deferred or contingent payment obligations which remain outstanding that would reasonably be expected to involve payments by or to any Seller after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, inventory, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, inventory, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business of Sellers), in each case solely to the extent relating to the Business or the Acquired Assets;

(xx)    is a Government Contract; or

(xxi)    is a Contract not otherwise required to be disclosed pursuant to this Section 3.5(a) that are material to the business or operations of any Seller or any Subsidiary of any Seller or involves payments to or by any Seller or any Subsidiary of any Seller in excess of $100,000.00 in any twelve (12) month period.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by Purchaser of the applicable Contract in accordance with applicable Law (including satisfaction

15

by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller that is a party thereto and, to the Knowledge of Sellers, each other party thereto, is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller (other than with respect to late payments) under any Material Contract, (D) there are no events or conditions which constitute, or, after notice or lapse of time or both, will constitute a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) Sellers have not received any written notice from any Person that such Person intends to terminate, or not renew, any Material Contract, except in each case of clauses (A) through (E), as would not, individually or in the aggregate, reasonably be expected to be material to the Business.

3.6   <u>No Litigation</u>. Except as set forth in <u>Schedule 3.6</u>, there are no material Actions pending or, to the Knowledge of Sellers, threatened in writing against or affecting any of the Sellers that will materially adversely affect any Seller's performance of its obligations under this Agreement or the consummation of the Transactions.

3.7   <u>Permits; Compliance with Laws</u>.

(a)   Except as set forth in <u>Schedule 3.7(a)</u>, each Seller (solely with respect to the Business) is, and has been since January 1, 2020, in compliance in all material respects with all state or federal laws, statutes, or regulations ("<u>Laws</u>") or Orders, applicable to such Seller (solely with respect to the Business), and each Seller holds all material licenses, permits, certificates, registrations, accreditations, provider or billing numbers, approvals and authorizations (or exemptions or waivers therefrom) from Governmental Bodies necessary for the lawful conduct of the Business (collectively, "<u>Permits</u>").

(b)   Except as set forth on <u>Schedule 3.7(b)</u>, no Seller has, with respect to the Permits listed on <u>Schedule 1.1(h)</u>, received written notice from any Governmental Body since January 1, 2023 of: (A) any material citations, complaints, breach or violation of any such Permit; (B) that the applicable Governmental Body intends to cancel, revoke, terminate, suspend or not renew any such Permit; and (C) any material investigation or review being conducted by any Governmental Body that could result in the events described in (A) or (B), in each case that has not otherwise been remedied or resolved.

(c)   All clinical employees of the Sellers who are part of the Business who are required by applicable Laws or Third Party Payor Programs to hold a license, certification or other Governmental Body approval in order to provide clinical services to, on behalf of, or on the premises of the Business are, to the Knowledge of Sellers, duly licensed, certified or approved, as applicable, and to the Knowledge of Sellers, are in good standing with the applicable Governmental Body granting such license, certification or approval. To the Knowledge of Sellers, no such clinical employee: (i) is or has been listed on the Office of Inspector General's Excluded Individuals/Entities list prohibiting him or her from participating

16

in Governmental Programs; or (ii) has been indicted or convicted of a criminal or civil offense under any applicable Laws relating to healthcare.

(d)   Except as set forth on <u>Schedule 3.7(d)</u>, no Seller has received written notice of denial of payment, recoupment, withhold, suspension or overpayment from any Third Party Payor with respect to the Business exceeding $500,000.00 individually or $1,500,000.00 in the aggregate, which in either case is pending or remains outstanding.

3.8   <u>Environmental Matters</u>. (a) Sellers are, and have been since January 1, 2020, in compliance in all material respects with all applicable Environmental Laws with respect to the Business or Acquired Assets, (b) Sellers have not received any notice, complaint, suit, Order, decree, citation, demand, claim or potentially responsible party letter alleging that any Seller or the Acquired Assets are or may be in violation of or liable under, any Environmental Law that is outstanding, unresolved or that has unfilled obligations with respect to the Business or Acquired Assets, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, (c) Sellers possess and are and since January 1, 2020 have been in compliance in all material respects with all Permits required under Environmental Laws for the operation of the Business and Acquired Assets ("<u>Environmental Permits</u>"), except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets or Assumed Liabilities, (d) except as set forth in <u>Schedule 3.8</u>, there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened against any Seller with respect to the Business or Acquired Assets, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets or Assumed Liabilities (e) Sellers are not subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller with respect to the Business or Acquired Assets, except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets or Assumed Liabilities, (f) no Seller has used, treated, stored, manufactured, disposed of, arranged for or permitted the disposal of, transported, handled, released or exposed any Person to any Hazardous Substance, or owned or operated any property or facility, in the case of each of the foregoing, in a manner (i) that requires Sellers or any other Person to conduct remedial activities, or that (ii) has given or would give to rise to any Liability to or Action against any Seller, under Environmental Laws, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Business, Acquired Assets or Assumed Liabilities, (g) to the Knowledge of Sellers, there have been no releases, spills, discard or other disposal of Hazardous Substances at, under or migrating to or from the Leased Real Property in quantities, concentrations or conditions that would reasonable be expected to give rise to an Environmental Claim against or any material Liability to any Seller under Environmental Laws and (h) copies of all material environmental assessments, investigations, audits and Environmental Claims relating to the Business, the Acquired Assets or any real property currently or formerly owned or leased by any Seller that are in the possession, custody or reasonable control of any Seller have been provided to Purchaser.

3.9   <u>Intellectual Property</u>.

(a)   <u>Schedule 3.9(a)</u> sets forth, as of the date hereof, a list of all Intellectual Property registrations or application for registration, including registered domain names,

17

material unregistered trademarks, and proprietary software owned or purported to be owned, by the Sellers in connection with the Business. Each such Intellectual Property registration is valid and subsisting. All necessary registration, maintenance and renewal fees in connection with such Intellectual Property have been paid.

(b)   Except as would not, individually or in the aggregate, be reasonably expected to be material to the Sellers, (i) Sellers own or have legally enforceable and sufficient rights to use all Intellectual Property necessary to the conduct of the Business with respect to the Acquired Assets as currently conducted free and clear of all Encumbrances (other than Permitted Encumbrances) and (ii) Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Intellectual Property and information with respect to the Acquired Assets; provided that nothing in this Section 3.9(b) shall be interpreted or construed as a representation or warranty with respect to whether there is any infringement, misappropriation, or violation of any Intellectual Property, which is the subject of Section 3.9(d).

(c)   Except as would not, individually or in the aggregate, be reasonably expected to be material to the Sellers, no Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and since January 1, 2023, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Intellectual Property owned by or exclusively licensed to any such Seller in respect of the Business or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person in the operation of the Business, in each case, with respect to the Acquired Assets.

(d)   Except as set forth on Schedule 3.9(d), (i) no Person has infringed, misappropriated or otherwise violated the rights of Sellers with respect to any Intellectual Property owned by or exclusively licensed to Sellers in respect of the Business and (ii) the operation of the Business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(e)   Except as would not, individually or in the aggregate, be reasonably expected to be material to the Sellers, each current and former employee and contractor who has contributed to the creation or development of any owned Intellectual Property with respect to the Acquired Assets has effectively transferred all of their rights to such intellectual property to the Sellers through a present assignment in writing or by operation of law. To the Knowledge of Sellers, none of the owned Intellectual Property with respect to the Acquired Assets was developed by or on behalf of, or using funding, grants or any other subsidies of, any Governmental Body or any university, and no government funding, facilities, faculty or students of a university, college, other educational institution or research center or funding from third parties or independent contractors concurrently working for a university, college, other educational institution or research center was used in the development of the owned Intellectual Property with respect to the Acquired Assets.

(f)   The owned Intellectual Property with respect to the Acquired Assets does not contain any software code that is licensed under any terms or conditions that impose any requirement on Seller, based on Seller's business as currently conducted, that any software

using, linked with, incorporating, distributed with, based on, derived from or accessing the software code: (i) be made available or distributed in source code form; (ii) be licensed for the purpose of making derivative works; (iii) be licensed under terms that allow reverse engineering, reverse assembly or disassembly of any kind; or (iv) be redistributable at no charge.

(g)   Except as would not, individually or in the aggregate, be reasonably expected to be material to the Sellers, none of Sellers, nor any other party acting on behalf of Sellers, has disclosed or delivered to any third party (other than to third parties performing work for Sellers), or permitted the disclosure or delivery by any escrow agent or other party of, any software or source code constituting owned Intellectual Property with respect to the Acquired Assets ("Source Code Assets"). To the Knowledge of Sellers, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time, or both) will, or would reasonably be expected to, require the disclosure or delivery by Sellers or any other party acting on behalf of Sellers to any third party of any Source Code Assets. Neither the execution of the Transactions document nor the consummation of any of the Transactions, in and of itself, would reasonably be expected to result in the release of any Source Code Assets from escrow.

3.10   Tax Matters.

(a)   Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all material Tax Returns with respect to the Acquired Assets required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are correct and complete in all material respects.

(b)   All material Taxes owed by a Seller with respect to the Acquired Assets that are due and payable on any Tax Return have been timely paid.

(c)   There are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)   None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(e)   Except to the extent that doing so would not adversely impact the Acquired Assets or the Purchaser's ownership of the Acquired Assets, none of the Sellers has participated in any "listed transaction" within the meaning of 26 C.F.R. § 1.6011-4(b)(2).

(f)   Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this Section 3.10 shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.11   Employees.

(a)   Schedule 3.11(a) sets forth a complete and correct list of all employees of the Sellers providing services to the Business as of the date hereof (including any employee on furlough and/or temporary layoff status), showing for each (i) name; (ii) hire date; (iii) current job title; (iv) part-time or full-time status, as applicable; (v) salaried or hourly; (vi) exempt or non-exempt status; (vii) current rate of compensation, including bonuses, commissions, incentive compensation, and equity-based compensation, if any; and (viii) the number of accrued but unused vacation, sick days, and/or paid time off. Schedule 3.11(a) also sets forth a complete and correct list of all the independent contractors who are individuals (excluding individuals leased through staffing agencies) or corporations leasing or providing the services of a single individual to the Business as of the date hereof.

(b)   None of the Sellers is party to any collective bargaining agreements or similar Contracts with any labor union applicable to any Business Employees. No employees are represented by a labor union or other employee representative body. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, (i) no written demand for recognition as the exclusive bargaining representative of any employees has been made to any Seller by or on behalf of any labor union in respect of Business Employees, and (ii) there is no pending or, to the Knowledge of Sellers, threatened, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the Business Employees.

(c)   Each Seller is in material compliance with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, human rights, pay equity, fair employment practices, collective bargaining, wages, and hours, benefits, leave from work, non-discrimination in employment, workers compensation, unemployment insurance, immigration and work authorization, exempt and non-exempt employee and individual independent contractor classification, occupational safety and health, and the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act") and any similar Law relating to plant closings and mass layoffs/terminations of employees, in each case with respect of the Business Employees. Except as would not, individually or in the aggregate, reasonably be expected to be material to the Business, no suits, charges, or administrative proceedings relating to any such Laws or regulation are pending, and, to the Knowledge of Sellers, except as set forth on Schedule 3.11(c), no suit, charge, or administrative investigation alleging a violation of any such applicable Law has been threatened, or a settlement agreement entered into by Seller with respect to any such applicable Law, in each case with respect to the Business Employees.

(d)   To the Knowledge of Sellers, there have been no workplace accidents, injuries, or exposures (including without limitation viral exposure, and including without limitation COVID-19) in the last twelve (12) months involving any Business Employee which are likely to result in, but have not yet resulted in, a claim for worker's compensation payments or benefits, or a violation of the Occupational Health and Safety Act (OSHA) or state or local equivalent against the Purchaser.

3.12   Affiliate Transactions. Except as set forth on Schedule 3.12, no Affiliate of any Seller, or, to the Knowledge of Sellers, any officer or director of any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or

actual Liability exceeding $500,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.13   <u>Brokers</u>. Except for Livingstone, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the Transactions based upon arrangements made by or on behalf of Sellers.

3.14   <u>Intentionally Omitted.</u>

3.15   <u>Financial Statements</u>.

(a)      Attached to <u>Schedule 3.15(a)</u> are Center for Autism and Related Disorders, LLC's and its consolidated Subsidiaries' (i) audited consolidated balance sheets as of December 31, 2021 and as of December 31, 2020, and the related consolidated statements of operations, comprehensive loss, shareholders' equity and cash flows for each fiscal year then ended (collectively, the "<u>Audited Financial Statements</u>"), and (ii) unaudited consolidated income statement and balance sheet of Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries for the twelve (12) month period ended December 31, 2022 (the "<u>2022 Financial Statements</u>") and (iii) unaudited consolidated income statement and balance sheet of Center for Autism and Related Disorders, LLC and its consolidated Subsidiaries for the five (5) month period ended May 31, 2023 (the "<u>Interim Financial Statements</u>" and together with the Audited Financial Statements and the 2022 Financial Statements, the "<u>Financial Statements</u>").

(b)   The Audited Financial Statements and the 2022 Financial Statements have been prepared in all material respects in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and the Financial Statements fairly present in all material respects the consolidated financial position of Center for Autism and Related Disorders, LLC and its respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto; <u>provided</u>, that the Interim Financial Statements do not include year-end audit adjustments and the notes thereto and do not include the impact of accounting for income Taxes or other customary audit adjustments.

3.16   <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Representations</u>") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that no Seller nor any other Person on behalf of any Seller makes, and neither Purchaser nor any member of the Purchaser Group has relied on, is relying on, or will rely on the accuracy or completeness of any express or implied representation or warranty with respect to any Seller, the Acquired Assets, the Business or the

21

Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Livingstone) (the "Information Presentation") or in that certain datasite administered by SmartRoom (the "Dataroom") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the Transactions or any discussions with respect to any of the foregoing information, except in the case of Fraud.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows.

4.1     Organization and Qualification. Purchaser is duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser's ability to consummate the Transactions. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Purchaser's ability to consummate the Transactions. Purchaser is not in violation of any of the provisions of its organizational documents, except as would not reasonably be expected to be material to Purchaser.

4.2     Authorization of Agreement. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the Transactions. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the Transactions, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the Transactions. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3    Conflicts; Consents.

(a)    Assuming that (i) requisite Bankruptcy Court approvals are obtained and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(a) are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the Transactions, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

(b)    Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the Transactions, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the Transactions.

4.4    Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Transactions, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the Transactions. Purchaser is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

4.5    Brokers. Except for TripleTree, there is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the Transactions.

4.6    No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the Transactions.

4.7    Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective board of managers (or applicable governing body of any Affiliate of any Seller), any

23

holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the Transactions or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.8    Solvency. Purchaser is, and immediately after giving effect to the Transactions (and, assuming that the representations and warranties of the other Parties hereto are true and correct) shall be, solvent. No transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Sellers. In connection with the Transactions, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

4.9    No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Sellers acknowledge that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

4.10    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the Transactions. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, any Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller, the Business or the quality, quantity or condition of any Seller's assets (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Business or the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Business or the Acquired Assets after the Closing, are, in each case specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities), properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers and the Business, and, in making its determination to proceed with the Transactions, Purchaser has relied solely on the results of the

Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, any Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations).

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1     <u>Bankruptcy Actions</u>.

(a)     The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(b)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with <u>Article VIII</u> and (ii) the Closing Date, Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)     The Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order. Purchaser shall use commercially reasonable efforts to promptly take all actions as are reasonably requested by Sellers to assist obtaining Bankruptcy Court approval of the Sale Order, and any other Order reasonably necessary in connection with the Transactions, as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(d)     Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement.

(e)     The parties agree that the Purchaser was not the prevailing party at the conclusion of the Auction (any such prevailing party, the "<u>Successful Bidder</u>") but was the next highest bidder at the Auction, and therefore Purchaser is required to serve as a back-up bidder (the "<u>Backup Bidder</u>") and keep Purchaser's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open

and irrevocable until the later of (i) 45 days following the hearing to consider the Sale Order and (ii) such other date as this Agreement is otherwise terminated. Sellers shall, within one (1) Business Day after the termination of this Agreement by the Sellers pursuant to Section 8.1(i) or Section 8.1(j) or consummation of an Alternative Transaction (in a case in which Purchaser is not called upon to consummate the transactions in its capacity as the Backup Bidder and this Agreement is terminated), whichever is earlier, reimburse Purchaser for any reasonably documented out-of-pocket fees, expenses and costs (including, for the avoidance of doubt, legal, accounting, diligence, and other advisory fees, costs, and expenses) incurred by Purchaser in connection with this Agreement and the Auction in an amount up to $1,000,000.00. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Sellers may consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction) no earlier than sixty (60) days after the date on which the Backup Bidder is deemed to have the new prevailing bid, unless the Backup Bidder consents in writing to an earlier date and the Outside Date, if it would fall on or prior to the end of such sixty (60) day period, will be automatically extended until the 1st Business Day following the end of such sixty (60) day period.

(f)   Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(g)   Purchaser shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Assigned Contracts. Purchaser agrees that it will take all actions reasonably required to assist in obtaining Bankruptcy Court approval of the Sale Order and a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(h)   Nothing in this Section 5.1 shall prevent Sellers from modifying the bidding procedures as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

5.2   Cure Costs. Subject to entry of the Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5, on or prior to the date of such assignment), subject to Section 2.1(a), pay the Cure Costs (as part of the Cash Payment) so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the

Bankruptcy Code and this Agreement. A list of the Seller's good faith estimate of Cure Costs as of the date hereof is set forth on Schedule 5.2.

5.3     Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their obligations under this Agreement, (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to any Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability.

5.4     Approval. Sellers' obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI
## COVENANTS AND AGREEMENTS

6.1     Conduct of the Business.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall use their reasonable best efforts to carry on the Business in the Ordinary Course in all material respects; provided that no action by any Seller or one of its Subsidiaries with respect to matters specifically addressed by Section 6.1(b) shall be deemed to be a breach of this Section 6.1(a) unless such action would constitute a breach of Section 6.1(b).

(b)   Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Sellers shall not with respect to the Business:

(i)   sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets which are Acquired Assets for consideration, individually or in the aggregate, in excess of $10,000 except (A) Ordinary Course dispositions of inventory and dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Sellers, (B) transfers among the Sellers or their Subsidiaries, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(ii)   except as permitted under Section 6.1(b)(ii), and except for acquisitions made with Purchaser's prior written consent, make any acquisition of, or investment in, any properties, assets, securities or business (including by merger) to the extent exclusively or primarily related to the Business and which would be Acquired Assets, except in the Ordinary Course (which for the avoidance of doubt and without limitation of the foregoing shall be deemed to include acquisitions of inventory in the Ordinary Course);

(iii)   except (A) in the Ordinary Course or (B) pursuant to the existing terms of any Seller Plan, (1) grant to any Business Employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former Business Employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards, or (4) hire any Business Employee whose base salary exceeds $75,000 per annum;

(iv)   grant any Encumbrance (other than Permitted Encumbrances) on any of its material Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i);

(v)   settle any pending or threatened Action against any Seller related to the Business that would result in an Assumed Liability in an amount in excess of $50,000, individually or in the aggregate; or

(vi)   authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

6.2     Access to Information

(a)     From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Sellers will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records and premises of Sellers to the extent with respect to the Business, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the Transactions; provided that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the Transactions, (iii) all requests for access will be directed to Livingstone or such other Person(s) as Sellers may designate in writing from time to time, and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to any Seller if the Transactions are not consummated, (B) would require any Seller to disclose any proprietary information of or regarding the Affiliates of any Seller (other than Sellers themselves) or otherwise disclose information regarding the Affiliates of any Seller (other than Sellers themselves) that such Seller deems to be commercially sensitive (as determined in good faith), (C) would require Seller to disclose information unrelated to the Business, the Acquired Assets and the Assumed Liabilities, (D) would waive any legal privilege, or (E) would be in violation of applicable Laws or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the Transactions, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will, in its reasonable discretion, provide Sellers and their Advisors with reasonable access, in a non-disruptive manner, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with

respect to periods or occurrences prior to the Closing Date, and reasonable access, in a non-disruptive manner, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records). Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, in its reasonable discretion, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)   From and after the Closing for a period of one (1) year following the Closing Date (or, if later, the closing of the Bankruptcy Cases, but not to exceed eighteen months following the Closing), each Seller will provide Purchaser and its Advisors with reasonable access, in a non-disruptive manner, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, in a non-disruptive manner, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of the Sellers (including for the purpose of better understanding the books and records), in each case to the extent in Seller's possession or control and other than as may be prohibited or limited by contract, attorney client privilege or applicable Law. Unless otherwise consented to in writing by Purchasers, Sellers will not, for a period of one (1) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Purchaser such books and records or any portion thereof that any Seller may intend to destroy, alter or dispose of.

(e)   Purchaser will not, and will not permit any member of the Purchaser Group to contact any customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the Transactions without the prior written consent of Seller (e-mail permissible) which shall not be unreasonably withheld, conditioned or delayed. If Seller does not respond to a request for such consent within twenty-four (24) hours of such request, such consent shall be deemed granted.

6.3   <u>Employee Matters</u>.

(a)   At least 10 Business Days prior to Closing, Purchaser shall extend to each Business Employee listed on <u>Schedule 11.1(i)(1)</u> hereto a written offer of employment, subject to customary background checks, qualifications, and other standards and conditions, providing for a position that is the same or reasonably equivalent in all material respects to such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this <u>Section 6.3</u>. Additionally,

Purchaser may, in its sole discretion, interview and/or extend an offer of employment to certain other Business Employees listed on <u>Schedule 11.1(i)(2)</u> hereto on terms determined by Purchaser in its sole discretion, subject to customary background checks, qualifications, and other standards and conditions (each such offer described in the preceding two (2) sentences, a "<u>Transfer Offer</u>"). Business Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this <u>Section 6.3(a)</u> shall be referred to herein as "<u>Transferred Employees</u>." Purchaser shall notify Sellers in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or their respective Affiliates. After the entry of a Sale Order, Purchaser may engage with Business Employees directly for planning and transition purposes (i.e. training and onboarding).

(b)   For a period of one (1) year from and after the Closing Date, Purchaser intends to provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is reasonably comparable in the aggregate to the base compensation or wage rate, as applicable, paid to the Purchaser's similarly situated employees, provided to such Transferred Employee as of immediately prior to the Closing; (ii) cash bonus opportunities that are reasonably comparable in the aggregate to those provided to Purchaser's similarly situated employees; and (iii) other employee benefits under Purchaser Plans for which Purchaser's similarly situated employees are eligible. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date, Purchaser intends that each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(c)   At the Closing each Business Employee (and their eligible dependences and beneficiaries) shall cease active participation in the Seller Plans that are not included in the Acquired Assets. Without limiting the generality of any other provision of this Agreement: (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all Purchaser Plans offered to similarly situated employees of Purchaser; (ii) for purposes of each Purchaser Plan providing health or welfare benefits, Purchaser shall cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents (unless such exclusions or requirements were applicable under comparable Seller Plans); and (iii) Purchaser shall cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee or his or her covered dependents during the plan year in which the Closing Date occurs to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Purchaser Plan.

(d) Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees earned but unused as of the Closing Date and shall otherwise be solely responsible for paying, providing and satisfying when due all compensation accruing, incurred or arising as a result of employment on or after the Closing Date with respect to the Transferred Employees.

(e) The provisions of this Section 6.3 are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to confer upon or give any Person (including for the avoidance of doubt any employees of Sellers or Transferred Employees), other than the Parties and their respective permitted successors and assigns, any legal or equitable or other rights or remedies (with respect to the matters provided for in this Section 6.3 or under or by reason of any provision of this Agreement). Nothing contained herein, express or implied: (i) shall be construed to establish, amend, or modify any benefit plan, program, agreement or arrangement; (ii) shall, subject to compliance with the other provisions of this Section 6.3, alter or limit Purchaser's or Sellers' ability to amend, modify or terminate any particular benefit plan, program, agreement or arrangement; or (iii) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(f) Effective as of the Closing, Purchaser and Purchaser's Affiliates shall be responsible for all obligations, Liabilities and commitments in respect of claims arising after the Closing made by any Transferred Employee and solely based on events, actions, or conduct occurring after the Closing.

(g) Purchaser shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

6.4     Regulatory Approvals.

(a) Sellers will (i) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any material filings required to be made by the Purchaser Group pursuant to Section 6.4(b), if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings required to be made pursuant to this Section 6.4(a) or Section 6.4(b) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b) Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the Transactions, if any, and (ii) (A) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(b) or Section 6.4(a) and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances. For the avoidance of doubt, Purchaser shall be responsible for all filings pursuant to Sections

6.4(a) and 6.4(b), except where Sellers are obligated in accordance with submission guidelines to file on behalf of Purchaser.

      6.5    Reasonable Efforts; Cooperation.

      (a)   Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the Closing to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Sellers will not require any Seller or any of its Affiliates or Advisors to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder.

      (b)   The obligations of Sellers pursuant to this Agreement, including this Section 6.5, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order), and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

      (c)   Notwithstanding anything to the contrary in this Agreement, effective immediately upon the entry of a Sale Order, Sellers shall reasonably cooperate in good faith with Purchaser and its designees with respect to the transition of data, systems and operations prior to and through the Closing Date, including with respect to (i) providing information regarding credentialing and authorizations under acquired Third Party Payor contracts and to the extent within Sellers' possession and control, (ii) provision of access for Purchaser and its designees to reasonably interview Business Employees during ordinary business hours and without undue interruption to ordinary course business operations, (iii) ability for Purchaser and its designees to view premises comprising the Acquired Leased Real Property during ordinary business hours and without undue interruption to ordinary course business operations, and (iv) transitioning and training of personnel, patients, and data.

      (d)   No later than ten (10) Business Days prior to Closing, Purchaser may elect not to assume the Arizona, Washington, and/or Louisiana Medicaid provider numbers of the Business and any related agreements that are specifically dependent on such Medicaid provider numbers from the Acquired Assets by delivering written notice to Holdings; provided, that, for the avoidance of doubt Purchaser will still acquire the Acquired Leased Real Property, Patient Records, Assigned Contracts (to the extent not specifically dependent on such Medicaid provider numbers) and all other Acquired Assets with respect to such locations and the Business in the states of Arizona, Washington and Louisiana, and such states will continue to be included in the Business for all respects, other than the Medicaid provider numbers themselves. If Purchaser provides such written notice, Seller may commence, without consent or further notice, all termination notices and required filings applicable to such Medicaid provider numbers.

6.6     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions.

6.7     Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.8     Receipt of Misdirected Assets; Liabilities.

(a)     From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)     From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

6.9     Acknowledgment by Purchaser.

(a)     Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Business (including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Sellers, and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the Transactions, Purchaser and the Purchaser Group have relied solely on the Express Representations and the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts, or other material made available to

Purchaser or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or the Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of any Seller or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) the Express Representations are the sole and exclusive representations, warranties, and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser or any member of the Purchaser Group may rely in connection with the Transactions and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, Projections, meetings, calls, or correspondence with management of any Seller, any of the Seller Parties or any other Person on behalf of any Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks, and prospects of Sellers, or the quality, quantity, or condition of any Seller's assets, are, in each case, specifically disclaimed by each Seller, on its behalf and on behalf of the Seller Parties, except, in each case, with respect to Fraud. Purchaser, on its own behalf and on behalf of the Purchaser Group, except in the case of Fraud: (1) disclaims reliance on the items in clause (ii) in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in clause (i) in the immediately preceding sentence. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Sellers, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims (except with respect to Fraud) it or they may have against any Seller Party with respect to the accuracy of, any omission of, or any misstatement with respect to, (x) any potentially material information regarding any Seller or any of their respective assets (including the Acquired Assets), Liabilities (including the Assumed Liabilities) or operations or the Business, and (y) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, fitness for a particular purpose, or condition of any Seller's business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof, except, in each case, solely to the extent expressly set forth in the Express Representations.

(b)     Without limiting the generality of the foregoing, in connection with the investigation by the Purchaser Group of the Sellers and the Business, Purchaser and the members of the Purchaser Group, and the Advisors of each of the foregoing, have received or may receive, from or on behalf of Seller, certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in the Information Presentation, Dataroom, management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (i) such

Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation of Sellers, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making their own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)   Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it will not assert, institute, or maintain, and will cause each member of the Purchaser Group not to assert, institute or maintain, any Action that makes any claim contrary to the agreements and covenants set forth in this Section 6.9, including any such Action with respect to the distribution to Purchaser or any member of the Purchaser Group, or Purchaser's or any member of the Purchaser Group's use, of the information, statements, disclosures or materials in the Information Presentation, the Dataroom or Projections or any other information, statements, disclosures, or materials, in each case whether written or oral, provided by them or any other Seller Party or any failure of any of the foregoing to disclose any information, other than for Fraud.

(d)   Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the covenants and agreements contained in this Section 6.9 (i) require performance after the Closing to the maximum extent permitted by applicable Law and (ii) are an integral part of the Transactions and that, without these agreements set forth in this Section 6.9, Seller would not enter into this Agreement.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1   Conditions Precedent to the Obligations of Purchaser and Seller. The respective obligations of each Party to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)   no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the Transactions that is still in effect; and

(b)   the Bankruptcy Court shall have entered the Sale Order.

7.2   Conditions Precedent to the Obligations of Purchaser. The obligations of Purchaser to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)   (i) the representations and warranties made by Sellers in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as

of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of <u>Section 3.4</u> or in <u>Section 3.5</u>)) and (ii) the representations and warranties set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, and <u>Section 3.13</u> (collectively, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)   Sellers shall not have materially breached any of the covenants required to be performed or complied with by Sellers under this Agreement on or prior to Closing; and

(c)   Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 2.5</u>.

7.3   <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)   the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)   Purchaser shall not have materially breached any of the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date; and

(c)   Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.6</u>.

7.4   <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the Transactions as required under this Agreement.

**ARTICLE VIII**
**TERMINATION**

8.1   <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)   by the mutual written consent of Holdings and Purchaser;

(b)  by written notice of either Purchaser or Holdings, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Closing or declaring unlawful the Transactions, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 8.1(b) if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

(c)  by written notice of either Purchaser or Holdings, if the Closing shall not have occurred on or before October 15, 2023 (the "Outside Date") (or such later date as provided in Section 5.1(e)); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)  by written notice from Holdings to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Holdings may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date which that the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Holdings at any time that Sellers are in material breach of, any covenant, representation or warranty hereunder;

(e)  by written notice from Purchaser to Holdings, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied, including a breach of Holdings' obligation to consummate the Closing; provided that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies Holdings of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(f)  by written notice from Holdings to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.4;

(g)  by written notice from Purchaser to Holdings, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver or such conditions at the Closing) or waived and Holdings fails to complete the Closing at the time required by Section 2.4;

(h)   [Intentionally Omitted]

(i)   by written notice of either Purchaser or Holdings, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; and

(j)   by written notice from either Purchaser or Sellers, if Purchaser (i) is not the Successful Bidder or the Backup Bidder at the Auction or (ii) is the Backup Bidder at the Auction and Sellers consummate an Alternative Transaction with the Successful Bidder.

8.2     Effect of Termination.

(a)   In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.3, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided further that no such termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder); provided, that, Purchaser's Liability for such damages shall not exceed an amount equal to three (3) times the Deposit (which shall be in excess of the Seller's retention of the Deposit in accordance with the terms hereof). Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement; provided, that Sellers shall only be entitled to the Deposit or damages, or specific performance, but not both.

(b)   Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.2 are an integral part of this Agreement.

## ARTICLE IX
## TAXES

9.1     Transfer Taxes. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by the Purchaser, and the Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2     Cooperation. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes; provided, that in providing

such information, assistance and access, each Party shall be entitled to redact information that is not related to the Business.

# ARTICLE X
## MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Except in the case of Fraud, each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the Transactions and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. Purchaser, for itself and on behalf of the Purchaser Group, acknowledge and agree that to the fullest extent permitted under applicable Law, including by contractually shortening the applicable statute of limitation, any and all rights, claims and causes of action, whether known or unknown, it may have against any member of the Seller Group relating to the Business, the Acquired Assets, the Assumed Liabilities, the operation of the Sellers and their respective Subsidiaries or their respective businesses or relating to the subject matter of this Agreement or the Schedules, whether arising under, or based upon, any Law (including any right, whether arising at law or in equity, to seek indemnification, contribution, cost recovery, damages or any other recourse or remedy, including as may arise under common law or any other Law) are hereby irrevocably waived. Furthermore, without limiting the generality of this <u>Section 10.1</u>, no claim shall be brought or maintained by, or on behalf of, Purchaser or any member of the Purchaser Group against any member of the Seller Group, and no recourse shall be sought or granted against any member of the Seller Group, by virtue of, or based upon, any alleged misrepresentation or inaccuracy in, or breach of, any of the representations, warranties, covenants or agreements of the Seller or any other Person set forth or contained in this Agreement, the Schedules, any certificate, instrument, opinion, agreement or other document of a Seller or any other Person delivered hereunder, the subject matter of this Agreement or the Schedules, the business or the ownership, operation, management, use or control of the business of any of the Sellers or their Subsidiaries, including the Business, the Acquired Assets and Assumed Liabilities, any of their assets, or any actions or omissions at, or prior to, the Closing. Nothing set forth in this <u>Section 10.1</u> shall limit <u>Section 10.20</u>.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including

fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the Transactions will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all Transfer Taxes will be allocated pursuant to Section 9.1 and (b) subject to Section 2.1(a), all Cure Costs will be allocated to the Purchaser pursuant to Sections 1.3(b), 2.1(b), and 5.2.

10.3    Notices. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

> Notices to Purchaser:
>
> Behavior Frontiers, LLC
> c/o Lorient Capital Management, LLC
> 3250 Mary Street, Suite 500
> Miami, FL 33133
> Attention: Jordan Broome and Doug Shinkle
> Email: jordan@lorientcap.com
> doug@lorientcap.com
>
> and
>
> Behavior Frontiers, LLC
> 100 N. Pacific Coast Highway, Suite 1400
> El Segundo, CA 90245
> Attention: Bryan Mader and Helen Mader
> Email: bmader@behaviorfrontiers.com and hmader@behaviorfrontiers.com
> with a copy to (which shall not constitute notice):
>
> McDermott Will & Emery LLP
> 333 Avenue of the Americas, Suite 4500
> Miami, Florida 33131
> Attention: Fred Levenson, Matt Friendly, and James Kapp III
> Email: flevenson@mwe.com
> mfriendly@mwe.com
> jkapp@mwe.com

Notices to Sellers:

Card Holdings, LLC
c/o Center for Autism and Related Disorders, LLC
9089 S. Pecos Rd., Suite 3600
Henderson, NV 89074
Attention:     Michelle Rapoport, General Counsel
Email:          MichelleRapoport@centerforautism.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:     Lauren M. Colasacco, P.C.
                    Christopher T. Greco, P.C.
                    Steve Toth
                    Allyson B. Smith
Email:          lauren.colasacco@kirkland.com
                    cgreco@kirkland.com
                    steve.toth@kirkland.com
                    Allyson.smith@kirkland.com

10.4    Binding Effect; Assignment. This Agreement (together with the exhibits and schedules attached hereto) shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, that Purchaser shall be able to assign this Agreement without consent (a) to its lenders, (b) in the event of a transaction involving Purchaser or any of its subsidiaries or Affiliates, (c) in connection with a sale, in whole or in part, of any Seller (or any assets thereof) by the Purchaser from and after the Closing; provided, further, that any such assignment described in the foregoing clauses (a) – (c) shall not relieve any Purchaser of its obligations under this Agreement.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the

42

Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    <u>Non-Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement or any document delivered hereto, this Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any past, present or future shareholder, equityholder, controlling person, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any of the foregoing (collectively, a "<u>Non-Recourse Party</u>") will have any Liability and there will be no right of recovery or any claims against any Non-Recourse Party (in each case whether in contract, tort, equity, through piercing or attempted piercing of the corporate veil, or otherwise, whether known or unknown, contingent or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute, and each of the Non-Recourse Parties are intended third party beneficiaries of this <u>Section 10.7</u> and shall be entitled to enforce this <u>Section 10.7</u> as if a party directly hereto.

10.8    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>provided</u> that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section or subsection of the Schedules where it is reasonably apparent on its face that such disclosure is also relevant to such other section or subsection. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules

or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parole evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy (including damages) to which they may be entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) (the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14   <u>Governing Law; Waiver of Jury Trial</u>.

(a)   Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT

SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf of the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

10.16   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.17   Publicity. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof; and provided, further, that Purchaser and its Affiliates shall be entitled to provide general information concerning the Transactions to their respective investors and prospective investors that are subject to customary confidentiality obligations with respect to such information solely for the purpose of fundraising, marketing or reporting or informational activities, in each case without obtaining such prior approval.

10.18   <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the Transactions.

10.19   <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

10.20   <u>Release</u>.

(a)   Except in the case of Fraud, effective as of the Closing, Purchaser (on behalf of itself and the other Purchaser Releasing Parties) (and, from and after the Closing, shall cause its Subsidiaries and Affiliates and each of its and their respective current and former officers, directors, employees, equityholders, partners, members, successors and assigns (collectively with Purchaser, the "<u>Purchaser Releasing Parties</u>") to) hereby irrevocably and unconditionally releases and forever discharges each member of the Seller Group (collectively, the "<u>Purchaser Released Parties</u>") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, obligations, liabilities, counterclaims, defenses, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever of any kind, nature or description, whether known or unknown or arising in law or equity, which the Purchaser Releasing Parties may have against each of the Purchaser Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to any of the Purchaser Released Parties, the Business, the Acquired Assets, or the Assumed Liabilities occurring or arising on or prior to the Closing Date (collectively, the "<u>Purchaser Released Claims</u>"), and each of the Purchaser Releasing Parties hereby agrees not to sue or bring any action in respect of the Purchaser Released Claims. Except for Fraud, the Purchaser Released Claims shall include, but are not limited to those Purchaser Released Claims and demands:

(i)   arising out of, or relating to, the organization, management or operation of the businesses of the Sellers or of their respective Subsidiaries, including the Business, relating to any matter, occurrence, action or activity on or prior to the Closing Date, including the businesses associated with the Acquired Assets and their capital structure;

(ii)   relating to this Agreement and the Transactions contemplated hereby (including Article V hereto and the transactions contemplated thereby or which occur in connection therewith);

(iii)   arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement

47

contained in this Agreement, the Schedules, exhibits and annexes hereto, in any document delivered in connection herewith or contemplated hereby or in any certificate contemplated hereby and delivered in connection herewith; and

(iv)   relating to any information (whether written or oral), documents or materials furnished by or on behalf of the Sellers and their Subsidiaries and/or Affiliates.

(b)   Except in the case of fraud by or on behalf of Purchaser, effective as of the Closing, each Seller (on behalf of itself and the other Seller Releasing Parties) (and, from and after the Closing, shall cause its Subsidiaries and each of its and their respective current and former officers, directors, employees, successors and assigns (collectively with each Seller, the "Seller Releasing Parties") to) hereby irrevocably and unconditionally releases and forever discharges each member of the Purchaser Group (collectively, the "Seller Released Parties") of and from any and all actions, causes of action, suits, proceedings, executions, judgments, duties, obligations, liabilities, counterclaims, defenses, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever of any kind, nature, or description, whether known or unknown, or arising in law or equity, which the Seller Releasing Parties may have against each of the Seller Released Parties, now or in the future, in each case in respect of any cause, matter or thing relating to any of the Seller Released Parties solely with respect to the Business, the Acquired Assets, or the Assumed Liabilities occurring or arising on or prior to the Closing Date (collectively, the "Seller Released Claims"), and each of the Seller Releasing Parties hereby agrees not to sue or bring any action in respect of the Seller Released Claims. The Seller Released Claims shall include those Seller Released Claims and demands:

(c)   relating to this Agreement and the Transactions contemplated hereby (including Article V hereto and the transactions contemplated thereby or which occur in connection therewith);

(d)   arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement contained in this Agreement, the Schedules, exhibits and annexes hereto, in any document delivered in connection herewith or contemplated hereby or in any certificate contemplated hereby and delivered in connection herewith; and

(e)   relating to any information (whether written or oral), documents or materials furnished by or on behalf of Purchaser and its Subsidiaries and/or Affiliates.

The Purchaser Released Parties and Seller Released Parties to whom this Section 10.20 applies shall be express third party beneficiaries of this Section 10.20.  Nothing in this Section 10.20 shall release the Parties rights with respect to the allocation of assets and liabilities as set forth herein. The releases contemplated by this Section 10.20 are in addition to and shall not in anyway limit any other release, covenant not to sue, or waiver by the Purchaser Releasing Parties in favor of the Seller Released Parties.

10.21   Sellers' Representative. Each Party agrees that Holdings has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under

this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Holdings on behalf of the Sellers.

## ARTICLE XI
## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    <u>Certain Definitions</u>.

(a)    "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b)    "<u>Advisors</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)    "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires a material portion of the Acquired Assets or equity of the Sellers, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, none of a liquidation or wind-down of Sellers' estates shall be an Alternative Transaction.

(e)    "<u>Auction</u>" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)    "<u>Bidding Procedures Order</u>" means an Order substantially in the form attached hereto as <u>Exhibit D</u>.

(g)    "<u>Business</u>" means the operation of the business of the Sellers solely at the locations set forth on <u>Annex I</u>.

(h)   "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(i)   "Business Employee" means any employee of the Sellers (or any of their respective subsidiaries) who is engaged in the Business as of the Closing, including those employees set forth on Schedule 11.1(i)(1) and Schedule 11.1(i)(2) hereto.

(j)   "Cash and Cash Equivalents" means the aggregate amount of all of Sellers' cash and cash equivalents as determined in accordance with GAAP (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(k)   "Confidentiality Agreement" means that certain Confidentiality Agreement, dated December 2, 2022, by and between Holdings and Lorient Capital Management, LLC.

(l)   "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(m)   "Contract" means any written or oral contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

(n)   "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(o)   "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(p)   "Environmental Claims" means any and all actions, suits, demands, demand letters, directives, claims, liens, investigations, orders, citations, proceedings or notices of noncompliance or violation (written or oral) by any Person alleging potential liability (including potential liability for enforcement, investigation costs, cleanup costs, governmental response costs, removal costs, remedial costs, natural resources damages, property damages, personal

50

injuries or penalties) arising out of, based on or resulting from: (1) the presence, use, treatment, storage, disposal, transportation, handling, export, labeling, exposure to or release into the environment of any Hazardous Substance at any location; or (2) circumstances forming the basis of any violation or alleged violation of any Environmental Law; or (3) any and all claims by any Person seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence, use, treatment, storage, disposal, transportation, handling, export, labeling, exposure to or release of any Hazardous Substances.

(q)    "Environmental Laws" means all applicable Laws concerning pollution, protection of the environment, worker and occupational health and safety and natural resources, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, cleanup of or exposure to any Hazardous Substances.

(r)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(s)    "Equity Interests" means, with respect to a Person, any membership interests, partnership interests, profits interests, capital stock or other equity securities (including profit participation features or equity appreciation rights, phantom stock rights or other similar rights) or ownership interests of such Person, or any securities (including debt securities or other indebtedness) exercisable or exchangeable for or convertible into, or other rights to acquire, membership interests, partnership interests, capital stock or other equity securities or ownership interests of such Person (or otherwise constituting an investment in such Person).

(t)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(u)    "Fraud" means a conscious act committed by a Seller, in the making to Purchaser of the representations and warranties of Sellers set forth in Article III in any such case, with knowing intent to (x) deceive the Purchaser (y) induce the Purchaser to enter into this Agreement and requires (i) a false representation or warranty of material fact made in such representation; (ii) with knowledge that such representation or warranty is false; (iii) with an intention to induce the Purchaser to act or refrain from acting in reliance upon it; (iv) causing the Purchaser, in justifiable reliance upon such false representation or warranty, to take or refrain from taking action; and (v) causing the Purchaser to suffer damage by reason of such reliance, which together constitutes common law fraud under Delaware Law (and does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory, equitable fraud, promissory fraud or any other fraud or torts based on recklessness or negligence).

(v)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(w)    "Government Contract" means any bid, quotation, proposal, Contract, written work authorization, lease, commitment or sale or purchase order of any Seller that is

with the United States government or any other Governmental Body, including all Contracts and written work authorizations to supply goods and services to the United States government or any other Governmental Body.

(x) "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(y) "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether federal or, state, or any agency, branch, department, official, entity, accrediting body, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(z) "Hazardous Substance" means any (i) petroleum or petroleum products, flammable materials, explosives, radioactive materials, radon gas, lead-based paint, lead, asbestos in any form, urea formaldehyde foam insulation, polychlorinated biphenyls, per- and polyfluoroalkyl substances and mold, (ii) any chemicals or other materials or substances which are defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances," "toxic pollutants," "contaminants," "pollutants," or words of similar import under any applicable Environmental Law and (iii) any other material, substance or waste regulated under any Environmental Laws.

(aa) "Immediate Family Member" means any individual related by blood, marriage or adoption to any such Person.

(bb) "Incremental Cure Cost Amount" means any Cure Costs as a result of the Purchaser's assumption (if any) of any contracts that are added to the Assigned Contracts schedule after the date hereof.

(cc) "Intellectual Property" means all of the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names, trade names, Internet domain names, rights to social media accounts and other indicia of source, origin, or quality, together with all goodwill associated with each of the foregoing; (iii) original works of authorship and copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets and other confidential or proprietary information (including know-how, inventions and invention disclosures, proprietary business information, customer and supplier lists, customer and supplier records, pricing and cost information, reports, data, databases, data collections, designs, processes, and business, financial, sales, and marketing plans); (vi) computer software, programs, applications, libraries, interfaces, development tools, in any form or format (including source code, object code, executable code, data, databases and related documentation), together with all translations, adaptations, modifications, deviations, combinations and derivative works thereof; (vii) drawings, schematics and other technical plans; and (viii) all other intellectual property or proprietary rights.

(dd) "<u>Knowledge of Seller</u>", "<u>Knowledge of Sellers</u>", or words of like import means the actual knowledge (and in no event encompass constructive, imputed or similar concepts of knowledge), after due and reasonable investigation and inquiry of direct reports, of Michelle Rapoport, Jennifer Webster, and Frank Keim, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(ee) "<u>Law</u>" means any federal or state, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, regulation, or Order, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(ff) "<u>Leasehold Improvements</u>" means all buildings, structures, improvements, equipment, and fixtures which are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(gg) "<u>Livingstone</u>" means Livingstone Partners LLC.

(hh) "<u>Liability</u>" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ii) "<u>Material Adverse Effect</u>" means any matter, event, change, development, occurrence, circumstance or effect (each, an "<u>Effect</u>") that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise), or assets of the Business (including the Acquired Assets), taken as a whole; <u>provided</u>, that none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any Effect in, arising from, or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from, or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado,

windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from, or relating to the decline or rise in price of any currency or any Equipment or supplies necessary to or used in the provision of services by any Seller; (v) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action required by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets, Assumed Liabilities, or employees, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules; (x) Effects that arise from any seasonal fluctuations in the business; (xi) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xii) the Effect of any action taken by Purchaser or its Affiliates with respect to the Transactions or the financing thereof or any breach by Purchaser of this Agreement; (xiii) the matters set forth in the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xiv) (A) the commencement or pendency of the Bankruptcy Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order or the reorganization or liquidation of Sellers, (3) the Bidding Procedures Order or (4) the assumption or rejection of any Assigned Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith.

(jj) "Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Sale Order).

(kk) "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and past practice in light of the current pandemic, epidemic or disease outbreak; provided that any action taken, or

omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the ordinary course of business.

(ll) "Patient Records" means, to the extent exclusively related to the Business, any of the Sellers' written and electronic patient files for all patients that were created as a result of services provided by the Sellers or clinical providers acting on behalf of the Sellers, including, but not limited to, treatment records and plans, observations, medical and behavioral history, progress summaries, clinical documentation, forms, authorizations, consents, notes, client data, insurance information, personally identifying information, discharge plans, and all other documentation required to be stored or kept in accordance with applicable laws and payor agreements.

(mm) "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes immaterial in amount and not yet due and payable, being contested in good faith through appropriate proceedings in a timely manner for which adequate reserves have been established, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of such Leased Real Property, as applicable, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course securing obligations not yet due and payable and that are not, individually or in the aggregate, material from the perspective of a reasonable Person operating in the industry in which Sellers operate, (iv) any Encumbrances set forth on Schedule 11.1(mm), and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(nn) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(oo) "Purchaser Group" means Purchaser, any Affiliate of Purchaser, and each of their respective direct and indirect equityholders, and each of their respective former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, agents, Advisors, successors or permitted assigns.

(pp) "Purchaser Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Purchaser or to which Purchaser is obligated to contribute or with respect to which Purchaser has any Liability.

(qq) "Sale Order" mean an Order of the Bankruptcy Court (i) approving this Agreement in a form reasonably acceptable to the Parties and (ii) authorizing Seller to undertake

the Transactions, including pursuant to sections 363 and 365, of the Bankruptcy Code in a form reasonably acceptable to the Parties.

(rr) "Security Deposit Amount" means $941,737.29, which Security Deposit Amount is detailed by location on Schedule 11.1(rr).

(ss) "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(tt) "Seller Group" means each Seller and any of its Affiliates and funds or partnerships managed or advised by it or its respective Affiliates, including Cardinal Buyer, LLC, and each of their respective direct and indirect equityholders, former, current or future Affiliates, control persons, officers, directors, employees, partners, general partners, limited partners, members, managers, investment vehicles, agents, Advisors, predecessors, successors or permitted assigns.

(uu) "Seller Parties" means each Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(vv) "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers or to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(ww) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, or whose management decisions are made or controlled, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, or whose management decisions are made or controlled, by such Person or one or more Subsidiaries of such Person or a combination thereof. The term Subsidiary shall include all Subsidiaries of such Subsidiary.

(xx) "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, escheat or abandoned

property, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(yy) "Tax Code" means the United States Internal Revenue Code of 1986, as amended.

(zz) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(aaa)      "Third Party Payor" means collectively, with respect to the Business: (a) all acquired Medicaid and Medicaid Managed Care programs, TRICARE, and such other similar federal, state or local reimbursement or governmental payors; and (b) all acquired private, non-governmental insurance and managed care programs with which a Seller contracts to provide goods and services or through which any receive reimbursements for goods or services provided.

(bbb)      "Third Party Payor Program" means collectively, (a) all Medicaid, Medicaid Waiver and Medicaid Managed Care programs, TRICARE, and such other similar federal, state or local reimbursement or governmental programs; and (b) all private, non-governmental insurance and managed care programs with which any Seller or any Subsidiary of any Seller contracts to provide goods and services or through which any receive reimbursement for goods or services provided.

(ccc)      "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(ddd)      "Transactions" means the transactions contemplated by this Agreement and the other Transaction Agreements.

(eee)      "Willful Breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act.

## 11.2   Index of Defined Terms.

2022 Financial Statements ....................... 21
Accounting Referee .................................... 8
Acquired Assets ......................................... 1
Acquired Business Performance Statement 8
Acquired Leased Real Property ................. 2
Agreement .................................................. 1
Agreement Dispute ................................... 44
Assigned Contracts .................................... 2
Assignment and Assumption Agreement.. 11
Assumed Liabilities .................................... 5
Audited Financial Statements ................... 21
Backup Bidder .......................................... 25
Bankruptcy Cases....................................... 1

Bankruptcy Code ....................................... 1
Bankruptcy Court....................................... 1
Cash Payment ............................................ 7
Chosen Courts.......................................... 45
Closing .................................................... 11
Closing Date............................................. 11
Closing Date Payment............................... 7
Cure Costs.................................................. 5
Dataroom................................................. 21
Deferred Payment ...................................... 8
Deposit .................................................... 10
Effect....................................................... 53
Enforceability Exceptions........................ 12

| | | | |
|---|---|---|---|
| Environmental Permits | 16 | Party | 1 |
| Escrow Agent | 10 | Permits | 16 |
| Excluded Assets | 3 | Projections | 35 |
| Excluded Contracts | 4 | Purchase Price | 7 |
| Excluded Liabilities | 5 | Purchaser | 1 |
| Express Representations | 21 | Purchaser Released Claims | 47 |
| Financial Statements | 21 | Purchaser Released Parties | 47 |
| First Deferred Payment | 8 | Purchaser Releasing Parties | 47 |
| First Measurement Period | 8 | Review Period | 8 |
| Fundamental Representations | 36 | Second Deferred Payment | 8 |
| Holdings | 1 | Second Measurement Period | 8 |
| Information Presentation | 21 | Seller | 1 |
| Interim Financial Statements | 21 | Seller Released Claims | 48 |
| Laws | 16 | Seller Released Parties | 48 |
| Leased Real Property | 13 | Seller Releasing Parties | 47 |
| Material Contract | 13 | Sellers | 1 |
| Measurement Period | 8 | Source Code Assets | 18 |
| No Objection Statement | 9 | Successful Bidder | 25 |
| Non-Recourse Party | 43 | Transfer Offer | 30 |
| Objection Statement | 8 | Transfer Taxes | 39 |
| Other APA | 1 | Transferred Claims | 3 |
| Outside Date | 37 | Transferred Employees | 30 |
| Parties | 1 | WARN Act | 20 |

11.3    Rules of Interpretation. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)   The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)   Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)   The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)   All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)   All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)   Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)   Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)   Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; _provided_ that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)   A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)   A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

[*Signature pages follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

BEHAVIOR FRONTIERS, LLC


By: _____
Name: Bryan Mader
Title:   President

**SELLERS:**

Card Holdings, LLC

By: _____
Name: _____
Title: _____

Card Intermediate Holdings I, LLC

By: _____
Name: _____
Title: _____

Card Intermediate Holdings II, LLC

By: _____
Name: _____
Title: _____

Center for Autism and Related Disorders, LLC

By: _____
Name: _____
Title: _____

SKILLS Global, LLC

By: _____
Name: _____
Title: _____

## EXHIBIT A

**CONTRIBUTION MARGIN CALCULATION METHODOLOGY**

*[See Attached.]*

## Site Summary P&L - Clinics Bidding

| | | | | | | | | | | | | | | | EBITDA (in 000s) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **$ in 000s** | **Sqft** | **Include** | **Jun-22** | **Jul-22** | **Aug-22** | **Sep-22** | **Oct-22** | **Nov-22** | **Dec-22** | **Jan-23** | **Feb-23** | **Mar-23** | **Apr-23** | **May-23** | **FY20** | **FY21** | **FY22** | **LTM May-23** | **L3M RR May-23** |
| CC04121-D Aurora CO | 4,409 | x | 7 | 2 | (18) | (7) | (11) | 4 | 15 | 10 | (7) | 14 | 4 | (4) | 89 | 181 | 39 | 10 | 59 |
| CC04122-S Denver | | x | (0) | 1 | (6) | 9 | (1) | 1 | (3) | 12 | (10) | (3) | (3) | (10) | 404 | 230 | 53 | (13) | (63) |
| CC04123-D Boulder | 3,856 | x | (3) | 2 | (18) | (15) | (7) | (9) | (10) | (12) | (19) | (12) | (16) | (14) | 97 | 0 | (81) | (133) | (166) |
| CC04124-D Fort Collins | 5,800 | x | 15 | 19 | (6) | 22 | 22 | 20 | 32 | 27 | (6) | 7 | 39 | (7) | 73 | 142 | 2 | 185 | 158 |
| CC04127-S Greeley | 3,412 | x | 1 | 0 | (24) | 11 | (2) | 6 | (11) | (15) | (25) | 18 | 3 | 16 | 45 | 223 | 71 | (22) | 147 |
| CC04128-D Lakewood CO | 5,303 | x | (22) | (11) | (19) | 1 | (4) | (8) | (1) | (7) | (18) | (15) | (5) | (41) | - | (144) | (179) | (149) | (246) |
| CC04129-D Westminster CO | TBD | x | (11) | (12) | (14) | (19) | (24) | (22) | (20) | (23) | (21) | (25) | (9) | (14) | - | (67) | (194) | (215) | (193) |
| CC04224-D Littleton | 3,978 | x | (4) | 12 | (20) | (9) | (10) | (14) | 7 | (1) | (9) | 4 | (9) | 5 | - | (44) | (39) | (49) | (1) |
| CC07182-D Castle Rock | 4,862 | x | (19) | (19) | (25) | (15) | (13) | (15) | 6 | (5) | (34) | (14) | (11) | 2 | - | (77) | (160) | (161) | (94) |
| Colorado | | 9 | (35) | (7) | (149) | (21) | (49) | (38) | 16 | (15) | (149) | (26) | (7) | (66) | 707 | 444 | (487) | (548) | (398) |
| CC05129-S Oak Lawn | 4,000 | x | 15 | 11 | (8) | 16 | (8) | 5 | 1 | (15) | 75 | 15 | 27 | 38 | 48 | 124 | 74 | 173 | 321 |
| CC05130-S Chicago - Ravenswood | 4,176 | x | 7 | 7 | (9) | (4) | (4) | 16 | 2 | (14) | 20 | 10 | 17 | 14 | (44) | 35 | 51 | 60 | 166 |
| CC05131-B Oak Park | 11,000 | x | 43 | 40 | (35) | 5 | 10 | 14 | 28 | (14) | 143 | 21 | 63 | 17 | 608 | 609 | 262 | 335 | 404 |
| CC05132-S Naperville | 5,002 | x | (8) | (9) | (18) | (7) | (9) | (14) | 22 | (3) | 22 | 37 | 59 | 15 | 252 | 384 | (66) | 85 | 441 |
| CC05133-D OFallon | 3,350 | x | 35 | 33 | (5) | 13 | (13) | 12 | (5) | 19 | (4) | 22 | 32 | 16 | 260 | 309 | 262 | 154 | 282 |
| CC05137-S Hoffman Estates | 4,520 | x | 8 | 30 | (15) | 8 | 5 | 20 | 9 | (7) | 30 | 7 | 8 | 0 | 196 | 293 | 164 | 103 | 59 |
| CC05139-S Westmont | 4,455 | x | (7) | (15) | (21) | (4) | (27) | (4) | (4) | (10) | (11) | (17) | (2) | (12) | 60 | 48 | (52) | (134) | (125) |
| CC05602-S Chicago - O'Hare | 4,081 | x | 1 | (4) | (15) | 17 | 8 | 19 | (19) | (4) | 21 | (5) | 29 | 4 | (48) | 36 | 32 | 52 | 111 |
| Illinois | | 8 | 93 | 93 | (128) | 44 | (39) | 69 | 34 | (48) | 295 | 89 | 232 | 94 | 1,332 | 1,838 | 728 | 828 | 1,660 |
| CC07189-D Plano | - | x | (16) | (12) | (74) | (13) | (29) | (66) | (2) | (46) | (12) | (4) | (26) | (17) | 112 | (125) | (235) | (317) | (187) |
| CC07190-S Helotes | 3,209 | x | 8 | (6) | (20) | (7) | (9) | (13) | (14) | (26) | 5 | (18) | (2) | (11) | 144 | (3) | (10) | (114) | (125) |
| CC07191-B Austin | 4,586 | x | (0) | (24) | (37) | 3 | (1) | (15) | (10) | (20) | (23) | (18) | (21) | (46) | 99 | 0 | (124) | (212) | (340) |
| CC07192-D Corpus Christi | 3,669 | x | 29 | 25 | 12 | 60 | 45 | 78 | 42 | 99 | 44 | 64 | 87 | 85 | 573 | 315 | 364 | 670 | 944 |
| CC07193-D San Antonio | 4,837 | x | 22 | 15 | (4) | 21 | 13 | 17 | 8 | 31 | 2 | 19 | 26 | 9 | 315 | 162 | 207 | 180 | 219 |
| CC07195-D North Richland Hills | 3,910 | x | 1 | (7) | (13) | (6) | (9) | (7) | (16) | 6 | (7) | (9) | 9 | (11) | (26) | 25 | (47) | (68) | (45) |
| CC07196-D Houston | 3,350 | x | (1) | (3) | (10) | 25 | (1) | (9) | (25) | (8) | (12) | (7) | (11) | (12) | 202 | 29 | (23) | (75) | (123) |
| CC07199-D Pearland | 4,366 | x | (59) | 12 | (34) | (28) | (26) | (19) | (4) | (11) | (14) | (10) | 1 | (14) | - | (25) | (256) | (206) | (94) |
| CC07401-D Stafford | 5,919 | x | 9 | 11 | (10) | 10 | 5 | (3) | (2) | (0) | 0 | (1) | 11 | 4 | 308 | 51 | 64 | 34 | 56 |
| CC07402-S Kyle | 2,666 | x | 24 | 18 | (6) | 18 | 3 | 3 | (22) | 31 | 9 | 17 | 41 | 10 | (67) | 27 | 88 | 145 | 272 |
| CC07404-D Georgetown | 3,857 | x | (18) | (8) | (43) | (4) | (10) | (8) | (8) | 10 | (13) | (12) | 34 | 2 | - | (2) | (143) | (78) | 97 |
| Texas | | 11 | (2) | 20 | (237) | 80 | (19) | (44) | (53) | 66 | (21) | 19 | 150 | (1) | 1,659 | 452 | (115) | (42) | 674 |
| CC04109-D Tucson-North | 4,866 | x | 16 | 19 | (29) | (14) | (0) | 7 | 19 | 12 | 16 | (2) | 6 | (9) | - | (7) | (55) | 42 | (18) |
| CC04110-D Mesa | 4,136 | x | (12) | (18) | (16) | (8) | 3 | (8) | 17 | 2 | 7 | (10) | 20 | 2 | - | (67) | (86) | (23) | 46 |
| CC04111-B Phoenix | 4,672 | x | 55 | 44 | 3 | 40 | 33 | 28 | 15 | 14 | 24 | 50 | 29 | 44 | 289 | 560 | 513 | 381 | 495 |
| CC04112-S Chandler - South | 3,469 | x | 37 | 19 | (40) | 1 | (32) | 18 | 5 | 8 | 2 | (3) | 28 | 15 | 247 | 502 | 166 | 57 | 160 |
| CC04113-S Scottsdale | 3,425 | x | 25 | 17 | (16) | 25 | 4 | 21 | 20 | 38 | 3 | 50 | 25 | (2) | 623 | 306 | 151 | 211 | 294 |
| CC04114-D Tucson-East | 3,510 | x | 37 | 29 | 11 | 36 | 47 | 29 | 14 | 31 | 32 | 68 | 54 | 25 | 352 | 278 | 319 | 412 | 589 |
| CC04116-S Tempe | 3,609 | x | 3 | 9 | (30) | 8 | (1) | 18 | 15 | 41 | 21 | 32 | 15 | 31 | 695 | 688 | 87 | 163 | 312 |
| CC04118-S Chandler - North | 4,244 | x | 35 | 5 | (28) | 18 | 28 | 34 | 35 | 23 | (26) | 58 | 53 | 20 | 565 | 587 | 366 | 255 | 525 |
| CC04119-S Gilbert | 3,688 | x | 67 | 56 | (17) | 9 | (42) | 5 | 0 | 13 | 0 | 29 | 66 | 35 | 541 | 633 | 329 | 221 | 516 |
| Arizona | | 9 | 263 | 180 | (161) | 115 | 39 | 152 | 140 | 182 | 79 | 272 | 296 | 161 | 3,313 | 3,479 | 1,791 | 1,719 | 2,919 |
| CC01102-B Garden Grove | 4,739 | x | 20 | 12 | (22) | 2 | (2) | (14) | 17 | 36 | (16) | 17 | 84 | (2) | 792 | 245 | 56 | 132 | 397 |
| CC01103-B San Diego | 3,986 | x | 25 | 4 | (18) | 16 | (3) | (8) | 7 | 32 | 21 | 10 | 62 | 14 | 554 | 528 | 43 | 161 | 343 |
| CC01104-B Ladera Ranch | 4,413 | x | 52 | 27 | (10) | 45 | 27 | 10 | 4 | (40) | (4) | 44 | 118 | 26 | 434 | 597 | 312 | 298 | 751 |
| CC01105-S San Marcos | 4,401 | x | 31 | 26 | (24) | 88 | (1) | 7 | (4) | 74 | 16 | 41 | 56 | 24 | 470 | 364 | 209 | 333 | 483 |
| CC01106-B Temecula | 4,062 | x | 31 | 29 | (14) | 36 | (14) | 16 | 4 | 32 | (1) | 26 | 72 | 10 | 328 | 477 | 163 | 228 | 433 |
| CC01109-B Woodland Hills | 4,033 | x | 23 | 12 | (8) | 36 | 20 | 18 | 16 | 57 | 56 | (9) | (44) | (12) | 627 | 298 | 303 | 165 | (264) |
| CC01110-S Monrovia | 3,600 | x | 33 | 29 | (8) | 21 | (20) | 6 | (7) | 17 | (14) | 28 | 19 | 14 | 235 | 455 | 130 | 117 | 243 |
| CC01112-S Santa Fe Springs | 4,516 | x | 57 | 50 | (28) | 66 | 14 | 25 | 37 | 18 | 12 | 22 | 54 | 35 | 529 | 830 | 412 | 361 | 443 |
| CC01113-S North Hollywood | 2,622 | x | 24 | 9 | (100) | 246 | (126) | 12 | 1 | (15) | 68 | 10 | (6) | 25 | 249 | 95 | 81 | 148 | 116 |
| CC01114-S Chula Vista - East | 3,795 | x | 33 | 16 | (27) | 38 | 5 | 7 | 11 | 78 | 36 | 36 | 83 | 31 | 595 | 266 | 196 | 347 | 601 |
| CC01115-S Moreno Valley | 7,340 | x | 44 | 41 | (0) | 61 | 17 | 65 | (19) | 45 | 34 | (6) | 100 | 35 | 323 | 446 | 414 | 416 | 516 |
| CC01116-S Santa Clarita | 3,983 | x | 14 | 7 | (17) | 8 | 0 | 0 | (1) | 36 | 12 | 24 | 34 | 14 | 217 | 126 | 76 | 131 | 288 |
| CC01117-S Irvine - South | 4,520 | x | 27 | 26 | (14) | 41 | 56 | 4 | 45 | 0 | 51 | 115 | 75 | 50 | 647 | 442 | 279 | 477 | 958 |
| CC01118-S Ontario | 3,925 | x | 21 | 7 | (19) | 18 | 11 | 0 | 25 | (14) | 19 | 13 | 15 | (15) | 161 | 276 | 165 | 82 | 53 |
| CC01119-S Torrance - South | 4,210 | x | 22 | 18 | (12) | 20 | 3 | 6 | (22) | (10) | 22 | 30 | 96 | 10 | 424 | 236 | 89 | 182 | 543 |
| CC01120-S Brentwood | 4,100 | x | 10 | 5 | (19) | 11 | 2 | 6 | (10) | 5 | (1) | 15 | 21 | 19 | 409 | 378 | 56 | 64 | 220 |
| CC01123-S Santa Ana | 2,938 | x | 35 | 36 | (8) | 51 | 25 | 31 | (76) | 66 | 8 | 61 | 51 | 31 | 286 | 243 | 201 | 311 | 572 |
| CC01124-S Oceanside | 4,157 | x | (6) | (4) | (22) | (3) | (11) | (16) | (30) | (6) | (19) | (12) | (15) | (17) | 315 | 264 | (162) | (160) | (177) |
| CC01125-S Orange | 3,978 | x | 20 | 15 | (15) | 17 | 10 | (11) | (38) | 3 | (40) | 52 | 116 | 52 | 189 | 129 | 68 | 180 | 880 |
| CC01126-S Simi Valley | 2,976 | x | 4 | 7 | (7) | 12 | 6 | (4) | (29) | 83 | (9) | 26 | 39 | 9 | 90 | 36 | 34 | 137 | 295 |
| CC01127-D Santa Barbara | 2,223 | x | 17 | (2) | (25) | 8 | 12 | 3 | 1 | 15 | (8) | 53 | 26 | 15 | 232 | 199 | 50 | 115 | 375 |
| CC01129-S Downey | TBD | x | 39 | 28 | (17) | 34 | 12 | 40 | 29 | 27 | (17) | 8 | 29 | (11) | 490 | 462 | 313 | 201 | 103 |
| CC01132-S Northridge | 2,800 | x | 20 | 17 | (7) | 16 | 31 | 19 | 14 | 17 | 74 | 26 | (38) | (21) | 765 | 324 | 203 | 167 | (133) |
| CC01134-S Cypress | 4,491 | x | 59 | 50 | (11) | 51 | 25 | 20 | 30 | 21 | 1 | 89 | 103 | 16 | 1,207 | 889 | 406 | 456 | 834 |
| CC01135-S Monterey Park | 2,747 | x | 15 | 4 | (52) | 2 | 3 | 9 | 31 | 1 | (16) | 13 | 16 | 19 | 347 | 190 | (23) | 44 | 189 |
| CC01136-S Riverside | 3,600 | x | 25 | 23 | (5) | 21 | (8) | 13 | (13) | 152 | 26 | 4 | 71 | 47 | 338 | 268 | 154 | 355 | 488 |
| CC02102-B Corona | 4,088 | x | 67 | 47 | (81) | 48 | 44 | 39 | 8 | 27 | 50 | 145 | 18 | 2 | 732 | 1,013 | 467 | 415 | 664 |
| CC02103-S Visalia | 3,500 | x | 45 | 39 | (14) | 37 | 31 | 38 | 35 | 39 | 20 | 55 | 127 | 69 | 339 | 310 | 334 | 519 | 1,002 |
| CC02108-B Fresno | 4,044 | x | 13 | 31 | (31) | 28 | 6 | 25 | 11 | 22 | (6) | 48 | 95 | 19 | 481 | 203 | 154 | 261 | 649 |
| CC03101-B Walnut Creek | 4,583 | x | 23 | 25 | (24) | 4 | 23 | 4 | (23) | 43 | 9 | 47 | 22 | 12 | 269 | 439 | 169 | 168 | 327 |
| CC03104-B Sacramento | 4,695 | x | 25 | 10 | (33) | 15 | (5) | 13 | (2) | 35 | 5 | 33 | 32 | 19 | 1,748 | 394 | 95 | 146 | 335 |
| CC03107-D San Luis Obispo | 4,090 | x | 7 | (24) | 9 | 7 | (3) | (31) | (14) | (12) | (10) | 17 | (18) | (9) | 85 | 21 | (56) | (82) | (42) |
| CC03109-S Elk Grove - West | 5,148 | x | 7 | 6 | (36) | (10) | (16) | (23) | (26) | (21) | 14 | 31 | 70 | 60 | 381 | 268 | (103) | 57 | 644 |
| CC03111-S San Jose | 4,579 | x | 7 | (2) | (43) | 5 | (17) | (2) | (15) | (26) | 13 | 19 | 38 | 5 | 300 | (18) | (117) | (19) | 248 |
| CC03113-S Madera | 3,888 | x | 90 | 88 | (53) | 112 | 56 | 72 | (14) | 70 | 25 | 99 | 66 | 47 | 1,277 | 1,091 | 717 | 657 | 845 |
| CC03115-S Davis | 3,523 | x | 81 | 43 | (7) | (1) | (6) | 28 | 39 | 29 | 24 | 53 | 33 | 40 | 348 | 625 | 380 | 356 | 503 |
| CC03117-S Rocklin | 3,597 | x | 22 | 11 | (44) | (17) | (24) | (37) | (35) | 68 | 23 | 40 | 15 | (7) | 452 | 598 | (13) | 15 | 193 |
| CC03119-D Salinas | 3,039 | x | 11 | (1) | (13) | 18 | 10 | 19 | (1) | 13 | (17) | 8 | 31 | 27 | 92 | 137 | 76 | 105 | 263 |
| CC03120-S Ventura | 2,788 | x | 18 | 13 | 57 | 21 | 2 | 16 | 47 | 19 | 11 | 39 | 12 | 31 | 77 | 130 | 276 | 285 | 327 |
| CC03123-S Fremont | 4,434 | x | 19 | 2 | (49) | 26 | (0) | 12 | 19 | 12 | (10) | 51 | 19 | 5 | 92 | 143 | 127 | 106 | 297 |
| CC03124-S Menifee | 5,363 | x | 45 | 29 | (24) | 54 | 15 | 48 | 42 | 68 | 48 | 38 | 93 | 65 | 502 | 458 | 353 | 522 | 783 |
| CC03125-S Rancho Cordova | 3,805 | x | 36 | 38 | (37) | (0) | (24) | (49) | (16) | 83 | 25 | 36 | 48 | 19 | 314 | 206 | 56 | 158 | 411 |
| CC03126-S Vacaville | 2,750 | x | (25) | 35 | (44) | (25) | 2 | (16) | (13) | 9 | 7 | 13 | 62 | 17 | 295 | 412 | 18 | 22 | 370 |
| CC03127-S San Dimas | 5,042 | x | 42 | 39 | (24) | 58 | 25 | (4) | 45 | 21 | 50 | 119 | 66 | 10 | 370 | 637 | 405 | 448 | 782 |
| CC03129-S Yuba City | 2,500 | x | 33 | 37 | (9) | 31 | 17 | 27 | 30 | 47 | 33 | 56 | 59 | 44 | 643 | 405 | 331 | 404 | 636 |
| CC03131-D Palm Desert | 2,606 | x | 29 | 40 | (13) | 14 | 0 | 11 | 1 | 25 | 54 | 23 | 24 | 58 | 169 | 515 | 172 | 266 | 421 |
| CC03136-S Irvine - North | 2,325 | x | 22 | (178) | 178 | 29 | 16 | 6 | 13 | (18) | 27 | 57 | 48 | (17) | 10 | 60 | 154 | 184 | 354 |
| CC03138-S Hermosa Beach | 4,758 | x | 21 | 11 | (27) | 27 | 15 | (5) | (18) | (20) | 8 | 61 | 99 | (14) | 193 | 219 | 76 | 159 | 583 |
| CC03142-S Bakersfield | 7,650 | x | 46 | 49 | (21) | 66 | (1) | (9) | (12) | 181 | (7) | 88 | 59 | 27 | 135 | 375 | 232 | 467 | 696 |
| CC03143-S Tulare | 6,465 | x | 36 | 16 | (32) | 32 | 21 | 0 | (1) | 25 | 14 | 52 | 57 | 2 | 267 | 379 | 206 | 222 | 442 |
| CC03158-S San Bernardino | 4,687 | x | 14 | 8 | (9) | 4 | (9) | 15 | 8 | 43 | (3) | 16 | 45 | 6 | 70 | 326 | 98 | 137 | 263 |
| CC03159-S Santa Maria | 2,617 | x | 0 | 9 | (1) | 14 | (9) | (5) | (6) | 4 | (11) | 11 | 49 | 25 | 109 | 29 | 20 | 79 | 339 |
| CC03160-S Citrus Heights | 4,554 | x | 27 | 21 | (26) | 2 | 2 | 10 | 13 | 55 | 14 | 10 | 69 | 67 | (306) | 267 | 161 | 266 | 587 |
| CC03162-S Clovis | 3,264 | x | 66 | 60 | (17) | 80 | 25 | 45 | 31 | 54 | 1 | 25 | 91 | 41 | 164 | 432 | 538 | 501 | 629 |
| CC03163-S Chula Vista - West | 3,430 | x | 0 | 8 | (9) | 29 | (4) | (9) | 59 | 37 | 12 | (14) | 27 | (0) | - | (93) | 92 | 136 | 50 |
| CC03164-S West Covina | 4,095 | x | 49 | 22 | (11) | 19 | 4 | 0 | 23 | 16 | 15 | 32 | 26 | 7 | - | (49) | 213 | 202 | 256 |
| California | | 56 | 1,573 | 1,022 | (996) | 1,687 | 292 | 500 | 249 | 1,679 | 750 | 2,043 | 2,716 | 1,091 | 20,860 | 18,995 | 9,856 | 12,607 | 23,405 |
| CC04221-A Henderson | 4,647 | x | 19 | 21 | (18) | 38 | 29 | 41 | 20 | 48 | 59 | 23 | 60 | 4 | 606 | 565 | 459 | 345 | 347 |
| CC04222-S Las Vegas | 3,353 | x | 26 | 21 | 4 | 25 | 23 | 23 | 15 | 28 | 10 | (8) | 65 | 28 | 86 | 69 | 257 | 260 | 340 |
| Nevada | | 2 | 45 | 42 | (13) | 64 | 52 | 64 | 34 | 77 | 69 | 15 | 125 | 32 | 692 | 634 | 716 | 605 | 687 |
| CC08220-D Lynnwood | 3,795 | x | 0 | 12 | (55) | 10 | 18 | 40 | 32 | 10 | 7 | (11) | (8) | 45 | 1,027 | 487 | 100 | 100 | 102 |
| CC08222-A Vancouver - West | 5,000 | x | 21 | 24 | (25) | 39 | 18 | 33 | (1) | (12) | (10) | (0) | 12 | 10 | 450 | 294 | 199 | 108 | 87 |
| CC08224-S Vancouver - East | 3,821 | x | 12 | 2 | (22) | 7 | 1 | 14 | (1) | 15 | 6 | 7 | 7 | 11 | 322 | 184 | 73 | 62 | 103 |
| CC08226-D Tacoma South | TBD | x | 1 | 1 | (22) | (3) | (2) | (7) | 10 | (13) | (5) | 3 | 2 | 0 | 227 | 28 | 25 | (34) | 21 |
| CC08309-S Vancouver South | 3,363 | x | 2 | (6) | (23) | 2 | (3) | 3 | (21) | 5 | (0) | 11 | (14) | 4 | 306 | 209 | (39) | (40) | 6 |
| Washington | | 5 | 36 | 33 | (148) | 56 | 32 | 84 | 19 | 5 | (2) | 10 | (1) | 71 | 2,331 | 1,202 | 359 | 195 | 319 |
| CC07145-D Zachary | 3,000 | x | 12 | 11 | 5 | 39 | 36 | 26 | 27 | 38 | (1) | 34 | 53 | 4 | - | (70) | 151 | 284 | 360 |
| CC07146-S Metairie | 3,800 | x | 8 | (13) | (11) | 12 | 25 | 29 | 37 | 15 | 24 | 20 | 7 | 9 | - | (117) | 109 | 162 | 142 |
| CC07148-S Gonzales | 6,000 | x | 24 | 31 | (10) | 46 | 18 | 28 | 19 | 27 | 12 | 24 | 11 | (2) | 314 | 150 | 234 | 229 | 130 |
| CC07150-S Baton Rouge - Downtown | 3,750 | x | 1 | 14 | (14) | 12 | 13 | 20 | 25 | 33 | 17 | 34 | 32 | 47 | 133 | 175 | 32 | 234 | 453 |
| CC07152-S Denham Springs | 6,354 | x | 28 | 40 | 7 | 34 | 27 | 22 | 14 | 24 | (2) | 49 | 23 | 29 | 276 | 85 | 240 | 296 | 405 |
| CC07153-S Baton Rouge - West | 6,210 | x | 29 | 26 | (51) | 54 | 39 | 51 | 48 | 35 | 32 | 40 | 45 | 15 | 256 | 204 | 287 | 362 | 401 |
| CC07154-S Prairieville | 3,500 | x | 25 | 23 | (7) | 47 | 30 | 34 | 42 | 29 | 24 | 28 | 34 | 20 | 192 | 298 | 255 | 328 | 325 |
| CC07157-S Hammond | 5,127 | x | 15 | 19 | 5 | 68 | 34 | 15 | 27 | 5 | 7 | 1 | 5 | 4 | 278 | 263 | 300 | 207 | 43 |
| CC07158-S Mandeville | 3,300 | x | 18 | 29 | (4) | 38 | 31 | 27 | 6 | 17 | 12 | 13 | 6 | 3 | 166 | 220 | 210 | 194 | 83 |
| CC07159-S Youngsville | 3,895 | x | 24 | 49 | (23) | 106 | 48 | 53 | 37 | 44 | 49 | 68 | 53 | 81 | 312 | 303 | 432 | 589 | 809 |
| Louisiana | | 10 | 182 | 229 | (102) | 458 | 303 | 305 | 282 | 268 | 173 | 310 | 268 | 210 | 1,926 | 1,511 | 2,250 | 2,885 | 3,152 |
| **Total** | | **110** | **2,155** | **1,612** | **(1,934)** | **2,482** | **610** | **1,092** | **722** | **2,213** | **1,194** | **2,732** | **3,781** | **1,591** | **32,821** | **28,556** | **15,097** | **18,250** | **32,418** |

## **EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

*[See Attached]*

**FORM OF**
**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of [●], 2023, by and between Behavior Frontiers, LLC, a California limited liability company ("Purchaser"), Card Holdings, LLC, a Delaware limited liability company ("Holdings") and the Subsidiaries of Holdings that are indicated on the signature pages attached hereto (together with Holdings, each a "Seller" and collectively "Sellers").

WHEREAS, reference is hereby made to that certain Asset Purchase Agreement, dated as of [●] (the "APA"), by and between Purchaser and Sellers, pursuant to which each Seller has agreed to sell, contribute and assign to Purchaser, and Purchaser has agreed to purchase and accept from each Seller, the Acquired Assets, and to assume the Assumed Liabilities, for good and valuable consideration and in accordance with the terms, and subject to the conditions, set forth in the APA; and

WHEREAS, Sellers desire to deliver to Purchaser such instruments of contribution, transfer, conveyance, assignment and delivery as are required to vest in Purchaser all rights in, to and under the Acquired Assets, in each case, free and clear of any Encumbrances, other than Permitted Encumbrances, and Purchaser desires to deliver to Sellers such instruments as are required in order to effectuate and evidence the assumption by Purchaser of the Assumed Liabilities.

NOW, THEREFORE, pursuant to the APA and in consideration of the mutual promises contained therein, and for other good and valuable consideration, the receipt and sufficiency of which Sellers and Purchaser acknowledge, the parties hereto agree as follows:

1.      Each capitalized term used, but not otherwise defined, herein shall have the meaning ascribed to such term in the APA.

2.      Effective as of the Closing, in accordance with the terms, and subject to the conditions, set forth in the APA, each Seller hereby sells, conveys, assigns, transfers and delivers to Purchaser all of such Seller's right, title and interest in and to the Acquired Assets, in each case, free and clear of any Encumbrances, other than Permitted Encumbrances. Purchaser hereby purchases, acquires, and accepts the Acquired Assets.

3.      Effective as of the Closing, in accordance with the terms, and subject to the conditions, set forth in the APA and the Sale Order, Purchaser hereby assumes and agrees to pay, perform or discharge when due or required to be performed, as the case may be, the Assumed Liabilities.

4.      Nothing in this Agreement shall be deemed to supersede, limit, qualify, enlarge or modify any of the provisions of the APA, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the APA. If any conflict exists between the terms of this Agreement and the terms of the APA, the terms of the APA shall govern and control.

5.       This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by each of the parties hereto. No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party under or by reason of this Agreement.

6.       This Agreement and all rights, interests and obligations hereunder, by or on behalf of any of the parties hereto, shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto, except that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by any Seller without the prior written consent of Purchaser, and neither this Agreement nor any rights, interests or obligations hereunder may be assigned or delegated by Purchaser (other than to an Affiliate of Purchaser) without the prior written consent of each Seller; provided, that Purchaser shall be able to assign this Agreement without consent (a) to its lenders, (b) in the event of a transaction involving Purchaser or any of its subsidiaries or Affiliates, (c) in connection with a sale, in whole or in part, of any Seller (or any assets thereof) by the Purchaser from and after the Closing; provided, further, that any such assignment described in the foregoing clauses (a) – (c) shall not relieve any Purchaser of its obligations under this Agreement. Any attempted assignment in violation of this Section 6 shall be void *ab initio*. This Agreement is for the sole benefit of the parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

7.       This Agreement, and all claims, disputes or causes of action (whether in contract or in tort, at law or in equity or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance or enforcement of this Agreement, shall be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State that would cause the application of the laws of any jurisdiction other than the State of Delaware.

8.       This Agreement shall be effective as of the Closing.

9.       From time to time following the date hereof, if any further action is reasonably necessary to carry out the purposes of this Agreement, each of the parties hereto will take such further action (including the execution and delivery of such further instruments and documents) that is reasonably necessary or appropriate to effectuate and perform the provisions of this Agreement.

10.       This Agreement may be executed in two or more counterparts (including by means of email in .pdf format), each of which shall be deemed an original, and all of which shall be considered one and the same agreement, and shall become effective when two or more such counterparts have been signed by each of the parties and delivered to the other party (it being understood that all parties need not sign the same counterpart).

**[*Remainer of this page is intentionally left blank*]**

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**SELLERS**:

CARD HOLDINGS, LLC

By: _____
Name:
Title:

CARD INTERMEDIATE HOLDINGS I, LLC

By: _____
Name:
Title:

CARD INTERMEDIATE HOLDINGS II, LLC

By: _____
Name:
Title:

CENTER FOR AUTISM AND RELATED DISORDERS, LLC

By: _____
Name:
Title:

SKILLS GLOBAL, LLC

By: _____
Name:
Title:

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

IN WITNESS WHEREOF, Sellers and Purchaser have caused this Bill of Sale, Assignment and Assumption Agreement to be executed and delivered as of the date first above written.

**PURCHASER:**

BEHAVIOR FRONTIERS, LLC

By: _____
Name: Bryan Mader
Title:  President

[Signature Page to Bill of Sale, Assignment and Assumption Agreement]

**Annex I**

| Clinic | State |
|---|---|
| CC04111-B Phoenix | Arizona |
| CC04114-D Tucson-East | Arizona |
| CC04118-S Chandler - North | Arizona |
| CC04119-S Gilbert | Arizona |
| CC04113-S Scottsdale | Arizona |
| CC04116-S Tempe | Arizona |
| CC04112-S Chandler - South | Arizona |
| CC04109-D Tucson-North | Arizona |
| CC04110-D Mesa | Arizona |
| CC03113-S Madera | California |
| CC03142-S Bakersfield | California |
| CC03162-S Clovis | California |
| CC01115-S Moreno Valley | California |
| CC03124-S Menifee | California |
| CC02102-B Corona | California |
| CC01136-S Riverside | California |
| CC01134-S Cypress | California |
| CC03115-S Davis | California |
| CC03129-S Yuba City | California |
| CC01112-S Santa Fe Springs | California |
| CC02103-S Visalia | California |
| CC03127-S San Dimas | California |
| CC01109-B Woodland Hills | California |
| CC01105-S San Marcos | California |
| CC01129-S Downey | California |
| CC01123-S Santa Ana | California |
| CC01114-S Chula Vista - East | California |
| CC03120-S Ventura | California |
| CC01117-S Irvine - South | California |
| CC03164-S West Covina | California |
| CC03101-B Walnut Creek | California |
| CC03143-S Tulare | California |
| CC03160-S Citrus Heights | California |
| CC01132-S Northridge | California |
| CC01106-B Temecula | California |

| | |
|---|---|
| CC03125-S Rancho Cordova | California |
| CC02108-B Fresno | California |
| CC03131-D Palm Desert | California |
| CC01104-B Ladera Ranch | California |
| CC03163-S Chula Vista - West | California |
| CC03158-S San Bernardino | California |
| CC01126-S Simi Valley | California |
| CC01116-S Santa Clarita | California |
| CC01103-B San Diego | California |
| CC01118-S Ontario | California |
| CC03136-S Irvine - North | California |
| CC03123-S Fremont | California |
| CC03119-D Salinas | California |
| CC01127-D Santa Barbara | California |
| CC03104-B Sacramento | California |
| CC01125-S Orange | California |
| CC01113-S North Hollywood | California |
| CC03117-S Rocklin | California |
| CC01102-B Garden Grove | California |
| CC01110-S Monrovia | California |
| CC01120-S Brentwood | California |
| CC01119-S Torrance - South | California |
| CC03159-S Santa Maria | California |
| CC03138-S Hermosa Beach | California |
| CC01135-S Monterey Park | California |
| CC03126-S Vacaville | California |
| CC03107-D San Luis Obispo | California |
| CC01124-S Oceanside | California |
| CC03111-S San Jose | California |
| CC03109-S Elk Grove - West | California |
| CC04124-D Fort Collins | Colorado |
| CC04121-D Aurora CO | Colorado |
| CC04127-S Greeley | Colorado |
| CC04224-D Littleton | Colorado |
| CC04123-D Boulder | Colorado |
| CC04128-D Lakewood CO | Colorado |
| CC04129-D Westminster CO | Colorado |

| | |
|---|---|
| CC07182-D Castle Rock | Colorado |
| CC05129-S Oak Lawn | Illinois |
| CC05130-S Chicago – Ravenswood | Illinois |
| CC05131-B Oak Park | Illinois |
| CC05132-S Naperville | Illinois |
| CC05133-D OFallon | Illinois |
| CC05137-S Hoffman Estates | Illinois |
| CC05139-S Westmont | Illinois |
| CC05602-S Chicago – O'Hare | Illinois |
| CC07159-S Youngsville | Louisiana |
| CC07153-S Baton Rouge - West | Louisiana |
| CC07152-S Denham Springs | Louisiana |
| CC07154-S Prairieville | Louisiana |
| CC07157-S Hammond | Louisiana |
| CC07148-S Gonzales | Louisiana |
| CC07145-D Zachary | Louisiana |
| CC07158-S Mandeville | Louisiana |
| CC07146-S Metairie | Louisiana |
| CC07150-S Baton Rouge - Downtown | Louisiana |
| CC04221-A Henderson | Nevada |
| CC04222-S Las Vegas | Nevada |
| CC07189-D Plano | Texas |
| CC07191-B Austin | Texas |
| CC07192-D Corpus Christi | Texas |
| CC07193-D San Antonio | Texas |
| CC07402-S Kyle | Texas |
| CC07401-D Stafford | Texas |
| CC07196-D Houston | Texas |
| CC07195-D North Richland Hills | Texas |
| CC07190-S Helotes | Texas |
| CC07199-D Pearland | Texas |
| CC07404-D Georgetown | Texas |
| CC08222-A Vancouver - West | Washington |
| CC08224-S Vancouver - East | Washington |
| CC08220-D Lynnwood | Washington |
| CC08226-D Tacoma South | Washington |
| CC08309-S Vancouver South | Washington |